| DISTRICT COURT, EL PASO COUNTY, COLORADO<br>270 South Tejon<br>Colorado Springs, CO 80901<br>(719) 452-5522 | DATE FILED: April 25, 2023 12:06 PM<br>CASE NUMBER: 2021CV31668<br><br>▲ COURT USE ONLY ▲ |
|---|---|
| Plaintiff: **TCPA LITIGATOR LIST**<br><br>Vs.<br><br>Defendant: **RINGBA LLC et al** | Case No. **21CV31668**<br><br>Division: 22<br><br>Courtroom: W370 |
| **ORDER REGARDING DEFENDANT MOTIONS TO TERMINATE AND COMPEL** | |

I have reviewed the defendants' motion to compel (filed February 28, 2023), the response, and the reply, along with all accompanying exhibits. I have also reviewed the motion to terminate (filed March 31, 2023), the response, and the reply, along with all accompanying exhibits. I have also considered all evidence presented and arguments made at the hearing held April 17 and 18, 2023.

The defendants argue that the case should be terminated because of discovery violations and violations of my January 19, 2023 order for plaintiff to produce source code. One of the most serious violations includes the disclosure on March 23, 2023 of a recorded conversation between Mr. O'Hare, plaintiff's principal, and Yevgeni Maloshev, a key programmer for plaintiff's website. Mr. O'Hare recorded this conversation on January 22, 2020. During the discussion the two discuss how, at least as of that date, there were no temporal limits on a customer's ability to download the entire list of phone numbers in plaintiff's database.

Defendants also point to plaintiff's counsel actually having had the recording in their possession as early as April 2022 and their decision not to release this recording.

In addition is the disclosure on March 23, 2023 of a number of emails between Mr. O'Hare and plaintiff's testifying expert, Mr. Frankovitz, on October 10, 2022, two and a half months before defendants filed their first motion to compel in December of 2022.

Defendants are also asking for termination of the case because of plaintiff's continuing failure to produce all of the source code that existed in April 2020, when Mr. Young downloaded the list from plaintiff's website.

Plaintiff argues that the late disclosures are an ordinary part of the discovery process and that they are actually helpful to defendants because plaintiff will no longer try to persuade the fact-

1

finder that Mr. Young essentially hacked into the website to obtain the entire database. Plaintiff, while now acknowledging that the recording should have been disclosed with its initial disclosures, suggests that the failure to do so was nothing more than an honest mistake by Mr. Tucker and a privately contracted attorney of his, Ms. Fritz, as a result of their narrow focus on evidence relevant only to the trade secrets claim. Plaintiff further asserts that it should not be punished for its attorneys' mistake since Mr. O'Hare delivered all of the recordings to his attorney in April of 2022.

As to the source code, plaintiff responds that it has produced all of the proprietary source code in effect in April 2020 and that the rest of the source code is publicly available and, therefore, defendants can find that source code for themselves. Plaintiff also points to how defendants can access the source code they seek by examining the website reconstruction produced by plaintiff on March 8, 2023.

I make the following findings based on a preponderance of the evidence standard.

I find that as part of his discovery obligations, Mr. O'Hare delivered approximately fifteen recordings between himself and others where TCPA business was discussed. This delivery, which occurred in April 2022, included the January 22, 2020 conversation between himself and Mr. Malosev acknowledging the non-existence of any time constraints to downloading the list.

In addition to the delivery was the April 4, 2022, email from Mr. O'Hare to Ms. Fritz specifically identifying the critical part of the January 22, 2020 audio recording.[1] In that email, Mr. O'Hare specifically identifies for Ms. Fritz the part of the thirty-three minute January 22, 2020 recording where Mr. O'Hare and Mr. Malosev discuss the lack of time constraints in downloading the entire phone list.

I find that Mr. Tucker had contracted with Ms. Fritz—who credibly emphasized in her testimony that she is "a research and writing attorney" (i.e. not someone who reviews evidence for disclosure)—to review the audiotapes and determine what should be released in discovery. I find that Mr. Tucker asked Ms. Fritz to review the recordings but only for anything specifically relevant to the trade secrets claim.

I find that this direction to Ms. Fritz was grossly negligent on Mr. Tucker's part, in light of paragraph 10 of the "Material Facts" section of the amended complaint that he himself had filed in December 2021. Paragraph 10 reads (underline added):

> 10.  Young somehow downloads list in violation of the TCPA Litigator List terms and conditions by exploiting a glitch in the program.

---

[1] I find that in suggesting that Mr. Tucker and Ms. Fritz overlooked the January 22, 2020, recording because of a myopic focus on the trade secrets claim, plaintiff has waived the attorney-client privilege as to his communications with counsel in connection with the production of the January 22, 2020, recording. See *People v. Trujillo*, 144 P.3d 539, 541 (Colo. 2006)(setting forth the six-part test for determining whether to conduct an in camera review of otherwise privileged materials).

In addition, Mr. Tucker knew that the trade secrets claim was only one of the five claims made by plaintiff.

As such, he should have directed Ms. Fritz to look for recordings that were in any way relevant to the ability of a customer to access the full database of phone numbers. I find that had he given that direction, Ms. Fritz would have recommended to Mr. Tucker disclosure of the critical January 22, 2020 recording and that it would have been produced in discovery.

Despite these conclusions, I found Mr. Tucker credible when he said his narrow focus on the trade secrets aspect of the case led him to only consider the audio recordings for trade secrets information when he gave Ms. Fritz her charge. Mr. Tucker came across in his testimony as elderly and well-intentioned in explaining the situation.

I also found Ms. Fritz credible when she testified that, following Mr. Tucker's directions, she was just listening to the recordings for anything related to trade secrets. Ms. Fritz was extremely nervous as she testified but was believable when she insinuated that she was in over her head while looking for trade secrets evidence among all of the recordings.

I find that she and Mr. Tucker talked about what she had listened to and that they had agreed that to comply with Rule 26, only a few of the recordings needed to be produced. Those disclosures did not include the January 22, 2020, recording.

Again, I find that Mr. Tucker was grossly negligent in his narrow scope of evidence production and his direction to Ms. Fritz.

I cannot make the same finding with respect to Mr. O'Hare.

As Exhibit 16 of the termination motion reveals, Mr. Frankovitz emailed Mr. O'Hare on July 10, 2022, asking that Mr. O'Hare verify that Mr. Frankovitz's account access mirror the access Mr. Young had in April 2020 so that he could fully understand the temporal limits on the website that Mr. Young encountered when he visited the website in April 2022.

Also part of Exhibit 16, on October 8, 2022, Mr. Malosev emailed Mr. Frankovitz to inform him that his account was set as "Basic Subscriber."

On October 10, 2022, Mr. Frankovitz responded and asked what kind of account Mr. O'Hare had. Mr. Frankovitz wanted to know what kind of account Mr. O'Hare had because while Mr. O'Hare had been able to show Mr. Frankovitz how the time limitation feature of the website worked, Mr. Frankovitz, with his Basic Account, was not able to re-create what Mr. O'Hare had shown him. I find based on this communication that Mr. Frankowitz, in analyzing the website at that time, was not limited by time constraints in downloading the whole list.

As part of that same communication string, Mr. Frankovitz also explained how he needed to be able to show that Mr. Young could only go back 30 days and download just a portion of the list.

3

With that proof, according to Mr. Frankovitz, he could argue that that limitation "would give [Mr. Young] motive to alter the URL parameters to download the database."

Mr. Frankovitz continued in that email to Mr. Malosev:

> If he did not have this limitation on his account, then I cannot argue that.
>
> So again, just to be clear, I need proof showing when Adam Young searched the database, he was prevented from clicking on a date more than 30 days in the past. **I have a basic subscriber account, and I can do a search that goes back several months if I want. If Adam Young had a basic subscriber account like mine, and if the calendar date selection code has not been changed since the test, then he would have just gotten the database without doing anything complicated.**

Mr. O'Hare subsequently sent his October 10, 2022, email to Mr. Frankovitz with the critical January 22, 2020, recording, and his message that the "download was limited to 30 days." As the recording indicates, however, Mr. O'Hare and Mr. Malosev had acknowledged that there was no limit in place in the months leading up to Mr. Young's being able to access the entire list.

The very next day Mr. Frankovitz issued his initial expert report, opining that Mr. Young manipulated the website to download the entire list. I find that this opinion was based in large part on Mr. O'Hare's representation that there was a 30-day time restriction when Mr. Young accessed the site.

At his deposition on January 12, 2023, however, Mr. O'Hare testified that his "personal knowledge" of Mr. Young manipulating the website comes from Mr. Frankovitz's report and the download log on page 9 of Mr. Frankovitz's initial report. I find that the download log gives no indication of manipulation of the website. It merely shows that Mr. Young completed four different downloads over a span of four minutes.

In other words, Mr. Frankovitz, in forming his opinion, relied on Mr. Young's "memory" about the time restrictions that existed on the site on April 5, 2020. Meanwhile Mr. Young testified that he has relied on Mr. Frankovitz's opinion in asserting that Mr. Young manipulated the website.

On March 9, 2023, Mr. Malosev, in his deposition, stated for the first time that he was mistaken in thinking there were time constraints on the website on April 5, 2023. It is still not clear to the court what it was exactly that caused Mr. Malosev to realize his mistake.

At this same time in March, plaintiff disclosed its "reconstruction" of exactly how the TCPA website worked in April 2020.

4

As a result of the recent change in Mr. Malosev's memory, Mr. Frankovitz has indicated he will no longer be opining that Mr. Young manipulated the website when he downloaded the entire list.

Based on the above facts, I find that Mr. O'Hare and Mr. Frankovitz were both reckless in pressing the argument and opinion that Mr. Young manipulated the website to download the entire list. I find that although Mr. Frankovitz had sought concrete evidence showing the actual time restrictions from April 2020, ultimately he only ended up with the word of Mr. O'Hare and Mr. Malosev.

In the meantime, defendants continued to defend against the allegation of manipulation from November to March, resulting in significant needless expense.

As to the source code production, I find that plaintiff has finally produced all of the proprietary source code for the website as it existed in April 2020. I further find that while it has identified the entities that generated the third-party source code for the website, it has not shown what version of the third-party source code it used, nor has it shown how that third-party source code was configured specifically for the website.

I find, however, that defendants wasted defendants' time, money, and expert witness fees when it produced just the proprietary source code for Mr. Gianturco's visit to Colorado in February 2022.

Noticeably absent from the record before me, I would note, is any testimony from Mr. O'Hare other than his affidavit describing when he delivered the audio recordings to his own counsel. Neither at the evidentiary hearing nor in any affidavit has Mr. O'Hare offered any testimony to support plaintiff's response to the motion for termination.

Finally, I note that on November 17, 2022, defense counsel requested the production of the 2-3 audio recordings whose existence had been identified by plaintiff in the initial disclosures. It was not until early March that even those recordings were actually produced by plaintiff.

According to C.R.C.P. 37:

> (4) *Expenses and Sanctions.*
> (A) If a motion is granted or if the disclosure or requested discovery is provided after the motion was filed, the court may, after reasonable notice and an opportunity to be heard, if requested, require the party or deponent whose conduct necessitated the motion or the party or attorney advising such conduct or both of them to pay to the moving party the reasonable expenses incurred in making the

5

motion, including attorney fees, unless the court finds that the motion was filed without the movant's first making a good faith effort to obtain the disclosure or discovery without court action, or that the opposing party's nondisclosure, response, or objection was substantially justified or that other circumstances make an award of expenses manifestly unjust.

(B) If a motion is denied, the court may make such protective order as it could have made on a motion filed pursuant to C.R.C.P. 26(c) and may, after affording an opportunity to be heard if requested, require the moving party or the attorney filing the motion or both of them to pay to the party or deponent who opposed the motion the reasonable expenses incurred in opposing the motion, including attorney's fees, unless the court finds that the making of the motion was substantially justified or that other circumstances make an award of expenses manifestly unjust.

In *Pinkstaff v. Black & Decker* (U.S.) Inc., 211 P.3d 698, 702 (Colo. 2009), the Colorado Supreme Court observed:

C.R.C.P. 37 provides a variety of sanctions trial courts may impose on parties failing to make disclosures or cooperate in discovery. The available sanctions include orders requiring payment of attorneys' fees and costs, orders staying proceedings until discovery orders are complied with, orders prohibiting a disobedient party from introducing designated matters into evidence, orders striking pleadings, and orders entering default judgment.

Generally, sanctions under C.R.C.P. 37 "should be applied in a manner that effectuates proportionality between the sanction imposed and the culpability of the disobedient party." *Kwik Way Stores, Inc. v. Caldwell,* 745 P.2d 672, 677 (Colo.1987). If Rule 37 sanctions are warranted in a case, "the trial judge must craft an appropriate sanction by considering the complete range of sanctions and weighing the sanction in light of the full record in the case." *Nagy v. Dist. Court,* 762 P.2d 158, 161 (Colo.1988). When discovery abuses are alleged, courts should carefully examine whether there is any basis for the allegation and, if sanctions are warranted, impose the least severe sanction that will ensure there is full compliance with a court's discovery orders and is commensurate with the prejudice caused to the opposing party.

I find that the recklessness of Mr. O'Hare and Mr. Frankovitz and the gross negligence of Mr. Tucker warrant sanctions. Had they not engaged in the conduct described above, the litigation

6

could have been narrowed considerably in the fall of 2022, leaving a singular focus on the terms and conditions box that plaintiff has alleged Mr. Young checked before he downloaded the list.

I do not find that the misconduct of the three was substantially justifiable in some way or that defendants have experienced little to no prejudice in defending against the manipulation allegation. Defendants have expended considerable attorney fees and spent a significant amount of their discovery resources in defending against this theory. I disagree with plaintiff that this is all just a normal part of discovery.

As for a sanction, I find that termination of the case in its entirety is too severe. I conclude that the proper sanction for the misconduct here is to prohibit Mr. Frankovitz from testifying altogether at trial. I find that Mr. Frankovitz embraced his original opinion based on not much more than the word of plaintiff's principal and primary software programmer, Mr. Malosev. I further find that he is now abandoning this opinion, again based on the word of these two men.

The court will also prohibit any mention by plaintiff of the reconstructed website, not only as a sanction but also for producing it so late in the litigation.

The court also orders that the attorney fees associated with Mr. Gianturco's trip to Colorado in February 2022 be fully reimbursed by plaintiff. The court also orders that any costs expended to fly Mr. Gianturco here for that trip be reimbursed by plaintiff.

DONE and ORDERED April 25, 2023.

BY THE COURT:

William B. Bain
DISTRICT COURT JUDGE

7

CERTIFICATE OF MAILING

I hereby certify that I have this 25th day of April 2023, e-filed and served a true copy of this Order, to the following:

Plaintiff's Counsel: Cohen, Yost, and Tucker
Defendant's Counsel: Cheng, Byer, and Linehan

_____
Deputy Clerk

8