## UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF COLORADO

| | |
|---|---|
| In re: | ) |
| | ) |
| DNC AND TCPA LIST SANITIZER, LLC, | )    Case No. 24-12624 KHT |
| | )    Chapter 11 |
| Debtor. | ) |

---

## OBJECTION TO DEBTOR'S MOTION TO ASSUME MANAGEMENT AGREEMENT WITH CASHYEW HOLDINGS, INC.

---

Adam Young, Tubmanburg Limited and Ringba, LLC (collectively, "Ringba"), by and through its counsel, Lewis Roca Rothgerber Christie LLP, respectfully files its Objection to Debtor's Motion to Assume Management Agreement With Cashyew Holdings, Inc. (the "Objection").  In support of the Objection, Ringba states as follows:

### JURISDICTION AND VENUE

1.      This Court has jurisdiction over this Chapter 11 case pursuant to 28 U.S.C. §§ 157(a) and (b) and 1334(a) and (b).  This matter constitutes a core proceeding under 28 U.S.C. § 157(b)(2)(A) and (O).

2.      Venue is proper in this Court pursuant to 28 U.S.C. § 1409.

### PROCEDURAL BACKGROUND

3.      DNC and TCPA List Sanitizer, LLC (the "Debtor") filed for relief under Chapter 11 of the Bankruptcy Code on May 16, 2024 (the "Petition Date").  In its Voluntary Petition, the Debtor elected to proceed under Subchapter V of Chapter 11.

4.      The Debtor is primarily owned by Cashyew Holdings Inc. ("Cashyew"), which holds a 99% equity interest in the Debtor.  The remaining ownership interests in the Debtor are held by Michael O'Hare (.50%), the Debtor's CEO, and Tatiana O'Hare (.50%), the Debtor's

125505772.1

Secretary.  *See* Statement of Financial Affairs No. 28.  Cashyew is wholly owned by the O'Hares.  *See* Report (as defined below), ¶ 8.

5.      Joli A. Lofstedt, Esq. is the duly appointed and acting Subchapter V Trustee (the "Trustee") in the Debtor's bankruptcy case.

6.      Ringba is listed on the Debtor's Schedule F as an unsecured creditor in the amount of $640,415.00 as a *disputed* creditor relating to a "Judgment entered for attorneys' fees and costs." *See* Schedule F, 3.1.  The Judgment stems from an Order re Forthwith Request for Emergency Hearing and terminating sanctions entered by the District Court, El Paso County, Colorado in Case No. 2021CV31668 (the "State Court Litigation").  In the State Court Litigation, the El Paso County District Court (the "State Court") entered terminating sanctions against the Debtor for its concealment of evidence and recordings that went to the heart of the State Court Litigation.  The Debtor has appealed the Judgment awarding the attorneys' fees and costs to the Colorado Court of Appeals in Court of Appeals Case No. 2024CA265.  The Debtor has also appealed three other orders entered by the State Court in Court of Appeals Case No. 2023CA891.

7.      The Debtor's 341(a) Meetings of Creditors was scheduled for June 10, 2024 at 12:00 p.m. (the "Creditors' Meeting").  At the Creditors' Meeting, Mr. O'Hare testified on behalf of the Debtor with regard to the Debtor's business operations:

> MR. MOTES: Okay. And, Mr. O'Hare, you operate out of your house; is that correct?
>
> MR. O'HARE: Correct.
>
> MR. MOTES: And obviously, your spouse is involved. Aside from you and your spouse, does the company have any other employees or independent contractors?
>
> MR. O'HARE: We have no employees. We have independent contractors.
>
> MR. MOTES: Okay. And about how many do you use?
>
> MR. O'HARE: Eight to -- maybe 8 to 10.

- 2 -

125505772.1

Transcript of 341 Meeting of Creditors, June 10, 2024, pp. 16-17, attached as **Exhibit 1** (the "Transcript").   Mr. O'Hare also testified to how moneys are taken out of the Debtor and immediately up-streamed to Cashyew.

> MR. MOTES: Mr. O'Hare, during the one year prior to the bankruptcy filing, did you receive a salary from the company?
>
> MR. O'HARE: No.
>
> MR. MOTES: No salary at all?
>
> MR. O'HARE: That's not how we're compensated. It's a different structure. So our structure is for tax purposes, not for judgment for settlements.
>
> MR. MOTES: Okay. So what type of compensation did you receive from the company?
>
> MR. O'HARE: So basically, the three, six, year, whatever, if it has any revenues, the revenues are then trans- -- or actually pay [sic], for example, management fee to Cashyew Holdings, and then I'm paid out from Cashyew Holdings.
>
> MR. MOTES: Okay. So any profits basically are paid to Cashyew Holdings and then you and perhaps your spouse are paid from Cashyew?
>
> MR. O'HARE: Okay.
>
> MR. MOTES: Did I get that correctly?
>
> MR. O'HARE: Yes, it is.

Transcript, pp. 24-25.

8.     On July 9, 2024, the Debtor filed its untimely Pre-Status Conference Report (Docket No. 55) (the "Report").   The Report indicates, *inter alia*, that "Mr. and Mrs. O'Hare receive a draw each month in the appropriate [sic] sum of $20,000 each.  Cashyew Holdings, LLC is separately paid a management fee (based on certain percentages of revenue) and receives approximately $50,000 per month from the Debtor."  Report, ¶ 15.

- 3 -

9.     The Court held a Status and Scheduling Hearing pursuant to 11 U.S.C. § 1188 on July 11, 2024 at 10:00 a.m.  Prior to the Status and Scheduling Hearing, on July 10, 2024, the Debtor filed its Motion to Assume Management Agreement with Cashyew Holdings, Inc. (Docket No. 58) (the "Motion to Assume").  Objections to the Motion to Assume are due on or before July 24, 2024.

## APPLICABLE LEGAL STANDARDS FOR THE ASSUMPTION OF A CONTRACT

10.     Section 365(a) is made applicable to a Subchapter V debtor-in-possession as set forth in 11 U.S.C. § 1184.  Pursuant to 11 U.S.C. § 365(a), "[e]xcept as provided in sections 765 and 766 of this title and in subsections (b), (c), and (d) of this section, the trustee, subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor."

11.     "In deciding whether to approve a debtor's assumption of an executory contract, bankruptcy courts usually apply the best business judgment test." *Matter of GP Exp. Airlines, Inc.*, 200 B.R. 222, 230 (Bankr. D. Neb. 1996). This test "generally requires a showing that assumption of an executory contract benefits and is in the best interests of the bankruptcy estate and is the result of the exercise of reasonable business judgment." *Id. See also In re Valley View Shopping Center, L.P.*, 260 B.R. 10, 39 (Bankr. D. Kan. 2001).

> A motion to assume an executory contract or unexpired lease is subject to court approval. The Court must examine the [contract] and the surrounding circumstances and apply the 'best business judgment' test to determine if assumption would be beneficial to the estate. This determination must include a consideration of the effects that assumption would have on the debtor; the implications for the lessor; the benefit or detriment to unsecured creditors; and the significance of the lease to the debtor's reorganization.

*In re Valley View Shopping Center, L.P.*, 260 B.R. 10, 39 (Bankr. D. Kan. 2001); *see also In re Ideal Mortgage Bankers, Ltd.*, 539 B.R. 409, 438 (Bankr. E.D. N.Y. 2015), *aff'd*, 2016 WL 4046767 (E.D.N.Y. 2016) ("In evaluating whether an executory contract should be assumed or

125505772.1

rejected, consideration is given to factors such as the following: (1) taking advantage of contracts which will benefit the estate; (2) relieving the estate of burdensome contracts; (3) promoting the debtor's fresh start; (4) permitting the allowance and determination of claims; and (5) preventing parties from remaining in doubt concerning their status vis-a-vis the estate.").

12.     Importantly, "'Business judgment' is defined as '[t]he presumption that in making business decisions not involving **direct self-interest or self-dealing**, corporate directors act on an informed basis, in good faith, and in the honest belief that their actions are in the corporation's best interest.'" *In re Network Access Sols., Corp.*, 330 B.R. 67, 75 (Bankr. D. Del. 2005) (quoting *Black's Law Dictionary* 212 (8th ed. 2004)) (emphasis added).

13.     Generally, the business judgment standard "presupposes that the estate will assume a contract only where doing so will be to its economic advantage and will reject contracts whose performance would benefit the counterparty at the expense of the estate." *In re Penn Traffic Co.*, 524 F.3d 373, 383 (2d Cir. 2008).  Finally, "[i]t is Debtor's burden to prove that lease assumption benefits the estate." *In re Crystalin, L.L.C.*, 293 B.R. 455, 464 (B.A.P. 8th Cir. 2003).

## DISCUSSION

### A.    The Management Agreement is a Postpetition Agreement and Cannot be Assumed Under Section 365(a)

14.     The application of Section 365(a) is limited to contracts that existed as of the petition date.  *In re Financial Oversight and Management Board for Puerto Rico*, 618 B.R. 349, 356 (D. Puerto Rico, 2020) (citing *In re Leslie Fay Cos., Inc.,* 168 B.R. 294, 300 (Bankr. S.D.N.Y. 1994) ("There are cases which have addressed the question of whether section 365 applies to postpetition agreements; the learning from these cases is that contracts ... entered into postpetition are not subject to rejection under section 365.")); *see also In re Airport Executive Center, Ltd.,* 138 B.R. 628, 629 (Bankr. M.D. Fla. 1992) (debtor cannot reject a postpetition lease); *In re Schuld*

125505772.1

*Manufacturing Co., Inc.,* 43 B.R. 535, 537 (Bankr. W.D. Wis. 1984) (trustee not permitted to reject a postpetition collective bargaining agreement); *In re IML Freight, Inc.,* 37 B.R. 556, 559 (Bankr. D. Utah 1984) (same); *accord In re TS Industries, Inc.,* 117 B.R. 682, 685 (Bankr. D. Utah 1990)).

15.     In this case, pursuant to the Motion to Approve, "Debtor and Cashyew Holdings, LLC have been operating under [the] agreement since before this bankruptcy case was filed." *See* Motion to Assume, p. 1, ¶ 3.   However, the actual agreement indicates that it was executed postpetition. *See* Exhibit 1 to Motion to Approve.  Moreover, the Debtor has attached to its Motion to Approve the "Cashyew Holding Management Services Agreement" (the "Management Agreement").  Although the Management Agreement was purportedly effective as of the Effective Date (January 1, 2023), the Management Agreement was curiously not signed by Michael O'Hare (on behalf of both the Debtor *and* Cashyew) until June 28, 2024. Because the Management Agreement was not executed until after the bankruptcy case was filed, it is not subject to assumption under Section 365(a) of the Bankruptcy Code.

**B.     Assumption is Not in the Best Interest of the Estate**

16.     "The act of assumption must be grounded, at least in part, in the conclusion that maintenance of the contract is **more beneficial to the estate than doing without the other party's services**." *In re Nat'l Gypsum Co.*, 208 F.3d 498, 505 (5th Cir. 2000) (quoting *MMR Holding Corp. v. C & C Consultants, Inc.* (*In re MMR Holding Corp.*), 203 B.R. 605, 612 (Bankr. M.D. La. 1996)) (cleaned up) (emphasis added). Moreover, the decision to assume must be "supported by valid business justifications." *In re Idearc Inc.*, 423 B.R. 138, 162 (Bankr. N.D. Tex. 2009), *subsequently aff'd sub nom.*, 662 F.3d 315 (5th Cir. 2011).

17.     In this case, in its one-page Motion to Assume (4 double-spaced paragraphs), the Debtor has not attempted to explain how the Management Agreement benefits the estate, other

125505772.1

than to state that the parties "have been operating under this agreement since before the bankruptcy case was filed." Motion to Assume, p. 1 at ¶ 3. Even if the Management Agreement were a prepetition executory contract (which it does not appear to be), and even if it were in the best interests of the estate for the Debtor to assume the contract under the business judgment standard, Debtor has not made that showing. Afterall, "[i]t is Debtor's burden to prove that lease assumption benefits the estate." *In re Crystalin, L.L.C.*, 293 B.R. 455, 464 (B.A.P. 8th Cir. 2003). The Motion is facially deficient and should be denied for this reason alone.

18.     Also, a duplicative Management Agreement that will move money from the Debtor to insiders benefits the counterparty (*i.e.*, the O'Hares via Cashyew) over the bankruptcy estate and creditors. *See Penn Traffic Co.*, 524 F.3d at 383. However, even if there were some benefit to the estate from these services, Debtor has done nothing to show that the costs associated with the Agreement (<u>sixty percent</u> of gross revenues) are outweighed by the purported benefits. Based on "Cashyew's Management Fee breakdowns for 2023 and 2024," attached to the Motion to Approve at Docket No. 58-2, it would appear that during 2023, the Debtor transferred $758,379 to Cashyew and/or its principals. While it is unclear from the information provided by the Debtor, it is clear that transferring approximately 75% of the Debtor's income to insiders ($758,379 divided by $1,010,704) is not at all beneficial to the estate and is actually quite detrimental to the Debtor's bankruptcy estate and creditors.

19.     Additionally, because the various services to be provided by Cashyew appear to be duplicative of those already provided by the Debtor's principals, it is more beneficial to the estate to "do[] without the other party's services." *Nat'l Gypsum*, 208 F. 3d at 505. The O'Hares *each* currently receive a $20,000 draw from the Debtor's estate each month ($40,000 total) and are already ostensibly managing the Debtor and the estate, undertaking the various "management

services" listed on the first page of the Management Agreement the Debtor wishes to assume. But, even if Cashyew were to provide some new and additional services as part of this agreement, the Debtor is surely better off retaining <u>sixty percent</u> of its gross revenue along with its current management.

20.     Likewise, the Debtor's requested assumption of the Management Agreement is contrary to the purpose of Section 365. *See Richmond Leasing*, 762 F.2d 1303, 1310 (5th Cir. 1985) ("[Section 365] serves the purpose of making the debtor's rehabilitation more likely."). By paying insiders of the Debtors well over half of Debtor's *gross revenues* for services already required to be done by Debtor's principals (and the wholly-owned counter-party to the Management Agreement, Cashyew), assumption of the contract decreases the likelihood of rehabilitation (not to mention an ability to pay the Debtor's creditors).

21.     Finally, simply put, this transaction involves "direct self-interest or self-dealing." *See In re Network Access Sols., Corp.*, 330 B.R. at 75. As noted above, insiders of the Debtor already receive $40,000 per month from the estate, ostensibly in connection with the management of the Debtor. Additionally, Cashyew—wholly-owned by the same individuals—receives about $50,000 per month from the estate. Yet, these same individuals, through Cashyew, now seek to assume a contract that provides them an additional sixty percent (60%) of the Debtor's gross revenues (over the claims of creditors in this bankruptcy) for services that are apparently the same as those already provided by the Debtor's insiders.

22.     The Debtor has not provided any valid business justification for the assumption of the Management Agreement. Indeed, it is difficult to conceive of an arrangement that could be more detrimental to the estate and more friendly to the O'Hares and Cashyew. Assumption of the Management Agreement is the epitome of self-interest and self-dealing.

- 8 -

125505772.1

23.     The circumstances surrounding the payment of the O'Hares $40,000 a month and Cashyew $50,000 a month cries out for an independent trustee to investigate the Debtor's financial affairs and is grounds for denying the Motion to Assume.

WHEREFORE, Adam Young, Tubmanburg Limited and Ringba, LLC, respectfully request that the Court enter an Order denying the Motion to Approve and request such other and further relief as the Court deems appropriate.

Respectfully submitted this 22nd day of July, 2024.

LEWIS ROCA ROTHGERBER CHRISTIE LLP

*s/ Chad S. Caby*
Chad S. Caby
1601 19th Street, Suite 1000
Denver, CO  80202
Tel:     303-628-9583
Fax:     303-623-9222
E-mail:   ccaby@lewisroca.com

*Attorneys for Adam Young, Tubmanburg Limited and Ringba, LLC*

- 9 -

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that, on July 22, 2024, a true and correct copy of the foregoing **OBJECTION TO DEBTOR'S MOTION TO ASSUME MANAGEMENT AGREEMENT WITH CASHYEW HOLDINGS, INC.** was electronically filed and served via CM/ECF, which action caused automatic electronic notice of such filing upon all parties in interest in this matter as follows:

John Cimino, Esq.
Cimino Law Office, LLC
5500 E. Yale Ave., #201A
Denver, CO 80222
Via: CM/ECF

*Counsel for Debtor*

Alan K. Motes, Esq.
Byron G. Rogers Federal Bldg.
1961 Stout St., Ste. 12-200
Denver, CO 80294
Via: CM/ECF

*Counsel for U.S. Trustee*

Joli A. Lofstedt, Esq.
PO Box 270561
Louisville, CO 80027
Via: CM/ECF

*Subchapter V Trustee*

*s/ Jennifer Eastin*
Of: Lewis Roca Rothgerber Christie LLP

- 10 -

125505772.1

# EXHIBIT 1

1                   UNITED STATES BANKRUPTCY COURT
                         DISTRICT OF COLORADO
2
     X- - - - - - - - - - - - - -X
3    IN THE MATTER OF:              .  Case No. 24-12624-kht
                                    .  Chapter 11
4    DNC and TCPA LIST              .  Denver, Colorado
     SANITIZER, LLC,                .
5             Debtor.               .  June 10, 2024
                                    .
6    X- - - - - - - - - - - - - -X

7             TRANSCRIPT OF 341 MEETING OF CREDITORS
                         TELEPHONICALLY
8                    BEFORE ALAN MOTES
                           TRUSTEE
9

10   APPEARANCES:

11   For the Debtor (Requestor)    CIMINO LAW OFFICE, LLC
     Date Ordered:  07/03/2024     By: John Cimino, Esq.
12   Date Completed:  07/17/2024   5500 East Yale Avenue
                                   Denver, CO 80222
13
     For Creditor Adam Young,      LEWIS ROCA
14   Tubmanburg Ltd. and           By: Chad Caby, Esq.
     Ringba LLC                    1601 19th Street
15                                 Denver, CO 80202

16   Subchapter V Trustee          Joli A. Lofstedt

17   Representing Debtor           Michael O'Hare

18

19

20

21

22        Proceedings recorded by electronic sound recording;
            Transcript produced by transcription service.
23   -----------------------------------------------------------
                      Veritext Legal Solutions
24                330 Old Country Road, Suite 300
                        Mineola, NY 11501
25                      Tel: 800-727-6396

```
 1                  P R O C E E D I N G S

 2            MR. MOTES:  Okay.  I've started the recorder.

 3            MR. CIMINO:  Excuse me.  Who all's on the phone?

 4            MR. MOTES:  I'm going to take attendance here in a

 5   moment.  I've started the recorder.  Today is June 10th,

 6   2024.  It's at 12:00 p.m.  We are convening today

 7   telephonically for the meeting of creditors pursuant to

 8   Bankruptcy Code Section 341 in the Chapter 11 case of DNC

 9   and TCPA List Sanitizer, LLC, which is Case No. 24-12624-

10   kht.

11            My name is Alan Motes.  I'm an attorney for the

12   U.S. Trustee Program.  The U.S. Trustee is a component of

13   the U.S. Department of Justice that oversees the

14   administration of bankruptcy cases.  Section 341 requires

15   the Debtors appear and be examined under oath concerning

16   matters such as the Debtor's assets and liabilities, their

17   financial affairs, their transactions.  This is a Chapter 11

18   case, and so the matters, you know, today may involve the

19   Debtor's plans to reorganize or the Debtor's prospects for

20   reorganizing.

21            I am recording this proceeding electronically.  If

22   you would like a transcript of this proceeding, you may

23   obtain one.  In order to obtain a transcript, you would

24   simply contact the court reporter.  The court reporter will

25   make a transcript for you; they will charge you a fee for
```

1    that.  If you would like any assistance in locating the

2    court reporter, please let me know.  I'd be happy to help

3    you.

4          As an agenda for today, I'm going to take some

5    appearances.  I'll give parties an opportunity to enter an

6    appearance on the record if they choose to.  After that, I

7    will swear in the representative of the Debtor entity.  I

8    will have some questions for that representative, and then

9    after that, the Subchapter V Trustee might have some

10   questions.  And then if any creditors are participating,

11   they may have some questions as well.

12         Let me go ahead and take appearances.  Would

13   counsel for the Debtor please enter an appearance.

14         MR. CIMINO:  John Cimino appearing.

15         MR. MOTES:  Great, thank you.  Would the

16   Subchapter V Trustee please enter an appearance.

17         MS. LOFSTEDT:  Good afternoon.  Joli Lofstedt, the

18   Subchapter V Trustee.

19         MR. MOTES:  Okay, thank you.  Are there any

20   creditors that are participating today who would like to

21   enter an appearance on the record?

22         MR. CABY:  Yes, good afternoon.  This is Chad

23   Caby.  I represent Adam Young, Tubmanburg Ltd., and Ringba

24   LLC, who I'll just simply refer to as Ringba.

25         MR. MOTES:  Okay, great.  Thank you.  Anyone else?

```
 1    Okay.  And so who is the representative of the Debtor

 2    appearing today?

 3              MR. O'HARE:  Michael O'Hare, the CEO.

 4              MR. MOTES:  Okay.  Mr. O'Hare, would you please

 5    raise your right hand to be sworn in.

 6              MR. O'HARE:  Yes, sir.

 7              MR. MOTES:  Okay, thank you.  Mr. O'Hare, do you

 8    swear under penalty of perjury that the testimony you are

 9    about to give today will be the truth, the whole truth, and

10    nothing but the truth?

11              MR. O'HARE:  I do.

12              MR. MOTES:  Okay.  Thank you very much.  Of

13    course, please put your hand down.  So, Mr. O'Hare, just for

14    some background questions.  The Debtor in bankruptcy is

15    named DNC and TCPA List Sanitizer, LLC.  You've identified

16    yourself to be the CEO of that company.  Are you the only

17    officer?

18              MR. O'HARE:  Well, there's two members of the

19    company, that's me and my wife.

20              MR. MOTES:  Okay and let me clarify that.  So are

21    you certain that there's two members, you and your wife, or

22    is there another party that's a member?

23              MR. O'HARE:  There's only two members as far as

24    human beings.

25              MR. MOTES:  Okay.
```

1              MR. CIMINO:  I wanted to say hello to Mr. Caby, by

2    the way, before you jumped into that.

3              MR. MOTES:  Okay.  So, Mr. O'Hare, is your wife

4    Tatiana?

5              MR. O'HARE:  Yes.

6              MR. MOTES:  Okay.  What is Cashyew Holdings?

7              MR. O'HARE:  That's the entity that owns 99

8    percent of DNC and TCPA List Sanitizer.

9              MR. MOTES:  Okay.  And then who owns the other 1

10   percent?

11             MR. O'HARE:  My wife and I.

12             MR. MOTES:  Okay.  And then who owns Cashyew

13   Holdings?

14             MR. O'HARE:  Me, my wife and I do too.

15             MR. MOTES:  Okay.  So Cashyew Holdings owns 99

16   percent of the company, you and your wife own all of Cashyew

17   Holdings, and then you each separately own the remaining 1

18   percent of the company; is that correct?

19             MR. O'HARE:  That's correct.

20             MR. MOTES:  Okay.  And how long has this company

21   been in existence approximately?

22             MR. O'HARE:  Which company?

23             MR. MOTES:  The Debtor, which is DNC and TCPA List

24   Sanitizer.

25             MR. O'HARE:  Okay.  Since March of 2019.

1          MR. MOTES:  Okay.  And have you been involved with

2     the company since March of 2019?

3          MR. O'HARE:  Yes.

4          MR. MOTES:  Okay.  Aside from you and your spouse,

5     have there ever been any other officers of the company?

6          MR. O'HARE:  Not to my knowledge, no.

7          MR. MOTES:  Has the ownership structure been the

8     same since March of 2019?

9          MR. O'HARE:  To the best of my knowledge, I

10    believe so.

11         MR. MOTES:  Okay.  There hasn't been any third

12    person that's been an owner or a member of the company?

13         MR. O'HARE:  To the best of my knowledge, no.

14         MR. MOTES:  Okay.  I mean, you would know,

15    correct?

16         MR. O'HARE:  Yeah, I would know.  I'm the founder,

17    so...

18         MR. MOTES:  All right.  Can you describe generally

19    the type of business that is DNC and TCPA List Sanitizer?

20         MR. O'HARE:  What our business does?

21         MR. MOTES:  Yes.

22         MR. O'HARE:  We are a TCPA, which stands for

23    Telephone Consumer Protection Act, list litigation and phone

24    suppression company/service.

25         MR. MOTES:  Okay.  And so, can you explain what

1    that means?

2         MR. O'HARE:  Yeah.  What we do is we collect phone

3    numbers from TCPA litigators.  These are individuals who may

4    or may not have received phone calls, may or may not with

5    express written consent and sometimes without, from usually

6    solicitors, call centers, lead generation companies, so

7    forth, all mom-and-pop type businesses.  And these

8    litigators turn around and then they sue these small

9    businesses mostly, sometimes for thousands and other times

10   for millions of dollars.  And we collect the numbers and our

11   clients scrub their phone list against these numbers to

12   remove them from their calling list so that they aren't

13   caught up in TCPA violations and litigation.

14        MR. MOTES:  Okay, thank you.  Mr. O'Hare, can you

15   explain -- you know, the company is in a Chapter 11 case.

16   Can you explain the events that led to the filing of this

17   bankruptcy case?

18        MR. CIMINO:  How much time do you have?

19        MR. O'HARE:  Yeah.  In 2020 during lockdown, I was

20   approached by Ringba and the principal, Adam Young.  He was

21   interested in buying my company.  I wasn't -- I mean,

22   normally, I wasn't very interested in selling the company,

23   but under the circumstances during COVID, I entertained the

24   idea.

25        He set up an account, which means he got an

1    account on my website.  He was able -- without my knowledge,

2    he was able to take my database, the whole thing.  He came

3    on and he kind of made a phony offer to buy my company.  And

4    three months later -- we signed an NDA, we agreed to our

5    terms and conditions on our side.  Three months later, he

6    set up a company called TCPA Sales, a subsidiary of Ringba,

7    basically using my list and using all my trade secrets.  I

8    turned around and sued, this is a breach of contract case

9    and misappropriation of trade secrets.

10           It should have been a very straightforward case.

11   It should not have cost the amount of money that I paid in

12   legal fees in Ringba.  Ringba engaged in what I consider

13   highly unethical with their attorney strategy, which is a

14   fee shifting strategy from the get-go, and they rang up

15   tremendous amount of fees going after my company's source

16   code, which in the Complaint, we never alleged they took our

17   source code.  They had used WTO, which is Wheeler Trigg

18   O'Donnell, with CiCi Cheng.  She had employed the same type

19   of fee shifting strategy with great success in also a recent

20   case, (indiscernible) v. Lagwell.  I had bad representation

21   on my side.  My attorneys were not very effective and so

22   forth and so on.

23           And so, basically what happened was in good faith,

24   my company for three or four months tried to comply with the

25   source code request in discovery.  And the judge even ruled

```
 1    on April 25th, 2023 that we had satisfied it, that source

 2    code production request, and then he changed his mind two

 3    weeks later and said we had a late disclosure.  And the day

 4    before the trial was to begin, he dismissed the case for

 5    that reason.  The defendants raised -- said it was a Rule 37

 6    violation and they wanted their attorney's fees.  I was

 7    caught greatly unaware (indiscernible).  I was very

 8    surprised that they would have given, the way the American

 9    rule.

10            And so, the judge hit me pretty hard with wanting

11    me to pay their attorney's fees for a case that should never

12    even, you know, gotten as far as it did and cost as much as

13    it did, so that's where we are today.

14            MR. MOTES:  Okay.  So did the judge enter a

15    judgment in favor of the other parties for their attorney's

16    fees?

17            MR. O'HARE:  Yes.

18            MR. MOTES:  And then I understand or at least it

19    appears that the company appealed that judgment; is that

20    correct?

21            MR. O'HARE:  We appealed both the decision, the

22    late disclosure dismissal, and we've appealed the judge's

23    order for fees.

24            MR. MOTES:  Okay.  Mr. O'Hare, I want to ask you

25    about the documents that were filed in the bankruptcy case.
```

1    That would include the petition, the schedules of assets and

2    liabilities, and the statement of financial affairs.  Do you

3    understand what I'm referring to when I refer to the

4    petition, the schedules of assets and liabilities, and the

5    statement of financial affairs?

6          MR. O'HARE:  Yes, I believe so.  This was the Form

7    201?

8          MR. MOTES:  Okay.  So Form 201 is the voluntary

9    petition, and then the schedules are -- I don't know if I

10   can tell you -- Form 206.  The statement of financial

11   affairs asks a series of questions about transfers and other

12   matters; that's Form 207.  You might have them in front of

13   you.

14         MR. O'HARE:  I'm trying to pull it up.  Okay,

15   Official Form 207, statement of financial affairs for non-

16   individuals filing for bankruptcy, yes.

17         MR. MOTES:  Okay.  So you're familiar with that

18   form?

19         MR. O'HARE:  Familiar, I mean, yes.  Looking at it

20   right now.

21         MR. MOTES:  I'm going to give you a moment to look

22   that over.  Can you pull up the schedules as well?

23   Hopefully, you have those available.

24         MR. O'HARE:  Yes, I have all the forms here on the

25   pdf.

1          MR. MOTES:  Okay.  So, Mr. O'Hare, did you provide

2     the information to Mr. Cimino's office that was used to

3     prepare the schedules and the statement of financial

4     affairs?

5          MR. O'HARE:  Yes, sir.

6          MR. MOTES:  Did you understand that the

7     information on those forms had to be true and correct?

8          MR. O'HARE:  Yeah.  I did it to the best of my

9     knowledge.

10          MR. MOTES:  Okay.  And did you review the

11     documents before you signed them?

12          MR. O'HARE:  Yes.

13          MR. MOTES:  And did you understand that you were

14     signing the documents under penalty of perjury?

15          MR. O'HARE:  Yes.

16          MR. MOTES:  And did you, in fact, sign those

17     documents?

18          MR. O'HARE:  I did sign them, yes.

19          MR. MOTES:  Okay.  Are you aware now of any assets

20     or debts that you should have included in your bankruptcy

21     schedules but did not?

22          MR. O'HARE:  I'm not aware.  I mean, the IRS had

23     put in a claim the other day for $1400.

24          MR. MOTES:  Okay.  What I'd like to do, Mr.

25     O'Hare, is I just have some questions about some of the

1    items in those forms.  I'm going to start with the

2    schedules.  Schedule A/B listed a couple of bank accounts

3    that the company was using before it filed the bankruptcy

4    case: one was at Chase Bank and one was at Integrity Bank.

5    Have those accounts been closed?

6              MR. O'HARE:  Yes.

7              MR. MOTES:  And is the debtor-in-possession

8    account at Integrity Bank?

9              MR. O'HARE:  It is open.

10             MR. MOTES:  Okay.  And that's at Integrity Bank?

11             MR. O'HARE:  Yes.  Integrity Bank, I'm sure.

12             MR. MOTES:  Okay.  There is another account that's

13   listed called Stripe and it's listed as being a credit card

14   processor with a value of about $20,000 or $21,000.  What is

15   Stripe; can you explain that?

16             MR. O'HARE:  Stripe is just an acquiring bank,

17   which is basically a passthrough.  So they facilitate the

18   payments from Visa, Mastercard, and American Express,

19   similar to Square or First Data or these type of companies.

20             MR. MOTES:  Okay.  And so, do you have an account

21   at Stripe; is that how that works?

22             MR. O'HARE:  Well, yeah, we have an account.

23             MR. MOTES:  I mean, so it's --

24             MR. O'HARE:  But it's not a bank.

25             MR. MOTES:  Okay.  So Item 3 of this --

1          MR. O'HARE:  What happened was -- oh, sorry.  Go

2     ahead.

3          MR. MOTES:  No, that's fine.  Go ahead.

4          MR. O'HARE:  I think you're going to say why is

5     the $21,000 in there?

6          MR. MOTES:  Yeah.  What does that mean; what does

7     it mean to say that $21,000 was held with Stripe as of the

8     bankruptcy filing?

9          MR. O'HARE:  Okay.  So what happened was, so

10    Stripe passes the money through.  So if I do, let's say,

11    $1,000 today in sales, then tomorrow, they'll deposit that

12    in my bank account or within 24 to 48 hours.  Okay?  Why it

13    was held up was because the defendants, or Ringba, their

14    attorneys filed a writ of garnishment without notice -- and

15    they've done that repeatedly, by the way -- to my banks and

16    Stripe honored that writ of garnishment and they suspended

17    all payouts to my account.

18          So this money accrued from our daily sales.  So

19    normally, the $21,000, there would be no money or very

20    little in Stripe because it would all pass through; in this

21    case now, it's all passing through to my Integrity Bank

22    account, the debtor-in-possession account.

23          MR. MOTES:  Okay.  So you have been able to

24    resolve that and those funds are no longer being held at

25    Stripe?

```
 1            MR. O'HARE:  Yes.  It took about three weeks to

 2    get it resolved, but we did resolve it.

 3            MR. MOTES:  Okay.  You listed as assets -- this is

 4    Item 60 and 61 of the Schedule A/B.  You listed as assets

 5    the TCPA list, which I think you've already described, as

 6    well as the website.  You included a valuation of those

 7    items and the basis of the valuation was an offer made by a

 8    potential buyer.  Earlier, you were referencing the

 9    potential purchase by Ringba.  Are these valuations based

10    upon the offer made by Ringba?

11            MR. O'HARE:  Yes.

12            MR. MOTES:  I'm going to go down to Item 77.  I

13    did not understand this.  Mr. Cimino, this is probably a

14    question for you.  You know, at the very end of 77, it lists

15    potential legal malpractice claims against some attorneys.

16    I do understand that.  But then above that, there are two

17    different descriptions.  They look like the types of

18    descriptions of assets you would see on a financing

19    statement.  I'm not sure how that information ended up at

20    Item 77.  Can you help with that?

21            MR. CIMINO:  Hang on one minute.  Yeah, let me get

22    there.  I'm sorry, hang on a second.  77?

23            MR. MOTES:  Right.

24            MR. CIMINO:  That is just a catchall in the event

25    CT Corporation System has a potential lien or a filed UCC
```

1   financing statement.  And I don't actually know of any;

2   that's why I chose unknown.  It was just done for belt-and-

3   suspender purposes, as Judge Clark used to say, "in an

4   abundance of caution."  But I don't think there's any

5   secured claims.

6        MR. MOTES:  Well, so Schedule A/B is already

7   asking for all of these things.  There were previously

8   opportunities to include accounts receivable, to include

9   inventory, to include equipment, general intangibles were

10  included, so it just seems duplicative to me.  So I guess I

11  just don't understand why these general descriptions of

12  assets appeared in Item 77.  If there are accounts

13  receivable, they should be disclosed; if there is chattel

14  paper, it should be disclosed; if there's inventory, it

15  should be disclosed; if there's equipment, it should be

16  disclosed.  Do you understand what I'm saying?

17       MR. CIMINO:  Yeah.  I could remove that 77

18  reference.

19       MR. MOTES:  Yeah, I would.  And just be careful to

20  --  you know, if there assets that fit into those

21  categories, just spell it out in the remainder of Schedule

22  A/B.  Leave, of course, the potential legal malpractice

23  claims.

24       MR. CIMINO:  One more time?

25       MR. MOTES:  You could leave the potential legal

```
 1   malpractice claims that are listed there.
 2            MR. CIMINO:  I will, or I could move them up to
 3   74.
 4            MR. MOTES:  Exactly.  Okay.
 5            MR. CIMINO:  I'll do that.  Yeah, I'm a little bit
 6   confused how I got there, to be honest with you, but I'll
 7   rearrange it.  No problem.
 8            MR. MOTES:  Okay, thank you.
 9            MR. CIMINO:  You're welcome.
10            MR. MOTES:  So just to confirm all that, Mr.
11   O'Hare, the company listed some cash in the bankruptcy
12   schedules, you know, the funds that were held by Stripe and
13   otherwise in the bank account, some office furniture, the
14   list itself and the website.  Are you aware of any other
15   assets that the company owns?
16            MR. O'HARE:  No.  To the best of my knowledge, no.
17            MR. MOTES:  Okay.
18            MR. O'HARE:  I mean, we're an online company.
19            MR. MOTES:  Okay.  And, Mr. O'Hare, you operate
20   out of your house; is that correct?
21            MR. O'HARE:  Correct.
22            MR. MOTES:  And obviously, your spouse is
23   involved.  Aside from you and your spouse, does the company
24   have any other employees or independent contractors?
25            MR. O'HARE:  We have no employees.  We have
```

1  independent contractors.

2          MR. MOTES:  Okay.  And about how many do you use?

3          MR. O'HARE:  Eight to -- maybe 8 to 10.

4          MR. MOTES:  Okay.  And are you current -- when I

5  say you, I mean the company -- is the company current with

6  respect to all obligations to those independent contractors?

7          MR. O'HARE:  As far as payments?  Yes.

8          MR. MOTES:  Okay.  I wanted to ask you about some

9  entries in the debt schedules, and specifically I think

10  Chase shows up at least twice, maybe a third time.  So I'm

11  going to start with Schedule E/F, which is where unsecured

12  debts are listed, and there's a debt listed in favor of

13  Chase Bank in the amount of about $85,000.  It's described

14  as a business installment loan.  Mr. O'Hare, is that

15  business installment loan secured by any assets?

16          MR. O'HARE:  Not that I'm aware of, unsecured.

17          MR. MOTES:  Okay.  Then on Schedule D, JPMorgan

18  Chase Bank appears again as potentially having a secured

19  claim.  Are you aware of JPMorgan Chase having a secured

20  claim?

21          MR. O'HARE:  I'm not aware.  I don't remember

22  putting up any collateral or anything, unless it's some

23  little fine print somewhere, but no.

24          MR. MOTES:  Okay.  And, Mr. Cimino, CT Corporation

25  is also listed as a secured creditor on Schedule D.  To your

```
 1    knowledge, Mr. Cimino, is CT Corporation System an agent for
 2    JPMorgan Chase?
 3              MR. CIMINO:  No, I don't know that.
 4              MR. MOTES:  Okay.  You just located that UCC-1?
 5              MR. CIMINO:  No, I have not.
 6              MR. MOTES:  How did CT Corporation System come to
 7    be listed on Schedule D?
 8              MR. CIMINO:  I think it was just a false entry.
 9    I'll remove it.
10              MR. O'HARE:  But I have it down here as un- --
11    these are unsecured.
12              MR. CIMINO:  Yeah, but he's saying on Schedule D,
13    somehow it got into Schedule D, but I'll remove it.  I'll
14    doublecheck the UCC.
15              MR. O'HARE:  Looking at Official Form 204.
16              MR. CIMINO:  Michael, hold up.
17              MR. MOTES:  Well, let me --
18              MR. CIMINO:  Let him ask a question.
19              MR. MOTES:  Let me just try to clarify because I'm
20    not sure if this information came from Mr. O'Hare or if it
21    came in the preparation of the schedules.  But, Mr. O'Hare,
22    are you aware of CT Corporation System being a creditor?
23              MR. O'HARE:  It showed up.  I don't know how they
24    did it, some sort of sweep, to find out if there were
25    creditors out there and I've tried to contact this company.
```

1     I don't know who they are, but it shows up as a creditor.  I

2     just put it down.

3           MR. MOTES:  That's fine, and it's better to give

4     them notice just in case they are a creditor.  So I don't --

5     okay.  If they're a creditor, they might assert a secured

6     claim, but you don't know; is that correct?

7           MR. O'HARE:  I have no clue.  I'd like to know who

8     they are.

9           MR. MOTES:  Okay.  And same goes for JPMorgan

10    Chase.  You're aware of there being a business loan with

11    Chase, but you're not aware of JPMorgan Chase having a

12    secured claim, right?

13          MR. O'HARE:  That's correct.  I don't believe they

14    have a secured claim.

15          MR. MOTES:  And so, as far as you are aware,

16    nobody has a security interest in the company's assets.

17          MR. O'HARE:  That's correct.  Now, American

18    Express, the one from 49, they say that I signed a personal

19    guarantee that I was unaware of.  I mean, I've had that card

20    for a number of years, so I don't know if that's a secured

21    claim, but...

22          MR. MOTES:  No.  Well, that just means that you've

23    guaranteed it.  So, Mr. O'Hare, another creditor that

24    appears in the schedules is the Law Firm Allen Vellone Wolfe

25    Helfrich & Factor.  Did that firm represent the company or

1    did that firm represent Mr. Young and Tubmanburg, et cetera?

2              MR. O'HARE:  No, that represented my company.

3              MR. MOTES:  Okay.  And did that firm represent

4    your company in the Ringba litigation?

5              MR. O'HARE:  Yes.  After they were --

6              MR. CIMINO:  They're the appellate attorneys.

7              MR. MOTES:  Oh, I see.

8              MR. CIMINO:  No, no, excuse me.  They did come in

9    tail end.  Explain that to him, Michael.

10             MR. O'HARE:  Well, they came in after -- well, the

11   judgment in May 12th of 2023.  They came in in July of 2023.

12   They represented me at the fee hearing and then they also

13   wrote the appeal and response to the appeal.

14             MR. MOTES:  Okay.  Another creditor is Quandary

15   Peak Research.  The basis of that claim is expert witness

16   fees.  Was that an expert witness in the Ringba litigation?

17             MR. O'HARE:  Yes.

18             MR. MOTES:  Do you know how much the company owes

19   to Quandary Peak Research?

20             MR. O'HARE:  I believe that's around $36,000.

21             MR. MOTES:  And then the box is checked disputed.

22   Do you know why the company disputes that?

23             MR. O'HARE:  The judge threw out my expert witness

24   for his gross negligence, what you call reckless, about

25   three weeks before the trial was to begin.

1          MR. MOTES:  All right.  Does the company -- so on

2     Schedule G, you would list any executory contracts and

3     unexpired leases.  Does the company have any contracts with

4     any other parties?

5          MR. O'HARE:  What does that mean?

6          MR. MOTES:  Is the company a party to any

7     contract?

8          MR. O'HARE:  John, we have -- we use different

9     services.  Like, we have Thomson Reuters CLEAR, for example,

10    but that's just day-to-day expenses, I mean, operations of

11    the company.  I don't know what -- what kind of contracts

12    are they asking for, John?

13         MR. CIMINO:  Let him clarify it.

14         MR. MOTES:  Yeah, this would be any type of

15    contracts.  So are there any written agreements between your

16    company and any other party?

17         MR. O'HARE:  Well, I guess yes, I guess so.

18         MR. MOTES:  What types of contracts?

19         MR. O'HARE:  I mean, we have a contract with

20    Stripe, for example.  We have a contract with PayPal.  We

21    have a contract with our hosting company.

22         MR. MOTES:  With your hosting company?

23         MR. O'HARE:  Yes.

24         MS. LOFSTEDT:  Do you have contracts with your

25    customers too?

1          MR. O'HARE:  We have contracts with our customers,

2     but they are just month-to-month.

3          MS. LOFSTEDT:  But they've entered into contracts

4     you can terminate on short-term notice?

5          MR. O'HARE:  I could terminate them within 30

6     days.

7          MR. MOTES:  Okay.  Mr. O'Hare, we talked about

8     potentially you've guaranteed the, you know, one or more

9     credit cards debts owing to American Express.  Have you

10    guaranteed any other debts, Mr. O'Hare?

11         MR. O'HARE:  Not to my knowledge, no.

12         MR. MOTES:  In the statement of financial affairs,

13    Mr. O'Hare, the question is asking about payments,

14    distributions, withdrawals, et cetera given to insiders

15    within the one year prior to the bankruptcy filing, so this

16    would basically be mid-May of 2023 to mid-May of 2024.  You

17    intended to, I think, to disclose that to answer that

18    question to show payments that were made to you and to your

19    spouse.

20         Mr. Cimino, in the SOFA, it references at Item 30,

21    it references see attached spreadsheet.  It looks like you

22    intended to attach a spreadsheet, but no spreadsheet is

23    attached.

24         MR. CIMINO:  Well, we made a decision that those

25    transfers and payments were made in the ordinary course of

1    business, so we never attached the spreadsheet.

2           MR. MOTES:  Okay.  So what it's asking, it's not

3    asking for transfers outside of the ordinary course of

4    business; it's asking for all transfers.  So Item 30 states

5    or requests within one year before filing this case, did the

6    Debtor provide an insider with value in any form.

7           This is Alan Motes.  I got kicked off this -- I

8    don't know why and had trouble dialing back in, but I am

9    back in.  I'm not sure if anybody else had any problems, but

10   let me confirm --

11          MS. LOFSTEDT:  We were all kicked off, I think.

12          MR. CIMINO:  And we lost you.

13          MR. MOTES:  And it might have been, since I was

14   kicked off, everybody else was as well.  I'm not sure.  But

15   let me just doublecheck, okay, Mr. O'Hare, are you back on?

16          MR. O'HARE:  Yes, sir.

17          MR. CIMINO:  This is John Cimino, I'm back on.

18          MR. MOTES:  Okay.  We heard from Ms. Lofstedt.

19   Mr. Caby, are you on?

20          MR. CABY:  I am.  I got kicked off as well.

21          MR. MOTES:  Okay.  I think that everybody who

22   appeared before is back on, so I apologize for that.  Where

23   we left off was at Item 30 of the statement of financial

24   affairs.  And what this is requesting is asking for the one

25   year -- during the one year prior to the bankruptcy filing,

1   did the Debtor provide an insider with value in any form,

2   including salary, other compensation, draws, bonuses, loans,

3   et cetera.  So it's not asking for transfers outside of the

4   ordinary course, but all transfers.  Do you understand that,

5   Mr. Cimino?

6            MR. CIMINO:  Yeah.  We'll get that to you.

7            MR. MOTES:  Okay.  Well, what I'm asking is that

8   you please go ahead, you can attach a spreadsheet with that

9   information as I think previously contemplated or you can

10  fill out the form with that information, but I would ask

11  that you please do that.  But just generally, Mr. --

12           MR. CIMINO:  I will.

13           MR. MOTES:  Mr. O'Hare, during the one year prior

14  to the bankruptcy filing, did you receive a salary from the

15  company?

16           MR. O'HARE:  No.

17           MR. MOTES:  No salary at all?

18           MR. O'HARE:  That's not how we're compensated.

19  It's a different structure.  So our structure is for tax

20  purposes, not for judgment for settlements.

21           MR. MOTES:  Okay.  So what type of compensation

22  did you receive from the company?

23           MR. O'HARE:  So basically, the three, six, year,

24  whatever, if it has any revenues, the revenues are then

25  trans- -- or actually pay, for example, management fee to

1    Cashyew Holdings, and then I'm paid out from Cashyew

2    Holdings.

3              MR. MOTES:  Okay.  So any profits basically are

4    paid to Cashyew Holdings and then you and perhaps your

5    spouse are paid from Cashyew?

6              MR. O'HARE:  Okay.

7              MR. MOTES:  Did I get that correctly?

8              MR. O'HARE:  Yes, it is.

9              MR. MOTES:  Okay.  So, yeah, if you would just

10   please make that amendment, Mr. Cimino.

11             MR. CIMINO:  We will.

12             MR. MOTES:  Okay.  Mr. O'Hare, are you aware of

13   the requirement to file monthly operating reports each

14   month?

15             MR. O'HARE:  Yes.  We discussed that with Joli and

16   Vincent and my attorney.

17             MR. MOTES:  Okay.  Who will be preparing those

18   reports?

19             MR. O'HARE:  My wife and I, if we can get my

20   accountant entered in.

21             MR. MOTES:  Okay.  And, Mr. O'Hare, are you

22   familiar with a document called the U.S. Trustee's Operating

23   Guidelines and Reporting Requirements for Chapter 11

24   Debtors?

25             MR. O'HARE:  Yes.  John Cimino, my attorney, gave

1   me a copy and I have reviewed it.

2          MR. MOTES:  Okay.  If you have any questions about

3   that, please ask Mr. Cimino.  And, Mr. Cimino, if you have

4   any questions or want to discuss any of those requirements,

5   then just please reach out to me.

6          MR. CIMINO:  I will.

7          MR. MOTES:  Okay, thank you.  Does the Subchapter

8   V Trustee, Ms. Lofstedt, have any questions?

9          MS. LOFSTEDT:  I do have just a few follow-up

10  questions.  I was able to participate in the initial Debtor

11  interview, which was very helpful in understanding the

12  business.  A couple of things on the agreement.  You

13  mentioned this management agreement with Cashyew Holdings.

14  Is there a written agreement with Cashyew Holdings?

15         MR. O'HARE:  Yes.

16         MS. LOFSTEDT:  Okay.  So that would be -- I think

17  that would be an executory contract you'll need to list on

18  Schedule G.  And then the potential contracts with your

19  customers, you may need to -- you know, even if -- I don't

20  know how many customers you have in total or how many

21  agreements that would be.  Those may need to be --

22         MR. O'HARE:  These agreements are just like when

23  you sign up for a website, when you sign up for Amazon or

24  something like that.  They're not written out contracts or

25  DocuSign type deals.

1          MS. LOFSTEDT:  It's kind of the term of your

2   transactions, business dealings.

3          MR. O'HARE:  Yeah.  So that's the crux of this

4   whole case and why I'm here even today is the fact that they

5   disputed, for example, that they had entered into a

6   contract, right?

7          MR. CIMINO:  Michael, no, stop.  She's not asking

8   about that.  She's just -- Ms. Lofstedt, there are no

9   written agreements with these customers.  They just log on

10  to the website, they check a box that says we agree to the

11  terms and services and they're off and running.  Just like

12  when you buy a book from Amazon is the way of getting in.

13         MS. LOFSTEDT:  All right.  And then what do the

14  independent contractors do for the business; why do you use

15  independent contractors?

16         MR. O'HARE:  We have web developers and

17  researchers.

18         MS. LOFSTEDT:  Okay.  And one thing that wasn't

19  clear to me after the initial Debtor interview.  The award

20  of the attorney's fees was that based on a discovery

21  sanctions or was it an award of attorney's fees under the

22  prevailing party, a provision in the non-disclosure

23  agreement.

24         MR. CIMINO:  It was under the discovery sanctions.

25         MR. O'HARE:  Yup.

1          MS. LOFSTEDT:  Discovery, okay.  And, Mr. Cimino,

2     I saw that you filed your application to be employed in the

3     bankruptcy case and the contingency fee for the potential

4     malpractice claims.  Are you also representing the Debtor in

5     the appeal of the judgment or who would be representing the

6     Debtor on appeal?

7          MR. CIMINO:  Technically, I entered my appearance,

8     yes.

9          MS. LOFSTEDT:  You did, okay.  I think you had

10    mentioned that at the initial Debtor interview.  Those are

11    my -- go ahead.

12         MR. CIMINO:  I'm shaking on it because counsel who

13    briefed everything on in the loan, they actually withdrew,

14    and then the court --

15         MS. LOFSTEDT:  I think you had --

16         MR. CIMINO:  And then the court vacated their oral

17    arguments that were to be scheduled but are not scheduled,

18    so I entered my appearance into that appeal so that oral

19    arguments would be reinstated first, although they're not

20    scheduled yet.  So technically, I represent him, yeah.

21         MS. LOFSTEDT:  I forgot we had discussed that at

22    the initial Debtor interview.

23         MR. CIMINO:  Right.

24         MS. LOFSTEDT:  And then as we were on the meeting

25    of creditors, I did do a search for Colorado Secretary of

1    State and any UCC filings.  There are two UCC financing

2    statements that were filed: one was JPMorgan Chase, and it

3    looks like almost a blanket lien on the assets of the

4    Debtor; and then the other one is the CT Corporation System,

5    but they file on -- they're a representative for another

6    company, so you have to contact them to find out who they

7    filed the UCC financing statement for.  It's frustrating

8    because they don't have to disclose who the secured creditor

9    is, but it's for all accounts, it says so accounts

10   receivable.

11        MR. CIMINO:  So it is accurate.

12        MS. LOFSTEDT:  It could be accurate, yeah.  I can

13   send you the information or you can --

14        MR. CIMINO:  No, I think I have it here somewhere;

15   that's why it's there obviously.

16        MS. LOFSTEDT:  Yeah, okay.  Those are my follow-up

17   questions.  Thank you.

18        MR. MOTES:  Thank you, Ms. Lofstedt.  Mr. Caby, do

19   you have any questions?

20        MR. CABY:  I do have a few questions.  Good

21   afternoon.  I represent Ringba.  With regard to -- and

22   maybe, Mr. Cimino, this is a question for you.  So I

23   understand that you entered your appearance.  Are you moving

24   forward on the appeals as appellant's counsel?

25        MR. CIMINO:  Yes.

```
 1              MR. CABY:  Okay.  And so, you're going to be
 2    bankruptcy counsel, appeals counsel.  And then you're also I
 3    saw I think on Friday, you're also seeking to be employed to
 4    be malpractice counsel on a contingency matter; is that
 5    correct?
 6              MR. CIMINO:  Mr. Caby, let me rephrase that.
 7              MR. CABY:  Sure.
 8              MR. CIMINO:  I entered my appearance in the appeal
 9    because, as you know, a corporation can't -- unless there's
10    some specific exceptions, but generally, a corporation, as
11    you know, cannot represent itself, so I entered my
12    appearance just to keep the appeal from being dismissed.
13    But at this point, we're still discussing whether I want to
14    do the appeal because I don't really do appellate work, so
15    Mr. O'Hare is discussing that with me.  I mean, he's trying
16    to find other appellate attorneys.  You know, appellate work
17    is not my forte' or my interest, so I did that really just
18    to protect the Debtor's interest.
19              So I think the long and short of it is I'm
20    probably not going to do the appeals and he's already talked
21    to another attorney who has expressed an interest in taking
22    over the appeals.  I hope that clarifies the answer.
23              MR. CABY:  Yeah, it does.  It's helpful, thank
24    you.  And I'll ask this of the Debtor's principal, what's
25    the status of the appeals at this point?
```

```
 1            MR. CIMINO:  Let me answer that one.  The one
 2   appeal is already been briefed and ready to go -- I mean,
 3   ready for oral argument, and that's the main appeal on the
 4   main case.  And then after that appeal was filed, there was
 5   another order entered for the dollar amount and the
 6   sanctions; that one has not been briefed at all.  In fact, I
 7   just saw that the record on appeal was transmitted.  I think
 8   that was transmitted mid last week, so the briefing schedule
 9   is not even set in place yet.
10            MR. CABY:  Okay.
11            MR. CIMINO:  They're trying to -- they're at both
12   ends of the spectrum.  In other words, one's already briefed
13   and ready to go to oral argument; the other one is just in
14   its infancy.
15            MR. CABY:  Okay.  And then with regard to the
16   malpractice case, that case has not been filed yet; is that
17   accurate?
18            MR. CIMINO:  That's accurate.
19            MR. CABY:  Okay.  And what is the thought process
20   as far as the timing on filing that action?
21            MR. CIMINO:  It'll get filed the minute I get
22   appointed as trial counsel; in fact, the Complaint is ready
23   to go.
24            MR. CABY:  Mr. O'Hare, what is the plan for the
25   bankruptcy?  I mean, in other words, what do you expect to
```

1    happen here?

2              MR. O'HARE:  Hopefully, I'll be treated fairly,

3    not like the last case.

4              MR. CABY:  (Indiscernible)

5              MR. O'HARE:  I never had (indiscernible) my side

6    of my case is pretty (indiscernible).

7              MR. CABY:  Right.  But you understand, sir, that

8    you have to have a Chapter 11 plan and that plan has to have

9    how you anticipate getting out of bankruptcy, so to speak.

10   What do you intend that plan to provide, if that makes

11   sense.

12             MR. O'HARE:  Money.

13             MR. CABY:  And when you say money, are you going

14   to be paying creditors over a period of time; is that what

15   you anticipate?

16             MR. O'HARE:  I anticipate, yes.  I mean, we'll put

17   together a plan and, hopefully, that will get accepted and,

18   you know, and obviously be paid over whatever the judge

19   decides, three to five years.  That appeal does not

20   (indiscernible), and everything goes away then, doesn't it?

21             MR. CABY:  I may not have a very good

22   understanding of the business, but where do the revenues

23   come from?

24             MR. O'HARE:  The customers.

25             MR. CABY:  Right.  But how do they make payments

1   and how do you -- so, I mean, I'm looking at your statement

2   of financial affairs, Page 1, and you show over the last two

3   to three years various amounts from, you know, basically a

4   million to $800,000 to this past year of $388,000.  Those

5   revenues are coming from whom?

6           MR. O'HARE:  Well, like I said, they're most of

7   the credit card paid is made by my clients.

8           MR. CABY:  I'm sorry, I missed that last part,

9   made by who?

10          MR. O'HARE:  By my clients, people who --

11          MR. CIMINO:  No, no.  Michael, describe your

12  clients to him.  I think that's what he's getting at.  You

13  know, you have a very interesting business that even myself,

14  I had a hard time understanding.

15          MR. O'HARE:  People, potential clients -- could be

16  people like me, but they've taken my property and

17  misappropriate it and is using it now and they're getting

18  incredible things; they're probably making hundreds of

19  thousands a dollars of year and at least getting a benefit

20  off of the list my team and my company put together.  Why do

21  they need it?  And I'll tell you why, because your company,

22  Ringba, they charge around 6 cents a minute to their

23  clients, okay, and bundled in there, they have their TCPA

24  seal, which blocks numbers of potential litigators, and so

25  that their clients feel like they can make more calls and if

1    they can make more calls, Ringba makes more money.  Makes

2    sense?

3              So any call center, any regeneration company,

4    texting platform that makes usually outbound -- they don't

5    receive inbound calls -- they want to protect themselves and

6    their clients from these professional litigators that are

7    inducing calls and whatever and suing people.  Makes sense?

8              MR. CABY:  Okay.  So if I may be --

9              MR. CIMINO:  Mr. Caby, if I'm selling vacuum

10   cleaners, I want to call people, right?  So we start calling

11   people.  In the old days, they would get sued because

12   consumers would go on a "do not call" list.  So what the

13   vacuum cleaner people do now or whoever, these salespeople,

14   they'll contact DNC and buy their list of all the people who

15   do not want to be called so that when they start calling

16   people, they don't call people on the "do not call" list, so

17   it's this form of self-insurance.  In other words, they're

18   protecting themselves from calling people like let's say

19   yourself, you're on a "do not call" list.  They want to know

20   that before they call you so they do not call you.

21             So Mr. O'Hare's company has assembled a database

22   of people who do not want to be called and these customers,

23   whether they're selling vacuum cleaners or trying to

24   generate leads for whomever or maybe a law firm trying to

25   find clients or a real estate company, they'll buy this list

1    to make sure they don't call the wrong person because they

2    don't want to get sued by the TCPA litigators, so it's like

3    a form of insurance.

4         MR. CABY:  Okay, and that's helpful, quite

5    frankly.  But what I'm -- it strikes another question in my

6    mind was when somebody buys the list, I mean, is it game,

7    set, match; is that done or are there monthly subscriptions

8    or annual plans?  I don't know.  That's what I'm trying to

9    get at.

10        MR. O'HARE:  There's monthly subscriptions.  We

11   don't sell the list.

12        MR. CABY:  Okay.  When you say you don't sell the

13   list, you just provide the list and then update it on, what,

14   a monthly basis or something like that?

15        MR. O'HARE:  Basically, you upload a CSD or Excel

16   file online through your account and then we clean the list

17   for you, take out any matches if there are any from that

18   list phone numbers, or we have an ATI that you can connect.

19   So say you're dialing, those are dial out numbers, it will

20   ping our database if there's a match; that call won't go

21   through.

22        MR. CABY:  Okay, that makes a little bit more

23   sense to me.  So you're scrubbing my list, for example.

24        MR. O'HARE:  Yeah, you have a list, a call list.

25        MR. CIMINO:  Yeah.  If I have a list of a thousand

1    people I want to start harassing, I want to start calling, I

2    send you the list, you scrub it, and you send a clean list.

3         MR. O'HARE:  We want you to follow all the FCC

4    guidelines for calling.  But even if you do that, there is

5    no safe harbor and you can get sued.  So you want to be very

6    careful and it's best to avoid these people because they're

7    wanting calls even though they claim in court that they

8    don't.

9         MR. CIMINO:  Well, my point is I misspoke.  My

10   point is I misspoke.  You don't sell the list.  You scrub my

11   list against your list.

12        MR. O'HARE:  Right.

13        MR. CABY:  All right.  Quick question with regard

14   to --

15        MR. O'HARE:  And by the way, Mr. Caby, your own

16   client is doing the exact same thing, by the way, because

17   they're a competitor of ours, by the way, so we look at

18   this, you know, adversarial.  They're like an adversarial

19   creditor because it's to their advantage to, I believe,

20   because they've already spent millions of dollars on this

21   case, to try to put me out of business.

22        MR. CABY:  All right.  With regard to the

23   malpractice claim, what do you believe you're entitled to?

24   I mean, how big is this malpractice claim?

25        MR. O'HARE:  John.

```
 1          MR. CABY:  Well, I'd ask you, and to the extent
 2   you don't know, you can say you don't know, but I'm asking
 3   you the question.
 4          MR. O'HARE:  For what they put me through?
 5   There's no sum big enough for them to pay me.
 6          MR. CABY:  All right.  Well, I guess what I'm
 7   trying to figure out is, if you were successful on this
 8   malpractice claim, would you be able to pay creditors in
 9   full or half of creditors or do you know?
10          MR. O'HARE:  I don't know.  I mean, I tried to go
11   for the maximum amount, you know, and if you guys can get --
12   I made already a deal.  I tried to make a deal earlier.  We
13   offered back in February and your clients rejected it.  And
14   that offer was we would basically --
15          MR. CIMINO:  No, no, no, he's not talking about
16   that.  He's asking you what do you expect Mr. Cohen and Mr.
17   --
18          MR. O'HARE:  Oh, I mean --
19          MR. CIMINO:  Mr. Tucker --
20          MR. O'HARE:  Yeah.  I mean, I think a part of
21   settlement if, you know, this judgment if we lose the
22   appeal.
23          MR. CIMINO:  No, what are your damages?  He's
24   asking what you think your damages are.  If you don't know,
25   I can tell him.
```

```
 1          MR. O'HARE:  Well, I don't know.  I mean, we've
 2     gone back and forth, so I don't have an exact figure, but...
 3          MR. CABY:  John, what are your thoughts on the
 4     malpractice claim?
 5          MR. CIMINO:  The defendant, their attorney,
 6     Wheeler Trigg, they were awarded half a million dollars,
 7     $500,000, plus their costs, which were another $158,000.  So
 8     Mr. O'Hare believes his company is entitled to $658,000.
 9     He's also got a potential -- and when I say he, I mean the
10     company -- they have a compensatory damage claim against the
11     attorneys because of the underlying lawsuit.  He was going
12     after Ringba for complete damages for what they did, whether
13     or not you believe they did whatever they did was wrong or
14     right or whatever.  But we may have compensatory damages
15     over and above the $658,000 that was awarded Wheeler Trigg
16     O'Donnell for your attorney -- for your client.
17          MR. CABY:  All right.
18          MR. CIMINO:  So the answer to the question, it's
19     either going to be a minimum of $658,000 or there's going to
20     be a maximum number, I think Mr. O'Hare telling us he feels
21     his losses are $2.8 million.  So the question is did the
22     attorneys, Tucker and Cohen and Mr. Yost.  Mr. Tucker was
23     told he was grossly negligent in the underlying litigation.
24     The question is does his gross negligence and what we
25     believe to be the negligence of Mr. Cohen and Mr. Yost, do
```

1    their damages exceed the $658,000, which would include the

2    damages that DNC believed they had against Ringba and Adam

3    Young.

4              And if that's true, then we're looking at $3

5    million in damages, actually more than that; it'd be, like,

6    $3.5 million.  It'd be $2.8 million, plus what we know to be

7    the damages, which actually I have a question about that

8    because the writ of garnishment said $500,000 and then left

9    off the costs, but we think the total damages are $658,000,

10   close to $2.8 million even though the garnishment said your

11   judgment is for $500,000, but that's a question for another

12   day.

13             So we think the total damages are $2.8 million,

14   plus the award of attorney's fees and costs that were

15   assessed against DNC, which is why they're here in the first

16   place.

17             MR. CABY:  Okay.  I don't have any further

18   questions.  Thank you.

19             MR. O'HARE:  You're welcome.

20             MR. MOTES:  Thank you, Mr. Caby.  Let me ask

21   again, are there any creditors that are present that have

22   any questions for the company, for the Debtor?  Okay, thank

23   you.

24             We will conclude the meeting of creditors.  Thank

25   you very much for your participation today.  Sorry for the

1    interruption in the middle of our meeting and, Mr. O'Hare,

2    best of luck.

3              MR. O'HARE:  Thank you very much.

4              MR. MOTES:  Okay, goodbye.

5              (Whereupon these proceedings were concluded)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
1                    C E R T I F I C A T I O N

2

3           I, Sonya Ledanski Hyde, certified that the foregoing

4      transcript is a true and accurate record of the proceedings.

5

6

7

8      Sonya Ledanski Hyde

9

10

11

12

13

14

15

16

17

18

19

20      Veritext Legal Solutions

21      330 Old Country Road

22      Suite 300

23      Mineola, NY 11501

24

25      Date:  July 17, 2024
```