## UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF COLORADO

In re:                                          )
                                                )
DNC AND TCPA LIST SANITIZER, LLC,  )          Case No. 24-12624 KHT
                                                )          Chapter 11
        Debtor.                              )

---

### MOTION TO CONVERT CHAPTER 11 CASE TO CHAPTER 7 PURSUANT TO 11 U.S.C. § 1112(b) FILED BY ADAM YOUNG, TUBMANBURG LIMITED AND RINGBA, LLC

---

Creditors Adam Young, Tubmanburg Limited and Ringba, LLC (collectively, "Ringba"), by and through their counsel, Lewis Roca Rothgerber Christie LLP, hereby request that the Court convert this case to a case under Chapter 7 of the Bankruptcy Code Pursuant to 11 U.S.C. § 1112(b). In support of their Motion, Ringba states as follows:

### PRELIMINARY STATEMENT

Under Section 1112(b) of the Bankruptcy Code, the Court must convert or dismiss a chapter 11 case upon a finding of "cause." Cause clearly exists in this above-captioned case based on the Debtor's: (i) bad faith litigation conduct in the State Court Litigation and filing bankruptcy to avoid funding a supersedeas bond relating to two appeals; (ii) unauthorized postpetition transfers and use of cash collateral; (iii) unauthorized pre and postpetition payments to insiders of the Debtor (Tatiana and Michael O'Hare and their wholly-owned entity, Cashyew Holdings, Inc. ("Cashyew")); (iv) failure to file complete and accurate monthly operating reports; (v) failure to file a plan that has a reasonable prospect of being confirmed in a reasonable amount of time; and (vi) the Debtor's principals' conflicts of interest in investigating and pursuing conveyance claims against themselves and Cashyew.

In this case, the unusual circumstances exception to conversion does not apply. For these

reasons, and as demonstrated more fully below, the Court should grant the Motion and convert this case to a case under Chapter 7.

## JURISDICTION

1.     This Court has jurisdiction over this Chapter 11 case pursuant to 28 U.S.C. §§ 157(a) and (b) and 1334(a) and (b).  This matter constitutes a core proceeding under 28 U.S.C. § 157(b)(2)(A) and (O).

2.     Venue is proper in this Court pursuant to 28 U.S.C. § 1409.

## PROCEDURAL BACKGROUND

3.     DNC and TCPA List Sanitizer, LLC (the "Debtor") filed for relief under Chapter 11 of the Bankruptcy Code on May 16, 2024 (the "Petition Date").  In its Voluntary Petition, the Debtor elected to proceed under Subchapter V of Chapter 11.  Accordingly, the Debtor's Chapter 11 plan was due on or before August 14, 2024.  *See* Docket No. 1.

4.     The Debtor is primarily owned by Cashyew, which holds a 99% equity interest in the Debtor.  The remaining ownership interests in the Debtor are held by Michael O'Hare (.50%), the Debtor's CEO, and Tatiana O'Hare (.50%), the Debtor's Secretary.  *See* Statement of Financial Affairs No. 28.  Cashyew is wholly owned by the O'Hares.  *See* Report (as defined below), ¶ 8.

5.     Joli A. Lofstedt, Esq. is the duly appointed and acting Subchapter V Trustee (the "Trustee") in the Debtor's Bankruptcy Case.

6.     Ringba is listed on the Debtor's Schedule F as a *disputed* unsecured creditor in the amount of $640,415.00, relating to a "Judgment entered for attorneys' fees and costs."  *See* Schedule F, 3.1.  The Judgment stems from an Order re Forthwith Request for Emergency Hearing and terminating sanctions entered by the District Court, El Paso County, Colorado in

2

Case No. 2021CV31668 (the "State Court Litigation"). In the State Court Litigation, the El Paso

County District Court (the "State Court") entered terminating sanctions against the Debtor for its

concealment of evidence and recordings that went to the heart of the State Court Litigation. The

State Court also entered an award of attorneys' fees and costs to Ringba. In making its decision

to enter terminating sanctions, the State Court made the following findings as to the Debtor's

litigation behavior:

> Ultimately, the court concludes that from the beginning of this litigation, plaintiff
> [-Debtor] has had ready access to all sorts of data directly relevant to this case that
> only recently they have begun to release in dribs and drabs. The court finds that
> Mr. O'Hare and Mr. Malosev completely disregarded their legally required
> discovery obligations until just recently in an attempt to increase their chances of
> prevailing at trial.
>
> . . .
>
> . . . in bringing suit, plaintiff [-Debtor] was required by law to timely disclose any
> relevant evidence in its possession, even if that evidence would help the other
> side. Here, plaintiff and its representatives have, until too late, disregarded that
> law completely.

Order: Proposed Order re: Forthwith Request for Emergency Hearing, p. 2, attached and

incorporated herein as **Exhibit A**. The Court similarly made findings of facts adverse to the

Debtor when it entered attorneys' fees and cost against the Debtor, noting that:

> Because plaintiff deliberately concealed all of this evidence until the eve of the
> third jury trial setting in this case and because this evidence lay at the heart of the
> case (and the heart of the never-filed breach of contract claim), the only
> reasonable sanction was termination of the case.
>
> Plaintiff argues that termination alone is a harsh enough sanction and that
> imposing attorney fees would be too harsh. The court disagrees. Were we talking
> about a modest number of hours and fees, the argument might be reasonable. But
> in a case where the defendants' attorneys spent hundreds of hours on the case and
> plaintiff paid all fees invoiced, I find that paying not all but at least a significant
> portion of those fees is warranted as an additional sanction to make clear to
> plaintiff, plaintiff's counsel, and the community that concealing critical evidence
> invites harsh sanctions.

*See* Order: Proposed Order for Defendants' Motion for Attorneys' Fees, dated January 12, 2024, attached and incorporated herein as **Exhibit B**.

7.     The Debtor has appealed the Judgment terminating his State Court case and awarding attorneys' fees and costs to the Colorado Court of Appeals in Court of Appeals Case No. 2024CA265.  The Debtor has also appealed three other orders entered by the State Court in Court of Appeals Case No. 2023CA891.

8.     Early in the Debtor's bankruptcy case, Ringba filed its *Ex Parte* Motion for Order Authorizing Rule 2004 Examination of Debtor DNC and TCPA List Sanitizer, LLC and Cashyew Holding (the "2004 Motion").  *See* Docket No. 22.  The Court granted the 2004 Motion on May 31, 2024.  *See* Docket No. 24.  The Debtor has provided a relatively small amount of the information requested by Ringba and has so far not sat for its Rule 2004 Examination.

9.     On June 26, 2024, JP Morgan Chase Bank, N.A. ("JP Morgan") filed its Notice of Non-Consent to Debtor's Use of Cash Collateral (Docket No. 50) indicating that JP Morgan claims a properly perfected security interest in all of the Debtor's assets (a blanket line) and that it did *not* consent to the Debtor's use of its Cash Collateral absent express agreement or subsequent Court order.

10.     On July 9, 2024, the Debtor filed its untimely Pre-Status Conference Report (Docket No. 55) (the "Report").  The Report indicates, *inter alia*, that "Mr. and Mrs. O'Hare receive a draw each month in the appropriate [sic] sum of $20,000 each.  Cashyew Holdings, LLC is separately paid a management fee (based on certain percentages of revenue) and receives approximately $50,000 per month from the Debtor."  Report, ¶ 15.

11.     On July 10, 2024, the Debtor filed its Debtor's Motion to Assume Management Agreement with Cashyew Holdings, Inc. (Docket No. 58) (the "Motion to Assume").  The

4

Motion to Assume sought Court approval to assume a Management Services Agreement (the "Agreement") between the Debtor and Cashew under which the Debtor would pay Cashew a 60% management fee (of Debtor's gross revenues) on a monthly basis. Ringba, JP Morgan and the United States Trustee have all objected to the Motion to Assume (Docket Nos. 88, 100 and 102).

12.     On June 11, 2024, the Court convened a Status Conference in the case. *See* Docket No. 65. At the Status Conference, the Debtor indicated it would be seeking an extension of time to file a plan and essentially would be requesting the Court hold its Bankruptcy Case in abeyance to allow the appeal process to play out in the Colorado Court of Appeals. *See also*, Report p. 3, ¶¶ 16-17. At the Status and Scheduling Conference, the Court indicated, *inter alia* that: (i) it would not hold the case in abeyance pending the state court appeals and it had already concerns about the case; (ii) it was going to take much work for the Debtor to get the case in compliance with code requirements; and (iii) that the Debtor would have a "short chain" to ready its case for confirmation.

13.     Since the Status Conference, the employment of Debtor's counsel has been challenged pursuant to Section 327(a), as well as counsel's ability to be employed as malpractice and/or appellate counsel in Colorado state courts. *See* Docket Nos. 49, 82, 114.

14.     On August 9, 2024, Allen & Vellone Wolf Helfrich & Factor, P.C. ("Allen & Vellone"), a prepetition creditor owed $62,021 by the Debtor, assigned its Proof of Claim No. 4 to Michael O'Hare. Mr. O'Hare then apparently paid the Allen & Vellone prepetition claim. *See* Docket No. 115. On August 15, 2024, the Court entered an Order employing Allen & Vellone as special litigation counsel. *See* Docket No. 125.

126054819.2

15.     On August 14, 2024, Debtor filed its Subchapter V plan pursuant to Section 1189(b) (the "Plan").  *See* Docket No. 123.  The Court has set a confirmation hearing for October 3, 2024.  *See* Docket No. 127.

16.     The Plan, as it relates to Ringba, indicates that any amounts reserved for Ringba will be "escrowed" by the Subchapter V trustee pending the resolution of the two appeals and Ringba will receive nothing during the pendency of the Plan.  *See* Plan, pp. 4-5.

### ARGUMENT

**A.     Cause Exists to Convert This Case to a Chapter 7 Case**

17.     Section 1112 of the Bankruptcy Code governs the dismissal or conversion of Chapter 11 cases.[1]  Section 1112(b)(1) provides, in relevant part:

> Except as provided in paragraph (2) and subsection (c), on request of a party in interest, and after notice and a hearing, the court shall convert a case under this chapter to a case under chapter 7 or dismiss a case under this chapter, whichever is in the best interests of creditors and the estate, for cause unless the court determines that the appointment under section 1104(a) of a trustee or an examiner is in the best interests of creditors and the estate.

11 U.S.C. § 1112(b)(1).  Section 1112(b) provides that if cause is established by the movant, "the Court *shall* convert or dismiss, unless there are 'unusual circumstances' that establish that such relief is not in the best interest of creditors and the estate."  *In re Whetten*, 473 B.R. 380, 382 (Bankr. D. Colo. 2012); *In re Muth*, 2014 WL 1712527, at *8 n.29 (B.A.P. 10th Cir. May 1, 2014) ("The 2005 amendments made dismissal or conversion mandatory upon a showing of cause"); *In re Brutsche*, 476 B.R. 298, 306 (Bankr. D.N.M. 2012 ("[W]ith one exception, the Court must convert or dismiss the chapter 11 case (or appoint a trustee or examiner) if it finds ... that there is cause to do so.").  "Although a finding of unusual circumstances is within the court's

---

[1]  Because Section 1104 does not apply in a subchapter V case, the Court has no power to appoint a chapter 11 trustee or an examiner in this case.  Therefore, the Court is restricted to converting or dismissing this case under § 1112(b).  *In re M.A.R. Designs & Construction, Inc.*, 653 B.R. 843, 854 (Bankr. S.D. Tex. 2023).

discretion, the word 'unusual' contemplates facts that are not common to chapter 11 cases generally." 7 Collier on Bankruptcy ¶ 1112.05[2] (16th ed. rev. 2011). Moreover, "[t]he statute is explicit that the Court may not rely on unusual circumstances to refuse to convert or dismiss if it finds cause under § 1112(b)(4)(A)." *In re Brutsche*, 476 B.R. at 306; *In re Morreale v. 2011-SIP-1 CRE/CADC Venture, LLC*, 533 B.R. 320, 322 (D. Colo. 2015).

18.     Section 1112(b)(4) provides a non-exhaustive list of sixteen factors from which the Court may find a showing of "cause" for purposes of paragraph (b)(1).  *See Hall v. Vance*, 887 F.2d 1041, 1044 (10th Cir. 1989) (stating list of enumerated grounds is not exclusive); *In re Muth*, 2014 WL 1712527, at *8 n.29 ("[Section 1112(b)(4)] sets forth non-exclusive grounds for cause."); 7 Collier on Bankruptcy, ¶ 1112.04[6], at 1112-27 (16th ed. rev. 2011) ("Courts that have analyzed section 1112(b)(4) almost unanimously conclude that the list of the items that constitutes cause is not exclusive….").

19.     As applicable to the Debtor's Bankruptcy Case, cause includes, but is not limited to, the Debtor's: (i) bad faith State Court litigation conduct and bankruptcy filing to avoid funding a supersedeas bond relating to two appeals; (ii) unauthorized use of cash collateral; (iii) unauthorized pre and postpetition payments to the O'Hares and Cashyew that have led to a substantial and continuing diminution of the estate; (iv) failure to file complete and accurate monthly operating reports; (v) failure to file a plan that has a reasonable prospect of being confirmed in a reasonable amount of time; and (vi) the Debtor's principals conflicts of interest in investigating and pursuing possible preference and fraudulent conveyance claims against themselves and Cashyew.

**B.      Debtor's Bad Faith State Court Litigation Conduct and Filing to Avoid Funding a Supersedeas Bond Constitute Cause for Conversion to Chapter 7**

20.     The filing of a Chapter 11 petition for bankruptcy can constitute bad faith justifying conversion to Chapter 7. *See In re Hyatt,* 479 B.R. 880, 897 (Bankr. D.N.M. 2012). Specifically, where the debtor files a bankruptcy petition as a substitute to posting a supersedeas bond on appeal in other litigation, and the debtor then fails to "mov[e] forward in good faith to confirm and implement a plan" in its bankruptcy case, the debtor's conduct constitutes bad faith justifying conversion or dismissal. *Id.* For example, in *Paolini*, where a debtor: filed for bankruptcy instead of posting a supersedeas bond; demonstrated a lack of sincerity in undertaking reorganization efforts; failed to reduce expenses during bankruptcy; and did not operate a business that would be disrupted by dismissing the bankruptcy case, the court held that the case had been filed in bad faith. *In re Paolini*, 312 B.R. 295, 308–9 (Bankr. E.D. Va. 2004). Some courts have also held that such conduct constitutes bad faith even where the debtor lacks "sufficient assets to post a bond…." *See, e.g., In re Wally Findlay Galleries (New York), Inc.,* 36 B.R. 849 (Bankr. S.D.N.Y. 1984) (dismissing case for cause in part because debtor used bankruptcy "as a litigating tactic" and "a substitute for a supersedeas bond of state court proceedings.").

21.     In addition to these considerations, the U.S. Bankruptcy Court for the Central District of California has enumerated several bad faith factors when a bankruptcy case is used as a substitute to posting a supersedeas bond, including:

> "Whether the debtor intends to pursue an effective reorganization within a reasonable period of time, or whether the debtor is unwilling or unable to propose a meaningful plan until the conclusion of the litigation;"

> "Whether the debtor has relatively few unsecured creditors, other than the holder of the adverse judgment;"

126054819.2

"Whether the debtor acted in good faith to exhaust all efforts to obtain a bond to stay the judgment pending appeal;" and

"Whether assets of the estate are being diminished by the combined ongoing expenses of the debtor, the chapter 11 proceedings, and prosecution of the appeal."

*In re Mense*, 509 B.R. 269, 279–81 (Bankr. C.D. Cal. 2014) (internal citations removed) (setting forth seven factors for a court's good faith determination "[w]hen a debtor files chapter 11 to dodge the requirement for an appeal bond….").[2]

- **Debtor Has Demonstrated a Lack of Sincerity in Undertaking Reorganization Efforts**

22.     Here, while waiting for the outcome of its appeals, the Debtor has demonstrated a lack of sincerity in undertaking reorganization efforts. The Debtor's lack of sincerity, includes, but is not limited to:

a.     The Debtor's initial schedules were deficient, including lacking separate "spreadsheets" for payments, distributions, or withdrawals credited or given to insiders and listing several creditors as being owed "unknown" amounts. *See* Docket No. 1.

b.     The Debtor filed deficient operating reports for the months of June and July 2024. *See* Docket Nos. 91, 130. The June report is missing Exhibits B (explanation of non-debtor-in-possession bank account), C (cash receipts), D (cash disbursements), and F (receivables). Despite being alerted to these deficiencies, the July report is still missing Exhibits B and F.

---

[2] Other factors identified by the *Mense* Court include: "Whether the debtor is a viable business which would suffer severe disruption if enforcement of the judgment was not stayed; and the chapter 11 petition was filed to preserve its status as an ongoing concern and to protect its employees and creditors; …Whether the debtor had financial problems on the petition date, other than the adverse judgment; … [and] Whether the debtor has sufficient assets to post a bond to stay the judgment pending appeal…." *Mense*, 509 B.R. at 280.

126054819.2

c.  As described elsewhere herein, the Debtor's monthly operating reports reflect various and substantial unexplained cash payments to insiders and others. *See* Docket Nos. 91, 91-1, 91-2, 130, 130-1.

d.  The Debtor's Schedules include relatively few unsecured creditors, and those creditors that are disclosed (with two exceptions) solely relate to the litigation with Ringba.

e.  The Debtor filed an Amended Schedule A/B but failed to file a notice of amendment or serve the amended schedule of the affected parties. Docket No. 62.

f.  The Debtor has failed to fully comply or otherwise respond to Ringba's requests for production of documents. *See* Docket No. 22.   Indeed, the Debtor provided only a relatively small amount of the information requested, instead providing only what it wanted to provide and not what is was directed to provide.  The Debtor has yet to sit for its Rule 2004 examination, which was cancelled at the Debtor's request because Mr. O'Hare supposedly fell ill immediately prior to the examination.  The Rule 2004 examinations of the Debtor and Cashyew have been reset for September 25-26, 2024.

g.  The Debtor filed an *Ex Parte* Motion for Order Authorizing Rule 2004 Examination of Creditor Ringba's Agents Adam Young and Harrison Gurvitz. Docket Nos. 135, 135-1. That motion and its exhibit contained highly confidential information subject to an "attorney's eyes only" designation and a stipulated protective order between the Debtor and Ringba in State Court Litigation. *See* Docket Nos. 135, 135-1. This appears to be

126054819.2

nothing more than an attempt to leverage the Debtor's position in resisting and preventing the oral examinations of Cashyew and the Debtor, through their principals. Ringba was forced to file an emergency Motion to Seal, which the Court granted. Docket Nos. 137, 138.

23.     The above noted deficiencies and behavior are particularly relevant in the Subchapter V context where the case "is meant to proceed quickly to confirmation and rehabilitation." *In re Landau*, No. 20-21114-11, 2022 WL 4647473, at \*5 (Bankr. D. Kan. Sept. 30, 2022) (converting a Subchapter V case to Chapter 7 in part because "[the debtor] or his counsel never gave the case the time or attention it deserved" while attempting to confirm a plan).

24.     Additionally, the Debtor's conduct is consistent with its admission in its Status Report to this Court that its "preference … [was] not to file a plan of reorganization **but to seek a stay of this bankruptcy pending the outcome of the appeal or the alleged legal malpractice case against Tucker and Cohen.**" Report, ¶ 16. By Debtor's own admission, this Bankruptcy Case serves the sole purpose of allowing the appellate process to play out while relieving Debtor of having to post a supersedeas bond. Rather than "proceed[ing] quickly to confirmation and rehabilitation," it is apparent Debtor would prefer to use Subchapter V bankruptcy as a tool in litigation and not for its intended purpose. *Landau*, 2022 WL 4647473, at \*5. *See also Paolini*, 312 B.R. at 309 (where the debtor's bad faith conduct demonstrated a "lack of intent to seriously reorganize and speaks volumes of [the debtor's] true purpose of utilizing this proceeding not as an honest attempt to reorganize his debt but simply as an extension of [] litigation tactics in the Idaho Litigation."). Moreover, the Plan that was filed by the Debtor will not pay Ringba, but instead will hold any payments in "escrow" pending the outcome of all

appeals in the matter. *See* Plan, pp. 4-5. Essentially, the Debtor is using its Bankruptcy Case as a supersedeas bond without posting one.

25.     In short, the Debtor seeks to "avoid the consequences of adverse state court decisions while it continues litigating." *Wally Findlay*, 36 B.R. at 851. As in *Wally Findlay*, this Court "should not … act as a substitute for a supersedeas bond of state court proceedings." *Id.*[3] The Debtor's Case should be converted to a Chapter 7 case.[4]

- **<u>Debtor's Recently Filed Plan Further Demonstrates a Lack of Sincerity in Undertaking Reorganization Efforts</u>**

26.     Additionally, the Debtor's desire to avoid posting a supersedeas bond is underscored by its proposal of a plan of reorganization contingent on the <u>conclusion of litigation</u> with Ringba. *See Paolini*, 312 B.R. at 309-10 ("The Plan proposed by [the debtor] also betrays the lack of serious commitment to reorganize. **[The debtor's] Plan is largely predicated on his speculation that he will … succeed in reversing the District Court in the Idaho Litigation**…. For these small and presumptively relatively painless [bond] payments, [the debtor] seeks to be able to continue his litigation with [the judgment creditors] **without any risk of enforcement of [the creditors'] judgment in the interim**. … [T]he Court is confronted with [the debtor's] attempt to continue the appeal of the Idaho Litigation in a manner contrary to the conditions imposed by the District Court and to postpone any material effort to reorganize until he has had

---

[3] Although it is unclear whether Debtor here could have paid the judgment at the time of its bankruptcy petition, the *Wally Findlay* Court explained that an inability to post a bond pending appeal in fact *reveals* a judgment debtor's motivations in bankruptcy—to avoid the consequences of an adverse state court decision. *Wally Findlay*, 36 B.R. at 851. In any event, the Debtor's projected gross revenues of $1,200,000.00 or more annually contradict any contention that it would have been unable to make payments on a supersedeas bond. *See* Docket No. 123-1.

[4] In addition to these considerations, a threshold matter for determining whether a Debtor's bankruptcy petition was filed in good faith is whether the filing serves a "valid bankruptcy purpose" or whether the case is "filed merely to obtain a tactical litigation advantage." *See In re LTL Management, LLC*, 64 F.4th 84, 100-101 (3rd Cir. 2023). Here, it is apparent the Debtor seeks only the benefit of the automatic stay and not a valid bankruptcy purpose.

the benefit of a stay of [the judgment creditors'] collection efforts without any material financial sacrifice." (Emphasis added)).

27.     Here, the Debtor's proposal for satisfying Ringba's claim is to hold monthly payments in escrow with the Subchapter V trustee until the Debtor's appeals have been fully and finally resolved (which could be years). Meanwhile, without having to pay these litigation-related claims, the Debtor gets to "postpone any material effort to reorganization … [with] the benefit of a stay" of Ringba's collection efforts. *Paolini*, 312 B.R. at 310. This is not a plan of reorganization, but a bad faith plan of litigation.

28.     The Plan is deficient in other respects, as discussed in Section D of this Motion. Namely, the Plan contains prohibited gerrymandered classifications of similarly situated unsecured claims, shows unauthorized transfers to individual creditors, is missing key exhibits that would supposedly support the feasibility of the Plan, and lacks appropriate remedies in the event of default. *See* Plan, pp. 4-5, 7-10. Debtor's Plan is yet another reflection of its lack of sincerity in this Bankruptcy Case and its true purpose of suspending any obligations to post a supersedeas bond while its appeals against Ringba proceed.

● **Debtor Has Relatively Few Unsecured Creditors, and All Debts Other than JP Morgan and American Express Relate to the State Court Litigation**

29.     The Debtor has relatively few unsecured creditors. Other than JP Morgan and American Express, the four other debts owed by the Debtor arise out of the State Court Litigation, judgment, and/or appeal. *See* Docket No. 123, pp. 4-5. In addition to Ringba and American Express, Debtor's other unsecured creditors are Allen & Vellone (its recently appointed appellate counsel), Gary Tucker (Debtor's trial counsel), and Jeffrey Cohen (Debtor's other trial counsel). *Id.* On its face, Debtor's Bankruptcy Case and Plan are about the non-

bankruptcy litigation and appeals. The relatively few creditors and make-up of Debtor's creditors further reveals its bad faith and justifies conversion to Chapter 7.

- **Debtor Did Not Exhaust All Efforts to Obtain a Bond to Stay the Judgment Pending Appeal**

30.     The Debtor, through its counsel at the Status and Scheduling hearing held on July 11, 2024, in response to the Court's question regarding whether the Debtor attempted to obtain a supersedeas bond, noted that the Debtor had attempted to do so, but could not because the bonding entity wanted Mr. O'Hare's house as collateral.  However, this is no excuse for failing to obtain a bond. *See Mense*, 509 B.R. at 283 (where debtor failed to demonstrate evidence that it had taken specific efforts to search for and obtain a bond before or after commencement of bankruptcy case and the debtor was "unwilling to borrow against his real estate investments or to liquidate any portion of his real estate holdings to provide the additional cash necessary to obtain an appeal bond"). Further, there is no evidence that the Debtor had made "**every effort** to post security during [its] appeal, but so far remains unsuccessful." *In re Dilling*, 322 B.R. 353, 362 (Bankr. N.D. Ill. 2005) (emphasis added). The Debtor has apparently only once tried to obtain a bond and has never made a good faith effort to obtain one, *i.e.,* by putting up the house as collateral. This fact demonstrates further bad faith and requires conversion to Chapter 7 in this case.

- **Debtor's Payments to the O'Hares and Cashyew Are Diminishing Estate Assets**

31.     A large percentage of the Debtor's monthly income is being siphoned from the Debtor to pay the O'Hares and Cashyew for unknown activities. For instance, pursuant to the Status Report, Mr. and Mrs. O'Hare each receive monthly payments of $20,000. Report, ¶ 15. In addition, another $50,000 per month is paid to Cashyew as a "management fee." *Id.* And in July

126054819.2

2024 alone, Cashyew received $85,948.60. *See* Docket No. 130-1, p. 3. But Cashyew is an entity wholly owned by Mr. and Mrs. O'Hare. It is unclear how Cashyew's "management" responsibilities differ from the O'Hares' management of the Debtor. Report at ¶8. Thus, based on the foregoing, there is at least $90,000 going to the Debtor's principals each month for unknown purposes—and likely more than that amount, based on the Debtor's most recent Monthly Operating Report.

32.     The Debtor has also reported approximately $93,000 and $107,199.00 in "Total Cash Disbursements" for June and July 2024 respectively. *See* Docket Nos. 91, p. 2; 130, p. 2. No explanation has been provided as to whether these amounts include or are in addition to the distributions to Debtor's principals each month. Given that the Debtor's Plan reports assets in the amount of only $99,141.00, these unauthorized payments are dissipating assets that could be used to pay to creditors, including Ringba. *See* Plan, p. 5. *See also Paolini*, 312 B.R. at 309 (explaining that evidence of the debtor's failure to reduce expenses to facilitate payment of creditors added to finding of bad faith); *see also Mense*, 509 B.R. at 208-9 (finding bad faith in part because "the assets of each bankruptcy estate are being diminished by the combined ongoing expenses of the Debtors, the chapter 11 cases, and the cost of the appeal."). Thus, immediate conversion to Chapter 7 is justified here where the Debtor's assets are at risk of being completely depleted.

33.     At end, the Debtor's unveiled strategy in this Case is to use the automatic stay to avoid posting a supersedeas bond while it litigates and appeals adverse judgments against it. The Debtor's failure to seriously prosecute its Bankruptcy Case and the structure of its Plan reveal the Debtor's ultimate motivation: to avoid posting a supersedeas bond while continuing to pursue

its appeals against Ringba. This constitutes bad faith and Debtor's Bankruptcy Case should be converted to Chapter 7.

**C.    The Debtor Continues to Use Cash Collateral Without Consent and Without Authorization from This Court**

34.    Section 1112(b)(4)(D) provides that the "unauthorized use of cash collateral substantially harmful to 1 or more creditors" constitutes cause for conversion or dismissal. A key responsibility of the Debtor "attendant to its status" is to <u>avoid</u> using cash collateral of the estate, unless authorized by the court or consented to by "each entity that has an interest in such cash collateral…." 11 U.S.C. 363(c)(2)(A). *In re Three Partners, Inc.*, 199 B.R. 230, 237 n.9 (Bankr. D. Mass. 1995). Failure to do so—"in conjunction with the viability of a Chapter 11 case or the continuation of the debtor in possession"—may constitute cause for dismissal or conversion. *Three Partners*, 199 B.R. at 237 n.9; *see also In re Hewett*, 32 B.R. 605, 606–7 (Bankr. W.D. Wash. 1983) (where court in part converted case to Chapter 7 because debtor had "used cash collateral in total disregard of Section 363(c)(2) …").

35.    Here, JP Morgan asserts a perfected blanket security interest in all the Debtor's assets.  JP Morgan has not consented to the use of its cash collateral and the Debtor has not sought approval from this Court to use cash collateral.  Nevertheless, the Debtor has made and continues to make payments in the amount of approximately $90,000 per month to its principals and insiders, Mr. and Mrs. O'Hare. *See* Report, ¶ 15. (In July, the Debtor paid $85,948.60 to Cashyew alone. Docket No. 130-1, p. 3.) This constitutes an unauthorized use of cash collateral.

36.    Additionally, the Debtor's monthly operating reports reveal other unexplained payments and transfers. *See* Docket No. 91. For example, Debtor's bank statements show various unexplained payments. These payments are made from JP Morgan's cash collateral without their consent.

126054819.2

37.     Also, Mr. O'Hare has personally paid the Debtor's debt to Allen & Vellone and is "in the process of paying American Express in full." Plan, p. 5. The Allen & Vellone debt repayment was facilitated by Allen & Vellone "assign[ing] its Proof of Claim to Michael O'Hare," after which Mr. O'Hare personally satisfied this prepetition debt.  Docket No. 120, ¶ 6. It appears highly likely that Mr. O'Hare satisfied the Allen & Vellone debt with monies he received from the Debtor and absent consent of JP Morgan or the Court. The Debtor and Mr. O'Hare now intend to repay American Express's prepetition debt outside of the bankruptcy process, as well. *See* Plan, p. 5. Though unclear, these transfers appear to constitute further unapproved and unconsented to uses of cash collateral.

38.     Finally, the Debtor filed an *Ex Parte* Motion to Approve Stipulated Final Cash Collateral Agreement without noticing all creditors and parties in interest. Docket No. 134. This motion appears to be an end-run around the three objections lodged against Debtor's Motion to Assume Management Agreement with Cashyew Holdings, Inc. at Docket No. 58. *See* Docket Nos. 88, 100, 102. In other words, the *Ex Parte* Motion is an attempt by the Debtor to slip by the requirements of bankruptcy and to assume a contract not approved by this Court. The Court denied the Debtor's motion because such relief cannot be granted *ex parte*. Docket No. 139.

39.     Although a Debtor's use of cash collateral is not a *per se* reason to dismiss or convert the bankruptcy case, a Debtor's refusal or failure to <u>account</u> for the unauthorized use of cash collateral or to subsequently and proactively seek authority from the Court can constitute cause to convert or dismiss. *See In re Bowers Inv. Co., LLC*, 553 B.R. 762, 771–773 (Bankr. D. Alaska 2016). Here, the Debtor has made absolutely no effort to seek authorization for its use of cash collateral. In fact, JP Morgan filed a notice expressly stating its opposition to any use of

126054819.2

cash collateral in this bankruptcy case and requested that the Debtor segregate and account for all post-petition cash collateral. *See* Docket No. 50.  Debtor has failed to do so.

**D.      Debtor's Plan Does Not have a Reasonable Prospect of Being Confirmed in a Reasonable Amount of Time**

40.      It is additionally appropriate for this Court to convert Debtor's Case to Chapter 7 because of the serious deficiencies in Debtor's proposed Plan. Generally, "Section 1112(b)(4)(J) may provide relief where a debtor fails 'to make meaningful and substantive progress toward the confirmation of a plan within the time periods fixed by the Bankruptcy Code and any court orders[.]'" *M.A.R. Designs*, 653 B.R. at 863 (quoting *In re Babayoff*, 445 B.R. 64, 64, 79 (Bankr. E.D.N.Y. 2011)).

●      **Debtor's Plan Is Not Feasible Under Section 1191(c)(3)**

41.      As a threshold issue, Ringba (and likely others) will object to the Debtor's Plan. Accordingly, the Debtor must satisfy the requirements of a nonconsensual Subchapter V plan under Section 1191. One requirement of a nonconsensual or "cramdown" Subchapter V plan is that it is "feasible" under Section 1191(c)(3). *See In re Curiel*, 651 B.R. 548, 561 (B.A.P. 9th Cir. 2023) ("[Section 1191(c)] sets forth the three minimum requirements a subchapter V cramdown plan must meet to be considered 'fair and equitable.' … [Section 1191(c)(3)] requires a harder look at feasibility than otherwise conducted under [Section] 1129(a)(11) alone.").

42.      The Debtor has failed to address Section 1191(c) in its Plan. First, Debtor has not established that it <u>will</u> make all payments under its Plan. *See* 11 U.S.C. § 1191(c)(3)(A). The Debtor states that its performance projections—consisting of $1,200,000.00 in sales in the first year, growing by 3.5% each year thereafter—are based on its "performance over the past few years, a summary of which is attached hereto as Exhibit B." Plan, p. 9; Docket No. 123-1. **No Exhibit B is attached or otherwise included with the Debtor's Plan**. The Debtor's failure to

provide any basis for the contention that its future sales will total more than $1,200,000.00 on an ongoing annual basis is fatal to confirmation of the Plan. Creditors have no reason to conclude that these projections are based on a reasonable performance history and thus the Debtor has failed to show that it "will" make all payments, per Section 1191(c)(3)(A).

43.     Additionally, the Debtor's discussion of the feasibility of its Plan discusses *only* American Express and no other creditors. *See* Plan, p. 9. Specifically, the Plan states that "[t]he Debtor has based payments to Class 4 Unsecured Creditors on Gross Revenue," which includes only American Express (as, apparently, Allen & Vellone has already been paid outside the bankruptcy process by the Debtor's principal). *Id*. Although the feasibility of the Plan is contingent on payment to *all* creditors, the Debtor fails to even mention JP Morgan, Ringba, Gary Tucker, or Jeffrey Cohen in its discussion of the Plan's feasibility. *Id.* at pp. 9-10. Again, this complete disregard for accounting for Debtor's ability to pay back *all* its creditors cannot form the basis of a feasible Plan.

44.     Because the Debtor has not satisfied the difficult standard of showing it *will* make all projected payments, it must show it has a reasonable likelihood of making payments and that the Plan provides appropriate remedies. *See* § 1191(c)(3)(A). As a threshold issue, the Debtor has not even shown that it is *reasonably* likely to make all payments under the Plan. The Plan effectively asks the Court and the creditors to trust that the Debtor's net income projections—without any evidence—are based on sustainable previous performance. As above, even if these projections are taken as reasonable, the Debtor has failed to explain how it will pay back *all* its creditors. The Debtor's Plan is not feasible because it is not even reasonably likely that the Debtor will make all projected payments.

45.      But, even if the Plan demonstrated that the Debtor is reasonably likely to make all projected payments, Debtor's Plan must also provide appropriate default remedies to creditors. It does not. Instead, the Plan merely points creditors to default remedies already available under the law. *See* Docket No. 123, p. 12, ¶ 11.7 ("Upon the Debtor's failure to cure the default …, the creditor may proceed to exercise their rights and remedies **under applicable State and Federal Law**, including seeking to enforce the terms of the Plan or conversion of the Debtor's case to a case under Chapter 7." (Emphasis added)). This type of default provision is insufficient in Subchapter V plans. *See In re Channel Clarity Holdings LLC*, No. 21BK07972, 2022 WL 3710602, at *16 (Bankr. N.D. Ill. July 19, 2022) (stating that appropriate remedies must offer "specific protections for unsecured creditors who are forced to forgo some of the standard protections of a typical chapter 11 case when debtors elect to proceed under subchapter V. To assert that creditors can pursue remedies under applicable law if [a debtor] should default is a toothless remedy."); *see also In re McBride*, 2023 WL 8446205, at *6 (Bankr. D. Me. Dec. 5, 2023) ("Merely providing creditors with the opportunity to pursue their state law rights or to seek enforcement of a plan is insufficient.").

46.      Thus, in addition to failing to address the proper feasibility standard for non-consensual Subchapter V plans, Debtor's plan is not feasible because it has provided absolutely no basis for its projections, outside of pure assertions in the Plan. Debtor has not shown it will make payments or that it is reasonably likely to make payments under the Plan, and the Plan in any event lacks appropriate remedies. These apparent deficiencies in the Debtor's Plan further justify conversion of this Case to a Chapter 7 case.

126054819.2

- **<u>Debtor's Plan Demonstrates Bad Faith Creditor Class "Gerrymandering"</u>**

47.    Debtor's Plan also contains prohibited and bad faith creditor class "gerrymandering." In order for the Debtor's Plan to be confirmed, it must satisfy the requirements of Section 1191(a) (governing Subchapter V plan confirmation), which in turn incorporates the requirements of Section 1129(a), governing Chapter 11 plans in general ("The court shall confirm a plan under this subchapter only if all the requirements of section 1129(a), other than paragraph (15) of that section, of this title are met."). To that end, Section 1129(a)(10) requires for confirmation that "at least one class of claims that is impaired under the plan has accepted the plan…." However, Section 1122(a)[5] **prohibits** separately classifying **similar claims** in order to artificially "gerrymander" a consenting impaired class of creditors. *In re Autterson*, 547 B.R. 372, 397 (Bankr. D. Colo. 2016) (quoting *In re Deming Hosp., LLC*, No. 11-12-13377 TA, 2013 WL 1397458, at *2 (Bankr. D.N.M. Apr. 5, 2013)) ("The 'main judicial gloss on § 1122(a) is that the subsection prohibits a debtor from separately classifying similar claims to 'gerrymander' a consenting class.'"). "'If a creditor objects to the classification scheme on gerrymandering grounds, most courts require the plan proponent to justify the classification.'" *Id.* (quoting *In re Rocky Mountain Land Co. LLC*, No. 12-21643 HRT, 2014 WL 1338292, at *15 (Bankr. D. Colo. Apr. 3, 2014)).

48.    In this case, the Debtor is attempting to gerrymander its unsecured creditors in the way prohibited by Section 1122(a). While it is not absolutely clear, it appears that "Class 4 - General Unsecured Claims" (containing only the debts of Allen & Vellone and American

---

[5] "Except as provided in subsection (b) of this section, a plan may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests of such class." § 1122(a). Section 1122(b) states that: "A plan may designate a separate class of claims consisting only of every unsecured claim that is less than or reduced to an amount that the court approves as reasonable and necessary for administrative convenience." The Plan does not state that the gerrymandered classification of Debtor's general unsecured creditors is for the purpose of "administrative convenience." In other words, the statutory exception to the prohibition against gerrymandering similarly situated classes does not apply.

Express) is aimed at artificially creating an impaired class of "creditors" that will vote for Debtor's Plan and satisfy Section 1129(a)(10). However, "Debtor's principal has personally paid Allen & Vellone … in full and is in the process of paying American Express in full." Plan, p. 4. Meanwhile, the Debtor has inexplicably separated its three other general unsecured creditors (whose debts all related to the State Court Litigation) into separate "classes," even though each "class" contains a single similar unsecured claim (Ringba, Gary Tucker, and Jeffrey Cohen, respectively). *See* Plan, pp. 4-5. Unlike Class 4, these other classes lack an arrangement through which the Debtor's principal would (without authorization) personally pay off the creditors prior to the Plan's effective date. *See id.* Presumably, the same would lead the impaired "Class 4" to approve Debtor's Plan, over the possible objections of similarly situated creditors. This constitutes bad faith and improper gerrymandering.

49.     Debtor has not provided any reasonable basis for classifying its similarly situated unsecured creditors in this way and the same unfairly discriminates against unsecured creditors by attempting to avoid the requirements of Sections 1129(a)(10) and 1122(a). Importantly, this conduct is not only statutorily prohibited but also constitutes bad faith in the context of other conduct related to the prosecution of this bankruptcy case. *See Autterson*, 547 B.R. at 402 ("[T]he Debtor's prosecution of the Debtor's Fourth Plan, alone, demonstrates bad faith conduct. … [T]he entire premise of the Debtor's Fourth Plan is an improper gerrymander. By knowingly misrepresenting the number of claimants in Class 6, the Debtor attempted to create the impression that there existed a basis for an administrative convenience class when, in fact, there was no such basis. Then, the Debtor used his own law firm to manufacture the only alleged impaired accepting class so that he could claim that the Debtor's Fourth Plan was confirmable. **Prosecution of the case under these circumstances circumvents the purposes of the**

**Bankruptcy Code and constitutes bad faith**." (emphasis added)). Here, even if Debtor's class gerrymandering were somehow consistent with Section 1122(a) (which it is not), this conduct also constitutes bad faith supporting conversion to a Chapter 7 case.

- **Debtor's Plan for Repayment of Ringba's Claim Is Inadequate**

50.     Finally, and relatedly, as it concerns Ringba's unsecured claim specifically, the Plan is woefully inadequate.  First, the Plan *tentatively* proposes to pay Ringba's claim over five years <u>without interest</u>. Docket No. 123, p. 8 ¶ 6.5.  As set forth below, pursuant to the Plan, it is not at all clear whether Ringba will be paid under the Plan as the Debtor in one place indicates it will pay Ringba, but alternatively, indicates that Ringba may not be paid.  Also, under applicable non-bankruptcy law, Colorado issued judgments accrue interest "at the rate of eight percent per annum compounded annually…." C.R.S. § 5-12-102(1)(b). The Plan contains no explanation or justification for why interest is not being paid as required by Colorado law.

51.     Second, the Plan classifies Ringba's claim as "disputed" and proposes to repay Ringba's debt to an escrow account controlled by the Subchapter V trustee, *not* directly to Ringba. *See* Plan, p. 8. Debtor provides no basis for its proposal not to pay Ringba directly. Ringba's claim is listed as "disputed," but nevertheless is in fact the result of a valid state court judgment that the Debtor has appealed and will continue to appeal. The Plan provides no explanation for why payment to Ringba should be deferred and "escrowed," *especially without the Debtor posting a supersedeas bond*. The Debtor apparently will only *begin* making payments to Ringba itself once Ringba succeeds on appeal. *See id.* The Plan is purposely vague about the mechanism and timing allowing for the Subchapter V trustee to actually pay Ringba after resolution of the appeal. *See id.* at p. 4 (In the Plan Overview, Debtor states only that "[u]pon a final resolution of the appeal, all funds in escrow will be returned to the Debtor, assuming Debtor

126054819.2

prevails." This section does not mention what will happen if Ringba prevails.), 8 (The Plan further explains that "[i]f the judgment in favor of Ringba is affirmed, debtor will pay its claim in full over 5 years without interest." This proposed payment process is unclear and unacceptably fails to specifically propose or allow for the Subchapter V trustee to start making payments to Ringba directly.). In short, the Plan's proposal for repaying Ringba is purposely inadequate and without sufficient justification.

52.     In summary, Debtor's Plan—exemplifies its generally unacceptable prosecution of this Bankruptcy Case. The Plan is riddled with deficiencies that prevent it from being reasonably likely to be confirmed within a reasonable amount of time in the context of a Subchapter V case. This is almost assuredly because the Debtor is primarily focused on suspending its financial obligations while pursuing appeals solely against Ringba. This does not constitute a plan of *reorganization*, but instead a plan of litigation.   The Debtor's bad faith requires conversion of this Case to a Chapter 7 case.

**E.     The Debtor Has Grossly Mismanaged the Estate, and the Debtor's Principals Have Conflicts of Interest**

53.     Courts have found gross mismanagement when Debtors "play[] it loose with [their] finances."  *In re Fall*, 405 B.R. 863, 869 (Bankr. N.D. Ohio 2009); *see also In re Gateway Access Sols., Inc.,* 374 B.R. 556, 565–66 (Bankr. M.D. Pa. 2007) (Debtor entered into unauthorized loans on "oral terms").  Courts have tended to look at the Debtor's overall course of conduct to determine whether an estate is grossly mismanaged.  *In re ARS Analytical*, 433 B.R. at 864 ("Each individual [example of mismanagement] may not be significant, but, when taken together, they amount to a gross mismanagement."); *M.A.R. Designs*, 653 B.R. at 857 ("Simple misconduct can collectively demonstrate gross mismanagement of the estate.").

- **Debtor Has Made and Continues to Make Unauthorized Postpetition Transfers**

54.     The Debtor has mismanaged its financial affairs since the Petition Date to a degree that constitutes gross mismanagement.  Most egregious, the Debtor paid approximately $62,000 in prepetition invoices after the Petition Date without Court approval, in violation of Section 549 of the Bankruptcy Code by paying a favored unsecured creditor postpetition. *See* Docket Nos. 120, ¶ 5; 115. Rather than seeking this Court's approval to use cash collateral to pay its prepetition appellate counsel, Debtor entered into a sham transaction through which Allen & Vellone (Debtor's appellate counsel) assigned "[f]or good and valuable consideration" its $62,092.80 debt to none other than Michael O'Hare—Debtor's CEO and principal. *Id.* at ¶6. Mr. O'Hare then apparently "paid the claim in full" (*i.e.*, to his own company). *Id. See also 3868–70 White Plains Rd., Inc.*, 28 B.R. 515, 519 (Bankr. S.D.N.Y. 1983) (where the court in part dismissed bankruptcy case due to postpetition transfers to the debtor's attorney).

55.     Now, the Debtor is apparently attempting to make another unauthorized postpetition transfer to American Express. *See* Plan, p. 4. This conduct demonstrates a "profound disregard for the fiduciary duty owed by this Debtor and jeopardizes the interest of creditors." *In re 239 Worth Ave. Corp.*, 236 B.R. 492, 495 (Bankr. S.D. Fla. 1999) (dismissing case for bad faith conduct of debtor, including unauthorized postpetition transfers for personal purposes). Meanwhile, as discussed elsewhere herein, various other of Debtor's transfers raise further concerns about its management of the estate. *See, e.g.,* Section C of this Motion. In short, there is a bounty of evidence that the Debtor is grossly mismanaging the estate through its unauthorized depletion of its assets.

- **The Debtor Has and Continues to Submit Incomplete and Inadequate Monthly Operating Reports**

56.     The Debtor has twice failed to submit complete and adequate monthly operating reports. *See* Docket Nos. 91, 130. This conduct alone can justify conversion to a Chapter 7 case. *See In re Whetten,* 473 B.R. 380, 384 (Bankr. D. Colo. 2012) ("[F]lagrant disregard of a debtor-in-possession's reporting duties may by itself constitute sufficient 'cause' for dismissal or conversion under §§ 1112(b)(4)(F) & (H)."); *see also In re NRS Properties, LLC*, 634 B.R. 395, 427-28 (Bankr. D. Colo. 2021) ("[T]he lack of timely and accurate Monthly Operating Reports coupled with the Debtor's inexplicable transfer of almost all of the Debtor's income to [a related entity owned by the debtor's sole owner] shows gross mismanagement.").

57.     Specifically, the Debtor's June 2024 operating report fails to include the exhibits required to fully understand Debtor's financial activity. That operating report is still missing Exhibits B (explaining any non-debtor-in-possession bank accounts), Exhibit C (cash receipts), Exhibit D (cash disbursements), and Exhibit F (receivables). *See* Docket Nos. 91, 91-1. Despite the Debtor being alerted to these deficiencies, the July 2024 Report is also lacking Exhibits B and F. *See* Docket Nos. 130, 130-1. These deficiencies are especially relevant where there are significant questions regarding the Debtor's unauthorized postpetition transfers to insiders and unauthorized use of cash collateral. Due to the insufficiency of the reports, the Debtor's creditors and this Court have been deprived of the most basic and primary method for gaining visibility into the Debtor's financial health.

- **The Debtor's Principals Have Significant Conflicts of Interest**

58.     Finally, cause exists to convert this Case to a Chapter 7 case based on the Debtor's principals' significant conflicts of interest.  *See, e.g., In re Pichaco Hills Utility Co.,* 518 B.R. 75, 81-82 (Bankr. D.N.M. 2014) (citing cases where courts have found cause "where

the debtor in possession has a conflict of interest in properly investigating and pursuing potential fraudulent transfers" and concluding that "the Debtor is [not] capable of pursuing estate causes of action in a professional and unbiased manner").

59.     Here, the O'Hares, operating as the Debtor's fiduciary, have significant conflicts of interest in analyzing and potentially bringing conveyance actions against themselves.  The same is true for Cashyew, the Debtor's holding company owned exclusively by the O'Hares. As explained above, significant sums have been transferred from the Debtor to Debtor's principals each month. By their own admission, the O'Hares receive a monthly draw in the amount of $20,000 each and Cashyew is separately paid a "management fee" in the amount of $50,000 per month (or apparently more, as demonstrated by the July 2024 Operating Report). Report, ¶ 15. *See also* Docket 130-1, p. 3. The Debtor has even sought to assume a postpetition "Management Agreement" entered into with Cashyew, which was executed postpetition on June 28, 2024. Docket Nos. 58; 58-1, p. 3. This Management Agreement seeks to disburse sixty percent (60%) of the Debtor's *gross* revenues to Cashyew. Docket No. 58-1, p. 4. (It is not clear if this amount includes or is in addition to the $90,000 monthly already paid to the Debtor's principals.)

60.     In short, in their role as fiduciaries of the bankruptcy estate, the O'Hares have received prepetition and postpetition transfers from the Debtor that benefit themselves rather than the Debtor and its creditors. In this context, Debtor's principals have a serious conflict of interest with the Debtor who, as a fiduciary, should be <u>maximizing</u> value for the estate on behalf of its creditors. Indeed, the Debtor's Plan completely fails to mention or analyze the potential fraudulent conveyance and preference claims against the Debtor's insiders. Plan, pp. 10-11 ("Michael O'Hare and Tania O'Hare are not paid compensation []by the Debtor for purposes of 11 U.S.C. § 1129(a)(5). … The Debtor does not believe there are any avoidance actions in this

case.") Although unclear, it appears the Debtor has both prepetition and postpetition transferred hundreds of thousands of dollars to its insiders without adequate justification. An impartial fiduciary must be appointed to analyze and, if appropriate, sue the O'Hares and Cashyew to recover payments for creditors. The inappropriate and illegal pre and postpetition transfers seem to be completely lost on the Debtor and its fiduciaries.

**F.    There Are No Unusual Circumstances in This Case, and the Best Interests of Creditors Supports Conversion Rather Than Dismissal**

61.    There are no unusual circumstances in this Bankruptcy Case establishing that converting the case is not in the best interests of creditors.[6] Ringba and other similarly situated creditors would be benefitted by preserving what is left of the Debtor's dwindling assets and converting this Bankruptcy Case to Chapter 7 as soon as possible.

62.    There are ample causes for conversion of this Bankruptcy Case. The status quo of the Debtor paying its insiders $90,000 or more per month, its unauthorized postpetition transfers and use of cash collateral, and its general inability to competently manage the estate is grounds for conversion and no unusual circumstances exist.

63.    Finally, the best interests of creditors are served by conversion to Chapter 7 rather than dismissal. Among other things, a Chapter 7 trustee will conduct an objective review of the Debtor's finances and accounting, and especially of the numerous transfers to insiders.

<strong>CONCLUSION</strong>

The Debtor continues to transfer large sums of money to its principals on a monthly basis and to make unauthorized postpetition transfers and use of cash collateral. The Debtor is suffering substantial and continuing losses as a result. Further, it appears the Debtor has only sought bankruptcy to avoid posting a supersedeas bond in its two appeals. The true purpose of

---

[6] The fact that this bankruptcy is governed by Subchapter V as opposed to Chapter 11 in general does <u>not</u> constitute an "unusual circumstance." *See M.A.R. Designs*, 653 B.R. at 871.

Debtor's bankruptcy petition is underscored by the several deficiencies of its Plan and its general failure to competently prosecute this Bankruptcy Case. The Debtor has mismanaged the estate and the Debtor's principals suffer from conflicts of interest.  For these reasons, the Court should grant the Motion and convert this Case to a Chapter 7 Case.

WHEREFORE, Adam Young, Tubmanburg Limited and Ringba, LLC request that the Court enter an Order granting the Motion, converting this Case to a Chapter 7 case, and granting such additional relief as the Court deems proper.

Respectfully submitted this 10th day of September, 2024.

LEWIS ROCA ROTHGERBER CHRISTIE LLP

*s/ Chad S. Caby*
Chad S. Caby, No. 30927
S. Wilson Collins, No. 59504
1601 19th Street, Suite 1000
Denver, CO  80202
Tel:       303-628-9549
E-mail:   ccaby@lewisroca.com
              wcollins@lewisroca.com

*Attorneys for Adam Young, Tubmanburg Limited and Ringba, LLC*

126054819.2

# EXHIBIT A

| DISTRICT COURT, EL PASO COUNTY, COLORADO | |
|---|---|
| Court Address:<br>270 S. TEJON, COLORADO SPRINGS, CO, 80903 | |
| **Plaintiff(s)** TCPA LITIGATOR LIST<br>v.<br>**Defendant(s)** RINGBA LLC et al. | DATE FILED<br>May 12, 2023 6:54 AM<br>CASE NUMBER: 2021CV31668 |
| | ⚠ COURT USE ONLY ⚠ |
| | Case Number: 2021CV31668<br>Division: 22          Courtroom: |
| **Order:Proposed Order re  Forthwith Request for Emergency Hearing** | |

The motion/proposed order attached hereto: ACTION TAKEN.

I have reviewed all pleadings and exhibits filed as of the time of this order, and I have considered the testimony presented at the hearing yesterday.

Defendants renew their motion to terminate the case based on yet more new disclosures, including a screenshot of data in plaintiff's possession plainly showing that Mr. Young had permission to download the list of phone numbers that he downloaded on April 5, 2023. Exhibit 2 to Defendants' reply brief.

I find by a preponderance of the evidence that this data compilation was generated on April 5, 2020 and has been easily accessible by plaintiff since that time. Until after my April 25th, 2023 order imposing sanctions, plaintiff had insisted that there was no such data compilation to show that Mr. Young actually had permission to download the list.

Yesterday, Mr. O'Hare acknowledged that all along (i.e. since April 5, 2020), he and his programmer, Mr. Malosev, have indeed had access to the "back end" of the original website. The court finds that since the end of 2022 defendants have requested access to the back end. The court finds that when plaintiff responded to the requests that it had no such information, its principal, Mr. O'Hare, knew that that was not true.

Plaintiff insists that all defendants had to do was ask for access to the back-end of the website using the right language and they would have had access to all of this information. As part of this argument, plaintiff asserts that defendants may have requested things similar to this information but didn't quite use the right words to make clear to plaintiff that that access to the back end is what defendants wanted.

The court finds that from the beginning of discovery requests, defendants have used broad and all-inclusive terminology to make clear to plaintiff what they were seeking. The court finds that all of the disclosures by plaintiff in the last three weeks should have been turned over in response to the initial requests for production based on those broad requests. More important and much more broadly, plaintiff should have disclosed <u>all</u> of the database that was accessible through the back end of the original website and not just taken a handful of screenshots of that database on the eve of trial.

The court found everything Dr. Gianturco testified to yesterday credible. The court finds based on his testimony that the Exhibit 2 screenshot was indeed a "smoking gun" and that had that exhibit been produced when first requested by defendants, the parties would immediately have turned their attention to plaintiff's backup theory that Mr. Young, in allegedly checking the Terms and Conditions box, explicitly agreed that he would not share the list with anyone else.

It was during Mr. Malosev's testimony at the April 2023 hearing that it became clear to the court that there was a good chance that there was far more evidence in this case than plaintiff had disclosed. Confronted by the fact that Dr. Gianturco was able to download the full list from the website recreation without agreeing to any terms and conditions, Mr. Malosev, while testifying, accessed data that had existed since April 5, 2020 in an attempt to show Mr. Young had not done what Dr. Gianturco had done. The court finds that this live display by Mr. Malosev showed everyone in the courtroom, including plaintiff's counsel, that there was likely far more such data in the case that plaintiff had not disclosed.

The court finds that after the April 2023 hearing, plaintiff's counsel followed up with Mr. Malosev to see what other undisclosed evidence there was at Mr. Malosev's fingertips. The result, in part, was Exhibit B. The court finds that had Mr. Malosev not shown in open court his access to this information, the new disclosures would never have been produced. After

Mr. Malosev's display, the court finds, plaintiff could no longer credibly claim that it had disclosed all relevant evidence in their possession.

Ultimately, the court concludes that from the beginning of this litigation, plaintiff has had ready access to all sorts of data directly relevant to this case that only recently they have begun to release in dribs and drabs. The court finds that Mr. O'Hare and Mr. Malosev completely disregarded their legally required discovery obligations until just recently in an attempt to increase their chances of prevailing at trial.

Faced again with yet more late disclosures, plaintiff asks this court now to focus on just how many times Mr. Young admitted in his interrogatories that he followed the terms and conditions that he had allegedly agreed to.

First, the court finds that Mr. Young used this language in his responses not to admit that he had checked the box indicating that he agreed to be bound by the terms and conditions on the website but to articulate that his downloading of the list on April 5, 2020 was not the result of his "manipulating" the website as alleged by plaintiff.

More significant, the court has zero confidence that plaintiff has disclosed the information in its possession regarding the Terms and Conditions box and whether Mr. Young actually checked that box. Again, had all of the recent disclosures been made when they should have and had Mr. O'Hare acknowledged early on that he and Mr. Malosev had ready access to the back end of the original website six months ago, defendants would have had a much fuller basis from which to probe for evidence directly connected to the Terms and Conditions box that plaintiff now insists is at the heart of this case.

I find that because they did not want to disclose evidence that might have helped defendants, they insisted until only recently that there was no computer evidence in their possession other than the fragments of proprietary code information shared with Dr. Gianturco during his February visit and the generic publicly available source code that plaintiff had used but without any of the uniquely specified configurations of that source code for the website.

Based on the foregoing, the court hereby terminates this case, applying the same standard set forth in its April 25, 2023 sanctions order. The trial set for May 15, 2023 is vacated.

The court fully understands Mr. O'Hare's grievance with Mr. Young's downloading Mr. O'Hare's significant collection of phone numbers and then using that list as part of a brand new, competing business. Nevertheless, in bringing suit, plaintiff was required by law to timely disclose any relevant evidence in its possession, even if that evidence would help the other side. Here, plaintiff and its representatives have, until too late, disregarded that law completely.

The court will entertain a motion for the recovery of fees and costs.

Issue Date:  5/12/2023

WILLIAM B BAIN
District Court Judge

| DISTRICT COURT, EL PASO COUNTY, COLORADO | |
|---|---|
| 270 South Tejon Street<br>Colorado Springs, CO 80903 | |
| **Plaintiff:**<br><br>TCPA LITIGATOR LIST,<br><br>v.<br><br>**Defendants:**<br><br>ADAM YOUNG, an individual, TUBMANBURG LIMITED, a Bahamas corporation a/k/a Ringba, RINGBA, LLC, a Delaware limited liability company. | ▲ **COURT USE ONLY** ▲ |
| | Case No. 2021CV031668<br><br>Division: 9 |
| **[PROPOSED] ORDER RE DEFENDANTS' FORTHWITH REQUEST FOR HEARING REGARDING PLAINTIFF'S CONTINUED VIOLATION OF COURT ORDERS AND DISCOVERY OBLIGATIONS** | |

Defendants' Forthwith Request for Hearing Regarding Plaintiff's Continued Violation of Court Orders and Discovery Obligations is hereby GRANTED.

Upon entry of this Order, Counsel for Defendants shall call the Clerk of the Court for the Court's availability on Wednesday, May 10, 2023 or Thursday, May 11, 2023 to hear argument on this matter via Webex.

SO ORDERED.

_____
District Court Judge

# EXHIBIT B

| DISTRICT COURT, EL PASO COUNTY, COLORADO | |
|---|---|
| Court Address:<br>270 S. TEJON, COLORADO SPRINGS, CO, 80903 | |
| **Plaintiff(s)** TCPA LITIGATOR LIST<br>v.<br>**Defendant(s)** RINGBA LLC et al. | DATE FILED<br>January 12, 2024 11:34 AM<br>CASE NUMBER: 2021CV31668 |
| | ⚠ COURT USE ONLY ⚠ |
| | Case Number: 2021CV31668 |
| | Division: 22          Courtroom: |
| **Order:Proposed Order for Defendants' Motion for Attorney Fees** | |

The motion/proposed order attached hereto: GRANTED IN PART.

I have considered the motion for attorney fees, the response, reply, supplemental brief, along with all exhibits, and the testimony from the September 16, 2023 hearing.

According to C.R.C.P. Rule 37:

"(c)(1) A party that without substantial justification fails to disclose information required by C.R.C.P. 26(a) or 26(e) shall not be permitted to present any evidence not so disclosed at trial or on a motion made pursuant to C.R.C.P. 56, unless such failure has not caused and will not cause significant harm, or such preclusion is disproportionate to that harm. The court, after holding a hearing if requested, may impose any other sanction proportionate to the harm, including any of the sanctions authorized in subsections (b)(2)(A), (b)(2)(B) and (b)(2)(C) of this Rule, and the payment of reasonable expenses including attorney fees caused by the failure."

To determine reasonable attorney fees, a "court makes an initial estimate of a reasonable attorney fee by calculating the lodestar amount. *Tallitsch,* 926 P.2d at 147. The lodestar amount represents the number of hours reasonably expended on the case, multiplied by a reasonable hourly rate. *Id.* The court's calculation of the lodestar amount carries with it a strong presumption of reasonableness. *Id.; see also Hensley v. Eckerhart,* 461 U.S. 424, 433, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983)." *Payan v. Nash Finch Co.,* 310 P.3d 212, 217, 2012 COA 135, ¶ 18 (Colo.App. 2012).

" . . . [I]t is not the court's burden 'to justify each dollar or hour deducted from the total submitted by counsel. It remains counsel's burden to prove and establish the reasonableness of each dollar, each hour, above zero.' *Mares v. Credit Bureau,* 801 F.2d 1197, 1210 (10th Cir.1986)." *Id.,* ¶ 35

"The fee applicant ... must ... submit appropriate documentation to meet 'the burden of establishing entitlement to an award.... [T]rial courts need not, and indeed should not, become green-eyeshade accountants. The essential goal in shifting fees ... is to do rough justice, not to achieve auditing perfection. So trial courts may take into account their overall sense of a suit, and may use estimates in calculating and allocating an attorney's time. And appellate courts must give substantial deference to these determinations, in light of 'the district court's superior understanding of the litigation.' We can hardly think of a sphere of judicial decisionmaking in which appellate micromanagement has less to recommend it. *Fox v. Vice,*" 131 S.Ct. 2205, 2216, 180 L.Ed.2d 45 (2011) (citations omitted) (quoting *Hensley,* 461 U.S. at 437, 103 S.Ct. 1933)." *Id.,* ¶ 35.

I make any findings of fact in this order based on a preponderance of the evidence standard.

Plaintiff argues that no sanctions are warranted because the source code discovery issue in this case was just a "sideshow." That is an incorrect statement. The source code issue was THE show.

It was only after $100,000's in attorney's fees, several months, and countless hours fighting over the source code that plaintiff finally acknowledged that the source code and other fatal evidence in plaintiff's sole possession all along showed that plaintiff's sole working theory for their case--that Mr. Young had manipulated the software on plaintiff's website to access

plaintiff's entire list--was wholly bogus. As my previous orders have made clear, had plaintiff disclosed this evidence in its sole possession at the beginning of the case rather than on the eve of the third trial setting, all parties could have started examining the viability of what plaintiff now insists was its second claim all along--that defendants breached the terms and conditions agreement that Mr. Young had explicitly agreed to.

The problem with plaintiff's insistence on this second theory is that at no time during this litigation did plaintiff's first attorney or second set of attorneys amend the complaint to add this claim. The only breach of contract claim in the first amended complaint revolved around the non-disclosure agreement the parties had entered into during their acquisition negotiations. Nor did plaintiff's expert, Mr. Frankowitz, address this theory in his expert report, at least not until April 17, 2023, after the manipulation theory had fallen apart. Nor did Mr. O'hare make any mention of this other theory during his deposition in January 2023. Nor did plaintiff ever disclose evidence showing how Mr. Young did in fact click on the website's terms and conditions box. Ms. Cheng was credible in testifying based on common sense and her expert's opinion that of course a business would preserve the evidence showing that a certain individual had clicked on the terms and conditions box. If no preservation of that data occurred, there was no point in requiring the click on such an alleged box in the first place.

There was also the concealment until the 11th hour of the Richard Nixon-esque audio-recording of Mr. O'Hare and Mr. Malosev, in which Mr. Malosev explained to Mr. O'Hare how anyone could do what Mr. Young had done (in downloading the list) without doing anything unlawful to manipulate the software security of the list.

Because plaintiff deliberately concealed all of this evidence until the eve of the third jury trial setting in this case and because this evidence lay at the heart of the case (and the heart of the never-filed breach of contract claim), the only reasonable sanction was termination of the case.

Plaintiff argues that termination alone is a harsh enough sanction and that imposing attorney fees would be too harsh. The court disagrees. Were we talking about a modest number of hours and fees, the argument might be reasonable. But in a case where the defendants' attorneys spent hundreds of hours on the case and plaintiff paid all fees invoiced, I find that paying not all but at least a significant portion of those fees is warranted as an additional sanction to make clear to plaintiff, plaintiff's counsel, and the community that concealing critical evidence invites harsh sanctions.

The cases plaintiff cites for this argument do not persuade me otherwise. For example in *Viruet v. City of New York*, 2020 WL 4458789, at *7 (S.D.N.Y. 2020), the magistrate recommended against attorney fees on top of a dismissal because the prevailing party had not expended many resources in that case. In this case, however, defendants spent vast sums and hundreds upon hundreds of hours defending themselves against a potential $2,800,000 judgment.

I reject plaintiff's argument that defense counsel early on hatched some fiendish plot to focus on this "sideshow" of the source code, based on 1.2 hours of fee-shifting research by one of the defendants' attorneys. I find it speculative that the 1.2 hours of fee-shifting research had anything to do with the source code and reject the suggestion that this 1.2. hours of research was the start of a convoluted plot to generate a sideshow. No law firm senior associate would need to research what should happen when the opposing party deliberately conceals evidence essential to adjudication of the case.

I also reject the argument that defense attorneys' research over three days in November 2022 shows that defendants themselves considered the breach of terms and conditions claim an important one, even though it had not even been pled. Those billings show that an associate did an initial review of the NDA in this case, followed by a review of that work and the NDA by Ms. Cheng. The fact that Ms. Cheng then spent part of a day looking at plaintiff's website terms and conditions hardly reflects that Ms. Cheng somehow anticipated that at some point, plaintiff would add a breach of the website terms and conditions claim to its complaint.

Among many things, in part, I base this conclusion on Ms. Cheng's very credible testimony that while the two sides discussed the possibility of plaintiff adding a breach of contract claim, plaintiff never followed through with it. Plaintiff cannot deliberately choose NOT to amend its complaint and then later, after the case has been terminated, insist that that claim was there all along.

Plaintiff argues that I cannot award attorney fees for all of the work by defense counsel because the source code issue only dealt with a portion of the case. I disagree. The concealed source code lay at the heart of all of plaintiff's claims because the ready access to plaintiff's database by Mr. Young and others who became customers of plaintiff was a key determinant in whether plaintiff's data could even be considered trade secrets.

I reject plaintiff's argument that defendants kept modifying their definition of "source code." Certainly no later than the January 19, 2023 hearing on defendants' motion to compel was it abundantly clear to plaintiff what defendants sought as critical evidence in this case. Even then, it still took months for plaintiff to begin revealing what it had concealed.

I reject plaintiff's argument that all defendants had to do to inspect the source code was to look at plaintiff's somehow perfectly re-constructed website on the eve of trial. I found Ms. Cheng very credible when she testified that it was clear to her based on communications and pleadings from plaintiff's counsel around this time (and the perfectly re-constructed website) that plaintiff had much more important source code that it was not disclosing. She was also credible when she testified that plaintiff's counsel never answered her questions as to why such critical source code evidence was only coming to light on the eve of trial. I find that in light of the above, Ms. Cheng reasonably rejected plaintiff's offer to look at the back-end of the perfectly re-constructed website and instead continued to insist on getting the original source code she knew plaintiff had but was not sharing.

The argument that defendants' request for attorney fees from the first round of hearings on the first motion to compel is also included in their June 2023 request for fees is denied, as the fees for the first motion to compel were NOT included in the later request for fees.

The court does agree with plaintiff's argument that defendants are not entitled to fees for anyone other than the four people described in defendants' request for fees on pages 13-14 of their motion: Ms. Cheng, Ms. Linehan, Mr. Byer, and Ms. Beeby.

I agree in part with plaintiff's argument that the hourly rates for these four are unreasonably excessive. Based on Ms. Cheng's credible testimony on this point and the excellent results for her client, I find that her rate was reasonable.

I do, however, find the associates' work in this case to be unreasonably high compared to Ms. Cheng and, therefore, reduce each of their hourly rates by $50 for all of their work on this case.

I find Ms. Cheng's testimony regarding the paralegal on this case, Ms. Beeby, credible and find her hourly rate to be reasonable.

I agree with plaintiff that the 22.7 hours of work by Ms. Linehan (Exhibit 6) to get up to speed should be reduced to 15 hours. The request for an across the board reduction based on Exhibit 6 is denied, in part because of Ms. Cheng's credible testimony that Ms. Linehan did much of the excellent brief-writing until her exit from the case.

The argument about block-billing is rejected, as I find the the billing sufficiently detailed to conclude that each entry is a reasonable request, including the example on page 15 of plaintiff's supplemental brief.

Having reviewed all of the invoices, I find that the hours defense counsel spent on this case were 10-20% higher than reasonable, even when I account for defendants' sua sponte reduction of more than $100,000 in fees that they are not asking to be reimbursed for.

In the spirit of doing "rough justice," recognizing the ultimate sanction of case termination that I imposed, acknowledging the general American rule that each party pays its own fees, and, given all of my above findings, I find that an appropriate attorney fees sanction is for plaintiff to pay $500,000 in attorney fees for this case. Even with the discounting down from the request for more than $800,000 in attorney fees based on my findings I have made above, the lodestar calculation remains well above $500,000.

In awarding this amount of attorney fees, I have taken account of the request for attorney fees incurred for the motion to compel litigation from December 2022 into January 2023. I have reviewed the May 26, 2023 amended application for attorney fees and accompanying exhibits. I make the same findings regarding the rates charged for that work but find that the amount of work done there was reasonable. Nevertheless, in giving some deference to the American rule regarding attorney fees, I have accounted for this request in ordering the reimbursement of $500,000 in attorney fees.

This $500,000 sanction also takes account of Lewis Roca's work on this matter after termination of the case.

Defendants are ordered to submit a proposed judgment consistent with this order within 7 days.

Issue Date:  1/12/2024

WILLIAM B BAIN
District Court Judge

| | |
|---|---|
| **DISTRICT COURT, EL PASO COUNTY, COLORADO**<br><br>270 South Tejon Street<br>Colorado Springs, CO 80903 | |
| **Plaintiff:**<br><br>TCPA LITIGATOR LIST,<br><br>v.<br><br>**Defendants:**<br><br>ADAM YOUNG, an individual, TUBMANBURG LIMITED, a Bahamas corporation a/k/a Ringba, RINGBA, LLC, a Delaware limited liability company. | ▲ **COURT USE ONLY** ▲<br><br>Case No. 2021CV031668<br><br>Division: 9 |
| **[PROPOSED] ORDER GRANTING DEFENDANTS' MOTION FOR ATTORNEY FEES** | |

THIS MATTER comes before the Court on Defendants' Motion for Attorneys' Fees pursuant to Pursuant to this Court's prior order dated May 12, 2023, C.R.C.P. 37, and C.R.S. §§ 13-17-102 and 7-74-105.

The Court, having reviewed the briefing, including the supporting declaration and exhibits filed with Defendants' Motion, and being fully advised in the premises, hereby finds Plaintiff lacked justification to bring its claims and asserted these claims in bad faith. Further, the Court finds that Plaintiff's abused Colorado's discovery procedures. An award of all reasonable fees incurred by Defendants in this lawsuit is therefore proper under C.R.C.P. 37 and C.R.S. §§ 13-17-102 and 7-74-105.

Further, the Court finds the attorneys' fees incurred in this action to be reasonable, given the complex and evolving nature of the dispute and Plaintiff's conduct throughout the litigation.

The Court hereby ORDERS Plaintiff pay Defendants **$815,694.00** in reasonable attorneys' fees.

SO ORDERED

Dated: _____, 2023                BY THE COURT:

                                                _____
                                                DISTRICT COURT JUDGE