**UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF COLORADO**

In re:                                                )
                                                          )
DNC AND TCPA LIST SANITIZER, LLC,   )          Case No. 24-12624 KHT
                                                          )          Chapter 11
          Debtor.                                  )

---

**OBJECTION TO DEBTOR'S FIRST PLAN OF REORGANIZATION DATED AUGUST 14, 2024 FOR SMALL BUSINESS UNDER CHAPTER 11, SUBCHAPTER V**

---

Adam Young, Tubmanburg Limited and Ringba, LLC (collectively, "Ringba"), by and through its counsel, Lewis Roca Rothgerber Christie LLP, respectfully files its Objection to Debtor's First Plan of Reorganization Dated August 14, 2024 for Small Business Under Chapter 11, Subchapter V (the "Objection"). In support of the Objection, Ringba states as follows:

**PROCEDURAL BACKGROUND**

**A.      Pre and Postpetition Background**

1.      DNC and TCPA List Sanitizer, LLC (the "Debtor") filed for relief under Chapter 11 of the Bankruptcy Code on May 16, 2024 (the "Petition Date"). In its Voluntary Petition, the Debtor elected to proceed under Subchapter V of Chapter 11. Accordingly, the Debtor's Chapter 11 plan was due on or before August 14, 2024. *See* Docket No. 1.

2.      The Debtor is primarily owned by Cashyew Holdings, LLC ("Cashyew"), which holds a 99% equity interest in the Debtor. The remaining ownership interests in the Debtor are held by Michael O'Hare (.50%), the Debtor's CEO, and Tania O'Hare (.50%), the Debtor's Secretary. *See* Statement of Financial Affairs No. 28. Cashyew is wholly owned by the O'Hares. *See* Docket No. 55 (the "Report"), ¶ 8.

126289006.1

3.      Joli A. Lofstedt, Esq. is the duly appointed and acting Subchapter V Trustee in the Debtor's Bankruptcy Case.

4.      Ringba is listed on the Debtor's Schedule F as a "disputed" unsecured creditor in the amount of $640,415.00 for a "Judgment entered for attorneys' fees and costs." *See* Schedule F, 3.1. The Judgment stems from an Order re Forthwith Request for Emergency Hearing and terminating sanctions entered by the District Court, El Paso Court, Colorado in Case No. 2012CV31668 (the "State Court Litigation"). There, the El Paso County District Court entered terminating sanctions against the Debtor for its concealment of evidence and recordings that went to the heart of the State Court Litigation. The El Paso District Court also entered an award of attorneys' fees and costs to Ringba.

5.      In Case No. 2024CA265, the Debtor appealed to the Colorado Court of Appeals the Judgment terminating its State Court case and awarding attorneys' fees and costs to Ringba. The Debtor also appealed three other orders entered by the State Court in Colorado Court of Appeals Case No. 2023CA891. The Debtor did not obtain a supersedeas bond for either of its appeals.

6.      On July 9, 2024, the Debtor filed its untimely Pre-Status Conference Report (Docket No. 55) (the "Report"). The Report indicates, *inter alia*, that "Mr. and Mrs. O'Hare receive a draw each month in the appropriate [*sic*] sum of $20,000 each. Cashyew Holding[], LLC is separately paid a management fee (based on certain percentages of revenue) and receives approximately $50,000 per month from the Debtor." Report, ¶ 15.

7.      On July 11, 2024, the Court convened a Status Conference in the case. *See* Docket No. 65. At the Status Conference, the Debtor indicated it would be seeking an extension of time to file a plan and essentially would be requesting the Court hold its Bankruptcy Case in abeyance

- 2 -

126289006.1

to allow the appeal process to play out in the Colorado Court of Appeals. *See* Report, ¶¶ 16-17. At the Status and Scheduling Conference, the Court indicated, *inter alia*, that: (i) it would not hold the case in abeyance pending resolution of the state court appeals and it already had concerns about the case; (ii) it was going to take much work for the Debtor to get the case in compliance with code requirements; and (iii) that the Debtor would have a "short chain" to ready its case for confirmation.

8.      Since the Status Conference, the employment of Debtor's counsel has been challenged pursuant to Section 327(a) and (e), relating to counsel's ability to be employed as Debtor's appellate or malpractice counsel in the Colorado state courts. *See* Docket Nos. 49, 82, 114. A hearing was held on September 24, 2024 to adjudicate the employment issues.  The matter has been taken under advisement.

9.      On August 9, 2024, Allen Vellone Wolf Helfrich & Factor, P.C. ("Allen Vellone"), a prepetition creditor owed $62,021 by the Debtor, assigned its Proof of Claim No. 4 to Michael O'Hare. Mr. O'Hare then apparently paid the Allen Vellone prepetition claim. *See* Docket No. 115. On August 15, 2024, the Court entered an Order employing Allen Vellone as special litigation counsel. *See* Docket No. 125.

10.      On September 19, 2024, the Colorado Court of Appeals affirmed Ringba's Judgment, denying one of Debtor's appeals in Case No. 2023CA891.[1] Docket No. 160.

**B.      The Rule 2004 Examination**

11.      Early in the Debtor's bankruptcy case, Ringba filed its *Ex Parte* Motion for Order Authorizing Rule 2004 Examination of Debtor DNC and TCPA List Sanitizer, LLC and Cashyew Holding (the "2004 Motion"). *See* Docket No. 22. The Court granted the 2004 Motion on May 31,

---

[1] The Colorado Court of Appeals has not yet ruled in Case No. 2024CA265.

2024. *See* Docket No. 24. The Debtor has provided a relatively small amount of the information requested by Ringba.

12.     On August 28, 2024, the Debtor filed a motion for Rule 2004 Examination of Ringba (the "Debtor's Rule 2004 Motion"). *See* Docket No. 135. The next day, Ringba filed an Unopposed Emergency Motion to Seal *Ex Parte* Motion for Order Authorizing Rule 2004 Examination of Ringba (the "Seal Motion"). *See* Docket No. 137. The basis for the Seal Motion was the Debtor's purposeful disclosure of matters that were deemed to be "Confidential" and "AEO" and were deemed to be subject to a protective order in the State Court Litigation. On the same day, the Court entered its Seal Order (Docket No. 138) and thereafter on August 30, 2024, entered an Order denying the Debtor's Rule 2004 Motion as it pertained to Ringba. *See* Docket No. 140. The Court's Order noted that the Debtor's Rule 2004 Motion did not fall within the appropriate scope of FED. R. BANKR. P. 2004. *See id.*

13.     The Rule 2004 examination of the Debtor took place on September 25, 2024. No Rule 2004 examination of Cashyew has yet occurred.

**C.     The Motion to Assume Management Agreement**

14.     On July 10, 2024, the Debtor filed its Debtor's Motion to Assume Management Agreement with Cashyew Holding, Inc. (Docket No. 58) (the "Motion to Assume"). The Motion to Assume sought Court approval to assume a Management Services Agreement between the Debtor and Cashyew under which the Debtor would pay Cashyew a 60% management fee (of Debtor's gross revenues) on a monthly basis. Ringba, JPMorgan Chase, N.A. ("Chase"), and the United States Trustee have all objected to the Motion to Assume (Docket Nos. 88, 100 and 102). The three objections argue, *inter alia*, that the Debtor cannot assume a postpetition management

- 4 -

agreement, the Motion to Assume is bereft of key details and information, and that the management agreement is not in the best interest of creditors and the estate.

**D.      The Plans of Reorganization**

15.     On August 14, 2024, Debtor filed its first Subchapter V plan pursuant to Section 1189(b) (the "Plan"). *See* Docket Nos. 123, 123-1. The Court has set a confirmation hearing for October 3, 2024. *See* Docket No. 127. The Plan, as it relates to Ringba, indicates that any amounts reserved for Ringba will be "escrowed" by the Subchapter V trustee pending the resolution of the two appeals and Ringba will receive nothing during the pendency of the Plan. *See* Plan, pp. 4-5. Otherwise, the Plan attempts to classify similarly situated creditors in different classes and not pay (or significantly curtail payments to) certain creditors relating to the State Court Litigation. Additionally, the Plan proposes to pay its creditors (that the Debtor's principal is not or has not already paid personally) over a five-year (sixty-month) period. Plan, pp. 4-5.

16.     Objections to the Plan were due September 26, 2024. However, Ringba moved unopposed to extend the deadline for filing Plan objections to October 2, 2024. Docket No. 169. The Court granted Ringba's motion. Docket No. 171.

17.     On September 25, 2024, the Debtor filed an Amended Plan of Reorganization Dated September 25, 2024 for Small Business Under Chapter 11, Subchapter V (the "Amended Plan"). The Amended Plan was filed without any separate notice of a confirmation hearing or time within which to object to the Amended Plan.

18.     On September 26, 2024, the United States Trustee filed its Objection to Debtor's Plan of Reorganization. Docket No. 178.

126289006.1

### E.     The Debtor's Motion to Use Cash Collateral

19.     On June 26, 2024, Chase filed its Notice of Non-Consent to Debtor's Use of Cash Collateral (Docket No. 50) indicating that Chase claims a properly perfected security interest in the Debtor's assets (a blanket lien) and that it did not consent to the Debtor's use of its Cash Collateral absent express agreement or subsequent Court order.[2]

20.     On August 28, 2024, the Debtor filed its *Ex Parte* Motion to Approve Stipulated Final Cash Collateral Agreement (Docket No. 134) (the "Ex Parte Motion"). The Ex Parte Motion sought to have the Court approve a stipulated cash collateral agreement on an *ex parte* basis. On the same date, Ringba filed an objection to the Ex Parte Motion noting that FED. R. BANKR. P. 4001(b)(1) generally required notice and an opportunity to object to the use of cash collateral and that the Ex Parte Motion was deficient as to notice and content. On August 30, 2024, the Court entered an Order denying the Ex Parte Motion noting that the motion requested relief that cannot be granted *ex parte*. *See* Docket No. 139.

21.     Subsequently, the Debtor has filed its Motion for Authority to Use Cash Collateral (Docket No. 149) and Notice requiring creditors and parties in interest to object on or before September 24, 2024. *See* Docket No. 150. However, on September 20, 2024, the Debtor filed notice of its withdrawal of its Motion for Authority to Use Cash Collateral. Docket No. 163.

### F.     Ringba's Motion to Convert Case to Chapter 7

22.     On September 10, 2024, Ringba filed its Motion to Convert Case From Chapter 11 to Chapter 7 (the "Motion to Convert"). *See* Docket No. 151. The Motion to Convert is based on, *inter alia*, Debtor's bad faith filing of its bankruptcy petition to avoid funding a supersedeas bond

---

[2] On September 18, 2024, Chase filed its Objection of Secured Creditor JP Morgan Chase Bank, N.A. to Debtor's Motion for Authority to Use Cash Collateral (Docket No. 156), reaffirming its objection and non-consent to the Debtor's use of cash collateral.

126289006.1

relating to the two appeals; unauthorized pre and postpetition payments to insiders; unauthorized postpetition transfers and use of cash collateral; its failure to file complete and accurate monthly operating reports; the Debtor's principals' conflicts of interest in investigating and pursuing conveyance claims against themselves and Cashyew; and for failure to file a plan that has a reasonable prospect of being confirmed in a reasonable amount of time, as discussed herein.

23.     Objections to the Motion to Convert were due on or before September 24, 2024 (extended for the Debtor to October 3, 2024). A preliminary hearing has been set on the Motion to Convert for October 8, 2024 at 9:30 a.m. *See* Docket No. 152.

24.     On September 24, 2024, without conferring with Ringba's counsel, the Debtor filed its Motion for Enlargement of Time to Respond to Ringba's Motion to Convert or Dismiss Case (with Limited Objection Made Herein) (at Docket No. 167). For its "Limited Objection," the Debtor included a "Six Month Cash Collateral Budget" (at Docket No. 167-1) and stated that "through August[] 2024, Debtor's income was $453,948.00 as shown in the attached actual budget prepared by its employed certified public accountant, Mark Dennis. It is estimated that Debtor will continue to generate $100,000 per month in gross revenue for the foreseeable future[—]more than enough to pay all allowed claims 100%." Docket No. 167, ¶ 5.

## OBJECTIONS TO PLAN

25.     Subchapter V plans must satisfy the requirements of 11 U.S.C. § 1191. Section 1191(a) incorporates the requirements of Section 1129(a), except for paragraph (15). 11 U.S.C. § 1191(a). However, if a Subchapter V plan is objected to, it must satisfy the requirements of

Section 1191(b) and (c). In that case, a proposed plan must not discriminate unfairly and must be found to be "fair and equitable" pursuant to Section 1191(c).[3]

26.     Among the other requirements of Section 1129, the Court can only confirm a Chapter 11 plan if it has been proposed in good faith. *In re Lost Cajun Enterprises*, LLC, 634 B.R. 1063, 1072 (Bankr. D. Colo. 2021). Whether a plan is proposed in good faith depends on whether, "there is a reasonable likelihood that the plan will achieve its intended results which are consistent with the purpose of the Bankruptcy Code, that is, the plan is feasible, practical, and would enable the company to continue and pay its debts in accordance with the plan provisions." *Id.* (citing *In re Pikes Peak Water Co.*, 779 F.2d 1456, 1459 (10th Cir. 1985)).

27.     Finally, under 11 U.S.C. 1129(a)(1) and (2), the plan and the proponent of the plan respectively must "compl[y] with the applicable provisions of this title," *i.e.* Title 11 of the U.S. Code.

28.     The debtor bears the burden of confirmation of its plan and compliance with Section 1129, including of proving good faith and proving feasibility. *In re Saratoga & N. Creek Ry., LLC*, 635 B.R. 581, 601, 608 (Bankr. D. Colo. 2022).

## I.     Debtor's Plan Has Apparently Been Superseded by the Amended Plan

29.     Ringba agrees with and incorporates by reference the objections made by the United States Trustee in his Objection to Debtor's Plan of Reorganization at Docket No. 178. Namely, Ringba objects to Debtor's Plan even if it has been superseded by the Amended Plan.

30.     Additionally, Ringba agrees with the United States Trustee's concerns regarding the Amended Plan. As discussed by the Trustee, the Amended Plan is substantially different from

---

[3] Under the Section 1191(b) exception, the plan, if objected to, no longer must satisfy Sections 1129(a)(8) or (10) (in addition to Subsection (15)).

the Plan and yet the Debtor has not provided a redline comparison of the two. It also appears that the Debtor now seeks confirmation of the Amended Plan, but no confirmation hearing has been set and no deadline to object has been set for the Amended Plan. The Debtor has not separately provided notice of the Amended Plan to its creditors and the Court.

31.     Given the unclear status of the Amended Plan, Debtor's intentions, and the fact that the Amended Plan has not been properly noticed, Ringba herein files its Objection to the originally proposed Plan.

## II.     Debtor's Plan Has Been Proposed in Bad Faith in Violation of 11 U.S.C. § 1129(a)(3) (and § 1129(a)(1) and (2))

32.     Debtor's Plan has been proposed in bad faith in violation of Section 1129(a)(3). "In the context of Chapter 11 confirmation, the plan proponent must prove, by a preponderance of the evidence, that the 'plan has been proposed in good faith and not by any means forbidden by law.'" *In re Autterson*, 547 B.R. 372, 399 (Bankr. D. Colo. 2016). "In assessing good faith, 'courts have looked to whether the debtor intended to abuse the judicial process and the purposes of the reorganization provisions.'" *Id.* (quoting *In re Paige*, 685 F.3d 1160, 1178 (10th Cir. 2012)). Thus, a plan must not only be technically in compliance with the Bankruptcy Code, but also a plan must be "'proposed with honesty and sincerity.'" *Id.* (quoting *In re Riviera Drilling & Expl. Co.*, No. BR 10-11902, 2012 WL 6719591, at *5 (Bankr. D. Colo. Dec. 19, 2012), *aff'd*, 502 B.R. 863 (10th Cir. BAP (Colo.) 2013)). The Court must also assess "whether a plan's terms or the process used to seek its confirmation was fundamentally fair." *Riviera Drilling*, 2012 WL 6719591, at *6. Plans that fail to meet these standards and are proposed in bad faith in violation of Section 1129(a)(3) and cannot be confirmed.

**A.      The Plan Demonstrates Bad Faith Creditor Class "Gerrymandering" in Violation of 11 U.S.C. 1122**

33.      Debtor's Plan should not be confirmed because it contains prohibited and bad faith creditor class "gerrymandering." Section 1129(a)(10) requires for confirmation that "at least one class of claims that is impaired under the plan has accepted the plan…." However, Section 1122(a)[4] **prohibits** separately classifying **similar claims** in furtherance of artificially "gerrymandering" a consenting impaired class of creditors. *Autterson*, 547 B.R. at 397 (quoting *In re Deming Hosp., LLC*, No. 11-12-13377 TA, 2013 WL 1397458, at *2 (Bankr. D.N.M. Apr. 5, 2013)) ("The 'main judicial gloss on § 1122(a) is that the subsection prohibits a debtor from separately classifying similar claims to 'gerrymander' a consenting class.'"). "'If a creditor objects to the classification scheme on gerrymandering grounds, most courts require the plan proponent to justify the classification.'" *Id.* (quoting *Rocky Mountain Land Co.*, 2014 WL 1338292, at *15).

34.      In this case, the Debtor is attempting to gerrymander its unsecured creditors in bad faith (in violation of Section 1129(a)(3)) and in the way prohibited by Section 1122(a) (in violation of Sections 1129(a)(1) and (2)). Indeed, it appears that "Class 4 - General Unsecured Claims" (containing only the debts of Allen Vellone and American Express) is aimed at artificially creating an impaired class of "creditors" that will vote for Debtor's Plan and satisfy Section 1129(a)(10). However, "Debtor's principal has personally paid Allen [] Vellone … in full and is in the process of paying American Express in full." Plan, p. 4. Meanwhile, the Debtor has inexplicably separated its three other general unsecured creditors (whose debts all relate to the State Court Litigation) into

---

[4] "Except as provided in subsection (b) of this section, a plan may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests of such class." § 1122(a). Section 1122(b) states that: "A plan may designate a separate class of claims consisting only of every unsecured claim that is less than or reduced to an amount that the court approves as reasonable and necessary for administrative convenience." The Plan does not state that the gerrymandered classification of Debtor's general unsecured creditors is for the purpose of "administrative convenience." In other words, the statutory exception to the prohibition against gerrymandering similarly situated classes does not apply.

126289006.1

separate "classes," even though each "class" contains a single similar unsecured claim (Ringba, GLegal LLC / Gary Tucker, and Cohen Trial, LLC / Jeffrey Cohen, respectively). *See* Plan, pp. 4-5. Unlike Class 4, these other classes lack an arrangement through which the Debtor's principal would (without authorization) personally pay off the creditors prior to the Plan's Effective Date. *See id.* Presumably, the same would lead the impaired "Class 4" (American Express) to approve Debtor's Plan, over the possible objections of similarly situated creditors. Thus, Debtor has attempted to rig its creditor classes to induce confirmation of the Plan, contrary to the purposes of the Bankruptcy Code, *i.e.*, Section 1122(a).

35.     Moreover, Debtor has not provided any reasonable basis for classifying its similarly situated unsecured creditors separately in different classes. The Debtor's proposed classification unfairly discriminates against unsecured creditors by attempting to avoid the requirements of Sections 1129(a)(10) and 1122, *i.e.*, classifying American Express separately in order to receive a vote in favor of the Plan. As a result, the Plan is both unconfirmable due to Debtor's bad faith (in contravention of Section 1129(a)(3)) and unconfirmable under Sections 1129(a)(1) and (2) due to Debtor's failure to "compl[y] with the applicable provisions of [Title 11]," including Section 1122.[5] 11 U.S.C. § 1129(a)(1), (2), (3). *See also Autterson*, 547 B.R. at 396 ("**The non-compliance with Section 1122(b) classification … dictates that the Debtor fails the test of Sections 1129(a)(1) and (a)(2)** which requires that the plan and the plan proponent must comply with 'the applicable provisions of this title.'"); *see also Autterson*, 547 B.R. at 402 ("[T]he Debtor's prosecution of the Debtor's Fourth Plan, alone, demonstrates bad faith conduct. … [T]he entire premise of the Debtor's Fourth Plan is an improper gerrymander. By knowingly misrepresenting the number of claimants in Class 6, the Debtor attempted to create the impression that there existed

---

[5] The same is also a violation of Section 1191(b), which prohibits unfair discrimination.

a basis for an administrative convenience class when, in fact, there was no such basis. Then, the Debtor used his own law firm to manufacture the only alleged impaired accepting class so that he could claim that the Debtor's Fourth Plan was confirmable. **Prosecution of the case under these circumstances circumvents the purposes of the Bankruptcy Code and constitutes bad faith**." (emphasis added)). Thus, Debtor's Plan should not be confirmed for its bad faith creditor class gerrymandering in violation of Section 1122 and Sections 1129(a)(1), (2), and (3).

    B.    **Debtor's Plan Is the Result of a Two-Party Dispute and Its Proposals Regarding Ringba's Judgment Claim Are Inadequate and Proposed in Bad Faith**

        1.    **Debtor's Plan for Repayment of Ringba's Claim Is Inadequate and in Bad Faith**

36.    Debtor's Plan further demonstrates bad faith in violation of Section 1129(a)(3) through its inadequate proposal to *tentatively* pay Ringba's Judgment claim over five years **without interest**. Docket No. 123, p. 8 ¶ 6.5.

37.    First, Debtor provides no justification for its proposal not to pay Ringba interest on its Judgment claim. Under applicable non-bankruptcy law, Colorado-issued judgments accrue interest "at the rate of eight percent per annum compounded annually…." C.R.S. § 5-12-102(1)(b). The Plan contains no explanation or justification for why interest is not being paid as required by Colorado law. This proposal demonstrates a bad faith attempt to forestall or even avoid timely repayment of Ringba's valid Judgment claim. *See, e.g., In re Paolini*, 312 B.R. 295, 310 (Bankr. E.D. Va. 2004) (finding bad faith where "[the debtor's] only sincere plan to financially reorganize is to reverse the adverse ruling of the District Court and prevail on his claims against [judgment creditors].").

38.    Second, it is not clear whether Ringba will be paid under the Plan.  On the one hand, the Plan seems to contemplate payment of the monies owed on Ringba's claim. Plan, p. 8.

However, on the other hand, the "Plan Overview" conveniently fails to address how the money will be distributed should Ringba prevail. *See* Plan, pp. 4-5. Instead, the Overview states only that "[f]unds will be paid and escrowed by the Subchapter V trustee pending the outcome of the appeal. Upon final resolution of the appeal, all funds in escrow will be returned to the Debtor, **assuming Debtor prevails.**" *Id.* In other words, Debtor's Plan assumes Debtor's success on appeal but not Ringba's success. In fact, Debtor has already <u>lost</u> one of its appeals, which determined the Debtor's case against Ringba was properly terminated because of Debtor's severe discovery violations.

39.    Even where the Plan does address Ringba's claim, the proposal is not to "repay" Ringba's debt, but to place the amounts owed into an **escrow account** controlled by the Subchapter V trustee. *See* Plan, p. 8. The Plan then proposes only to pay Ringba once the appeals process is completed, and apparently only if Ringba is successful on Debtor's second appeal. Plan, p. 8. The Debtor makes this proposal even though it failed to obtain a supersedeas bond for its appeals and even though Ringba possesses a valid Judgment claim upon which payments are currently owing. Ringba has already prevailed on one of Debtor's appeals, and if Ringba prevails on the second appeal, it is unclear what will happen under the Plan. The details concerning the mechanism and timing for the Subchapter V trustee to actually pay Ringba (even according to Debtor's unacceptably elongated payment schedule) are nonexistent. *See id.* at p. 8 ("If the judgment in favor of Ringba is affirmed, debtor will pay its claim in full over 5 years without interest. Pending the appeal, debtor will escrow and pay to the Subchapter V trustee $10,935.13 per month until this claim is paid in full."). These inadequacies, among others, demonstrate that the Plan has been proposed in bad faith.

- 13 -

**2.    Debtor's Plan Is, at its Essence, Based on a Two-Party Dispute Between Debtor and Ringba**

40.    Relatedly, Debtor's Plan demonstrates that it is proposed effectively as a litigation tactic in a two-party dispute (even though Debtor has already lost in the State Court Litigation). The existence of a two-party dispute may constitute bad faith preventing confirmation of a debtor's proposed plan. *See In re Swartville, LLC*, No. 11-08676-8-SWH, 2012 WL 3564171, at *4-*5 (Bankr. E.D.N.C. Aug. 17, 2012) (analyzing two-party dispute as issue of bad faith in context of plan confirmation and denying confirmation of plan). Generally, bankruptcy courts abstain in "two-party disputes where the petitioner can obtain adequate relief in a non-bankruptcy forum." *In re Springs Hosp., Inc.*, 2006 WL 2458679, at *8 (Bankr. D. Colo. Aug. 22, 2006) (quoting *Remex Elec. Ltd. V. Axl Indus., Inc.* (*In re Remex Elec. Ltd.*), 127 B.R. 482, 484 (S.D. Fla. 1991)). Likewise, courts have resisted the use of bankruptcy as a tactic in non-bankruptcy litigation. *See, e.g., In re Schempp Real Est., LLC*, 303 B.R. 866, 877 (Bankr. D. Colo. 2003) ("This bankruptcy appears to be nothing more than an effort to enlist the resources of the bankruptcy court as yet another litigation tactic in a two-party dispute."). One indicator of a two-party dispute is where a single creditor holds a significant share of the debtor's overall indebtedness. *See In re Ozcelebi*, 639 B.R. 365, 413-14 (Bankr. S.D. Tex. 2022) (where one of three creditors held most of the debtor's indebtedness and the court determined that debtor's bankruptcy petition constituted "textbook bad faith conduct.").

41.    The Debtor's Plan here is effectively a tool of non-bankruptcy litigation and a demonstration that this Bankruptcy Case is a two-party dispute between Ringba and the Debtor. As discussed in Ringba's Motion to Convert at Docket No. 151, the Debtor is using bankruptcy in bad faith to avoid posting a supersedeas bond and to avoid paying Ringba on its Judgment claim while the appeals process plays out. Indeed, Debtor's stated "preference" in this Bankruptcy Case

was "not to file a plan of reorganization but to seek a stay of this bankruptcy pending the outcome of the appeal or the alleged legal malpractice case against Tucker and Cohen**.**" Report, ¶ 16. By Debtor's own admission, this Bankruptcy Case and the Plan serve the sole purpose of allowing the appellate process to play out while relieving Debtor of having to post a supersedeas bond. Rather than "proceed[ing] quickly to confirmation and rehabilitation," it is apparent Debtor would prefer to use Subchapter V bankruptcy and its Plan as litigation tools and not for their intended purposes. *In re Landau*, No. 20-21114-11, 2022 WL 4647473, at *5 (Bankr. D. Kan. Sept. 30, 2022). *See also Paolini*, 312 B.R. at 309 (where the debtor's bad faith conduct demonstrated a "lack of intent to seriously reorganize and speaks volumes of [the debtor's] true purpose of utilizing this proceeding not as an honest attempt to reorganize his debt but simply as an extension of [] litigation tactics in the [state court] Litigation."). The Plan effectuates Debtor's preference to avoid posting a supersedeas bond or paying Ringba's claim while the appeals proceed. For this reason, the Plan cannot be confirmed.

42.     Further, Ringba is not only Debtor's largest creditor by a significant margin (Ringba's claim is $640,415.00 and the next largest claim is Cohen, LLC at $200,976.23), but Debtor has or is attempting to fully pay off (outside the bankruptcy process and without authorization) its two unsecured creditors not associated with the State Court Litigation (*i.e.*, Allen Vellone and American Express). Docket No. 1, pp. 14-15; Plan, pp. 4, 7-8. The remaining unsecured creditors (Ringba, GLegal, LLC, and Cohen, LLC) and their claims arise out of the State Court Litigation and appeals. In other words, the Plan appears to be Debtor's attempt to selectively pay only the creditors it wants—namely, those not associated with the State Court Litigation. Debtor's Plan is not sincere and instead is a tool of litigation and an encapsulation of

- 15 -

the two-party nature of this dispute. For this reason, the Plan should not be confirmed per Section 1129(a)(3).

C.   **The Proposed Plan Is a Culmination of Debtor's Bad Faith Conduct in this Bankruptcy Case**

43.   In addition to the significant deficiencies and bad faith associated with Debtor's proposed Plan itself, the Plan is the culmination of a series of bad faith actions and misconduct by the Debtor in this Bankruptcy Case, in violation of Section 1129(a)(3). The Tenth Circuit has "not rule[d] out the possibility that a plan could be unconfirmable under § 1129(a)(3) because of the proponent's … improper conduct." *In re Way to Grow, Inc.*, 610 B.R. 338, 346 (D. Colo. 2019) (quoting *Paige*, 685 F.3d at 1179). Indeed, as part of the bad faith analysis under Section 1129(a)(3), the Court must also assess "whether a plan's terms **or the process used to seek its confirmation** was fundamentally fair." *Riviera Drilling*, 2012 WL 6719591, at *6 (emphasis added).

44.   Here, the Defendant's improper conduct, culminating in its proposed Plan, render the Plan unconfirmable. Among other actions and omissions, these include, but are not limited to:

a.   **DISCLOSURE OF AEO INFORMATION**: The Debtor filed an *Ex Parte* Motion for Order Authorizing Rule 2004 Examination of Creditor Ringba's Agents Adam Young and Harrison Gurvitz. Docket Nos. 135, 135-1. That motion and its exhibit contained highly confidential information subject to an "attorney's eyes only" designation and a stipulated protective order between the Debtor and Ringba in the State Court Litigation. *See* Docket Nos. 135, 135-1. This appears to have been nothing more than an attempt at the time to leverage the Debtor's position in (unsuccessfully) resisting and preventing the oral examinations of Cashyew and the Debtor, through their principals. Ringba

- 16 -

was forced to file an emergency Motion to Seal, which the Court granted. Docket Nos. 137, 138.

b. **LARGE TRANSFERS TO INSIDERS:** The Debtor's monthly operating reports reflect various and substantial unexplained cash payments to insiders and others. *See* Docket Nos. 91, 91-1, 91-2, 130, 130-1. According to the Report, Mr. and Mrs. O'Hare each receive a monthly payment of $20,000. Report, ¶ 15. Additionally, another *$50,000* per month is paid to Cashyew as a "management fee." *Id.* In July 2024 alone, Cashyew received $85,948.60 (not including any payments made to the O'Hares directly). *See* Docket No. 130-1, p. 3. It is unclear how Cashyew's "management" responsibilities differ from the O'Hares' management of the Debtor. Report at ¶ 8. Thus, based on the foregoing, there is at least $90,000 going to the Debtor's principals each month for unknown purposes—and likely more than that amount, based on the Debtor's July 2024 Monthly Operating Report. In addition, the Debtor belatedly filed its August 2024 Monthly Operating Report. That report indicates the Debtor continues to pay, without Court authority, and in contravention of the three objections to the Debtor's Motion to Assume, more than $91,000 to Cashyew, the Debtor's upstream owner.

c. **DISSIPATION OF ESTATE ASSETS:** The Debtor has also reported approximately $93,000 and $107,199.00 in "Total Cash Disbursements" for June and July, 2024, respectively. *See* Docket Nos. 91, p. 2; 130, p. 2. No explanation has been provided as to whether these amounts include or are in addition to the distributions to Debtor's principals each month. Given that the

Debtor's Plan reports assets in the amount of only $99,141.00, these unauthorized payments are dissipating assets that could be used to pay to creditors, including Ringba. *See* Plan, p. 5.

d. **FAILURE TO FULLY COMPLY WITH DISCOVERY OBLIGATIONS:** The Debtor has failed to fully comply or otherwise respond to Ringba's requests for production of documents. *See* Docket No. 22.  The Debtor provided a relatively small amount of the information requested but not what it was directed to provide.  At the Debtor's Rule 2004 examination, the Debtor's principal, Mr. O'Hare, testified that the Debtor provided to Ringba, that information that it thought was relevant and not any further information.

e. **ATTEMPT TO ASSUME POSTPETITION CONTRACT:** The Debtor has moved to assume a postpetition "Management Agreement" entered into with Cashyew, which was executed <u>postpetition</u> on June 28, 2024. Docket Nos. 58; 58-1, p. 3. The Debtor, through the postpetition Management Agreement, seeks to disburse sixty percent (60%) of the Debtor's gross revenues to Cashyew.  Docket No. 58-1, p. 4. (It is not clear if this amount includes or is in addition to the $90,000 monthly already paid to the Debtor's principals.) Several parties have objected to the Debtor's Motion to Assume and that motion is still pending. Yet, Debtor's Plan projections rely on the motion being granted and the Management Agreement being assumed.

f. **FAILURE TO PROVIDE NOTICE OF CASH COLLATERAL AGREEMENT:** The Debtor filed an *Ex Parte* Motion to Approve Stipulated Final Cash Collateral Agreement without noticing all creditors and parties in

- 18 -

interest. Docket No. 134. This motion appears to be an end-run around the three objections lodged against Debtor's Motion to Assume Management Agreement with Cashyew Holding, Inc. at Docket No. 58. *See* Docket Nos. 88, 100, 102. In other words, the *Ex Parte* Motion is an attempt by the Debtor to slip by the requirements of bankruptcy and to assume a contract not approved by this Court. The Court denied the Debtor's motion because such relief cannot be granted *ex parte*. Docket No. 139.

g.   **UNAUTHORIZED POSTPETITION TRANSFERS:** The Debtor has made unauthorized postpetition transfers. Specifically, Debtor has paid approximately $62,000 in prepetition invoices after the Petition Date without Court approval, in violation of Section 549 of the Bankruptcy Code, paying a favored unsecured creditor postpetition. *See* Docket Nos. 120, ¶ 5; 115. Rather than seeking this Court's approval to use cash collateral to pay its appellate counsel, Debtor entered into a sham transaction through which Allen Vellone (now Debtor's appellate counsel) assigned "[f]or good and valuable consideration" its $62,092.80 debt to none other than Michael O'Hare— Debtor's CEO and principal. *Id.* at ¶ 6. Mr. O'Hare then apparently "paid the claim in full" (*i.e.*, to his own company). *Id. See also 3868–70 White Plains Rd., Inc.*, 28 B.R. 515, 519 (Bankr. S.D.N.Y. 1983) (where the court in part dismissed bankruptcy case due to postpetition transfers to the debtor's attorney). The Debtor is apparently also attempting to make an unauthorized postpetition transfer to American Express. *See* Plan, p. 4.

h. **DEFICIENT SCHEDULES:** The Debtor's initial Schedules were deficient, including lacking separate "spreadsheets" for payments, distributions, or withdrawals credited or given to insiders and listing several creditors as being owed "unknown" amounts. *See* Docket No. 1.

i. **DEFICIENT MONTHLY OPERATING REPORTS:** The Debtor filed deficient operating reports for the months of June and July, 2024. *See* Docket Nos. 91, 130. The June report is missing Exhibits B (explanation of non-debtor-in-possession bank account), C (cash receipts), D (cash disbursements), and F (receivables). Despite being alerted to these deficiencies, the July report is still missing Exhibits B and F. The Debtor's August 2024 Monthly Operating Report is similarly deficient.

j. **UNAUTHORIZED USE OF CASH COLLATERAL:** The Debtor has used cash collateral without authorization. Chase asserts a perfected blanket security interest in all the Debtor's assets, but Chase has not consented to the use of its cash collateral. *See* Docket No. 50. Although the Debtor initially moved for approval to use cash collateral (Docket No. 149), this motion was objected to by Chase (Docket No. 156) and Ringba (Docket No. 159), and Debtor subsequently withdrew its motion for approval (Docket No. 163). Thus, the Debtor has made and continues to make unauthorized payments in the amount of approximately $90,000 per month to its principals and insiders, Mr. and Mrs. O'Hare, using cash collateral. See Report, ¶ 15. (In July, the Debtor paid $85,948.60 to Cashyew alone. Docket No. 130-1, p. 3.) Additionally, the Debtor's monthly operating reports reveal other unexplained payments and

- 20 -

transfers. *See* Docket No. 91. For example, Debtor's bank statements show various unexplained and unauthorized uses of cash collateral. Additionally, Mr. O'Hare has personally paid the Debtor's debt to Allen Vellone and is "in the process of paying American Express in full." Plan, p. 5. The Allen Vellone debt repayment was facilitated by Allen Vellone "assign[ing] its Proof of Claim to Michael O'Hare," after which Mr. O'Hare personally satisfied this prepetition debt.  Docket No. 120, ¶ 6. It appears highly likely that Mr. O'Hare satisfied the Allen Vellone debt with monies he received from the Debtor and absent consent of Chase or the Court. The Debtor and Mr. O'Hare now intend to repay American Express's prepetition debt outside of the bankruptcy process, as well. *See* Plan, p. 5. Though unclear, these transfers appear to constitute further unapproved and unconsented to uses of cash collateral.

k. **PRINCIPALS' CONFLICTS OF INTEREST:** The Debtor's principals have significant conflicts of interest. The O'Hares ostensibly operate as the Debtor's fiduciary, but they have significant disincentives to analyze and potentially bring conveyance actions against themselves or Cashyew, which is wholly owned by the O'Hares. As explained elsewhere herein, significant sums have been transferred from the Debtor to Debtor's principals each month. By their own admission, the O'Hares receive a monthly draw in the amount of $20,000 each and Cashyew is separately paid a "management fee" in the amount of $50,000 per month (or apparently more, as demonstrated by the July 2024 Operating Report). Report, ¶ 15. See also Docket 130-1, p. 3. The Debtor has even sought to assume a postpetition "Management Agreement" entered

into with Cashyew, which was executed postpetition on June 28, 2024. Docket Nos. 58; 58-1, p. 3. This Management Agreement seeks to disburse sixty percent (60%) of the Debtor's gross revenues to Cashyew. Docket No. 58-1, p. 4.  The Plan is proposed in bad faith because it reflects a diminished base of assets and proposals for repayment that are only possible because of the O'Hares conflicts of interest.

45.     In the end, the Plan is an encapsulation of Debtor's continuing bad faith and misconduct in this Bankruptcy Case. Confirmation would facilitate Debtor's abuse of the bankruptcy process and undermine the actual purpose of bankruptcy; that is, reorganization and rehabilitation for honest debtors. The Debtor here instead seeks to cramdown a Plan allowing it to avoid paying Ringba its valid Judgment and paying the other litigation creditors. Such a Plan cannot be confirmed.

### III.     The Plan Is Not Feasible under 11 U.S.C. § 1191(c)(3)

46.     Because the Debtor has elected to proceed under Subchapter V of Chapter 11, its Plan must satisfy the requirements of Section 1191(a) governing the confirmation of Subchapter V plans. Section 1191(a) incorporates the requirements of Section 1129(a), governing Chapter 11 plans in general ("The court shall confirm a plan under this subchapter only if all the requirements of section 1129(a), other than paragraph (15) of that section, of this title are met.").

47.     However, in addition to the requirements of Section 1129(a), the Debtor's objected-to Plan must also satisfy the requirements of a nonconsensual Subchapter V plan under Section 1191. One requirement of a nonconsensual or "cramdown" Subchapter V plan is that it is "feasible" under Section 1191(c)(3). *See In re Curiel*, 651 B.R. 548, 561 (B.A.P. 9th Cir. 2023) ("[Section 1191(c)] sets forth the three minimum requirements a subchapter V cramdown plan must meet to

- 22 -

be considered 'fair and equitable.' … [Section 1191(c)(3)] requires a harder look at feasibility than otherwise conducted under [Section] 1129(a)(11) alone."); *see also In re Samurai Martial Sports, Inc.*, 644 B.R. 667, 698 (Bankr. S.D. Tex. 2022) (stating that "Section 1191(c)(3) [is] often referred to as the feasibility test...").[6]

48.     Under Section 1191(c)(3), the Debtor must establish either a) that the Debtor "will be able to make all payments under the plan" or b) that "there is a reasonable likelihood that the debtor will be able to make all payments under the plan … **and** the plan provides appropriate remedies, which may include the liquidation of nonexempt assets, to protect the holders of claims or interests in the event that the payments are not made." 11 U.S.C. § 1191(c)(3) (emphasis added).

49.     The "Debtor bears the burden to show feasibility by a preponderance of the evidence." *In re Investment Company of the Southwest, Inc.*, 341 B.R. 298, 310 (B.A.P. 10th Cir. 2006) (citing *In re Danny Thomas Props. II Ltd. P'ship*, 214 F.3d 959, 963 (8th Cir. 2001)). Additionally, "[f]easibility determinations must be 'firmly rooted in predictions based on objective fact.'" *Id.* at 311. A "plan is not feasible where income projections are not based on concrete evidence of financial progress, or are speculative, conjectural, or unrealistic." *In re Rocky Mountain Land Company LLC*, 2014 WL 1338292, at *11 (Bankr. D. Colo. 2014) (citing *In re Merrimack Valley Oil Co., Inc.*, 32 B.R. 485, 488 (Bankr. D. Mass. 1983)). As an initial matter, the Debtor has entirely failed to address Section 1191(c), which must be satisfied for the Subchapter V Plan to be confirmed. Thus, the Debtor has necessarily failed to satisfy its burden to demonstrate that the Plan is feasible. This failure is especially evident where the Debtor is allegedly

---

[6] Generally, Chapter 11 plans and consented to Subchapter V plans must only satisfy the feasibility requirements of Section 1129(a)(11). *See Curiel*, 651 B.R. at 561.

126289006.1

going to pay most creditors "in full," but provides absolutely no financial basis for its ability to do so. *See* Plan, pp. 4-5.

50.     In any event, Debtor's Plan is not feasible. First, Debtor has not established that it <u>will</u> make all payments under its Plan. *See* 11 U.S.C. § 1191(c)(3)(A). The Debtor states that its performance projections—consisting of $1,200,000.00 in sales in the first year, growing by 3.5% each year thereafter—are based on its "performance over the past few years, a summary of which is attached hereto as Exhibit B." Plan, p. 9; Docket No. 123-1. In fact, **no Exhibit B is attached or otherwise included with Debtor's Plan**. Debtor's failure to provide any basis for the contention that its future sales will total more than $1,200,000.00 on an ongoing annual basis is fatal to confirmation of the Plan.[7] Creditors have no "objective fact" upon which to conclude that these projections are based on a reasonable performance history and thus the Debtor has failed to show that it "will" make all payments, per Section 1191(c)(3)(A).

51.     Additionally, the "feasibility" section of the Debtor's Plan discusses *only* American Express and no other creditors. *See* Plan, p. 9. Specifically, the Plan states that "[t]he Debtor has based payments to Class 4 Unsecured Creditors on Gross Revenue," which includes only American Express (as, apparently, Allen Vellone has already been paid outside the bankruptcy process by Debtor's principal). *Id*. Although the feasibility of the Plan is contingent on payments to *all* creditors, the Debtor fails to even mention Chase, Ringba, GLegal, LLC (Gary Tucker), or Cohen Trial, LLC (Jeffrey Cohen) in its discussion of the Plan's feasibility. *Id.* at pp. 9-10. Again, a Plan that fails to describe how it will pay back *all* of its creditors cannot be feasible.

---

[7] It is of no moment if the Debtor has elsewhere attempted to demonstrate that it can make the payments laid out in its Plan. The Plan itself must be feasible. Possibly, the Amended Plan is feasible, but as noted elsewhere herein, given the recent filing of that Amended Plan, Ringba has not had an opportunity to fully review the contents. To the extent Debtor pursues confirmation of the Amended Plan, Ringba will lodge objections to the Amended Plan, if any, by the deadline set by this Court.

126289006.1

52.     Because the Debtor has not satisfied the difficult standard of showing it *will* make all projected payments, it must show it has a reasonable likelihood of making payments and that the Plan provides appropriate remedies. *See* § 1191(c)(3)(A). It is the Debtor's burden "to present concrete evidence" that it can maintain its expenses "while funding all Plan payments." *Curiel*, 651 B.R. at 562-63. These projections must be factually supported. *See Curiel*, 651 B.R. at 562-63 ("'Factual support must be shown for the Debtor's projections.' *In re Hobble-Diamond Cattle Co.*, 89 B.R. 856, 858 (Bankr. D. Mont. 1988). … Thus, '[t]he mere fact that the bare numbers in the income and expense projections provided in the plan demonstrate an apparent surplus to adequately fund the plan is not enough to meet the burden on feasibility.' *In re Kowalzyk*, 2006 WL 3032145, at *5 (Bankr. D. Minn. 2006).").

53.     As above, the Debtor also has not even shown that it is *reasonably* likely to make all payments under the Plan. The Plan effectively asks the Court and the creditors to trust that the Debtor's net income projections—without any evidence—are based on sustainable previous performance. Even if these projections are taken as reasonable as to American Express, the Debtor has failed to explain how it will pay back *all* its creditors. The "mere fact" that the Debtor's "bare numbers" might adequately fund its proposed Plan "is not enough to meet the burden on feasibility." *Kowalzyk*, 2006 WL 3032145, at *5. Thus, the Debtor's Plan is not feasible because it is not reasonably likely that the Debtor will make all projected payments.

54.     But even if the Plan demonstrated that the Debtor is reasonably likely to make all projected payments, Debtor's Plan must also provide appropriate default remedies to creditors. *See* § 1191(c)(3)(B)(ii). In this case, it does not. Instead, the Plan merely points creditors to default remedies already available under the law. *See* Docket No. 123, p. 12, ¶ 11.7 ("Upon the Debtor's failure to cure the default …, the creditor may proceed to exercise their rights and remedies **under**

**applicable State and Federal Law**, including seeking to enforce the terms of the Plan or conversion of the Debtor's case to a case under Chapter 7." (Emphasis added)). This type of default provision is insufficient in Subchapter V plans. *See In re Channel Clarity Holdings LLC*, No. 21BK07972, 2022 WL 3710602, at *16 (Bankr. N.D. Ill. July 19, 2022) (stating that appropriate remedies must offer "specific protections for unsecured creditors who are forced to forgo some of the standard protections of a typical chapter 11 case when debtors elect to proceed under subchapter V. To assert that creditors can pursue remedies under applicable law if [a debtor] should default is a toothless remedy."); *see also In re McBride*, 2023 WL 8446205, at *6 (Bankr. D. Me. Dec. 5, 2023) ("Merely providing creditors with the opportunity to pursue their state law rights or to seek enforcement of a plan is insufficient."). Here, because Debtor's Plan is proposed under Subchapter V, it must include appropriate remedies in the event of default other than those already available under the law. It does not do so and is therefore not feasible under Section 1191(c)(3)(B)(ii).

55.     Thus, Debtor's plan is not feasible because it has provided absolutely no basis for its projections, outside of pure assertions in the Plan. It also fails to discuss feasibility with respect to all of its creditors. Debtor therefore has not shown it will make payments or that it is reasonably likely to make payments under the Plan. Additionally, even if Debtor has satisfied that burden, the Plan lacks appropriate remedies and is also infeasible for this reason.

## CONCLUSION

In conclusion, Ringba objects to Debtor's Plan. The Plan is deficient on its face because it has been proposed in bad faith and is not feasible under Section 1191(c)(3). Further, the Plan contains creditor classes that are gerrymandered in bad faith and in violation of Sections 1122 and 1129(a)(1), (2), and (3) of the Bankruptcy Code. Finally, the Plan is essentially a bad faith litigation

tactic in a two-party dispute (in violation of Section 1129(a)(3)). It allows Debtor to avoid posting

a supersedeas bond without paying Ringba's claim, even though Ringba is by far its largest creditor

and all of Debtor's unsatisfied unsecured creditor claims arise out of the State Court Litigation.

The Plan therefore should not be confirmed.

WHEREFORE, Adam Young, Tubmanburg Limited and Ringba, LLC, respectfully

request that the Court enter an Order denying Debtor's Plan of Reorganization Dated August 14,

2024 for Small Business Under Chapter 11 Subchapter V and request such other and further relief

as the Court deems appropriate.

Respectfully submitted this 2nd day of October, 2024.

LEWIS ROCA ROTHGERBER CHRISTIE LLP

*s/ Chad S. Caby*
Chad S. Caby
1601 19th Street, Suite 1000
Denver, CO  80202
Tel:       303-628-9583
Fax:       303-623-9222
E-mail:  ccaby@lewisroca.com

*Attorneys for Adam Young, Tubmanburg Limited and Ringba, LLC*

- 27 -

<u>**CERTIFICATE OF SERVICE**</u>

The undersigned hereby certifies that, on October 2, 2024, a true and correct copy of the foregoing **OBJECTION TO DEBTOR'S FIRST PLAN OF REORGANIZATION DATED AUGUST 14, 2024 FOR SMALL BUSINESS UNDER CHAPTER 11 SUBCHAPTER V** was electronically filed and served via CM/ECF, which action caused automatic electronic notice of such filing upon all parties in interest in this matter as follows:

| | |
|---|---|
| John Cimino, Esq.<br>CIMINO LAW OFFICE, LLC<br>5500 E. Yale Ave., #201A<br>Denver, CO 80222<br>Via: CM/ECF<br><br>*Counsel for Debtor* | Joli A. Lofstedt, Esq.<br>PO Box 270561<br>Louisville, CO 80027<br>Via: CM/ECF<br><br>*Subchapter V Trustee* |
| Alan K. Motes, Esq.<br>Byron G. Rogers Federal Bldg.<br>1961 Stout St., Ste. 12-200<br>Denver, CO 80294<br>Via: CM/ECF<br><br>*Counsel for U.S. Trustee* | Reza D. Rismani, Esq.<br>TREECE ALFREY MUSAT P.C.<br>633 17th Street, Suite 2200<br>Denver, CO 80202<br>Via: CM/ECF<br><br>*Counsel for Glegal, LLC* |
| Peter A. Cal, Esq.<br>John S. Gray, Esq.<br>SHERMAN & HOWARD L.L.C.<br>675 Fifteenth St., Ste. 2300<br>Denver, CO 80202<br>Via: CM/ECF<br><br>*Counsel for JPMorgan Chase Bank, N.A.* | Gary Tucker, Esq.<br>GLEGAL, LLC<br>1600 Broadway, Suite 1660<br>Denver, CO 80202<br>Via: CM/ECF<br><br>*Counsel for GLegal, LLC* |
| Arthur Lindquist-Kleissler, Esq.<br>LINQUIST-KLEISSLER & COMPANY, LLC<br>950 S. Cherry Street, Suite 418<br>Denver, CO 80246<br>Via: CM/ECF<br><br>*Counsel for Cashyew Holding, LLC* | Jeffrey Cohen, Esq.<br>COHEN, LLC<br>1600 Broadway, Suite 1660<br>Denver, CO 80202<br>Via: CM/ECF<br><br>*Counsel for Cohen, LLC* |

*s/ Jennifer Eastin*
_____
Of: Lewis Roca Rothgerber Christie LLP

- 28 -

126289006.1