UNITED STATES BANKRUPTCY COURT
DISTRICT OF COLORADO

IN RE: . Case No. 24-12624-KHT
. Chapter 11
DNC and TCPA LIST SANITIZER . Subchapter V
LLC, .
.
Debtor. .
.
. . . . . . . . . . . . . . .

**TRANSCRIPT OF PRELIMINARY HEARING ON THE MOTION TO CONVERT CASE FROM CHAPTER 11 TO CHAPTER 7 (DOCKET #151)**

BEFORE THE HONORABLE KIMBERLEY H. TYSON
UNITED STATES BANKRUPTCY JUDGE

TUESDAY, OCTOBER 8, 2024
DENVER, COLORADO

TRANSCRIPT REQUESTED BY: MICHAEL O'HARE
TRANSCRIPT ORDERED ON: DECEMBER 3, 2024
TRANSCRIPT DELIVERED ON: DECEMBER 16, 2024
TRANSCRIPT PRICE: $5.10 PER PAGE; $255.00

APPEARANCES:

| | |
|---|---|
| For the Debtor: | Wadsworth Garber Warner Conrardy, P.C.<br>By: Aaron A. Garber*<br>2580 West Main Street<br>Suite 200<br>Littleton, CO 80120<br>(303) 296-1999 |
| | Allen Vellone Wolf Helfrich & Factor, PC<br>By: Vandana Koelsch*<br>1600 Stout Street<br>Suite 1900<br>Denver, CO 80202<br>(303) 534-4499 |
| United States Trustee: | Alan K. Motes*<br>1961 Stout Street<br>Suite 12-200<br>Denver, CO 80294<br>(303) 312-7999 |
| Subchapter V Trustee: | Joli A. Lofstedt<br>600 17th Street<br>Suite 425N<br>Denver, CO 80202<br>(720) 457-7064 |
| For Creditor Jeffrey Cohen: | Cohen LLC<br>By: Jeffrey Cohen*<br>1600 Broadway<br>Suite 1660<br>Denver, CO 80202<br>(303) 524-3636 |
| For Creditor GLegal, LLC: | Treece Alfrey Musat P.C.<br>By: Reza Rismani*<br>633 17th Street<br>Suite 2200<br>Denver, CO 80202<br>(303) 292-2700 |

Appearances continued:

| | |
|---|---|
| For Creditor Ringba, LLC: | Lewis Roca Rothgerber Christie LLP<br>By: Chad S. Caby*<br>1601 19th Street<br>Suite 1000<br>Denver, CO 80202<br>(303) 628-9583 |
| For Creditor JPMorgan Chase: | Sherman Howard LLC<br>By: Peter A. Cal<br>675 15th Street<br>Suite 2300<br>Denver, CO 80202<br>(303) 297-2900 |
| Court Recorder: | Clerk's Office<br>U.S. Bankruptcy Court<br>721 19th Street<br>Denver, CO 80202 |
| Transcription Service: | AB Litigation Services<br>216 16th Street, Suite 600<br>Denver, CO 80202<br>(303) 296-0017 |

*Appeared via telephone.

Proceedings recorded by electronic sound recording; transcript produced by transcription service.

(Time Noted: 9:36 a.m.)

THE COURT: Case number 24-12624, DNC and TCPA List Sanitizer, LLC. This is a preliminary hearing on the motion to convert case from Chapter 11 to Chapter 7.

May I have appearances, please?

MR. O'HARE: Michael O'Hare for the Debtor.

THE COURT: Thank you, Mr. O'Hare.

MS. LOFSTEDT: Good morning, Your Honor. Joli Lofstedt, the Subchapter V Trustee.

THE COURT: Thank you, Ms. Lofstedt.

MR. CAL: Good morning, Your Honor. Peter Cal from Sherman and Howard, representing the secured creditor JPMorgan Chase Bank, N.A.

THE COURT: Thank you. Who do we have on the line?

MR. CABY: Good morning, Your Honor. Chad Caby appearing on behalf of Adam Young Cubman Berg, Ltd., and Ringba, LLC, who I'll simply refer to as Ringba.

MR. COHEN: Good morning, Your Honor. Jeffrey Cohen on behalf of Cohen LLC, unsecured creditor.

THE COURT: Good morning.

MR. RISMANI: Good morning, Your Honor. Reza Rismani on behalf of creditor GLegal, LLC.

THE COURT: Good morning to you.

MR. MOTES: Good morning, Your Honor. Alan Motes

appearing for the U.S. Trustee.

THE COURT: Thank you, Mr. Motes.

MR. GARBER: Good morning, Your Honor. Aaron Garber, supposedly replacement counsel for the Debtor-in-Possession.

THE COURT: Thank you, Mr. Garber.

MS. KOELSCH: Good morning, Your Honor. This is Vandana Koelsch. We're special counsel to the appellant.

THE COURT: Good morning. All right. Mr. Caby, this is your motion.

MR. CABY: It is. Thank you, Your Honor. As a preliminary matter, I just wanted to provide for the Court's edification that pursuant to Local Bankruptcy Rule 2081(3), I have provided our witness and exhibit lists, filed that with the Court.

I'm somewhat unclear on who to provide the exhibits to, so I provided them to the Court, as well as Mr. Garber, Ms. Sender, and Mr. Cimino. So whomever is representing the Debtor, I believe they have notice of our witness and exhibit lists, as well as our exhibits.

As another preliminary matter, Your Honor, before I get to my offer of proof, the past few days of activity in the Debtor's case, I think, exemplifies why this case needs an independent third party to resolve the claims of creditors.

Your have three sets of counsel in the last three days: Mr. Cimino, Alan Vellone, as well as Mr. Garber.

Now, they've all either entered appearance, substituted in and out, or are here, but are not going to be making an argument.

And I think more importantly at this time, it doesn't -- from my understanding in the docket, it doesn't appear the Debtor is even represented by counsel. And I think that's evidenced by Mr. O'Hare's pleadings at docket number 212, 216, and 217, which are, first of all, a motion requesting extension on behalf of the Debtor to file a response to motion convert, and then two objections which appear to be similar, if not exactly the same with regard to the conversion motion.

And this Court had already indicated that objections need to be filed by 9:30 yesterday morning. So to the extent that Mr. O'Hare is here on behalf of the Debtor, I don't think that's permissible under Our Local Rule 9010(1E) and otherwise.

And so I just bring that up in case that is indeed the case here.

So what I would suggest before I get into my offer of proof, Your Honor, is this case is -- the best way to describe it is rudderless. There's little chance of success unless a third party Trustee comes in to clean things up.

Mr. O'Hare has demonstrated he is not a good fiduciary. And I'll go into this in my offer of proof, but what's happened in the last three days is just indicative of what's happened in this case since May 16th.

Now, separately, Your Honor, Ringba has filed its motion to convert based on numerous factors, but most notably what we think is the most important is the Debtor's bad faith conduct in filing the case to avoid posting a supersedeas bond in the Colorado Court of Appeals matters, unauthorized post-petition transfers of largest amounts of cash to the Debtor's principles, which are Cashyew and Mr. And Mrs. O'Hare, the unauthorized use of cash collateral since the beginning of the case, the failure to complete and include accurate monthly operating reports to creditors and the Court, the failure to file a plan that has a reasonable prospect of being confirmed in a reasonable amount of time, and then, quite frankly, the Debtor's principles. Serious conflicts of interest with regard to cash collateral and pre-petition and post-petition payments made to essentially upstream ownership.

At a final hearing on this matter, Your Honor, the testimony would be that the Debtor indeed filed a bankruptcy case on May 16th, that’s at our Exhibit 1, the voluntary petition, as well as the statement of financial affairs and schedules.

In those documents, the Debtor admits that the Debtor is primarily owned by Cashyew Holding, LLC, which holds a 99% equity interest in the Debtor. The remaining ownership interest are held by Mr. O'Hare and his wife, Mrs. O'Hare, and that can be found at the statement of financial affairs, number 28.

Again, Cashyew is wholly owned by the O'Hares, and that can be found at docket number 55, which is the status of scheduling report filed by Mr. Cimino. We list that as Exhibit 9 at paragraph 8.

The Court would hear testimony with regard to that Ringba is a creditor of the Debtor listed on Schedule F, listed as disputed in the amount of $640,415.00 for a judgment entered for attorney's fees and costs. And again, that can be found in Exhibit 1, page 14, Schedule F, paragraph 3.1.

Now, that judgment stems from an order regarding forthwith request for emergency hearing and terminating sanctions entered by the District Court in El Paso County in case number 2012 CB 31668. That can be found at our Exhibit 6, which is captioned order regarding forthwith request for emergency hearing in El Paso County District Court.

In addition to that order that terminated the underlying State Court litigation, the El Paso County District Court also entered an award of attorney’s fees and

costs, which can be found under Exhibit 5, which is the bill of cost.

The testimony would indicate that the Debtor appealed those orders and judgments, terminating its case as well as the attorney's fees, and finally also appealed three other related orders by the El Paso County District Court.

Your Honor, those facts I don't believe are in contest. Those are facts that are either provided by the Debtor's schedules or the pleadings in this case otherwise attached to my motion to convert.

Now, the testimony would also indicate that there is a State Court appeal in the Colorado Court of Appeals. The Debtor enterer, Mr. Adam Young, who is the CEO of Ringba, would testify as to the following facts with regarding the State Court appeal. That there was an appeal filed and that Debtor has been unsuccessful in the first appeal, which was denied recently on September 19, 2024. That's at Exhibit 22, your honor, which is a notice of the Colorado Court of Appeal's judgment affirming the termination of the case on page four of that docket.

Testimony would show, in addition, that significant monies are being siphoned out of the Debtor each month without Court authority. The testimony at an evidentiary hearing would show that in the June 2024 monthly operating report, Exhibit 6 -- excuse me, Exhibit 17 of our

exhibits that we've provided, the Debtor reported $93,249.00 in total cash disbursements. It would also show, however, that there was $15,000.00 to an account ending in 5355, $18,000.00 to that same account.

And on the profit and loss statement payments for unexplained operating expenses for different amounts, anywhere from $8,000.00 to a little bit over $5,000.00 for various, various line items. Those transfers, the testimony would show the $15,000.00, $18,000.00 were transferred to Cashyew Holdings, the Debtors' upstream parent.

The evidence will also show, Your Honor, with regard to the June 2024 monthly operating report, that it did not contain exhibits B, C, D and F.

In July of 2024, the evidence had showed that the Debtor filed another monthly operating report. This is our Exhibit 18. That Debtor reported $107,199.00 in total cash disbursements. The testimony would show that that monthly operating report is similarly deficient and doesn't include exhibits B and F. That report, Your Honor, shows that in July, there was a $25,807.00 transfer to Cashyew. More specifically, that shows at docket number 131, which is our exhibit for the July monthly operating report 18.

And then another $60,141.60 transferred to Cashyew, which is at docket number 131, page 8 of 9. That monthly operating report also shows various categories of

expenses that went up from roughly $5,000.00 to approximately $7,500.00 in expenses. And that's page 4 of 9 of docket 131.

The evidence would similarly show, Your Honor, that In August of 2024, the Debtor reported $123,946.00 in total cash disbursements. That can be found at Exhibit 19, which is the Debtor's August monthly operating report. And the evidence would show that again, the Debtor's monthly operating report is deficient. It fails to provide Exhibits B and F. But it would also show that the Debtor transferred $91,134.00 to Cashyew Holding for -- and I quote, “July owner comp accrual paid.” And as far as far as being on Exhibit 19, that's at docket number 186, which is an attachment page 13 of 15.

In addition to the report showing large amounts of money leaving the Debtor and going to Cashyew, the Debtor -- the testimony would be that the Debtor pays Mr. O'Hare and Mrs. O'Hare approximately $20,000.00 per month. That's at Exhibit 9, page 2, the status report, paragraph 15. There's some question with regard to that expense whether it's 20,000.00 each or it's 20,000.00 together based on examination at the Rule 2004 examination. But it's very unclear nevertheless on what's being paid to the O'Hares in addition to what's being paid to Cashyew.

The evidence would also show that the Debtor pays approximately $50,000.00 per month to Cashyew Holding.

That's also Exhibit 9, page 2, the status report at paragraph 15. I'll note again, I don't know whether that is inclusive of the amounts that are being paid in the monthly operating report. The point, I guess, is that it's very unclear, based on the monthly operating reports, exactly what amounts are being paid, who's being paid, and who it's being paid to.

And I'd note also that finally, as the most recently proposed plan, which I will call the amended plan, the Debtor's assets are only $109,000.00, so approximately $110,000.00. That's at Exhibit 16, page five of the amended plan.

Now the testimony would also indicate that the Debtor has filed a motion to assume what it calls a Management Agreement with Cashyew Holding. That's at Exhibit 10. And Your Honor, that agreement purportedly is dated January 1st, 2023, but as the parties have noted, it was executed on June 28th, 2024, which is post-petition.

The Debtor wants to assume that Management Services Agreement, that post-petition agreement with Cashyew Holding, its wholly owned upstream owner.

That agreement was for the provision of certain management services by Cashyew, including several things including strategic planning and the like. And in exchange for these services, the evidence would show that Cashyew is receiving 60% of the Debtor's gross revenues. Not net, but

gross.

The evidence would show also that Ringba as well as JPMorgan Chase, as well as the US Trustee filed objections to that motion to assume in Exhibits 11, 12 and 13, all based on essentially pretty much the same thing, a lack of disclosure, inability to assume a post-petition agreement, and just inability to understand what was going on and whether these expenses were legitimate.

I will note for the Court and the record that the Debtor has not sought to have a Court determination on the motion to assume, but nevertheless continues to pay Cashyew approximately $90,000.00 a month, as evidenced by the two monthly operating reports at Exhibit 18 and 19.

There will be testimony, Your Honor, with regard to the use of cash collateral where there is no consent and there is no court authorization to do so. The testimony with regard to that, Your Honor, is that JPMorgan asserts a perfected blanket security interest in all the Debtor’s assets. That's at Exhibit 8, which is captioned Notice of Non-consent to Debtor’s Use of Cash Collateral. Now that document was filed by JPMorgan on 6-26-2024 at docket number 50.

So even if the Debtor didn't know the rules, a month into its case, it certainly had notice that JPMorgan Chase didn't consent to the use of cash collateral as of June

26th, although it should have had notice before that.

Now the Debtor, in order to try to I guess, alleviate that circumstance, filed an ex parte motion to approve a stipulated final cash collateral agreement at Exhibit 20. However, the Debtor failed to notice that out to creditors and parties in interest. I believe we objected and the Court denied that based on the ex parte nature of it.

And I would note, Your Honor, and I think the evidence would show that the motion appears to be an end run around the three objections lodged by Ringba, JPMorgan, as well as the US Trustee to the motion to assume the Management Agreement with Cashyew Holding, because those same expenses were included in the budget in that cash collateral agreement.

The evidence would show the Debtor subsequently filed a motion to withdraw that motion to use cash collateral, which can be found in Exhibit 21.

And finally, as I noticed earlier, the Debtor does not have the consent of JPMorgan to use its cash collateral, which was noticed by JPMorgan in its actual notice that I talked about at docket number 50, an objection at docket number 168.

And then most recently last Thursday on October 3rd, where Mr. Cal requested that the Court enter an order that the Debtor not be able to use cash collateral and

account for that cash collateral and segregate that cash collateral.

The evidence would show, Your Honor, based on that, that the Debtor has been using cash collateral to pay Cashyew, to pay Mr. and Mrs. O'Hare and to pay other unauthorized payments and transfers without the consent of JPMorgan. And I think the Court knows that the Court has yet to enter an order on any use of cash collateral, so without the Court's consent.

The evidence would further show that there are significant post-petition transfers that are potentially recoverable by a Trustee. In addition to the payments to Cashyew, the Debtor has made other post petition transfers and uses of cash collateral. You will see at Exhibits 14 and 29. Exhibit 14 is an assignment of claim that the Debtor entered into a transaction through which Allen Vellone, it's Appellate Counsel, and possibly it's proposed bankruptcy counsel, at one point, assigned for good and valuable consideration its claim of $62,000.00 approximately to Mr. O'Hare. That's at Exhibit 14.

You'll also see that the Debtor's principal paid Allen Vellone in full for its claim outside of the bankruptcy process, which can be found in Exhibit 29, which is the ex parte application of Allen Vellone to be counsel in the Debtor's case. You can also find that admission at Exhibit

16, which is the amended plan at page four, where the Debtor freely admits that.

Now the Debtor's principal, Mr. O’Hare also personally paid American Express, the evidence would show, for its claim outside the bankruptcy process. That's at Exhibit 16, page 4 of the amended plan, where they freely admit that back.

And evidence would show that on October 2nd, the Debtor paid Allen Vellone $25,000.00 in a retainer without Court authorization. And that can be found in Exhibit 30, which is the application to be employed, page 3, paragraph 12. There is some indication that that amount will be given back to the Debtor. However, I don't know whether that has happened or not.

It's also unclear, Your Honor, and this is maybe just happened recently, where Mr. Garber's $45,000.00 retainer came from. And it's important because while the retention motion filed by Mr. Garber says it was paid by Mr. O'Hare, what we know is that Mr. O'Hare and or Cashyew, which are essentially one in the same, are simply siphoning off money from the Debtor's accounts. So it's likely the Debtor's money that was used in violation of cash collateral rules as well.

Evidence would also show, Your Honor, that there have been two plans filed and they're not being prosecuted.

Evidence would show at five months in the bankruptcy, we really have no plan of reorganization with a likelihood of being confirmed. As I mentioned, the Debtors submitted two plans of reorganization. Those are Exhibits 15 and 16 filed on August 14th and September 25th, respectively.

At the status conference last Thursday, you heard, Your Honor, that the Debtor would not be pursuing either of those two plans before the Court.

So as we sit here today, even though there have been two plans filed, neither of those will be prosecuted.

The testimony of the Debtor will show, I believe, that the Debtor has not proposed a conformal plan of reorganization and is not prosecuting either plan that has been filed today.

Now, there will also be testimony with regard to the lack of a supersedeas bond and the filing of the bankruptcy and bad faith.

I think you'll hear testimony at an evidentiary hearing that will show that the Debtor filed this bankruptcy case simply to avoid posting a supersedeas bond on the two appeals against Ringba. And I think this evidence actually is an admission by the Debtor. It's already been admitted. If this court looks at what is Exhibit 9, page 3, paragraph 16, of the status report, it notes the Debtor appealed Ringba's valid judgment claim and filed for bankruptcy.

What it says, though, and I quote here, “It's the Debtor's preference not to file a plan of reorganization, but to seek a stay of this bankruptcy pending the outcome of this appeal or the alleged legal malpractice case against Tucker and Cohen.

We have the Debtor admitting that the Debtor doesn't want to file a plan. The Debtor just wants to use this bankruptcy case for purposes of his stay while it appeals the judgment.

You'll hear testimony that the Debtor didn't exhaust all of its efforts or really any efforts to secure a supersedeas bond because it failed to put up collateral that was required for a bond.

You'll hear testimony and see testimony that really the Debtor has few unsecured creditors in this case. And those creditors that haven't been paid, including my client, Mr. Cohen, Mr. Tucker, and JPMorgan Chase, there are other creditors that have been paid, American Express and Allen Vellone.

But really, when it comes down to it, the creditors that are remaining besides JPMorgan Chase are simply related to the State Court appeal. And you can see the Debtor’s admissions of this in the amended plan, Exhibit 16, pages 9 through 10.

And the plan that I just noted at Exhibit 16

originally proposed payments to Ringba, but only those payments sit in an escrow account and not be paid directly to Ringba. That was Exhibit 15 at the original plan.

The evidence would show that Debtor’s performance over the past five months shows cash receipts of approximately $100,000.00 or more each month. That's Exhibit 16 at the amended plan. Nevertheless, the Debtor has not and would not post a supersedeas bond for its appeals.

The evidence would further show, Your Honor, that there have been numerous discovery failures in this case. As the Court is aware, it entered a Rule 2004 examination order with regard to the Debtor and Cashyew, which can be found in Exhibit 7. The Debtor testified in a Rule 2004 examination just a couple weeks ago that it provided information only that it thought was relevant, but not any information or documents beyond that. And that's Exhibit 4. It's the transcript of the Rule 2004 examination. I apologize, it's a dirty copy. Meaning it's -- we don't have a final copy yet. Probably won't have that in a couple days. But if you're so inclined, that area pages 14 through 35 show the Debtor's testimony with regard to discovery.

In addition, Your Honor, I would suggest that that transcript shows the Debtor's lack of sincerity in this case. Mr. O'Hare testified on behalf of the Debtor. He was unresponsive. He was unable to answer questions. He was

argumentative. He was showing pictures. And this is in the transcript, of individuals from the royal family flipping me off instead of flipping me off himself. And I noted that for the record. I don't care about that. But I think what it shows and what it demonstrates, this Debtor's fiduciary that is in control of this case is simply not up to the task.

In addition, Your Honor, the evidence would show that there was a disclosure of attorney's eyes only information from the State Court in this case as a means of leverage. You would hear testimony from an individual from Ringba that certain information arising out of the State Court litigation between Ringba and Debtor was subject to attorney's eyes only designation. The Debtor filed an ex parte motion for Rule 2004 exam against creditors Ringba and Adam Young and Harrison Gebertz [phonetic]. That's at Exhibit 26.

You may remember, or otherwise the evidence would show that Ringba was forced to file an emergency motion to seal which the Court granted at Exhibit 27. Now I've called to testify Mr. Young would specifically testify to the fact that there was a protective order in place in the State Court litigation and that some of the information set forth in the Exhibit to the Rule 2004 exam was subject to an AEO designation in the State Court. It was highly confidential information and that this information was disclosed in the

bankruptcy case in violation of the protective order. And this simply would just go to the Debtor’s good or bad faith.

So Your honor, I think we have sufficient cause to convert this case. The Debtor's case has been filed in bad faith and in light of what is really a two party dispute. We have two subchapter five cases, or, excuse me, plans that have been filed, but neither are going to be prosecuted.

This process, as you know, is designed to proceed quickly and expeditiously. That's why the Debtor has to file a plan within 90 days. The Debtor, in the end, hasn't really paid attention to this case and has not demonstrated a serious intent to organize. Indeed, at the status report and Mr. Cimino's comments, the Debtor really wanted a parking spot in chapter 11 in order to finish up the appeals.

The Debtor’s use of cash collateral without consent and without court order is quite frankly one of the most egregious examples of cause that I've seen since I've been doing this. I have not seen a Debtor that essentially has been warned several times, not only by the Court but also by the creditor base that it's using cash collateral on an unauthorized and unconsented to basis, yet nevertheless continues to pay its upstream ownership and insiders.

The goal of this bankruptcy case, Your Honor, is to use the protection of bankruptcy to avoid posting a supersedeas bond and apparently to facilitate significant

fraudulent transfers to the Debtor.

Now the reasons for the conversion that are requested is the Debtor continues to do this notwithstanding the warnings from the Court and otherwise.

A Chapter 7 Trustee could recover pre-petition payments made to the Debtor and Cashyew, could recover post-petition payments to Cashyew and the O’Hares, could review the appeals and determine whether they are frivolous or not. At least having a third party determine that would be very helpful. And I guess most importantly, payment of all creditors on equal footing rather than payment of some creditors and not others.

Chapter 7 Trustee could also analyze the malpractice case that this Court heard about at the hearing on the employment of Mr. Cimino and determine whether there is -- I don't know, any there or there, with regard to that claim.

If there is, fine, then maybe a Chapter 7 Trustee would proceed. But if there isn't, that's also fine because it's a waste of -- it could be potentially, depending on what a Trustee decides, a waste of estate resources and going forward on that.

And so based on that, Your Honor, offer of proof, we believe that there is cause to convert this case to chapter seven.

And I wanted to address also the idea that there's not a better way to do this. And as the Court knows, you know, 1104 doesn't really apply to subchapter 5 cases pursuant to 1181 A, which kind of incorporates what provisions under chapter 11 are applicable.

So potentially under 1185, I could have requested that this Court remove the Debtor. But if I remove the Debtor and have Ms. Lofstedt in place, my reading of the code under 1183 is that -- in case law -- is that she doesn't have avoidance powers. And really, that's the biggest reason to appoint a Chapter 7 Trustee in this case is to recoup those monies that have gone to Cashyew, Mr. O'Hare, and use those monies to pay creditors. I mean, the amount of money that's going to those creditors post-petition, that's the same amount or similar amount going to them pre-petition. There is a significant amount of money that could recoup to pay all creditors in full.

And so based on that, Your Honor, we would respectfully request that the Court convert this case to chapter seven. Thank you, Your Honor.

THE COURT: Thank you. Mr. Garber or Ms. Koelsch, it's my understanding that you're only here on as special counsel in the appeals. Is that correct?

MS. KOELSCH: That's correct, Your Honor.

THE COURT: Mr. Garber.

MR. GARBER: Your Honor, so I don't believe -- I know I don't represent the Debtor at this moment.

I do have some general observations about the case, as well as some of the comments made by Mr. Caby, but I think what it would be better from, given my -- the limited role I think I can play at this point in time, is to hear from the Debtor itself.

I’m a little surprised and disappointed that Mr. Cimino isn't here representing the Debtors as Debtor’s counsel. But being that as it may, I think we should let the Debtor make some observations as well as the other party, and then I'd like to reserve to make comments at the end, if that will be okay with the court.

THE COURT: Well, Mr. Garber, Mr. O'Hare is not licensed in Federal Court. This is an entity, his business, that is in bankruptcy. So the only way the Debtor can be represented is through counsel at this hearing.

MR. GARBER: Understood, Your Honor. And if the Court won't hear from Mr. O'Hara, then I would still ask that the Court hear from the subchapter 5 Trustee, as well as Mr. Cal and then allow me to comment last, if that would be okay.

THE COURT: That's fine. Ms. Lofstedt.

MS. LOFSTEDT: Thank you, Your Honor. First, I did not take a position on the motion to dismiss or convert, but at this time, I'm not in support of dismissing or

converting the case.

I had been working with previous counsel to clean up the issues with cash collateral and to amend the original plan that was filed.

The motion to use cash collateral has now been filed. The Debtor did use cash collateral without an order. But you'll hear from counsel for Chase that I believe that Chase, they've reached a resolution that will resolve the issues with use of cash collateral for the previous use and going forward for future use of cash collateral.

The budget attached to the cash collateral motion will allow the Debtor to Pay Cashyew Holdings $40,000.00 per month for management services, retain $15,000.00 for operating expenses, and the balance will be set aside to ultimately be available to make payments under a confirmed plan.

I did work with counsel to amend the plan that was originally filed. And we were further working to amend the plan to file a second amended plan that would incorporate the cash collateral settlement with JPMorgan Chase. And then there were also a few other amendments that we were working on.

As shown on the monthly operating reports and the budget, this is a Debtor who is generating significant cash flow. Based on the past revenue numbers, the Debtor should

have sufficient funds to pay all allowed claims in full over the plan term.

The Debtor disputed --

THE COURT: This is a Debtor who hasn't bothered to pay. I mean, the Debtor has enjoyed the privilege of the automatic stay, but has to this point not bothered to pay attention to its obligations under the code and has acted as though this is just a free for all at this point.

MS. LOFSTEDT: And, --

THE COURT: And that's a very big concern to the Court.

MS. LOFSTEDT: And a concern to me as well. But I think we've been working to try to resolve those and in essence rectify or you know, a path forward, how to proceed forward.

And you'll hear from counsel for Chase. I think the budget that's being proposed, and those were going to be incorporated into a plan, would provide for essentially all allowed claims in full.

The Debtor does still dispute two of the claims. The plan would allow the Debtor to continue to dispute those. But during the plan term set aside any additional funds after payment for the management services and for the operating expenses. And I think just based on previous cash flow, that would be sufficient to pay the claims if allowed.

I do not see this case as a two party dispute. It wasn't a two party dispute when it was filed. And I think other creditors would be impacted if the case were converted.

THE COURT: What other creditors do we have? I mean Debtor's principal has paid Allen Vellone, so they're not a creditor at this point. American Express, if I'm understanding correctly, has been being paid post-petition and it's really the litigation parties that are left. Isn't that correct? Or am I missing some creditors?

MS. LOFSTEDT: Well, for one thing, American Express, my understanding is that Mr. O'Hare would probably have joint liability for any expenses that he charged on a business credit card. So he would have personal liability for that.

As Mr. Caby stated, if a Chapter 7 Trustee is appointed, I think the Chapter 7 Trustee would look at the transfers and potential avoidance claims and some of those may be pulled back. So whether the payment to Allen Vellone is appropriate, you know, they may eventually be a creditor if those payments are paid back.

THE COURT: But that's if we've got a Chapter 7 Trustee in place. Mr. O'Hare, who's the managing partner or manager, this Debtor is certainly not going to be inclined to look carefully at those sorts of post-petition payments, is he?

MS. LOFSTEDT: As the -- I think that that was another issue that we were discussing, I was discussing with counsel. That's an issue. Some of those payments that were made to Cashyew, Chase had raised those issues. And I know there was $55,000.00 that came back into the Debtor as one of the demands that Chase had made and that would have then in Essence allowed the $40,000.00 to go to Chase for the management services and allow the Debtor to cover just its operating expenses.

So, and I understand the Court's concern and these are concerns that I have had too, but just based --

THE COURT: And they kind of go to the heart of bankruptcy.

MS. LOFSTEDT: I know. I understand. And I think this is a unique situation in that there is significant funds. If it's converted, I don't know what value the do not call list would have if it's not continually being updated, whether you can market and sell that.

So what a Chapter 7 Trustee would be looking at are avoidance claims. Would that be sufficient to pay all creditors in full? You know, I don't know. I just think that based on the revenue stream and the continuing operations, with new counsel having more oversight going forward and the amendments that we were proposing to be made to the plan to kind of address some of these past issues,

that I think there's a path forward for all creditors that would benefit all creditors. So, thank you.

THE COURT: Thank you. Mr. Cal.

MR. CAL: Good morning, Your Honor. Peter Cal from Sherman and Howard representing the secured creditor, JPMorgan Chase Bank, NA, which I'll refer to as Chase.

Chase did file an objection and reservation of rights to the motion to convert. That's at docket number 168. Chase did not receive the movant's exhibits. So just wanted to point that out.

THE COURT: Yeah, but your objection was sort of, we don't object if there's a cash collateral agreement that we can reach, but we do object if there -- So it was a little unclear to me as to whether or not you all still had an objection, given that there's the --

MR. CAL: Well, I --

THE COURT: -- cash collateral motion filed.

MR. CAL: So, Your Honor, I think what our objection was, you know, if the Debtor could get its act together and get an agreement on cash collateral, and I think we may have also referenced an amended plan -- let me take a look. Yeah, at paragraph 10, we wanted an agreement on cash collateral and amend the plan.

We thought it would be in the best interest of the estate for the Debtor to be allowed to continue to operate.

I think we also had an objection -- yeah, so, yeah. That was our objection, Your Honor.

And so at this point, I do think we have an objection. You know, the cash collateral issue, as well as an amended plan, is something that I don't think is quite finalized yet. I have -- having worked with proposed new counsel on a number of cases, including representing secured creditors in subchapter 5's, I have a level of confidence that I will be able to quickly reach agreement with the Debtor through their new proposed counsel.

I think the motion and the proffer do raise a number of frankly, factual issues. I mean, the evidence may be pretty heavily weighted one way on the surface, but I think when you're really trying to get into what exactly are the motives of the Debtor, I think they have to put the Debtor on the stand. And the Court has to make -- observe the Debtor's testimony and, and really determine just that.

There's this big, you know, there's this big issue behind here that the elephant in the room is what was going on between the Debtor and its prior counsel. And I think testimony is required there. I don't know how much is on the Debtor, how much is on Debtor's prior counsel. It does look, based on even the exhibits that the movant would offer, that there is sufficient cash flow here where modest or even maybe a little bit more than modest payments to Cashyew/the O'Hares

will leave, you know, $50,000.00 a month in the bankruptcy estate for creditors.

You know, all creditors, on the surface, all creditors could be paid in full in a matter of, you know, two years.

So I think it seems that this is a case that has a chance for a reorganization. Chase basically, look, Chase has a security interest in cash collateral. I don't want to end up in a fight with the Trustee. If there's a Chapter 7 Trustee, I'll ultimately prevail on that issue. Chase will prevail on that issue.

But I think the easiest, quickest way for Chase to be paid in full is to keep the case in chapter 11 and let this Debtor reorganize a plan. You know, there aren't a whole lot of other creditors. I do think it's a fair question to ask what is -- well, what is motivating the movant here. I think it's a fair question that the Court should determine.

THE COURT: Well, I understand that everybody's got their own motivations in this, but the issues that are being raised are well beyond bad motivation on the part of the movant.

MR. CAL: Yeah, and I'm sort of in -- I feel I'm in a bit of an odd position. I'm not sure how I put myself here, but I do not want to defend what the Debtor has done

during this chapter 11.

THE COURT: I understand.

MR. CAL: I am looking out for what's the easiest, quickest way. You know, Chase has an $85,000.00 claim here. I'm just trying to be -- find an efficient way without me incurring a bunch of fees to charge to Chase that they're going to have to pay me anyway under the attorney's fee clause to get to my client being paid. And the circumstance there, I think, is that through a chapter 11 plan and with a cash collateral order, that can happen.

I think there are, you know, maybe 1104. There are extenuating circumstances, unusual circumstances. I don't know what all the standards are under 1185 that the court should be applying. But this case really is a very odd case in terms of -- and I'm not -- the status of counsel, you could read that in a bad way or frankly in a good way. I'm not, you know, the timing of it is unfortunate on this motion, but it does look like the Debtor really is trying to get new counsel and counsel who will be able to move this case to a rapid, efficient close with again, all creditors, including the movant’s being paid in full.

So I think there are factual issues that the Court would have to decide at an evidentiary hearing. And I would suggest that there's really -- this case would be best served, all creditors would be best served, I guess with the

proverbial one last chance and Mr. Garber's perhaps the last best hope for this Debtor.

Thank you for hearing me, Your Honor.

THE COURT: Thank you. Mr. Motes.

MR. MOTES: Thank you. Your Honor. The U.S. Trustee did not take a position on the motion to convert and I'm not going to take a position on that today.

I did want to observe and especially since Mr. Garber is present. And I don't think it was discussed, but Mr. Caby went through a litany of concerns that he had about the monthly operating reports in this case.

And I wanted to point out that the case was filed on May 16th and I don't think there's ever been a report filed for the second half of May. I think there is a report for June and thereafter, but unless I somehow have missed it, I don't see a report having been filed for that, you know, roughly two week period during May. Just wanted to observe that for the record.

Thank you. Your Honor.

THE COURT: Thank you. Mr. Cohen or Mr. Rismani.

MR. COHEN: Yes, you, Honor.

THE COURT: I'm assuming you're both kind of in the same position.

MR. COHEN: Yeah, I want to echo certainly the counsel that did a very thorough job for Ringba and I think

that's absolutely true.

And I think the one concern about the conversion to chapter seven and appointment of the Trustee is the continuation of the Debtor, since I think people believe there is ongoing concern value of the Debtor that needs to be preserved, which indeed may be true, which does not and is a separate issue from the manifold and manifest errors and totally ignoring the requirements of the code since May and now we're in almost mid October.

But as I recall, a Chapter 7 Trustee can, if he wants to, continue under a limited basis, if he makes a motion, the business of the Debtor. And has the authority, if he believes in a liquidation, to continue and get that fair market value of this TCPA list so that the list itself can continue to throw off cash to creditors, while at the same time we have an independent third party, a true fiduciary, look at this, look at what has happened, be able to reach back and claw back whatever transfers were inappropriately made, which I don't think this Debtor can.

And frankly, right now the Debtor is being run through Cashyew Holdings and Mr. And Mrs. O'Hare individually at the expense of the bankruptcy code. And essentially they're getting a bond for free, and that's not allowed. And that's obviously bad faith. I think there's an opinion we cited in a prior objection by Judge Rosanio on this point.

And there are a plethora of bankruptcy cases on this point showing bad faith of the Debtor.

Your Honor, it really continues. It really continues, it really continues the conduct that was highlighted by Judge Bain in the orders that this Debtor seeks to appeal. If the Court reads the orders, as painful as that may be, you see, it's the same exact thing. It's hiding, it's not disclosing, it's not following the rules. It's shucking and jiving. This is just a continuation for the past two and a half years of the same conduct, Your Honor.

And I think this Court can consider pre-petition conduct, especially since it reaffirms the post-petition conduct. This is exactly the same thing and it must stop.

We need truly an independent Trustee to preserve value, claw back and reach back, take a look and examine these transactions. It's highly, highly irregular, Your Honor. I’ve practiced in this Court for 35 years. I'm not seen such a total, I mean, just a complete dropping of the ball on the bankruptcy requirements. It's shocking and it's so --

And at the same time, taking maybe $80,000.00 or $90,000.00 a month for either Cashyew Holdings and/or the individuals. It's just shocking. Without disclosure and approval, it's obviously a transaction out of the ordinary

course of business under 363(c). I mean, it's just patent that that kind of money coming out of the Debtor needs to be approved before, not after, it comes out of the debt.

Your Honor, I just think it's so overwhelming. I would move for the appointment of a Trustee at the end of this hearing. I don't think we need any evidence. I think this is all undisputed. Thank you.

THE COURT: Mr. Rismani, do you need to add anything? Are you on mute?

MR. RISMANI: Apologies, Your Honor. Yes. Nothing further, Your Honor.

THE COURT: All right.

MR. RISMANI: My clients join in the statements made by Mr. Caby and Mr. Cohen.

THE COURT: Thank you. Mr. Garber.

MR. GARBER: Thank you, Your Honor. So a few observations here.

When I looked at the case docket before I agreed to be retained, I recognized that the case was, for lack of a better word, a mess. You know, I understand the sort of instinct to blame the Debtor or, you know, the buck stopped with the Debtors. The Debtors are responsible for its case.

I also understand that if I come in and approve to be substitute counsel, that I take the case in the form that it's in. And I am learning of more potential issues with the

case as we have proceeded through this hearing.

But I still think there's a couple very important observations that are worth the Court's consideration, which is that I hear, not that they're not important and not that it's not an essential part of the bankruptcy case, but that there are a lot of what I would call administrative issues that can be rectified and rectified quickly.

Monthly operating reports can be corrected and amended. My quick glance at the plan shows that it's, you know, not put forth in a way that renders the current plan confirmable. I've spoken to Ms. Lofstedt about it in the short time that I've been in the case. I believe we can quickly put forth an amended plan that should be confirmable.

I think that the cash collateral issue, I've already spoken to Mr. Cal, and that can get remedied. And while you can't sort of retroactively approve cash collateral, it is the bank's collateral, and that issue can be remedied and there's a budget. I've learned today that some money has already come back.

I think that the consent, the fact that there's concern about potential transfers, there is a medium ground for investigating that, which is that the subchapter five Trustee, I don't know if they can or can’t bring claims, but they certainly can have their authority expanded so that they can investigate the claim and inform the court and the

parties of what the findings are. And Ms. Lofstedt would be more than capable of putting forth a report, and that can be remedied as a plan.

But then at the end of the day, as has been observed, my understanding from my short time in the case is the Debtor has an ability to pay all the creditors in full and do it in a year or two. That's going to be just as fast, if not much faster, than a Chapter 7 Trustee being appointed, the Trustee commencing litigation and litigation continuing. And there's no guarantee of the result of any of that.

So before I got involved in this case, I spent a lot of time trying to understand as much as I could, as quickly as I could. And I don't understand everything. But this is a case where a company can be saved. There are employees of this company. There are customers of this company that rely on the company. I think there's circumstances that extend beyond the surface of what the court is just hearing that are really important. And this is a company that can readily be saved and I think pretty quickly.

And I think we can know -- I've spoken to the Debtor. He understands that my involvement means this case gets fixed and does not continue in the pattern that has continued, whether it's the Debtor's fault or counsel's fault. And I'm not going to start pointing fingers at

people, though I think I easily could. This is a case that's ready to get fixed, get fixed quickly.

I think we can tie conversion to a confirmation hearing. Once I get employed, I think I can file an amended plan.

In the meantime, I will get cash collateral fixed. Mr. Cal and I, I think, are mere steps away from getting that resolved. I think my retainer, even if you can trace it all the way back to the Debtor, and I don't know if you can or can't, I've been told it came from, you know, Mr. O'Hare's personal bank account. That would still be Chase's cash collateral. And I think Mr. Cal can confirm, but I think and I get the sense from his comments, he thinks my involvement in the case is really beneficial. I think it'll sort of tamper down a lot of this litigation, tamper down a lot of these issues. We'll get a confirmable plan on file. We'll get cash collateral resolved. We'll get creditors paid, my understanding is in full, quickly. And this case, can be put to bed.

And again, that does not ignore all the concerns. I understand what the Court's saying and I hear what the creditors are saying. But I just think, as it sort have been mentioned, this is a special case with special circumstances. And that's why I consider taking it on, because I think this is a company that can and is worth saving and we can get to a

spot that pays everybody in full.

And the thought that a Chapter 7 Trustee is going to run this business and that I think technically they can, but I've never seen it. They'd have to, you know, hire somebody that knows how to run the business. The Chapter 7 Trustee does not, which means we're likely right back to the management agreement is where we probably end up at. And that doesn't seem to change much.

And I think if there's great concern about these transfers and I only know a tad bit about them, Ms. Lofstedt can prepare a report and let us know what transfers there are, what needs to come back and we can see if it's even necessary to proceed that way because if the Debtor is paying the creditors in full anyway, bringing a bunch of avoidance action litigation isn’t going to do anything but ramp up administrative claims whether in an 11 or 7?

So while I hear everything that the Court and everybody's saying, I think there should be some time, by tying conversion to confirmation to allow me to get employed.

In the meantime, I will continue to do as much as I think I can do while I'm not technically employed to resolve some of these issues. There's no reason I can't work with the Debtor to fix monthly operating reports. There's no reason we can't get a cash collateral agreement on file and allow this case to move forward in what should be a normal

path.

This case should not be as tortured as it is. It's just not that complicated of a case.

THE COURT: Thank you. I'm going to set this matter over for a final evidentiary hearing. I've got October 24th and 25th available both days. There seems to be a lot that will mean needed to be gone through. Mr. Caby, does that work for you?

MR. CABY: It does, Your Honor.

THE COURT: All right. Mr. Garber.

MR. GARBER: I’m sorry, Your Honor. I'm bringing up my computer. It locked. Do you want to check -- what were the two dates again? October 25 and 26.

THE COURT: The 24th and 25th.

MR. GARBER: 24th, 25th. Do you want to check with the other parties while my computer, for whatever reason, is just acting crazy?

THE COURT: While you're looking, Mr. Cal, does that work for you?

MR. CAL: It does, Your Honor. Thank you.

THE COURT: Ms. Lofstedt.

MS. LOFSTEDT: Your Honor, I have a confirmation hearing at 1:30 with Mr. Garber that afternoon, so.

THE COURT: Which afternoon?

MS. LOFSTEDT: The 24th. And I'm not sure I would

be at the full hearings, but Mr. Garber's got at least the afternoon.

THE COURT: Well, we could do the morning of the 24th and then all of the 25th. Does that work for you?

MS. LOFSTEDT: I have a docket on the 25th, but again, I don't think I will be here for the all of the hearing.

THE COURT: All right. Mr. Cohen.

MR. COHEN: Your Honor, as long as I could appear by telephone. Otherwise I've got a deposition on the 24th and 25th.

THE COURT: Well, this is going to be an in-person evidentiary hearing.

MR. COHEN: I see. I don't want to -- I will make that work.

THE COURT: Thank you.

MR. COHEN: Thank you

THE COURT: Mr. Rismani.

MR. RISMANI: I'll make it work, Your Honor.

THE COURT: Thank you. Mr. Garber, understanding you have a confirmation hearing the afternoon of the 24th. We could do the morning of the 24th and all day the 25th.

MR. GARBER: Okay, Your Honor, we can do that.

THE COURT: I understand that you're new to the case. I understand that you've got to prepare for

confirmation. This thing, though, can't sit here and languish very long. It's either got to be addressed or in one way or the other, either converted.

Actually, there are a number of options. Expand the duties of the subchapter 5 Trustee. Dismiss the case. I mean, there are a number of things that the Court needs to consider, but I don't want this thing languishing. The case has been pending for a while. There's been a significant amount of mischief that's occurred during the case that I understand there may be ways to remedy, but I don't want additional mischief to continue.

MR. GARBER: That's fair, Your Honor. I just got to ask the Court a question because I haven't really done this before.

THE COURT: Yes.

MR. GARBER: I'm not really -- I am not -- and I think under the objection deadline that's set by the Court, I probably will not be retained at that point. Is the Court comfortable with me and the parties comfortable, the U.S. Trustee is comfortable with me sort of taking on this role as if I am Debtor’s counsel, while Mr. Cimino is technically still counsel for this Debtor? That's my, that's my concern. Right.

Like I want to get myself retained as quickly as possible. I'm surprised that Mr. Cimino is not here. I

mean, I didn't say anything on the docket that relieved them of his duties as counsel for Debtor, the Debtor in possession.

THE COURT: Let me look at the calendar.

MR. CAL: Your Honor.

THE COURT: Yes.

MR. CAL: And I hesitate to do this, and I apologize. I know. Your Honor denied the motion to shorten time on Mr. Garber's application. Perhaps you could set a deadline for objections prior to the hearing you just set. I think all the parties who would object -- anyone who would object to the retention by Mr. Garber is probably on the phone today. So I apologize for raising that.

THE COURT: No, and I was thinking the same thing, Mr. Cal. Why don't we do this. Mr. Garber, why don't you file a motion to reconsider the denial of the motion to shorten time and I'll look at that.

The retainer, I think, does need to be -- well, I mean, you may have everybody here who needs to object to the retainer. File a motion to reconsider.

MR. COHEN: On the retainer. Okay. May I be heard on the retainer issue, Your Honor, or just file an objection?

THE COURT: Mr. Cohen, it will be file an objection. But please think long and hard about doing that.

MR. COHEN: Okay.

THE COURT: And think about how best to get this case moving forward.

MR. COHEN: Understood.

THE COURT: Okay. All right. We will go forward. Mr. Garber, in terms of exhibits and witnesses, I know there's been nothing filed. There was a pleading filed by Mr. O'Hare, but the Court, given that this is an entity, not an individual, can't consider that. I'll give you until October 11th to file a witness and exhibit list by close of business at 5:00 o’clock.

And Mr. Caby, would you please make sure that everybody who appeared today has a copy of your witness and exhibit list, and most importantly, the exhibits?

MR. CABY: Absolutely, Your Honor.

THE COURT: All right.

MR. CABY: And might I ask also, in case we had some additional exhibits, would that October 11th apply to any amended witnesses.

THE COURT: Yeah. Yeah. Let's put it as any amended exhibits need to be filed by the 11th. I think that should give everybody the opportunity to review the exhibits.

All right. Is there anything further in this matter we need to address this morning, Mr. Caby?

MR. CABY: I don't, I don't think so. Nothing

more than what we talked about previously.

THE COURT: All right.

MR. CABY: So I won't respond to some of the comments. I'll just save those for our evidentiary hearing.

THE COURT: Thank you. Mr. Garber.

MR. GARBER: Nothing for me, Your Honor.

THE COURT: All right, Ms. Lofstedt.

MS. LOFSTEDT: Nothing further. Thank you.

THE COURT: Thank you. Mr. Motes.

MR. MOTES: No, thank you, Your Honor.

THE COURT: Mr. Cal.

MR. CAL: I think it might be worthwhile for you to remind Mr. O'Hare that he is not authorized to use cash collateral.

THE COURT: Mr. O'Hare, no monies are to go out of the Debtor at this point.

MR. O’HARE: Yes, ma'am. Do you think we can get that resolved fairly soon?

THE COURT: Pardon?

MR. O’HARE: We can get that agreement with --

THE COURT: Well, that needs to be a motion. There needs to be properly moved forward in order for the Debtor to be able to pay operating expenses.

But all of the cash of this Debtor is subject to the lien of Chase. And there is no agreement on file. There

is no -- and you had no business using any of the funds before.

MR. O'HARE: Because currently we have about $200,000.00.

THE COURT: That's staying where it is.

MR. O'HARE: Yes, and by the end of this month, we'll probably have $300,000.00 and we haven't paid ourselves for my wife and I for the work that we do.

THE COURT: Well, but you paid prior to recently, did you not? You've paid yourself since the start of this case, correct?

MR. O'HARE: We have taken, yes, some payments under the management. Yes, ma'am.

THE COURT: Right. And that was in violation of the automatic stay. The monies were to have been there unless you a cash collateral agreement in place. That has not occurred. So until there is a cash collateral agreement, no monies are to go out of the estate.

MR. O'HARE: I was following the advice of my counsel, which abandoned me and is not here today. But --

THE COURT: Well, it's easy to blame somebody who's not here. And whoever's fault it is --

MR. O'HARE: Yes.

THE COURT: -- doesn't really matter to the Court. What matters to the Court is that there are no monies that go

out of the estate until there is a cash collateral order in place.

MR. O’HARE: May I ask one question for clarification, Your Honor?

THE COURT: Yes.

MR. O’HARE: So I filed bankruptcy because there was a bit of garnishment which is strangling about holding, suspending about 90% of our revenue.

I go into bankruptcy and then Chase comes in and says, you can't spend any money that comes in. So I'm going to catch 22. Am I not?

THE COURT: Well, that's why you have to put in place a cash collateral agreement.

MR. O’HARE: Yes.

THE COURT: Without that you can't use those funds. And that's so that the secured creditor understands what's happening to its collateral, which it is entitled to as of the filing of the bankruptcy. And it is so the parties know what monies are coming in and what monies are going out.

MR. O’HARE: Yes, ma'am.

THE COURT: And that is part of bankruptcy is that you will operate your books openly.

MR. O’HARE: Yes, ma'am. I perfectly understand that. And we were complying with that. However, at the beginning of the bankruptcy, I went to my attorney and I

asked him, I said, how are we going to keep staying in business, keep the lights on if we're not paying operating expenses?

THE COURT: I don't know the conversation you and your counsel had.

MR. O'HARE: Yes, ma'am.

THE COURT: I don't know what your counsel told you.

MR. O'HARE: Yes.

THE COURT: But what I am telling you right now is that nothing is to go out of the bank account until there is a cash collateral agreement in place.

MR. O'HARE: Yes, ma'am.

THE COURT: All right. Ms. Lofstedt, did you have anything you wish to add?

MS. LOFSTEDT: No, Your Honor.

THE COURT: All right, thank you.

All right. Since there is nothing -- oh, Mr. Cohen, anything further?

MR. COHEN: Nothing further, Your Honor.

THE COURT: All right, thank you all very much. The Court will now move on to its next case. Thank you very much.

MR. O'HARE: Thank you, Your Honor.

MR. CABY: Thank you, Your Honor.

(Time Noted: 10:46 a.m.)

* * *

CERTIFICATE

I, RANDEL RAISON, certify that the foregoing is a correct transcript from the official electronic sound recording of the proceedings in the above-entitled matter, to the best of my ability.



______________________________ December 16, 2024

Randel Raison