**UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF COLORADO**

| | |
|---|---|
| In re: ) | |
| ) | |
| DNC AND TCPA LIST SANITIZER, LLC, ) | Case No. 24-12624 KHT |
| ) | Chapter 11 |
| Debtor. ) | |

**OBJECTION TO CASHYEW HOLDING, LLC'S MOTION FOR ADMINISTRATIVE EXPENSES AND FEES PURSUANT TO 11 U.S.C. §§'s 503(b)(1) AND (2)**

Adam Young, Tubmanburg Limited and Ringba, LLC (collectively, "Ringba"), by and through its counsel, Womble Bond Dickinson (US) LLP, respectfully files their Objection to Cashyew Holding, LLC's Motion for Administrative Expenses and Fees Pursuant to 11 U.S.C. §§'s 503 (b)(1) and (2) (the "Objection"). In support of their Objection, Ringba states as follows:

**PRELIMINARY STATEMENT**

The Motion for Administrative Expenses and Fees Pursuant to 11 U.S.C. §§'s 503(b)(1) and (2) (Docket No. 302) (the "Motion") filed by Cashyew Holding, LLC ("Cashyew"), is the Debtor's and Cashyew's third improper attempt to have Cashyew paid for postpetition "services" that Cashyew has allegedly performed for the Debtor. In its first attempt, the Debtor filed its Motion to Assume Management Agreement with Cashyew. The motion to assume received three objections and thereafter was never prosecuted by the Debtor. The Debtor's second attempt was its untimely Motion for Authority to Use Cash Collateral which include budgeted expenses to pay Cashyew for "Owner Comp" in the total amount of $549,433.82 between May 2024 and March 2025. The motion to use cash collateral received two objections. Ultimately, the Court approved the cash collateral motion (on a stipulated basis), but only on the condition that no payments were allowed to be paid to Cashyew. Now, undeterred by its prior unsuccessful attempts, Cashyew (and

127509207.1

the Debtor) seek to, yet again, extract payments from the bankruptcy estate through its present Motion.

Cashyew's present Motion is just as improper as its prior attempts. The present Motion must be denied because Cashyew is a "professional person" as provided for under 11 U.S.C. § 327(a). Even though Cashyew qualifies as a professional person, the Debtor and Cashyew never sought approval of Cashyew's employment as required under Section 327(a). In an apparent admission of its failure to be employed, Cashyew now attempts to wire-around Section 327(a) and request administrative status under Section 503(b), asserting that its "agreed compensation" of $35,000 per month for August 2024 through January 2025 qualifies as an administrative expense. However, Cashyew's request for administrative status does not meet the legal requirements under Section 503(b) and, furthermore, the services allegedly provided to the Debtor were not necessary to the preservation of the estate. Indeed, if the Court considered Cashyew's Motion under the applicable standard (Section 327(a)), the Motion would be summarily denied: Cashyew is not "disinterested," as it is an insider of the Debtor, owns 99% of the Debtor, and shares the same two principals, Mr. and Mrs. O'Hare, all of whom have received numerous prepetition fraudulent transfers made by the Debtor that are ultimately subject to recovery by the Debtor's bankruptcy estate. As set forth in greater detail below, the Motion must be denied.

**JURISDICTION AND VENUE**

1. This Court has jurisdiction over this Chapter 11 case pursuant to 28 U.S.C. §§ 157(a) and (b) and 1334(a) and (b).

2. Venue is proper in this Court pursuant to 28 U.S.C. § 1409.

- 3 -

## PROCEDURAL BACKGROUND

3. DNC and TCPA List Sanitizer, LLC (the "Debtor") filed for relief under Chapter 11 of the Bankruptcy Code on May 16, 2024.

4. The Debtor is 99% owned by Cashyew. Docket No. 55 ¶ 8. The remaining ownership interests in the Debtor are held by Michael O'Hare (.50%), the Debtor's CEO, and Tanya O'Hare (.50%), the Debtor's Secretary. Docket No. 84 § 28. Cashyew is in turn wholly owned by the O'Hares. Docket No. 55 ¶ 8.

5. On July 10, 2024, the Debtor filed its Motion to Assume Management Agreement with [Cashyew] (the "Motion to Assume"), under which the Debtor sought authority to pay Cashyew a 60% management fee (of the Debtor's gross revenues) on a monthly basis going forward. Docket Nos. 58, 58-1, 58-2.

6. Multiple objections were filed in opposition to the Motion to Assume. *See* Docket Nos. 88, 100, 102 (objections were filed by Ringba, JPMorgan Chase, N.A. ("JPMorgan") and the United States Trustee (the "UST")). The objecting parties asserted that the contract to be assumed was not beneficial to the estate and was apparently executed after the petition date. *See* Docket Nos. 88 ¶¶ 15, 18–21; 100 ¶¶ 10–11; 102 ¶ 9. For example, Ringba noted that the Management Agreement would "move money from the Debtor to insiders;" would benefit the O'Hares and Cashyew "over the bankruptcy estate and creditors;" and evidenced self-dealing by and between the O'Hares and their two entities (the Debtor and Cashyew). Docket No. 88 ¶¶ 18, 21. JPMorgan likewise objected that it did "not consent to the use of cash collateral to pay Cashyew" under the Management Agreement or otherwise. Docket No. 100 ¶ 12. Additionally, the UST objected that the Motion to Assume entirely lacked any explanation as to why the Court should approve the motion and that it was unclear whether the Management Agreement was executed pre or

postpetition. Docket No. 102 ¶¶ 5, 6. The UST also observed that it would be impossible for the Debtor to pay its proposed 60% of gross revenue to Cashyew while also paying its other expenses, amounting to about 80% of the Debtor's gross revenue. *Id.* ¶ 9. The Debtor failed to further prosecute the Motion to Assume in light of the three objections.

7. Nearly three months later, on October 2, 2024, the Debtor filed its untimely Motion for Authority to Use Cash Collateral "[i]n order to pay necessary operating expenses[.]" (the "Cash Collateral Motion"), Docket No. 189 ¶ 9. Attached to the Cash Collateral Motion was a proposed budget, which included payments to Cashyew for "Owner Comp" in the total amount of $549,433.82 between May 2024 and March 2025. *See* Docket No. 189-1. The Cash Collateral Motion was filed only after Cashyew had made multiple postpetition *unauthorized* transfers to Cashyew, the O'Hares, and others, without the consent of JPMorgan or permission from this Court. *See* Docket Nos. 50; 151 ¶¶ 34–39.

8. On October 24, 2024, this Court, pursuant to the consent of Ringba, JPMorgan, and the UST, partially granted the Debtor's Motion for Authority to Use Cash Collateral but held that "[t]he Debtor can make all payments provided for in the Budget **except for payments to Cashyew Holding** . . . ." Docket No. 252 ¶ 1 (emphasis added).

9. In this case, various applications for the employment of professionals have been filed pursuant to 11 U.S.C. § 327(a). *See, e.g.*, Docket Nos. 37, 73, 205. No similar application was filed for Cashyew, notwithstanding Cashyew admits that it is performing "essential management services" for the Debtor. *See* Motion, ¶ 6.

10. On January 24, 2025, Cashyew filed its present Motion. The Motion asserts that "Michael O'Hare and Tanya O'Hare are the two (2) primary employees/independent contractors utilized by Cashyew Holding, LLC . . . to perform services for the Debtor, DNC and TCPA

Sanitizer, LLC." Motion, p. 1. The Motion describes the services provided by Cashyew as "essential management services under a structure designed to maximize tax deductions." *Id.* ¶ 6. The categories of services purportedly performed by Cashyew for the Debtor include, but are not limited to: "financial management, bookkeeping, operations management, sales and marketing, and risk/crisis management." *Id.* ¶ 7. At paragraph 13 of the Motion, Cashyew specifically indicates that it provides the Debtor the following professional services:

> Michael and Tanya O'Hare performed the following essential duties for the Debtor: a. **Financial Management:** Budgeting, forecasting, cash flow management, and financial reporting. b. **Bookkeeping:** Recording and maintaining financial transactions. c. **Operations Management:** Overseeing daily operations, managing customer service issues, and addressing technical problems with the Debtor's platform. d. **Sales and Marketing:** Driving revenue growth through marketing initiatives, sales outreach, and webinars. e. **Risk/Crisis Management:** Mitigating threats to the business, including cyberattacks and legal challenges.

Motion, ¶ 13 (emphasis in original).

11. Cashyew now seeks payment, as an administrative expense, the amount of $210,000.00, representing $35,000.00 per month for "compensation" from August 2024 to January 2025. *Id.* ¶ 9.

## OBJECTION

### A. Legal Standard for Administrative Expense Claims under Section 503(b)

12. Under 11 U.S.C. § 503(b), an entity may seek payment of certain administrative expenses related to the costs of preserving a debtor's bankruptcy estate. "The burden of proving entitlement to an administrative expense priority claim falls on the movant . . . and such priority must be 'narrowly construed.'" *In re Blair Oil Investments*, LLC, 588 B.R. 579, 591 (2018) (citing *Isaac v. Temex Energy, Inc.* (*In re Amarex, Inc.*), 853 F.2d 1526, 1530 (10th Cir. 1988)). Administrative expense priority claims are reserved for "actual, necessary costs and expenses of preserving the estate." *Id.* at 598 (quoting *Peters v. Pikes Peak Musicians Assoc.*, 462 F.3d 1265,

1268 (10th Cir. 2006)) (cleaned up). Further, for reimbursement by the estate, administrative claims must satisfy two elements: "(1) the claim resulted from a post-petition transaction; and (2) the claimant supplied consideration that was beneficial to the debtor-in-possession (or trustee) in the operation of the company's business." *Id.* at 591 (quoting *Pikes Peak Musicians*, 462 F.3d at 1268). Administrative claims that are not necessary to the preservation of the estate or that fail to satisfy either of the stated elements, must be denied. *See id.*

**B.     Cashyew is a "Professional Person" and Should Have Been Employed and Applied for Compensation Under 11 U.S.C. § 327(a), not § 503(b)**

13.     Despite the availability of Section 503(b) for administrative expenses, "professional persons" *must* apply for employment and compensation under 11 U.S.C. § 327(a), not Section 503(b). *See Blair Oil*, LLC, 588 B.R. at 592. Otherwise, "[t]o allow a 'professional person' to skip Section 327(a) and still assert an administrative expense priority claim would 'effectively write § 327(a) out of the Bankruptcy Code.'" *Id.* (quoting *Interwest Bus. Equip., Inc. v. U.S. Tr.* (*In re Interwest Bus. Equip., Inc.*), 23 F.3d 311, 318 (10th Cir. 1994)). Where an entity is found by the Court to be a "professional person," it "cannot avoid such adverse result by merely invoking Section 503(b)(1)(A) and requesting allowance of an administrative expense priority claim." *Id.* at 598.

14.     Section 327(a) allows a debtor to employ "professional persons," including, "attorneys, accountants, appraisers, auctioneers, **or other professional persons**, that do not hold or represent an interest adverse to the estate, and that are disinterested persons, to represent or assist the trustee in carrying out the trustee's duties under this title." 11 U.S.C. § 327(a) (emphasis added). Any "professional person" seeking compensation from the bankruptcy estate must apply under Section 327(a) or else they forgo compensation. *Blair Oil*, LLC, 588 B.R. at 591 ("Compliance with Section 327(a) is mandatory for all 'professional persons.' Indeed, bankruptcy

courts are not authorized to approve compensation for 'professional persons' who do not meet the requirements of Section 327(a), **including court approval of employment**." (emphasis added)). In other words, a professional person providing services to the bankruptcy estate without court approval is "simply considered a volunteer[.]" *See Blair Oil*, LLC, 588 B.R. at 591 (quoting *Mark J. Lazzo, P.A. v. Rose Hill Bank* (*In re Schupbach Inv., L.L.C.*), 808 F.3d 1215, 1219 (10th Cir. 2015)) (quotations removed).

15.     Although the term "other professional persons" is not expressly defined in the Bankruptcy Code, courts have held that it includes professionals "who play a central role in the administration of the debtor's estate." *Id.* (quoting *Matter of Seatrain Lines, Inc.*, 13 B.R. 980, 981 (Bankr. S.D.N.Y. 1981)) (cleaned up); *see also In re Neidig Corp.*, 117 B.R. 625, 628 (Bankr. D. Colo. 1990). "[T]he term 'person' includes individual, partnership, and **corporation**[.]" 11 U.S.C. § 101(41) (emphasis added). Thus, a corporation hired to fulfill a central administrative role for a debtor's estate must apply for compensation under Section 327(a), not Section 503(b).

16.     As this Court has noted, there are various "non-exclusive factors" "bearing on whether a person [or corporation] is a 'professional person' under [Section 327(a).]" *Blair Oil*, LLC, 588 B.R. at 593. These factors include:

> (1) whether the employee controls, manages, administers, invests, purchases or sells assets that are significant to the debtor's reorganization;
>
> (2) whether the employee is involved in negotiating the terms of a Plan of Reorganization;
>
> (3) whether the employment is directly related to the type of work carried out by the debtor or to the routine maintenance of the debtor's business operations;
>
> (4) whether the employee is given discretion or autonomy to exercise his or her own professional judgment in some part of the administration of the debtor's estate ...;

> (5) the extent of the employee's involvement in the administration of the debtor's estate ...; and
>
> (6) whether the employee's services involve some degree of special knowledge or skill, such that the employee can be considered a "professional" within the ordinary meaning of the term.

*Id.* (quoting *In re First Merchants Acceptance Corp.*, 1997 WL 873551, at *3 (D. Del. Dec. 15, 1997)).

17. For instance, in *Blair Oil*, this Court held that a Chapter 7 trustee who appointed himself as the *manager* of the debtor corporation (Blair Oil Investments, LLC) and subsequently applied for compensation under Section 503(b), was a "professional person" that should have (but failed to) apply for compensation under Section 327(a). *Id.* at 593–94. The Court found that the trustee put himself in a central role over administration of the estate; had special knowledge and skill, by virtue of his experience, law degree, and graduate degree in finance; and "controlled virtually every facet of the bankruptcy proceedings[,]" including deciding to liquidate assets rather than to reorganize the debtor, selecting other professionals for the debtor, preparing the disclosure statement and proposed plan of reorganization, and communicating with creditors. *Id.* Thus, the Court denied the trustee's application under Section 503(b).

**C. Cashyew's Motion Must Be Denied Because it is a "Professional Person" that Failed to Apply for Compensation under Section 327(a)**

18. Here, Cashyew's Motion seeking an administrative expense must be denied because Cashyew is a "professional person" that failed to apply for compensation under the applicable statute, Section 327(a).

19. By Cashyew's own admission and description of its services, Cashyew is a "professional person" because of the central role it purports to play in the operation and administration of the Debtor. As Cashyew states: "Michael and Tanya O'Hare, acting through

Cashyew Holding, have provided **critical operation and managerial services to the Debtor**, including but not limited to financial management, bookkeeping, operations management, sales and marketing, and risk/crisis management." Motion, ¶ 7 (emphasis added); *see also* Motion, ¶ 13 (describing Cashyew's "essential duties for the Debtor[.]"). Based on this description, there are few if no duties remaining for the Debtor, with respect to the daily administration of the bankruptcy estate.[1] Indeed, Cashyew effectively admits that its role is not just "central" but all encompassing. On the face of Cashyew's Motion, it is a "professional person."

20. Furthermore, in its Motion, Cashyew does not directly address the applicability of Section 327(a), even though Cashyew bears the burden of justifying its administrative expense claim. *See Blair Oil*, 588 B.R. at 591. Instead, Cashyew predominantly touts its management of the Debtor, claiming that Cashyew's services have increased revenues and "were essential to the Debtor's operations and directly contributed to the preservation and enhancement of the estate for the benefit of all creditors." Motion, ¶¶ 8, 10. Further, Cashyew states that, without compensation, the estate will be negatively impacted. *Id.* ¶ 12.

21. All of those facts militate <u>against</u> granting Cashyew's Motion. Based on Cashyew's own arguments, its employment is essential to keeping the Debtor "as a going concerning and . . . for maintaining [the Debtor's] value." *Neidig*, 117 B.R. at 629 ("[A Section 503(b) applicant's] specialized and important services had more than a tangential relationship with the administration of the estate. The ongoing and successful operation of the station [(the main asset of the debtor)] was pivotal to the business and effectiveness and success of any proposed plan. . . . [The applicant] was employed to keep the station as a going concern and was responsible for maintaining its value.

---

[1] It should also be noted that the Debtor and Cashyew are operated by the same two individuals, Mr. and Mrs. O'Hare. To the extent there was any ambiguity as to whether the "Debtor" or "Cashyew" is primarily managing the bankruptcy estate, this Motion requesting $35,000.00 to be paid to Cashyew each month decisively settles that question.

127509207.1

Simply stated, [the applicant's] role as manager of the Debtor's business was central and significant; its conduct very consequential to the reorganization."). This strongly indicates that Cashyew plays *the* central role in the administration and management of the estate and is thus a "professional person" under Section 327(a).

22. Moreover, Cashyew satisfies all of the "professional person" factors set out by this Court in *Blair Oil.* First, Cashyew's services require special knowledge and skill. Cashyew itself describes the specialized tasks it has reportedly performed for the Debtor, including "[b]udgeting, forecasting, cash flow management, and financial reporting," and "[b]ookkeeping." Motion, ¶ 13. Cashyew also oversees "technical problems with the Debtor's platform;" "[d]riving revenue growth through marketing initiatives;" and "[m]itigating threats to the business, including cyberattacks and legal challenges." *Id.* All of these alleged tasks are based on the specialized skills and knowledge of Cashyew, such as accounting, marketing, information technology, and the specific technical skills required to manage Debtor's platform. Courts have held that persons performing accounting and bookkeeping services are "professional persons" under Section 327(a). *See In re Jenkins*, 188 B.R. 416, 421 (B.A.P. 9th Cir. 1995), *aff'd*, 130 F.3d 1335 (9th Cir. 1997) (denying compensation to a trustee-bookkeeper who "performed professional accounting services" but failed to seek court approval for such services under Section 327(a)); *see also In re Renaissance Residential of Countryside, LLC*, 423 B.R. 848, 860–61 (Bankr. N.D. Ill. 2010) (holding that bookkeeping and related services "of an accounting, legal, and consulting nature" were "professional" under Section 327); *see also* 11 U.S.C. § 327(a) (naming "accountants" as one type of professional person). Indeed, Cashyew's and the Debtor's principal, Mr. O'Hare, has a Master's degree in Business Administration. Thus, Cashyew's services (at least as reported by Cashyew)

require not only special knowledge and skill but special knowledge and skill across several "essential" categories.

23. Second, Cashyew's services are not related "to the routine maintenance of the debtor's business operations[.]" *Blair Oil*, 588 B.R. at 593. Instead, Cashyew characterizes its reported activities as dealing with <u>creditors</u>, "stabiliz[ing] the Debtor's operations," and "protect[ing] its assets and value for the benefits of all creditors." Motion, ¶¶ 14–15. Cashyew also claims it "righted the ship as far as fixing the issues and challenges at the beginning of the bankruptcy" and "worked with the creditors on settlement of differences." *Id.* ¶ 14; *see also Blair Oil*, 588 B.R. at 594 (citing the applicant's management of the bankruptcy case and "communicat[ions] with creditors" as factors in support of finding he was a "professional person"). Far from routine, these are actions directly related to the *bankruptcy case*, not the routine carrying out of the Debtor's business. *See In re Brookstone Holdings Corp.*, 592 B.R. 27, 35–36 (Bankr. D. Del. 2018) (finding that closing of retail stores and restructuring activities were not routine and thus factor weighed in favor of "professional person" finding); *Renaissance Residential*, 423 B.R. at 860–61 (Bankr. N.D. Ill. 2010) (holding that bookkeeping services related to the bankruptcy case itself "were not a part of [the professional person's] routine pre-petition bookkeeping services."). Thus, this factor weighs in favor of finding that Cashyew is a "professional person."

24. Third, Cashyew enjoys complete discretion and autonomy to exercise its "own" professional judgment because it is owned by the Debtor's principals (the O'Hares), and the O'Hares and Cashyew in turn own the Debtor. Indeed, the whole *purpose* of the "services" provided by Cashyew is to operate the Debtor, "because the Debtor company has no employees; **Cashyew Holding performs all management work related to the Debtor's services**." Docket No. 301 at 3 (emphasis added); *see also Neidig*, 117 B.R. at 629 (holding that manager was a

127509207.1

professional person under Section 327(a) where it "appears to have provided rather specialized services and acted with relatively unfettered discretion and autonomy."). In short, besides the O'Hares, there is no other person or entity associated with the Debtor from which Cashyew must obtain approval or direction. Cashyew has unfettered control over the Debtor and it is therefore a "professional person" under Section 327(a).

25. Fourth, relatedly, Cashyew controls, manages, and administers the Debtor's estate and assets and negotiates the terms of its proposed plans of reorganization. Again, Cashyew controls all aspects of the Debtor. Its role is more akin to that of a Chief Restructuring Officer, which is indisputably a "professional person" under Section 327(a). *See In re Lodging Enterprises, LLC*, No. 24-40423, 2024 WL 4229132, at *2 (Bankr. D. Kan. Sept. 17, 2024); *In re Blue Stone Real Est., Const. & Dev. Corp.*, 392 B.R. 897, 906–7 (Bankr. M.D. Fla. 2008). Cashyew and the Debtor are controlled only by the O'Hares. Thus, all decisions in this bankruptcy case, including those pertaining to the Debtor's assets and the plans of reorganization, are dictated by Cashyew.

26. Therefore, all the *Blair Oil* factors strongly weigh in favor of a finding that Cashyew is a "professional person" under Section 327(a). Nevertheless, through this Motion, Cashyew is attempting to obtain significant compensation from the Debtor's bankruptcy estate, in the amount of $35,000.00 a month since August 2024, to the present, and likely into the future. But, Cashyew has failed to be employed under Section 327(a) and thus has no Court authorization for such compensation. Cashyew cannot skirt the requirements of Section 327(a), and therefore, its Motion under Section 503(b) must be denied.

**D.  Even if Cashyew Had Applied Under Section 327(a), its Employment Would Have Been Denied because it is Not "Disinterested"**

127509207.1

27. Even if Cashew had appropriately applied for employment under Section 327(a), that application would have been denied because Cashyew is not "disinterested" as required under that statute.

28. A "disinterested person" is defined in the Bankruptcy Code as one who:

(A) is not a creditor, an equity security holder, or an *insider*;

(B) is not and was not, within 2 years before the date of the filing of the petition, a *director, officer, or employee of the debtor*; and

(C) *does not have an interest materially adverse to the interest of the estate* or of any class of creditors or equity security holders, by reason of any direct or indirect relationship to, connection with, or interest in, the debtor, or for any other reason.

11 U.S.C. § 101(14) (emphasis added); *see also In re 7677 E. Berry Ave. Assocs., L.P.*, 419 B.R. 833, 843 (Bankr. D. Colo. 2009).

29. Based on this definition, Cashyew is plainly not "disinterested" because Cashyew is an insider of the Debtor. An "insider" is defined in part as "a person in control of the debtor[.]"[2] 11 U.S.C. § 101(31)(iii). As discussed herein, Cashyew owns 99% of the Debtor and the Debtor has no employees besides Cashyew. Cashyew controls every facet of the Debtor. *See* Motion, ¶¶ 6, 7, 10, 13; Docket No. 301 at 3. And Cashyew is fully owned by the O'Hares, who are also the principals of the Debtor. Docket No. 55 ¶ 8. Thus, Cashyew is an insider of the Debtor and not "disinterested" under Section 327(a).

30. Additionally, Cashyew has an interest materially adverse to the interests of the estate and the Debtor. An adverse interest is defined as "any economic interest that would tend to lessen the value of the bankruptcy or that would create either an actual or potential dispute in which the estate is a rival claimant." *In re Roper & Twardowsky, LLC*, 566 B.R. 734, 755 (Bankr. D.N.J.

---

[2] This definition also includes a director of the debtor, an officer of the debtor, and relatives of directors, officers, and persons in control of the debtor. 11 U.S.C. § 101(31)(B).

- 13 -

2017) (quoting *In re eToys, Inc.*, 331 B.R. 176, 189 (Bankr. D. Del. 2005)). Here, Cashyew and the O'Hares have a financial interest in reimbursing themselves for the alleged "services" provided by "Cashyew" while diminishing the pool of funds payable to creditors of the estate. While a disinterested third-party professional is entitled to receive compensation for legitimate services rendered upon application and approval by a bankruptcy court, insiders of a debtor are not permitted to siphon monies from the bankruptcy estate for their own personal gain, outside of the procedures and scrutiny of the Bankruptcy Court and at the expense of creditors.

31. Moreover, there is substantial evidence of prior and current duplication of expenses and compensation involving Cashyew. First, as discussed more below, the O'Hares already received several monthly payments in the amount of $40,000 per month, ostensibly for their roles as managers of the Debtor. *See* Docket No. 55 ¶ 15. It is unclear how the services provided by the O'Hares differ from those provided by Cashyew. *See* Motion, ¶ 13. Next, the Debtor is already paying substantial sums for "Advertising and Marketing"—over $6,000 as of the Monthly Operating Report for the month ending December 31, 2024. *See* Docket No. 300, p. 22. Yet Cashyew now asserts it must also be compensated for "Sales and Marketing" services, including "[d]riving revenue growth through marketing initiatives, sales outreach, and webinars." Motion, ¶ 13. Similarly, both the most recent Monthly Operating Report and the cash collateral budget contain Debtor expenditures for "Sales People and Commissions." Docket Nos. 189-1; 300, p. 22. Neither Cashyew nor the Debtor explain how this differs from the various other sales and marketing related activities undertaken by Cashyew.[3]

---

[3] Additionally, it must be noted that it appears Cashyew has attempted to tailor this Motion to avoid the appearance of duplicative estate expenses. For example, the previously provided Management Agreement between Cashyew and the Debtor states that one service provided by Cashyew includes "Recruitment and Talent Acquisition." Docket No. 58.1, p. 4. Now, mention of this service is conspicuously absent from the Motion but appears as a line item in the Debtor's cash collateral budget. *See generally* Motion; *see also* Docket No. 189-1. The Debtor provides no explanation for this discrepancy. *See* Motion, ¶ 13.

32. In short, this arrangement, negotiated only by the O'Hares as representatives of both Cashyew and the Debtor, gives Cashyew an interest that is materially adverse to the bankruptcy estate. Thus, the Motion should be denied for this separate reason, even if the Court were inclined to consider the same under Section 327(a).[4]

**E. Alternatively, Cashyew's Motion Should be Denied Because the Debtor Did Not Induce Cashyew to Perform New Post-Petition Work and Because Cashyew is Acting Primarily in its Own Interest**

33. To the extent this Court would determine that Cashyew is not a "professional person" under Section 327(a), the Motion must still be denied because Cashyew was not induced by the Debtor to perform new, post-petition work, and because Cashyew is acting primarily in its own interest rather than the interest of the bankruptcy estate. Thus, Cashyew is ineligible for compensation under Section 503(b).

34. Compensable administrative claims must satisfy two elements: first, it must result from a post-petition transaction and, second, it must be beneficial to the debtor-in-possession's operation of the debtor's business. *Blair Oil*, 588 B.R. at 591.

35. A valid post-petition transaction requires "affirmative action from the debtor-in-possession to either (1) accept the prior agreement between the debtor and claimant, or (2) agree to a new contract." *Id.* (quoting *Pikes Peak Musicians*, 462 F.3d at 1271). However, "[a] debt is not entitled to priority simply because the right to payment arises after the debtor in possession has begun managing the estate." *Amarex*, 853 F.2d at 1530 (quoting *Trustees of Amalgamated Ins. Fund v. McFarlin's*, 789 F.2d 98, 101 (2d Cir. 1986)) (cleaned up).

---

[4] Cashyew is also a "director, officer, or employee of the debtor." As noted, the Debtor has no employees besides Cashyew. Cashyew reasonably fills the role equivalent to that of a director or officer as the majority owner of the Debtor. Thus, Cashyew is also not disinterested for this separate reason.

127509207.1

36. Additionally, an administrative expense is only beneficial to the estate if it is "actual and necessary to preserve the bankrupt estate or enable it to maintain its business[.]" *In re Cheatle*, 150 B.R. 266, 270 (Bankr. D. Colo. 1993) (holding that homeowners' assessments did not provide an actual benefit to the bankruptcy estate). Likewise, where a creditor claiming an administrative expense acts "primarily in its own interest," the claim must be denied, even if there is "ultimately . . . some benefit to the estate[.]" *In re McK, Ltd.*, 14 B.R. 518, 520 (Bankr. D. Colo. 1981) (denying administrative expense claim for cost of hazard insurance for property of the Debtor where creditor secured by the property and seeking compensation under Section 503(b) was acting primarily in its own interest); *see also In re Lister*, 846 F.2d 55, 57 (10th Cir. 1988) ("Efforts undertaken by a creditor solely to further his own self-interest . . . will not be compensable, notwithstanding any incidental benefit accruing to the bankruptcy estate.").

37. Cashyew's administrative claim fails because Cashyew has not demonstrated that its request results from a post-petition transaction induced by the Debtor. To the contrary, Cashyew states that "[s]ince [the Debtor's] inception in **2019**, the Debtor has contracted with Cashyew Holding[.]" Motion, ¶ 6 (emphasis added).[5] Based on this description alone, Cashyew has failed to establish that its requested compensation "resulted from a post-petition transaction[.]" *Blair Oil*, 588 B.R. at 591. Cashyew does not otherwise argue that its claim resulted from a post-petition transaction affirmatively induced by the Debtor. *See* Motion, ¶¶ 6–15. Instead, it appears Cashyew

---

[5] In the Motion to Assume Executory Contract with [Cashyew], which remains pending before the Court, the Debtor and Cashyew also attempted to argue that they "have been operating under [the services agreement between them] since **before this bankruptcy case was filed**." Docket No. 58 ¶ 3 (emphasis). Although the relevant agreement was, in fact, executed post-petition on June 28, 2024, based on the Debtor's and Cashyew's own description of the relationship, there is no evidence to suggest that the services provided by Cashyew are administrative expenses *newly induced* during the term of the Debtor's bankruptcy case. *See* Docket No. 58-1 at 3. Moreover, in the instant Motion, Cashyew does not even directly reference the services agreement, except to vaguely cite "agreed upon compensation[.]" Motion, ¶ 9.

continued performing pre-petition services without inducement from the Debtor or authorization from this Court.

38. Additionally, Cashyew's Motion must be denied because Cashyew is acting primarily in its own interest. As an initial matter, it is unclear exactly what specific benefits Cashyew is providing to the estate. Cashyew broadly asserts it engages in various services such as "financial management" and "operations management," but it provides little detail beyond those general descriptions. *See* Motion, ¶ 13. Cashyew and the Debtor have provided no transparency into the substance of Cashyew's alleged services.[6]

39. Even assuming that Cashyew's services provide some benefit to the estate, the "services" are primarily for *Cashyew's* benefit and not the Debtor's benefit. As noted elsewhere, Cashyew and the Debtor share the same two insiders, principals, and employees, Mr. and Mrs. O'Hare. Thus, compensation to Cashyew necessarily benefits those two individuals. Here, "Cashyew" seeks to siphon over $200,000 from the bankruptcy estate, based on apparently extensive services already rendered. Motion, ¶ 9. This request comes *after* the Debtor has already paid Cashyew "approximately $50,000 per month" earlier in the bankruptcy case, *without Court authorization*. Docket No. 55 ¶ 15. The Debtor has also admitted to directly paying the O'Hares $40,000 each month, again without Court authorization. *Id.* These are likely unauthorized postpetition transfers that are subject to recovery by the Debtor's bankruptcy estate. Past conduct indicates that the Debtor and Cashyew have operated with the intent of enriching their own insiders and principals, outside the procedures and scrutiny of this Court. Here, Cashyew is, again, attempting to jump to the front of the line before the Debtor pays its creditors.

---

[6] This lack of transparency is accentuated by the fact that there are various examples of duplication and overlap between the payments made or proposed to be made to Cashyew, the O'Hares, and other vendors. *See supra* paragraph 31.

40. In summary, even if Cashyew's administrative expense priority claim were properly brought under Section 503(b) (which it is not), the Motion should be denied because the claim does not result from a post-petition transaction induced by the Debtor and because Cashyew seeks primarily to benefit itself and its insiders rather than the Debtor's estate. However, Cashyew's Motion is not properly brought under Section 503(b) because Cashyew is a "professional person" under Section 327(a). As such, the Motion must be denied because Cashyew failed to apply for compensation under that section of the Bankruptcy Code. Finally, even if the Court were inclined to construe Cashyew's Motion as one brought under Section 327(a), the Motion could be summarily denied because Cashyew is not "disinterested" as an insider of the Debtor.

WHEREFORE, Adam Young, Tubmanburg Limited and Ringba, LLC, respectfully request that the Court deny Cashyew's Motion for Administrative Expenses and Fees Pursuant to 11 U.S.C. §§'s 503(b)(1) and (2) and enter such other and further relief as the Court deems just and appropriate.

Respectfully submitted this 17th day of February, 2025.

                WOMBLE BOND DICKINSON (US) LLP

                *s/ Chad S. Caby*
                Chad S. Caby, No. 30927
                1601 19th Street, Suite 1000
                Denver, CO 80202
                Tel: 303-628-9583
                Fax: 303-623-9222
                E-mail: Chad.Caby@wbd-us.com

                *Attorneys for Adam Young, Tubmanburg Limited and Ringba, LLC*

127509207.1

## **CERTIFICATE OF SERVICE**

The undersigned hereby certifies that, on February 17, 2025, a true and correct copy of the foregoing **OBJECTION TO CASHYEW HOLDING, LLC'S MOTION FOR ADMINISTRATIVE EXPENSES AND FEES PURSUANT TO 11 U.S.C. §§'s 503(b)(1) AND (2)** was electronically filed and served via CM/ECF, which action caused automatic electronic notice of such filing upon all parties in interest in this matter as follows:

Aaron A. Garber, Esq.
Wadsworth Garber Warner Conrardy, P.C.
2580 W. Main St., Ste. 200
Littleton, CO 80120
Via: CM/ECF

*Counsel for Debtor*

Vandana S. Koelsch, Esq.
Katharine S. Sender, Esq.
ALLEN VELLONE WOLF HELFRICH & FACTOR P.C.
1600 Stout Street, Suite 1900
Denver, CO 80202
Via: CM/ECF

*Special Counsel for Debtor-in-Possession*

Alan K. Motes, Esq.
Byron G. Rogers Federal Bldg.
1961 Stout St., Ste. 12-200
Denver, CO 80294
Via: CM/ECF

*Counsel for U.S. Trustee*

Peter A. Cal, Esq.
John S. Gray, Esq.
SHERMAN & HOWARD L.L.C.
675 Fifteenth St., Ste. 2300
Denver, CO 80202
Via: CM/ECF

*Counsel for JPMorgan Chase Bank, N.A.*

Joli A. Lofstedt, Esq.
PO Box 270561
Louisville, CO 80027
Via: CM/ECF

*Subchapter V Trustee*

Reza D. Rismani, Esq.
Jason D. Cooper, Esq.
TREECE ALFREY MUSAT P.C.
633 17th Street, Suite 2200
Denver, CO 80202
Via: CM/ECF

*Counsel for Glegal, LLC*

Gary Tucker, Esq.
GLEGAL, LLC
1600 Broadway, Suite 1660
Denver, CO 80202
Via: CM/ECF

*Counsel for GLegal, LLC*

Arthur Lindquist-Kleissler, Esq.
LINQUIST-KLEISSLER & COMPANY, LLC
950 S. Cherry Street, Suite 418
Denver, CO 80246
Via: CM/ECF

*Counsel for Cashyew Holding, LLC*

127509207.1

| | |
|---|---|
| Jeffrey Cohen, Esq. | Robert J. Shilliday III |
| COHEN, LLC | SHILLIDAY LAW, P.C. |
| 1600 Broadway, Suite 1660 | 2616 W. Alamo Avenue |
| Denver, CO 80202 | Littleton, CO 80120 |
| Via: CM/ECF | Via: CM/ECF |
| | |
| *Counsel for Cohen, LLC* | *Counsel for John Cimino* |

                                  *s/ Jennifer Eastin*
                                  Of: Womble Bond Dickinson (US) LLP

127509207.1