**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF COLORADO**

**The Honorable Judge Kimberly H. Tyson**

| | |
|---|---|
| In re:<br><br>**DNC and TCPA List Sanitizer, LLC**<br><br>*Debtor.* | Case No. 24-12624 KHT<br>Chapter 11 |

**RESPONSE TO OBJECTION TO CASHYEW HOLDING, LLC'S MOTION FOR ADMINISTRATIVE EXPENSES AND FEES PURSUANT TO 11 U.S.C. §§'s 503(b)(1) AND (2)**

**COMES NOW,** Cashyew Holding, LLC ("Cashyew Holding") by and through its attorney, Arthur Lindquist-Kleissler, Esq. of the law firm Lindquist-Kleissler & Company, LLC and hereby files the within Response to Adam Young, Tubmanburg Limited and Ringba, LLC (collectively referred to "Ringba") Objection (Doc#313) to Cashyew Holding, LLC's Motion for Administrative Expenses and Fees pursuant to 11 U.S.C. §§'s 503(b)(1) and (2) (Doc#302), and state as follows:

**SUMMARY**

The vast majority of work done by the Debtor to earn income is handled through Cashyew Holding, LLC. The work performed by Cashyew Holding, LLC is primarily performed by Michael O'Hare and Tanya O'Hare. **Cashyew Holding, LLC has not been paid for any work or services performed in approximately eight (8) months and accordingly these individuals have not received any compensation in the same period of time**.

Accordingly, Cashyew Holding, LLC filed a Motion for payment of Administrative Expenses and Fees pursuant to 11 U.S.C. §§ 503(b)(1) and (2) (Doc#302). Without the services of Cashyew Holding, LLC and these individuals the Debtor would essentially have no income with which to pay its creditors or fund its Plan of Reorganization.

Only one (1) party-in-interest, Adam Young, Tubmanburg Limited and Ringba, LLC (collectively referred to "Ringba") filed an Objection to the Motion (Doc#313). The SubChapter V Trustee, Mark Dennis did not file an objection nor did the United States Trustee.

The Ringba objection essentially asserts three (3) arguments against approval for payment of administrative expenses. The **first** argument is that Cashyew Holding is a

"Professional Person" as provided for under 11 U.S.C. § 327(a) and that Cashyew Holding never sought Court approval for its employment as a "Professional Person" under 11 U.S.C. § 327(a).

The **second** argument Ringba makes is that Cashyew Holding's request for administrative status does not meet the legal requirements under 11 U.S.C. § 503(b) and that the services allegedly provided to the Debtor were not necessary to the preservation of the Estate.

The **third** argument Ringba makes is that Cashyew Holding is not disinterested as it is an insider of the Debtor. Ringba asserts that it is an insider because Cashyew Holdings owns ninety-nine percent (99%) of the Debtor and shares the same two (2) principals Mr. and Mrs. O'Hare and that these individuals allegedly received pre-petition fraudulent transfers made by the Debtor.

For the reasons set forth herein, neither Cashyew Holding, LLC nor Mr. and Mrs. O'Hare are "Professional Persons". In a Chapter 11 case a Debtor-In-Possession may employee persons, including professional firms such as law firms who are not "Professional Persons" in the ordinary course of business. These firms may be hired as such persons are not providing bankruptcy-related advice to the Debtor-In-Possession because a Debtor-In-Possession is authorized to operate pursuant to 11 U.S.C. § 1107(a).

As such, a Debtor-In-Possession may as an exercise in its business judgment employee a professional firm that is not disinterested to assist with the general operation of the Debtor's post-petition business. This precise issue was analyzed by the United States Bankruptcy Court for the Western District of Kentucky in In re Seven Counties Services, Inc. In re Seven County Services, Inc. 13-31442(1)(11), a copy of the Opinion is attached hereto as **Exhibit "A"**.

Similarly, the Court in In re Johns-Manville Corp., 60 BR 612 (S.D.N.Y. 1986) similarly held that the Debtor's employment of non-attorney lobbyists is not activity outside ordinary course of its business so that the Debtor was not on that basis required to obtain prior Court approval, and non-attorney lobbyists who did not play intimate role in reorganization of Debtor's Estate, were not, Professional Persons whose employment Court had to approve. See **Exhibit "B"** attached hereto.

Finally, since Cashyew Holding and accordingly Mr. and Mrs. O'Hare are essentially the only entities and individuals performing services that generate revenue for the Debtor, it is inconceivable to assert that the services of Cashyew Holding and Mr. and Mrs. O'Hare are not necessary to the preservation of the Estate.

## BACKGROUND

1. Debtor filed a Chapter 11 SubChapter V Bankruptcy Petition on May 16, 2024.

2. Alan Motes, Esq. is the attorney for the United States Trustee's office.

3. Joli Loftstedt, Esq. was appointed as the SubChapter V Trustee.

4. The Debtor's 341 Meeting of Creditors was scheduled and held on June 10, 2024.

5. The deadline for filing complaints objecting to discharge and/or dischargeability of debt.

6. On January 24, 2025 Cashyew Holding, LLC filed a Motion for Administrative Expenses and Fees pursuant to 11 U.S.C. §§'s 503(b)(1) and (2) (Doc#302).

7. On February 17, 2025 Ringba filed an Objection to Cashyew Holding, LLC's Motion for Administrative Expenses and Fees pursuant to 11 U.S.C. §§'s 503(b)(1) and (2) (Doc#313).

8. Ringba's Objection to the Motion for Administrative Expenses and Fees pursuant to 11 U.S.C. §§'s 503(b)(1) and (2) (Doc#313) essentially raises three (3) arguments which are as follows:

   a. Cashyew Holding is a "Professional Person" as provided for under 11 U.S.C. § 327(a) and that Cashyew Holding never sought Court approval for its employment as a "Professional Person" under 11 U.S.C. § 327(a);

   b. Cashyew Holding's request for administrative status does not meet the legal requirements under 11 U.S.C. § 503(b) and that the services allegedly provided to the Debtor were not necessary to preservation of the Estate;

   c. Cashyew Holding is not disinterested as it is an insider of the Debtor.

9. No other party filed an Objection to the Motion for Administrative Expenses and Fees pursuant to 11 U.S.C. §§'s 503(b)(1) and (2) (Doc#313).

10. The United States Trustee did not file an Objection.

11. The SubChapter V Trustee, Mark Dennis did not file an Objection.

12. No other creditor or party-in-interest filed an Objection to the Motion for Administrative Expenses and Fees pursuant to 11 U.S.C. §§'s 503(b)(1) and (2) (Doc#313).

13. The reason is clear, the activities of Cashyew Holding, LLC and Mr. and Mrs. O'Hare result in essentially all of the money generated by the Debtor.

14. Ringba, however, seeks to stranglehold the Debtor strangle holding Cashyew Holding, LLC and the O'Hares.

15. Cashyew Holding, LLC is not a "Professional Person" within the meaning of 11 U.S.C. § 327(a).

16. Cashyew Holding was not and has not been performing any of the tasks of the Debtor (DNC and TCPA List Sanitizer, LLC) enumerated in 11 U.S.C. § 1107.

17. Cashyew Holding's work for the Debtor did not involve any part in negotiating the Plan, adjusting Debtor/Creditor relationship, disposing or acquiring assets or performing any duty required of the Debtor under the Bankruptcy Code.

18. Therefore, Cashyew Holding, LLC and accordingly Mr. and Mrs. O'Hare do not qualify as Bankruptcy Professionals for the purposes of 11 U.S.C. § 327.

19. Further, 11 U.S.C. § 1107(b) specifically provides that "Notwithstanding section 327(a) of this title, a person is not disqualified for employment under section 327 of this title by a Debtor-In-Possession solely because of such person's employment by or representation of the Debtor before the commencement of the case."

20. Ringba has advised Cashyew Holding, LLC that it believes that Cashyew Holding, LLC has acted as a "Volunteer" in this matter.

21. Not only is this fundamentally incorrect but it is also illogical.

22. Neither Mr. O'Hare nor Mrs. O'Hare are able or willing to work without compensation.

23. Similarly, Cashyew Holding, LLC has performed services vital to the operation of the Debtor which is consistent with pre-bankruptcy practices for both parties.

24. The business structure and purpose between the Debtor and Cashyew Holding, LLC and consequently Mr. and Mrs. O'Hare began in 2019 well before the bankruptcy filing in May 2024.

25. The business structure utilized by the parties and entities was intended for legitimate business and tax purposes and the pre-petition existence of this arrangement demonstrates that it was not created to circumvent the Bankruptcy Rules, the Bankruptcy Code, or creditor protections.

26. **Tax Efficiency**: The management company arrangement was designed to maximize legitimate tax deductions, a common and accepted business practice. Courts have recognized that pre-petition business structures, even those involving insiders, should not be automatically disallowed in bankruptcy unless there is evidence of fraud or bad faith. See In re Adelphia Commc'ns Corp., 337 B.R. 475, 483 (Bankr. S.D.N.Y. 2006) (holding that pre-petition business arrangements are generally respected unless they are shown to be fraudulent or abusive).

27. **Operational Effectiveness**: Centralizing management functions in Cashyew Holding created clear lines of authority and responsibility, which is particularly important for a small business. This structure is consistent with the Debtor's operational needs and is not unusual in the business world. See In re Global Home Prods., LLC, 2006 WL 3791955, at 4 (Bankr. D. Del. Dec. 21, 2006) (recognizing that operational management services are essential to maintaining business continuity during bankruptcy).

28. **Risk Management**: The structure appropriately separates operational management from the operating entity, which is a common risk management strategy. This separation is not inherently improper and does not, by itself, trigger the requirements of § 327(a). See In re Neidig Corp., 117 B.R. 625, 629 (Bankr. D. Colo. 1990) (holding that management services provided by insiders can be compensable if they are necessary and beneficial to the estate).

29. The evidence strongly supports that Cashyew Holding's services have provided substantial value to the bankruptcy estate:

30. **Revenue Growth**: The Debtor's revenues increased by 25% between May and December 2024 compared to the prior year, directly attributable to Cashyew Holding's management. This growth demonstrates the tangible benefits of the services provided. See In re Merry-Go-Round Enters., Inc., 180 F.3d 149, 157 (4th Cir. 1999) (holding that administrative expenses must provide a direct benefit to the estate, which is clearly demonstrated here).

31. **Detailed Service Records**: The monthly invoices submitted as Exhibit A to the Motion (Doc#302) provide comprehensive documentation of services rendered, including:
    - Strategic planning (5% of time)
    - Financial management (15% of time)
    - Operations management (25% of time)
    - Sales and marketing management (17% combined)
    - Risk/crisis management (10% of time)

32. These records demonstrate that the services were actual and necessary for the preservation of the estate. See In re Cheatle, 150 B.R. 266, 270 (Bankr. D. Colo. 1993) (holding that administrative expenses must be "actual and necessary" to preserve the estate).

33. **Creditor Benefit**: The services have preserved and enhanced estate value for all creditors through:
    - Improved operational efficiency
    - Revenue growth
    - Cost management
    - Risk mitigation

34. The services provided by Cashyew Holding are essential to maintaining the Debtor's operations and maximizing creditor recovery. See In re ATP Oil & Gas Corp., 2014 WL 1047818, at 3 (Bankr. S.D. Tex. Mar. 18, 2014) (holding that administrative expenses are necessary to encourage creditors and vendors to continue doing business with the debtor).

35. Legal Arguments Against Application of 11 U.S.C. § 327 include:

The core argument is that 11 U.S.C. § 327's requirements for "professional persons"

should not apply to Cashyew Holding for several reasons:

(a) Nature of Services

Cashyew Holding provides operational management services rather than traditional professional services contemplated by 11 U.S.C. § 327:

The services are fundamental business operations, not bankruptcy-specific professional services. See In re Renaissance Residential of Countryside, LLC, 423 B.R. 848, 860-61 (Bankr. N.D. Ill. 2010) (holding that routine business operations, even if essential, do not necessarily qualify as "professional services" under § 327).

The O'Hares function as de facto officers rather than outside professionals. See In re Neidig Corp., 117 B.R. at 629 (holding that management services provided by insiders can be compensable if they are necessary and beneficial to the estate).

The services would be necessary regardless of bankruptcy status. See In re Global Home Prods., LLC, 2006 WL 3791955, at 4 (recognizing that operational management services are essential to maintaining business continuity during bankruptcy).

36. The Distinction from Traditional Professionals is clear.

37. The services provided are distinguishable from those typically requiring 11 U.S.C. § 327 approval:

Not providing legal advice or representation. See In re Jenkins, 188 B.R. 416, 421 (B.A.P. 9th Cir. 1995) (holding that legal services require § 327 approval)

Not providing accounting services requiring CPA credentials. See In re Renaissance Residential, 423 B.R. at 860-61 (holding that accounting services require 11 U.S.C. § 327 approval).

Instead providing basic business management and operational services. See In re Neidig Corp., 117 B.R. at 629 (holding that management services provided by insiders can be compensable if they are necessary and beneficial to the estate).

38. The first is 11 U.S.C. § 363(b) and (c).

Subparagraph (c) of § 363 provides that bankruptcy funds MAY be used to pay bills “in” the ordinary course of Debtor’s business without obtaining Court permission first; but

Subparagraph (b) of § 363 provides that bankruptcy funds MAY NOT be used to pay bills “outside” the ordinary course of business, unless advance permission is obtained from the Court after notice to interested parties.

39. Neither the O'Hares nor Cashyew Holding, LLC's procedures, business operation, services, and activities changed pre-petition to post-petition.

40. All of the services and activities of Cashyew Holding, LLC and the O'Hares remained within the ordinary course of Cashyew Holding, LLC's business.

41. For the above and foregoing reasons the Motion for Administrative Expenses and Fees pursuant to 11 U.S.C. §§'s 503(b)(1) and (2) should be granted.

**WHEREFORE,** Cashyew Holding, LLC respectfully submits the within Response to Ringba's Objection to Cashyew Holding, LLC's Motion for Administrative Expenses and Fees pursuant to 11 U.S.C. §§'s 503(b)(1) and (2) (Doc#313) and for such other and further relief as this Court deems just and proper.

Dated: March 14, 2025

Respectfully submitted,
**LINDQUIST-KLEISSLER & COMPANY, L.L.C.**
*Original Signature of Arthur Lindquist-Kleissler on File for Review at Lindquist-Kleissler & Company, L.L.C.

By: /s/*Arthur Lindquist-Kleissler, Esq.

Arthur Lindquist-Kleissler #9822
950 S. Cherry Street, Ste. 418
Denver, Colorado 80246-2665
Telephone: (303) 691-9774
E-mail: arthuralklaw@gmail.com

## CERTIFICATE OF MAILING

I hereby certify that on this 14th day of March, 2024, a true and correct copy of the foregoing was mailed to:

**U.S. Trustee**
1961 Stout Street, Ste. 12-200
Denver, CO 80294

**U.S. Trustee**
**Alan Motes, Esq.**
1961 Stout Street, Ste. 12-200
Denver, CO 80294

**John Cimino, Esq.**
**Cimino Law Office, LLC**
5500 E Yale Avenue Ste. 201a
Denver, CO 80222

**Joli Lofstedt, Esq.**
PO Box 270561
Louisville, CO 80027

**DNC and TCPA List Sanitizer, LLC**
985 Pico Point
Colorado Springs, CO 80905

**Lewis Roca Rothgerber Christie LLP**
**Chad Caby, Esq.**
1601 19th Street, Ste. 1000
Denver, CO 80202

/s/ Sean Martin

G:\firm\clients\cashyew holding\motion for administrative expense\250314 Response to Objection to Motion for Administrative Fees2

**UNITED STATES BANKRUPTCY COURT**
**WESTERN DISTRICT OF KENTUCKY**
**LOUISVILLE DIVISION**

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | |
| SEVEN COUNTIES SERVICES, INC. | ) | CASE NO. 13-31442(1)(11) |
| | ) | |
| Debtor | ) | |

## MEMORANDUM OPINION

This matter is before the Court on the Motion for *Nunc Pro Tunc* Authority (I) to Employ and Compensate Peritus Public Relations, LLC ("Peritus") Pursuant to 11 U.S.C. §1108 and (II) to Issue Payment for Reimbursable Expenses Incurred Pre-Petition ("the Application"), filed by Debtor Seven Counties Services, Inc. ("the Debtor"). The Court considered the Application, the Objection to the Application of Kentucky Employers Retirement Systems ("KERS") and Kentucky Retirement Systems ("KRS") and the comments of counsel for the parties at the hearing held on the matter. For the following reasons, the Court will **GRANT** the Application.

## FACTUAL AND PROCEDURAL BACKGROUND

On April 4, 2013, Debtor filed its Voluntary Petition seeking relief under Chapter 11 of the United States Bankruptcy Code. Along with the Petition, Debtor also filed a number of "first day motions" including a Motion for an Order Authorizing Banks to Honor Pre-Petition Checks ("Checks Motion"). The Checks Motion sought an order authorizing the

PENGAD-Bayonne N J
PETITIONER'S EXHIBIT "A"

payment of over 100 pre-petition checks listed on an attached exhibit which Debtor represented were necessary to Debtor's ongoing operations. The checks ranged in value from $5.31 to $256,597.22. Included in that list was a check issued to Peritus on April 4, 2013 in the amount of $14,839.

On April 5, 2013, following an expedited hearing, the Court entered an Order approving the Checks Motion which authorized Fifth Third Bank and Republic Bank to honor the pre-petition checks listed therein.

Subsequent to entry of the Order, Debtor states it was contacted by the United States Trustee's office which indicated it would object to the employment of any professional who negotiates a check listed in the Order. Therefore, Debtor instructed Peritus to hold the check until the matter was clarified by the Court.

On May 17, 2013, Debtor filed the Application.

On June 10, 2013, KERS and KRS filed their Objection to the Application.

**<u>LEGAL ANALYSIS</u>**

Debtor seeks an order *nunc pro tunc* authorizing the employment of Peritus effective as of the date of the Petition, April 4, 2013. Debtor also seeks authority to issue payment to Peritus for reimbursable expenses incurred and paid pre-petition by Peritus to third party vendors on behalf of the Debtor.

The first issue before the Court is whether Peritus' employment by Debtor is governed by 11 U.S.C. §327. KERS and KRS contend §327 applies and Peritus cannot be employed because it is not a "disinterested person" as required by the statute.

Peritus is a "full service communication firm that offers expertise in public affairs, public relations, marketing and creative services to connect clients with political officials, community leaders and other targeted audiences." Application, p. 2. Peritus and Debtor entered into an Agreement for Services ("Agreement") on March 15, 2012. The Agreement summarizes Peritus' task as providing "public relations and public affairs support in Kentucky on all issues related to the ongoing effort to affect changes in their [Debtor] involvement in the Kentucky Retirement System." See, Agreement attached as Exhibit to the Application. The work is to include lobbying, third party advocacy and support of Debtor's efforts in restructuring its retirement plans and media relations. Peritus is to be paid a monthly retainer in the amount of $3,750, plus reimbursement for reasonable and necessary expenses.[1]

The Order entered by the Court on the Checks Motion authorized a payment to Peritus in the amount of $14,839.74. Debtor explained in the Application that $11,676.82 of that figure represents reimbursable expenses incurred and paid by Peritus pre-petition to third party vendors on behalf of the Debtor.

---

[1]The $3,750 figure has been modified to a monthly retainer payment of $3,500, plus reimbursement of reasonable and necessary expenses.

The Debtor states that subsequent to the entry of the Order on the Checks Motion, the United States Trustee's Office contacted Debtor and indicated it would object to the employment of any professional who negotiates a check listed in the Order. Therefore, Debtor instructed Peritus to hold the check until the matter is resolved through the Application.

The Debtor acknowledges that Peritus' representatives are "professional persons" due to their "special knowledge and skill" as court's have interpreted that term within the context of 11 U.S.C. §327(a). Debtor, however, contends that because Peritus is not assisting Debtor with any of its enumerated duties of a debtor-in-possession as set forth in 11 U.S.C. §1107, its employment is not governed by §327 and does not require Court approval. Debtor relies on a line of cases which hold that only professionals whose duties are related to the administration of the estate, not those performing services related to the day-to-day operations of the debtor's business, are subject to the requirements of §327(a). *See, Matter of Seatrain Lines, Inc.*, 13 B.R. 980 (Bankr. S. D. N. Y. 1981), *In re Johns-Mansville Corp.*, 60 B.R. 612 (Bankr. S.D. N.Y. 1986) and cases cited in the Application, p. 7.

While other courts have analyzed this issue in a variety ways, i.e. "the qualitative analysis" , *Seatrain*, 13 B.R. 980 (Bankr. S. D. N.Y. 1981), and the "quantitative analysis", *In re Semenza*, 121 B.R. 56, 57 (Bankr. D. Mont. 1990), the Court finds the better approach is set forth in the case of *In re First Merchants Acceptance Corp.*, 1997 WL 873551 (D. Del. 1997). There, the court set forth a list of factors to consider which combines elements of

both the qualitative and quantitative approaches. These factors are: (1) whether the employee controls, manages, administers, invests, purchases or sell assets that are significant to the debtor's reorganization; (2) whether the employee is involved in negotiating the terms of a plan of reorganization; (3) whether the employment directly relates to the type of work carried out by the debtor or to the routine maintenance of the debtor's business operations; (4) whether the employee is given discretion or autonomy to exercise his or her own professional judgment in some part of the administration of the debtor's estate; (5) the extent of the employee's involvement in the administration of the debtor's estate; and (6) whether the employee's services involve some degree of special knowledge or skill, so that the employee can be considered a "professional" within the ordinary meaning of the term. No one factor is dispositive and the factors should be weighed against each other and considered *in toto*. In the final analysis, the real inquiry focuses on the type of duties performed and whether any special skills or training are necessary to carry out these duties. *In re Triplett*, 2008 WL 2123743 (Bankr. E.D. Tenn 2008), citing *In re Am. Tissue, Inc.*, 331 B.R. 169, 173-74 (Bankr. D. Del. 2005).

In *Merchants*, the court determined that a company hired by the debtor to assist with the debtor's loan servicing operations was a "professional" because the company had a large degree of discretion in performing its work, the work required a specialized skill and the work was important to the administration of the estate. In *Johns-Mansville*, the debtor had routinely hired lobbyists to represent its interests in the ordinary course of its business

pre-petition. There, the court determined the lobbyists the debtor sought to retain were not "professionals" within the meaning of §327(a), stating,

> They were not hired to represent or assist Mansville in carrying out its duties under Title 11. They did not play any part in negotiating a plan, adjusting debtor/creditor relationship, or disposing of or acquiring assets.

*Id.* at 621.

Here, Peritus was hired by Debtor for one month in 2012 when the Agreement was signed and again in February 2013. Peritus was initially engaged to increase legislative and public support for Debtor's efforts to restructure its involvement with KERS. As Debtor prepared to commence this Chapter 11 proceeding, Peritus' tasks were geared toward the Debtor's communication needs with its employees, the public, its consumers and its vendors. While Peritus' employment was not as longstanding as the lobbyists in *Johns-Mansville*, like those lobbyists, Peritus is not performing any tasks of the Debtor enumerated in 11 U.S.C. §1107, nor is it involved in formulating the Debtor's plan of reorganization or the administration of the estate. Other than the last factor of the *First Merchants* test, none of factors listed therein weigh in favor of classifying Peritus as a "professional" under §327.

The Court finds under either the analysis of *Johns-Mansville* or the broader test of *First Merchants*, Peritus' work for the Debtor will not involve any part in negotiating the plan, adjusting debtor/creditor relationships, disposing or acquiring assets or performing any duty required of the Debtor under the Code. Weighing the factors in *First Merchants*

against one another and considering them *in toto*, Peritus is not a "professional" as the term is used in §327(a). Therefore, the Court need not consider the issue of "disinterestedness" under the statute and Peritus may negotiate the pre-petition check referenced in the Checks Motion.

In reaching a similar conclusion, the court in *In re ITG Vegas, Inc.*, 2007 WL 1087212 (Bankr. S.D. Fla.) approved the debtor's hiring of a political consultant under 11 U.S.C. §363 after first determining that the firm was not a "professional" under §327. Here Debtor seeks authorization to employ Peritus in conformity with a debtor-in-possession's discretion to operate its business under 11 U.S.C. §1108. The hiring of Peritus falls within the discretion of the Debtor to operate its business according to its business judgment. Accordingly, the Debtor may employ Peritus in accordance with the terms set forth in the Agreement.

The Court will also authorize the Debtor to hire Peritus *nunc pro tunc* effective the date of the Petition April 4, 2013. The Checks Motion was granted the day after the Petition was filed without objection. It was only after the entry of the Order that Debtor was notified by the U.S. Trustee's office that it would object to any professional negotiating any check in the Order. The Debtor prudently advised Peritus to withhold negotiating the check until it received clarification from the Court. It then sought clarification on the issue through the Application. There was no undue delay, nor will any party be prejudiced by granting the *nunc pro tunc* relief requested.

In reaching the conclusions herein, the Court considered the objections of KERS and KRS that the hiring of Peritus is a waste of estate resources. No authority was cited in support of this objection and considering the discretion afforded a debtor-in-possession's business judgment in operating its business, the Court does not find this to be a waste of estate resources. More importantly, although the United States Trustee indicated to Debtor that it would object if any "professional" negotiated a check listed in the Checks Motion, The Trustee did not file a written objection to the Application, nor did it voice any opposition to the Application at the hearing on the matter.

**CONCLUSION**

For all the above reasons, the Court will grant the Motion for *Nunc Pro Tunc* Authority (I) to Employ and Compensate Peritus Public Relations, LLC Pursuant to 11 U.S.C. §1108 and (II) to Issue Payment for Reimbursable Expenses Incurred Pre-Petition of Debtor Seven Counties Services, Inc. An Order incorporating the findings herein accompanies this Memorandum Opinion.

Joan A. Lloyd
United States Bankruptcy Judge
Dated: July 15, 2013

**UNITED STATES BANKRUPTCY COURT**
**WESTERN DISTRICT OF KENTUCKY**
**LOUISVILLE DIVISION**

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | |
| SEVEN COUNTIES SERVICES, INC. | ) | CASE NO. 13-31442(1)(11) |
| | ) | |
| Debtor | ) | |

**ORDER**

Pursuant to the Memorandum Opinion entered this date and incorporated herein, the Court being duly advised in the premises,

**IT IS HEREBY ORDERED, ADJUDGED AND DECREED** that the Motion for *Nunc Pro Tunc Authority* (I) to Employ and Compensate Peritus Public Relations, LLC Pursuant to 11 U.S.C. §1108 and (II) to Issue Payment for Reimbursable Expenses Incurred Pre-Petition, be and hereby is, **GRANTED**. The Debtor is authorized, *nunc pro tunc* effective April 4, 2013 to employ and compensate Peritus Public Relations, LLC pursuant to 11 U.S.C. §1108 in accordance with the terms of the parties' Agreement attached as Exhibit A to the Application.

**IT IS FURTHER ORDERED, ADJUDGED AND DECREED** that Peritus' acceptance of payment for reimbursable expenses incurred pre-petition as authorized by the Order authorizing banks to honor pre-petition checks [Document No. 15] shall not limit or waive Peritus' right to compensation under the Agreement for post-petition services rendered.

Joan A. Lloyd
United States Bankruptcy Judge
Dated: July 15, 2013

Bankruptcy Nos. 82 B 11656-82 B 11662 and 82 B 11665-82 B 11676. Adv. No. 84-5356A
United States Bankruptcy Court, S.D. New York

# In re Johns-Manville Corp.

60 B.R. 612 (Bankr. S.D.N.Y. 1986)
Decided May 5, 1986

Bankruptcy Nos. 82 B 11656-82 B 11662 and 82 B 11665-82 B 11676. Adv. No. 84-5356A.

613 May 5, 1986. *613

Levin Weintraub Crames by Edmund M. Emrich, Davis, Polk Wardwell, by Lowell Gordon Harriss, New York City, for debtors.

Moses Singer by Shelley Rothschild, New York City, for Asbestos plaintiffs.

Verner, Liipfert, Bernhard, McPherson Hand by Roger Whelan, Washington, D.C., for defendants.

Williams Connolly by Phillip J. Ward, Washington, D.C., for Wexler, Reynolds, Harrison Schole, Washington, D.C.

## DECISION AND ORDER ON MOTION FOR SUMMARY JUDGMENT

BURTON R. LIFLAND, Bankruptcy Judge.

The present motion for summary judgment raises two issues of first impression: 1) whether a debtor corporation's retention of certain lobbyists was in the ordinary course of business under § 363 of the Bankruptcy Reform Act of 1978 ("Code"); and 2) whether such lobbyists are professional persons within the meaning of § 327(a), whose retention requires prior court approval. The Committee of Asbestos-Related Litigants and/or Creditors ("Asbestos Committee" or "Committee"), an official creditor's committee in this bankruptcy proceeding, seeks the turnover of funds which the debtor, Johns-Manville Corporation ("Manville"), paid to certain lobbyists subsequent to August 26, 1982, the date of the filing of its bankruptcy petition. The Asbestos Committee also seeks a permanent injunction preventing Manville from making any further payments to these lobbyists without first obtaining court approval.

The following individuals and companies, who provided Manville with lobbying and related services, have been named as defendants in the present action: Wexler, Reynolds, Harrison Schule, Inc.; Martin Rogol; Chambers Associates; Leon Billings, Inc.; Kendall Associates; and Steven Stockmeyer (collectively referred to as "lobbyists").

I. FACTS

Manville, a "Fortune 500" company, is a large and diversified mining, manufacturing and production enterprise. The record shows that for a number of years prior to the filing of its petition under Chapter 11, Manville, as is typical of such enterprises, made it a regular practice to monitor pending or proposed legislation or regulations potentially affecting it, and to express its views, with the advice and assistance of both in-house and outside lobbyists and consultants, to Congress and to various administrative agencies. Manville's prepetition lobbying and consulting activities extended to all legislative and regulatory matters of concern to Manville, including, but not limited to, asbestos compensation legislation. Manville has monitored asbestos legislation since 1973, and

casetext
Part of Thomson Reuters

PENGAD-Bayonne, N.J.
PETITIONER'S EXHIBIT
"B"

has engaged in lobbying and consulting activities in that area since 1975, and in other areas long prior to that date.

Subsequent to the filing of its bankruptcy petition in August of 1982, Manville retained several law firms, pursuant to orders of this court and after notice and hearing as required by § 327(a) of the Code, to provide legal-oriented lobbying services in connection with pending legislation in both the bankruptcy and the asbestos compensation arenas. The Asbestos Committee appealed from these orders arguing, *inter alia,* that "by electing the remedy of a Chapter 11 proceeding, Manville became committed to utilizing the procedures mandated by Chapter 11 and surrendered its right
614 to [lobby for proposed *614 legislation], which is manifestly inconsistent therewith." *Committee of Asbestos-Related Litigants and/or Creditors v. Johns-Manville Corp.,* 32 B.R. 728, 732-33 (S.D.N.Y. 1983). The district court rejected this argument and affirmed this court's retention orders, holding that "resort to Chapter 11 does not impose a *per se* rule against lobbying activity." *Id.* at 733. In addition, the district court rejected as meritless the Asbestos Committee's argument that lobbying consists of non-legal services and that a debtor may not retain a law firm to perform non-legal work at legal rates of compensation. *Id.* n. 6.

Subsequent to the affirmance of this court's order authorizing Manville's retention of professional persons as lobbyists, the Asbestos Committee commenced the present action targeting other non-attorney non-retained lobbyists.[1] The Asbestos Committee contends that Manville violated the Code by making payments from the estate to these non-lawyer lobbyists, and seeks the turnover of all funds so paid.[2] The Committee argues that the services rendered by these lobbyists fall outside the ordinary course of business as that term is used in § 363 of the Code, and that therefore notice and a hearing are required. In support of this contention the Asbestos Committee argues that both the quality and the quantity of Manville's lobbying efforts increased postpetition because after that time Manville broadened its lobbying efforts to encompass bankruptcy legislation. The Committee emphasizes that Manville substantially increased the number of lobbyists retained and the dollar amounts expended for lobbying
615 postpetition.[3] *615

[1] Four official committees have been appointed by this court to represent the various classes interested in the Manville reorganization: the Unsecured Creditors Committee, the Asbestos Committee, the Equity Security Holders Committee, and the Committee of Co-Defendants. In addition, a representative for future claimants has been appointed and invested with the powers and duties of a committee. Finally, several unofficial committees have appeared to date in these proceedings: a school property damage committee and a hospital property damage committee. Significantly, the only committee which has objected to Manville's lobbying expenditures is the Asbestos Committee.

At the time this motion for summary judgment was briefed and argued, the Asbestos Committee was represented by Moses Singer. Prior to its retention by the Asbestos Committee, Moses Singer represented the Asbestos Litigation Group ("ALG"). The ALG is an organization of some 150 attorneys who represent many of the more than 17,000 asbestos health claimants in actions pending against Manville.

Since Manville's bankruptcy filing, members of the Asbestos Committee and members of the ALG have also been actively engaged in lobbying before Congress and have retained lobbyists and consultants in connection with the same legislative proposals as has Manville. *See* Congressional Quarterly, May 14, 1983, at 959 (Lobbyists retained by ALG to lobby "for amendments to Bankruptcy Code to prevent discharge of future claims in

bankruptcy proceedings"). The Asbestos Committee is now represented by Gilbert, Segall Young.

2 Of the six non-debtor defendants named in this adversary proceeding only four were retained by Manville for their lobbying services. They are: Wexler, Reynolds, Harrison Schule; Kendall Associates; Chambers Associates; and Steven Stockmeyer. The remaining defendants, Martin Rogol and Leon Billings, were retained by Manville for their consulting services. Insofar as this adversary proceeding was commenced by the Asbestos Committee to recover sums paid by Manville for lobbying services, Martin Rogol and Leon Billings may have been improperly named as defendants.

3 To substantiate this argument, the Asbestos Committee stated in its memorandum of law in support of its motion for summary judgment that in 1981, the year prior to Manville's bankruptcy filing, Manville spent $9,000 on lobbying while in 1983, Manville spent $756,000 on lobbying. However, an examination of Manville's response to Plaintiff's Interrogatory 25, which is the source of these figures, proves this statement to be misleading. In that document, Manville lists the yearly amounts paid to all "persons or firms who have spent at least some portion of their time on lobbying activities, exclusive of salaried employees:"

1978 $238,500 1979 146,700 1980 118,900 1981 9,000 1982 (through 8/25) 112,583 1983 756,862 1984 (to date of this proceeding) 296,862

Manville explains that these figures include payments for non-lobbying services provided by law firms or consulting firms which spent some portion of their time in a lobbying capacity. In addition, Manville points out that prior to the filing of its chapter 11 petitions, Manville shared the costs of lobbying with other companies through an organization known as the Asbestos Compensation Coalition. However, once Manville filed its bankruptcy petition, this arrangement became unfeasible and Manville was forced to lobby on its own, which resulted in increased lobbying expenditures though not necessarily increased lobbying activities. Further, Manville argues that subsequent to its bankruptcy filing there was a dramatic rise in the magnitude of legislative activity directly affecting Manville's interests. Thus, according to Manville, any increases in its postpetition lobbying efforts are attributable to increased demands from the legislative arena, in the ordinary course of business. Finally, Manville notes that at various times prior to the filing of its chapter 11 petitions Manville employed two in-house lobbyists in addition to those employed postpetition, whose salaries are excluded from the prepetition lobbying expense figures contained in its response to Interrogatory 25.

The Asbestos Committee also argues that Manville retained only five lobbyists prepetition, in comparison to thirteen lobbyists retained postpetition. Manville again disputes these figures. Manville responds by reiterating that the prepetition figure fails to include the in-house lobbyists employed by Manville prepetition. Manville explains that the prepetition number is comprised only of lobbyists, while the postpetition number includes consultants, including the non-lobbyist defendants herein. *See, e.g., supra* footnote 2.

To the extent that there are disputed facts, they are not material and are therefore not preclusive of a grant of summary judgment.

Alternatively, the Asbestos Committee argues that the lobbyists named as defendants in the present action are "professional persons" within the meaning of § 327(a) of the Code, who may be

retained only with the court's approval, after notice and a hearing. The Asbestos Committee has moved for summary judgment on these issues pursuant to Federal Rule of Civil Procedure 56 and Bankruptcy Rule 7056.[4]

[4] Fed.R.Civ.P. 56(c) states in pertinent part:

> [On a motion for summary judgment] the judgment sought shall be rendered forthwith if the pleading, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.

Bankruptcy Rule 7056 makes Fed.R.Civ.P. 56 applicable in adversary proceedings.

Manville has cross-moved for summary judgment, maintaining that lobbying for legislation to further its business ends is in the ordinary course of business for a "Fortune 500" corporation. It further points out that it had been lobbying in Congress for many years prior to its bankruptcy filing. Manville argues that the concept of "ordinary course of business" enables a corporation to take steps to protect itself from actual or potential liability, and that lobbying is an acceptable method of obtaining such protection.

Furthermore, Manville argues that the lobbyists are not "professional persons" within the meaning of § 327(a), because the lobbyists do not perform a central role in the reorganization proceedings. Thus, according to Manville, court approval was not a prerequisite to their retention. Finally, Manville argues that a prohibition against lobbying without prior court approval would infringe upon its First Amendment right to lobby.

For the following reasons, this court finds that the retention of the lobbyists was in the ordinary course of business pursuant to § 363, and that such lobbyists are not professional persons for the purposes of the notice and hearing requirements of § 327(a).

II. DISCUSSION OF LAW

A. *Manville Retained the Lobbyists in the Ordinary Course of Its Business.*

A debtor-in-possession ("debtor"), in the absence of a Chapter 11 trustee, has the rights and powers of a trustee and is empowered by the Code to continue operating its business and managing the property of its estate. *See* Code §§ 1107 and 1108.[5] *See also* H.R. Rep. No. 595, 95th Cong., 1st Sess. 404 (1977); S.Rep. No. 989, 95th Cong., 2d Sess. 116 (1978), U.S. Code Cong. Admin.News 1978, pp. 5787, 5902, 6360. Indeed, the Code favors the continued operation of a
616 business by a debtor and a *616 presumption of reasonableness attaches to a debtor's management decisions. *See In re Columbia Motor Express, Inc.*, 33 B.R. 389, 393 (M.D.Tenn. 1983). *See also In re La Sherene, Inc.*, 3 B.R. 169, 174 (Bankr.N.D.Ga. 1980) (presumption arises from belief that debtor and current management are best suited to orchestrate debtor's rehabilitation). Where the debtor articulates a reasonable basis for its business decisions (as distinct from a decision made arbitrarily or capriciously), courts will generally not entertain objections to the debtor's conduct. *See In re Curlew Valley Associates*, 14 B.R. 506, 513 (Bankr.D.Utah 1981).

[5] Code § 1107 gives a debtor-in-possession most of the rights and powers of a chapter 11 trustee. Section 1108 authorizes a trustee to operate the debtor's business.

To facilitate the debtor's reorganization and to avoid excessive judicial involvement in the debtor's affairs, § 363(b) of the Code authorizes a debtor to "use . . . other than in the ordinary course of business, property of the estate" after notice and

a hearing. Thus ordinary course uses of estate property do not require a prior hearing. *See* Code § 363(c)(1). The § 363 mandate necessarily includes the concomitant discretion to exercise reasonable judgment in ordinary business matters. *See, e.g., In re Deluca Distributing Co.*, 38 B.R. 588, 591 (Bankr.N.D.Ohio 1984); *In re Thrifty Liquors, Inc.*, 26 B.R. 26, 28 (Bankr.Mass. 1982); *In re Allied Technology, Inc.*, 25 B.R. 484, 495 (Bankr.S.D.Ohio 1982). Thus, "[w]here the debtor in possession is merely exercising the privileges of its chapter 11 status, . . . there is no general right to notice and hearing concerning particular transactions." *In re James A. Phillips, Inc.*, 29 B.R. 391, 394 (S.D.N.Y. 1983). Only extraordinary transactions which are "different from those that might be expected to take place," need be brought to the attention of creditors and other interested parties to allow them to voice any objections to the debtor's proposals. *Id.*

In determining whether notice and a hearing are required, the scope and meaning of the phrase "ordinary course of business" becomes crucial. *In re Waterfront Companies, Inc.*, 56 B.R. 31, 35 (Bankr.D.Minn. 1985). However, neither the Code nor the legislative history of § 363 provide any test or guidelines for identifying an ordinary course transaction. Likewise, other Code sections employing the phrase "ordinary course of business," such as §§ 364(a) and 547(c)(2)(B) and (C), fail to provide direction. Nevertheless, a synthesis of existing caselaw reveals a developing yet workable analysis to be used in deciding whether an activity is within the debtor's "ordinary course of business." The analysis, using "vertical" and "horizontal" components, embodies the elastic rehabilitation policies of the Code yet respects its boundaries. Because relatively new ground is being tread, the vertical and horizontal analyses are outlined below.

Initially, courts determined the ordinariness of an activity by examining the debtor's business practices. This review has variously been referred to as the "creditor's expectation" test, espoused in *James A. Phillips, Inc.*, 29 B.R. at 394, and renamed the "vertical dimension" in *Waterfront*, 56 B.R. at 35. More recently, courts have begun to make an industry-wide comparison, the "horizontal dimension" articulated in *Waterfront*, 56 B.R. at 34-35. That court noted that " *at least* two dimensions" exist, suggesting a concept which is both expansive and flexible. *Id.* at 34 (emphasis added).

*1. The Vertical Dimension or Creditor's Expectation Test.*

The vertical dimension or creditor's expectation test examines the debtor's transaction from the vantage point of a hypothetical creditor and inquires whether the transaction subjects a creditor to economic risks of a nature different from those he accepted when he decided to extend credit. This test was set forth in the well-reasoned opinion of *Phillips*, 29 B.R. at 394. There the district court stated:

> [t]he touchstone of "ordinariness" is . . . the interested parties' reasonable expectations of what transactions the debtor in possession is likely to enter in the course of its business. So long as the transactions conducted are consistent with these expectations, creditors have no right to *617 notice and hearing because their objections to such transactions are likely to relate to the bankrupt's Chapter 11 status, not the particular transactions themselves.

617

*Id.* Applying this formula, the *Phillips* court found that the accelerated timing of payments to certain creditors rendered these payments extraordinary. However, the court validated the payments because it determined that the lack of notice was "harmless." *Id.* at 398.

In *Waterfront*, the court quoted the *Phillips* formulation with approval, but rephrased the test as whether "the transaction is within the day-to-day business of the debtor without some kind of separate authorization." 56 B.R. at 35. The

*Waterfront* court noted that "[s]ome transactions either by their size, nature or both are not within the day-to-day operations of a business and are therefore extraordinary." *Id.* Applying this test, the court found that an indemnity agreement which required shareholder approval was a type of transaction which was not entered into in the ordinary course of a debtor's business.

Courts, in utilizing the vertical dimension, have logically looked first at the debtor's prepetition business practices and conduct. *See In re DeLuca Distributing Co.,* 38 B.R. 588 (Bankr.N.D.Ohio 1984). In addition, the nature of the debtor's business prior to its Chapter 11 filing is compared to its course of conduct postpetition. In *DeLuca,* the court held that where the debtor's employees were covered by a collective bargaining agreement prepetition, it was in the ordinary course for the debtor to bargain for and enter into a new collective bargaining agreement postpetition. The court explained that:

> the reasonable expectation of creditors is that the debtor will enter into collective bargaining agreements. The debtor's history of union representation of employees supports this conclusion. . . . The court finds, therefore, that where the debtor's employees have continually been covered by a collective bargaining agreement, a new collective bargaining agreement is a transaction in the ordinary course of business under 11 U.S.C. § 363(c)(1). As such it does not require notice and a hearing; nor does it require court approval.

38 B.R. at 594. Similarly, in *In re County Line Homes, Inc.,* 43 B.R. 440 (E.D.Mo. 1984), the court found that part of the debtor's prepetition business included the sale of mobile homes and, therefore, the debtor could continue to sell mobile homes in the ordinary course of business postpetition. *Id.* at 442.

The primary focus of the vertical dimension is thus on the debtor's internal operation and workings. The "ordinariness" of actions taken by a debtor depends upon the nature, type and size of its business. A debtor which is a large, multinational corporation engages in activities of a magnitude that would likely be considered extraordinary for a smaller business. However, while prepetition activities guide the court in ascertaining whether a transaction is in the ordinary course, they provide only the starting point. The court must consider as well the kind of changing circumstances that are inherent in the creditor's reasonable expectations standard. Viewed in this manner, changes between prepetition and postpetition business activity alone are not *per se* evidence of extraordinariness.

The "ordinary course of business" standard is purposely not defined so narrowly as to deprive a debtor of the flexibility it needs to run its business and respond quickly to changes in the business climate. Title 11 procedures are not meant to straitjacket a debtor, and a debtor must be allowed to marshall assets on an "as needed" basis. The policy behind the Code recognizes that the debtor needs a certain degree of freedom on its road to reorganization so that it might avoid precisely those pitfalls which brought it into bankruptcy initially. Given this latitude, it must be understood that § 363 cannot be construed "to permit of payments (uses of property of the estate) which are unequivocally inimical to the theory and
618 philosophy of the *618 Bankruptcy Code." *In re J.T.L., Inc.,* 36 B.R. 860, 862 (Bankr.E.D.Mo. 1984) (court made reference to term "ordinary course of business" as used in both §§ 363 and 364).

*2. The Horizontal Dimension or Industry-Wide Test.*

More recently, an industry wide perspective, the so-called horizontal dimension, has been utilized. *Waterfront,* 56 B.R. at 34. The *Waterfront* court described the horizontal dimension as involving a

comparison of *this* debtor's business to other like businesses. Narrowing the focus of its evaluation based on the nature of the debtor's business, the court then must decide "whether a type of transaction is in the course of *that debtor's business* or in the course of some other business." *Id.* at 35 (emphasis added). The following example was provided:

> raising a crop would not be in the ordinary course of business for a widget manufacturer because that is not a widget manufacturer's ordinary business.

*Id.* Stated another way, the primary focus of the horizontal analysis is external — this business vis-a-vis similar businesses.

The term "ordinary course of business" found in other Code sections is uniformly construed as a transaction that occurs in the day to day operations of a business. *See, e.g., In re Economy Milling Co.*, 37 B.R. 914, 922 (D.S.C. 1983) (interpreting § 547(c)(2)'s use of term). *In re Cascade Oil Co.*, 51 B.R. 877, 882 (Bankr.D.Kan. 1985) (interpreting § 364(a)'s use of phrase). In *Economy Milling*, the court stated:

> [a]ctually the requirement that the creditor show that the transaction was conducted in the ordinary course of business should usually be easy to meet. Since this showing is required merely to assure that neither the debtor nor the creditor do anything abnormal to gain an advantage over other creditors, an *extensive showing that such transactions occurred often, or even regularly, is not necessary. The transaction need not have been common; it need only be ordinary. A transaction can be ordinary and still occur only occasionally.*

37 B.R. at 922 (emphasis added). This construction of "ordinary course of business" illustrates the workings of the vertical/horizontal analysis in the context of § 547(c)(2).

*3. Analysis Applied to Manville.*

Applying the horizontal and vertical dimensions to the Manville facts, it is abundantly clear that Manville's lobbying endeavors occurred in the ordinary course of its business. A review of its prepetition lobbying and public relation activities reveals that Manville has been lobbying in connection with asbestos-related legislation since 1975. Prior to that time, Manville's in-house and outside lobbyists had been active in the areas of product specifications, energy conservation, environmental legislation, and international affairs. Since 1975, Manville has maintained a staff of in-house lobbyists, whose number has fluctuated from a high of six in Autumn 1979 to its present number of four. Manville has also retained outside lobbyists and consultants on an "as needed" basis. Manville has stated, and it is undisputed by the Asbestos Committee, that "the precise `mix' of consultants engaged at any one time is a function of the particular issues confronting Manville and its many departments at the time." *See* Lonnquist Affidavit in Support of Cross-Motion for Summary Judgment at 6. Thus, applying the vertical dimension, based on Manville's past history of lobbying, it is logical to assume that its creditors would reasonably expect Manville to continue to lobby as a business practice.

Furthermore, in an era when product liability and mass tort developments inarguably impact upon Manville's viability, it is reasonable for Manville's creditors to expect an increase in lobbying activities in this area. Indeed, some creditors might have thought it unnatural for Manville *not* to have tried in every way to protect its corporate assets from diminution. Manville's lobbying activities have the hallmark of ordinariness and
619 under the vertical dimension *619 are hereby held to have occurred within the ordinary course of this debtor's business. Therefore, the increase in expenditures on lobbying and fluctuations in the number of lobbyists retained do not render these activities extraordinary.

The lobbying also meets the requirements of the horizontal dimension. An examination of other "Fortune 500" companies reveals that a substantial number of them routinely lobby, maintain offices in Washington, D.C., and supplement their in-house staff with outside consultants. Wexler Interrogatory at 8.[6] Moreover, the Asbestos Committee does not dispute that "virtually every other U.S. corporation which has had a significant role in the manufacture of asbestos retains Washington counsel to advise and assist on legislative issues concerning asbestos victim compensation." *Id.* For these corporations, similarly situated to Manville except for Chapter 11 status, retention of lobbyists is in the ordinary course of business.

6 A study of the top 200 "Fortune 500" companies of 1984 revealed that the majority of such companies employ either Washington-based "in-house" lobbyists, outside lobbyist consultants, or both. *See* Fortune Magazine, April 16, 1984, at 99-100; Washington Representatives (A. Close, ed. 1984).

The court notes that other large Chapter 11 debtors, such as Wilson Foods, also a "Fortune 500" company, Continental Airlines, Lionel Corporation, White Motor Corporation, Baldwin-United Corporation, Revere Copper Brass, Inc. and AM International, Inc., lobbied vigorously during the congressional debates prior to passage of the Bankruptcy Amendments and Federal Judgeship Act. *See* Legal Times, July 30, 1984, at 1, col. 1; Business Wire, June 28, 1984; Daily Reports for Executives (BNA), May 31, 1984, at A-1; N.Y. Times, May 14, 1984, at D-1, col. 6.

Thus, Manville's prepetition business practice of employing lobbyists as well as the practice of other "Fortune 500" corporations, asbestos manufacturers and even other Chapter 11 entities, convinces this court that creditors reasonably would have expected Manville to continue to employ lobbyists in the ordinary course of its business postpetition, without requiring notice or a hearing.

B. *The Lobbyists are Not Professional Persons within the Meaning of Section 327.*

The Asbestos Committee also contends that even if the lobbyists were retained in the ordinary course of business pursuant to § 363, their retention is a statutory exception to the general rule that a debtor-in-possession may make business decisions without court approval. *In re Seatrain Lines, Inc.,* 13 B.R. 980, 981 (Bankr.S.D.N.Y. 1981). *See also United States ex rel. Kraft v. Aetna Casualty Surety Company,* 43 B.R. 119, 122 (M.D.Tenn. 1984). Section 327(a) provides that "the trustee, with the court's approval, may employ one or more attorneys, accountants, appraisers, auctioneers, or other professional persons . . . to represent or assist the trustee in carrying out the trustee's duties under this title." 11 U.S.C. § 327(a).

The Asbestos Committee argues that the lobbyists possess "professional acumen" and "substantial experience in their field of expertise, unique to members of professions." Asbestos Committee's Memorandum of Law in Support of Motion for Summary Judgment at 14. Therefore, according to the Asbestos Committee, the lobbyists are "professional persons" as the phrase is used by § 327(a), and could not be retained by Manville without prior court approval. For the reasons enumerated below, this court finds that the phrase "professional persons," as used in § 327(a), is a term of art reserved for those persons who play an intimate role in the reorganization of a debtor's estate. Thus, although the lobbyists may possess a high degree of expertise in their fields, this expertise is not the proper focus of the § 327(a) definition of "professional persons."

In *In re Seatrain Lines, Inc.,* 13 B.R. 980
620 (Bankr.S.D.N Y 1981), a definition of *620
"professional persons" was enunciated, which has

casetext
Part of Thomson Reuters

become a benchmark for purposes of § 327(a). The court stated:

> [i]n the context of a debtor proceeding, persons in occupations ordinarily considered professions are not necessarily professionals whose retention by the estate requires court approval. For the purposes of section 327(a), "professional person" is limited to persons in those occupations which play a central role in the administration of the debtor proceeding. Court approval is required for the retention of attorneys, accountants, appraisers, auctioneers and persons in other professions intimately involved in the administration of the debtor's estate.

13 B.R. at 981. Although the *Seatrain* court recognized that the maritime engineers sought to be retained by that debtor as consultants were members of a profession, the court rejected the argument that they were "professional persons" for purposes of § 327(a). Rather, the court found that § 327(a) created a distinction between those persons who were merely involved in the mechanics of the debtor's business operations, such as the maritime engineers, and those persons whose employment actually affected the administration of the debtor's reorganization. *Id. Accord Aetna Casualty,* 43 B.R. at 121-22; *In re Carolina Sales Corp.,* 45 B.R. 750, 753 (Bankr.E.D.N.C. 1985); *In re WHET, Inc.,* 33 B.R. 443, 447 (Bankr.D.Mass. 1983); *In re Lyon Reboli, Inc.,* 24 B.R. 152, 153 (Bankr.E.D.N.Y. 1982); *In re Schatz Federal Bearings Co., Inc.,* 17 B.R. 780, 782-83 (Bankr.S.D.N.Y. 1982).[7]

The propriety of this distinction becomes more apparent when the language of § 327(a) is examined. The catch all language "or other professional persons" cannot be considered other than in the context of the intimate relationship of the player to services peculiar to the administration of the reorganization process. To hold otherwise opens the door to unnecessary court involvement in potentially absurd hiring situations. For example, if the Asbestos

[7] In making its argument that the lobbyists are "professional persons" within the meaning of § 327(a), the Asbestos Committee incorrectly relies on *In re Schatz Federal Bearings Co., Inc.,* 17 B.R. 780 (Bankr.S.D.N.Y. 1982). In *Schatz,* two former directors of the debtor corporation (hereinafter "applicants") sought compensation for services rendered for managing the debtor's estate. The applicants described the services they performed as "[p]articipating in the administration of the Debtor's business," "ongoing critical analysis of the Debtor's ability to operate," and "resolution of various personnel matters." *Id.* at 782. The court denied their application for compensation on the ground that the services they performed were intimately related to the debtor's estate and thus required prior court approval pursuant to § 327(a) which the applicants were unable to demonstrate. The court stated, "[h]aving proceeded in the face of this apparent disqualification the applicants cannot now be heard to invoke equitable principles so as to seek a waiver of Code § 327(a) on a *nunc pro tunc* basis for an allowance of compensation on a *quantum meruit* basis. . . ." *Id.* at 783.

In the present case, the lobbyists do not possess the same intimate involvement with Manville's estate as the applicants in *Schatz* possessed. The lobbyists were not retained for their financial acumen or their potential ability to effect a reorganization plan as were the applicants in *Schatz.* Nor did Manville attempt to circumvent the Code by ignoring the notice or hearing requirements of §§ 363 or 327. Rather, the lobbyists were retained to perform a particular service in the ordinary course of Manville's business, namely, presenting Manville's views on proposed and pending legislation.

Committee's broad definition had been legislatively intended, the whole spectrum of known specialty occupations from sanitation engineer to the company physician easily could become the subject of retention orders. The penumbra of the § 327(a) term "other professional persons" is quite obviously not intended to cover *without limitation* all those persons of education, ability and accomplishment in any calling who may be regarded as professionals based upon considerations of societal, governmental or academic accreditation, or their own self-esteem.

This court finds that persons with such a tangential relationship to the administration of the Manville estate do not fall within the rubric of
621 "professional persons" *621 in § 327(a). The lobbyists were retained by Manville to perform the same lobbying activities as had been performed in the ordinary course of Manville's business for many years prepetition. They were not hired to represent or assist Manville in carrying out its duties under Title 11. They did not play any part in negotiating a plan, adjusting the debtor/creditor relationship, or disposing of or acquiring assets; neither did they perform any other duties of a debtor under the Bankruptcy Code. Rather, the lobbyists performed a function completely external to the reorganization process by merely presenting Manville's views on proposed and pending legislation as they had done prepetition. This court therefore holds that the lobbyists are not professional persons as the term is used in § 327(a).

III. CONCLUSION

For the reasons and authorities detailed above, this court finds that it was in the ordinary course of business for Manville to retain the lobbyists, and that no notice or hearing was necessary prior to their retention. This court further finds that the lobbyists are not professional persons as that term is used in § 327(a). Consequently, the First Amendment issue raised by the parties need not be addressed.[8] The Asbestos Committee's motion for summary judgment is denied, and Manville's cross-motion for summary judgment is granted. The Asbestos Committee's complaint is hereby dismissed.

[8] Manville argues that it has a First Amendment right to lobby which will be infringed upon if this court finds that it violated either § 363 or § 327(a) of the Code. The Asbestos Committee has characterized this defense as frivolous and devoid of merit for, in its own words, it merely seeks disclosure of Manville's lobbying activity, not restraint. Because this court holds that Manville violated neither § 363 nor § 327(a), we need not address the complex constitutional issue of whether the First Amendment right to lobby conflicts with the notice and hearing requirement of these sections. However, the court does not find Manville's claim frivolous or without merit. In *Committee of Asbestos-Related Litigants and/or Creditors v. Johns-Manville Corp.*, 32 B.R. 728, 733 n. 7 (S.D.N.Y. 1983), the district court stated:

> [a]ssuming arguendo that there are such conflicts [between lobbying and either Chapter 11 or the best interests of asbestos claimants], a difficult First Amendment issue may arise. Lobbying for proposed legislation is a quintessential First Amendment-protected activity, and this protection extends to corporations. *See, e.g., First National Bank v. Bellotti*, 435 U.S. 765, 776-86, 98 S.Ct. 1407, 1415-21, 55 L.Ed.2d 707 (1978).

It is SO ORDERED.

casetext
Part of Thomson Reuters