## UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF COLORADO

| | |
|---|---|
| In re: | ) |
| | ) |
| DNC AND TCPA LIST SANITIZER, LLC, | )   Case No. 24-12624 KHT |
| | )   Chapter 11 |
| Debtor. | ) |

## OBJECTION TO DEBTOR'S FOURTH AMENDED SUB-CHAPTER V PLAN OF REORGANIZATION DATED FEBRUARY 26, 2025

Adam Young, Tubmanburg Limited, and Ringba, LLC (collectively, "Ringba"), by and through their counsel, Womble Bond Dickinson (US) LLP, respectfully file their Objection to Debtor's Fourth Amended Sub-Chapter V Plan of Reorganization Dated February 26, 2025 (the "Objection"). In support of their Objection, Ringba states as follows:

### PRELIMINARY STATEMENT

The Debtor's bankruptcy case was filed on May 16, 2024, as a Subchapter V, Chapter 11 case, as a substitute to funding a supersedeas bond while appealing two of Ringba's judgments against the Debtor. After a year of proposing numerous failed plans (originally required to be filed within 90 days of the petition date), the Debtor's latest proposal amounts to a "litigation plan" pertaining to two of its largest creditors, Ringba and Cohen, LLC ("Cohen").  Significantly, other than Ringba and Cohen, who hold approximately 98% of the Debtor's unsecured debt, the Debtor owes nominal unsecured claims to American Express ($8,014.09), GLegal ($2,528.70) and the Internal Revenue Service ($200), totaling $10,742.90. However, instead of paying its creditors in good faith, the Debtor treats the claims of Ringba and Cohen as "disputed" and proposes to continue the saga of appeals related to state court litigation. Based on this backdrop, the Debtor's

127930774.1

Fourth Amended Sub-Chapter V Plan of Reorganization Dated February 26, 2025 (the "Plan") cannot be confirmed.

First, the Plan proposes, in bad faith, to significantly delay payment to the Debtor's two largest unsecured creditors and to omit interest payments to unsecured creditors. Second, the Bankruptcy Case and the Plan are the result of a two-party dispute that should be resolved outside of bankruptcy. Third, the Plan and Bankruptcy Case are the result of the Debtor's bad faith attempts to avoid posting a supersedeas bond while it pursued its state court appeals of Ringba's two judgments. Fourth, the Plan is the culmination of the Debtor's bad faith misconduct in this bankruptcy case. Fifth, although unclear, the Plan seems to propose paying a significantly reduced sum to unsecured creditors. Sixth, the Plan lacks adequate default remedies and is therefore not feasible. Finally, the Plan contains an impermissibly broad "Exculpation" provision, which is also indicative of the Debtor's, and the Debtor's principal, Mr. O'Hare's, continued bad faith.

## BACKGROUND

### A.    State Court Procedural Background

1.    On May 25, 2023, in litigation between the Debtor and Ringba in the District Court, El Paso County, Colorado, in Case No. 2021CV31668 (the "State Court Litigation"), the District Court issued an Order re Forthwith Request for Emergency Hearing and terminating sanctions against the Debtor (the "Judgment"). There, the El Paso County District Court entered terminating sanctions against the Debtor for its concealment of evidence and recordings that went to the heart of the State Court Litigation. The El Paso District Court also entered an award of attorneys' fees and costs against the Debtor and in favor of Ringba. Ringba's claim in this Bankruptcy Case is based on this Judgment and the award of attorneys' fees and costs.

127930774.1

2.        In Case No. 2024CA265, the Debtor appealed to the Colorado Court of Appeals the Judgment terminating its State Court case and awarding attorneys' fees and costs to Ringba. The Debtor also appealed three other orders entered by the State Court in Colorado Court of Appeals Case No. 2023CA891.

3.        On September 19, 2024, the Colorado Court of Appeals affirmed the District Court's judgment against the Debtor, denying the Debtor's appeal at 2023CA891.[1] Then, on March 12, 2025, in Case No. 2024SC724, the Debtor filed a Petition for Writ of Certiorari with the Colorado Supreme Court as to the Colorado Court of Appeals' decision (with respect to 2023CA891). The Debtor did not obtain a supersedeas bond for any of its appeals.

**B.      The Debtor's Bankruptcy Case**

4.        DNC and TCPA List Sanitizer, LLC (the "Debtor") filed for relief under Chapter 11 of the Bankruptcy Code (the "Bankruptcy Case") on May 16, 2024 (the "Petition Date"). *See* Docket No. 1. The Debtor is primarily owned by Cashyew Holdings, LLC ("Cashyew"), which holds a 99% equity interest in the Debtor. The remaining ownership interests in the Debtor are held by Michael O'Hare (.50%), the Debtor's CEO, and Tania O'Hare (.50%), the Debtor's Secretary. *See* Statement of Financial Affairs No. 28. Cashyew is wholly owned by the O'Hares. *See* Docket No. 55 ¶ 8.

**a.   The Rule 2004 Examination**

5.        Early in the Debtor's Bankruptcy Case, Ringba filed its *Ex Parte* Motion for Order Authorizing Rule 2004 Examination of Debtor DNC and TCPA List Sanitizer, LLC and Cashyew Holding (the "2004 Motion"). *See* Docket No. 22. The Court granted the 2004 Motion on May 31,

---

[1] The Colorado Court of Appeals has not yet ruled in Case No. 2024CA265.

127930774.1

2024. *See* Docket No. 24. The Debtor provided a relatively small amount of the information requested by Ringba.

6. On August 28, 2024, the Debtor filed a retaliatory motion for Rule 2004 Examination of Ringba (the "Debtor's Rule 2004 Motion"). *See* Docket No. 135. The next day, Ringba filed an <u>Unopposed</u> Emergency Motion to Seal *Ex Parte* Motion for Order Authorizing Rule 2004 Examination of Ringba (the "Seal Motion"). *See* Docket No. 137. The basis for the Seal Motion was the Debtor's purposeful disclosure of matters that were deemed to be "Confidential" and "AEO" and were deemed to be subject to a protective order in the State Court Litigation. On the same day, the Court entered its Seal Order (Docket No. 138) and thereafter, on August 30, 2024, entered an Order denying the Debtor's Rule 2004 Motion as it pertained to Ringba. *See* Docket No. 140. The Court's Order noted that the Debtor's Rule 2004 Motion did not fall within the appropriate scope of FED. R. BANKR. P. 2004. *See id.* The Rule 2004 examination of the Debtor took place on September 25, 2024. No Rule 2004 examination of Cashyew has occurred.

**b. The Motion to Assume Management Agreement**

7. On July 10, 2024, the Debtor filed its Motion to Assume Management Agreement with Cashyew Holding, Inc. (Docket No. 58) (the "Motion to Assume"). The Motion to Assume sought Court approval allowing the Debtor to assume a Management Services Agreement between the Debtor and Cashyew under which the Debtor would pay Cashyew a 60% management fee (of Debtor's gross revenues), on a monthly basis. Ringba, JPMorgan Chase, N.A. ("Chase"), and the United States Trustee all objected to the Motion to Assume (Docket Nos. 88, 100 and 102).

**c. The Debtor's Numerous Motions to Use Cash Collateral**

8. On June 26, 2024, Chase filed its Notice of Non-Consent to Debtor's Use of Cash Collateral (Docket No. 50) indicating that Chase claims a properly perfected security interest in

the Debtor's assets (a blanket lien) and that it did not consent to the Debtor's use of its cash collateral absent express agreement or subsequent Court order.[2]

9.      On July 9, 2024, the Debtor filed its untimely Pre-Status Conference Report (Docket No. 55) (the "Report"). The Report reveals, *inter alia*, that "Mr. and Mrs. O'Hare receive a draw each month in the appropriate [*sic*] sum of $20,000 each. Cashyew Holding[], LLC is separately paid a management fee (based on certain percentages of revenue) and receives approximately $50,000 per month from the Debtor." Report, ¶ 15.

10.     On August 28, 2024, the Debtor filed its *Ex Parte* Motion to Approve Stipulated Final Cash Collateral Agreement (Docket No. 134) (the "Ex Parte Motion"). The Ex Parte Motion sought Court approval of a stipulated cash collateral agreement on an *ex parte* basis. On the same date, Ringba filed an objection to the Ex Parte Motion noting that FED. R. BANKR. P. 4001(b)(1) generally required notice and an opportunity to object to the use of cash collateral and that the Ex Parte Motion was deficient as to notice and content. On August 30, 2024, the Court entered an Order denying the Ex Parte Motion, noting that the motion requested relief that cannot be granted *ex parte*. *See* Docket No. 139.

11.     Subsequently, the Debtor filed its Motion for Authority to Use Cash Collateral (Docket No. 149) and Notice, requiring creditors and parties in interest to object on or before September 24, 2024. *See* Docket No. 150. However, after multiple parties objected, the Debtor filed notice of its withdrawal of its Motion for Authority to Use Cash Collateral on September 20, 2024. Docket No. 163.

---

[2] On September 18, 2024, Chase filed its Objection of Secured Creditor JP Morgan Chase Bank, N.A. to Debtor's Motion for Authority to Use Cash Collateral (Docket No. 156), reaffirming its objection and non-consent to the Debtor's use of its cash collateral.

127930774.1

12.     On October 2, 2024, the Debtor filed its next, untimely, Motion for Authority to Use Cash Collateral "[i]n order to pay necessary operating expenses[.]" Docket No. 189 ¶ 9. Attached to the motion was a proposed budget, which included payments to Cashyew for "Owner Comp" in the total amount of $549,433.82 between May 2024 and March 2025. *See* Docket No. 189-1. The Cash Collateral Motion was filed only after the Debtor had made multiple postpetition unauthorized transfers to Cashyew, the O'Hares, and others, without the consent of Chase or permission from this Court. *See* Docket Nos. 50; 151 ¶¶ 34–39.

13.     On October 24, 2024, this Court, pursuant to the consent of Ringba, Chase, and the United States Trustee, partially granted the Debtor's Motion for Authority to Use Cash Collateral but held that "[t]he Debtor can make all payments provided for in the Budget except for payments to Cashyew Holding . . . ." Docket No. 252 ¶ 1 (the "Cash Collateral Order").

### d.  Cashyew's Motion for Administrative Expense

14.     On January 24, 2025, despite the Court's prior order disallowing the use of cash collateral to pay Cashyew, Cashyew filed its Motion for Administrative Expenses and Fees Pursuant to 11 U.S.C. §§'s 503(b)(1) and (2). Docket No. 302. On February 17, 2025, Ringba objected because, *inter alia*, the application was an end-run attempt around the Court's Cash Collateral Order and because Cashyew is a "professional person" that should have, but failed to, seek employment under 11 U.S.C. § 327(a). Docket No. 313.

### e.  The Debtor's Numerous Plans of Reorganization

15.     On August 14, 2024, Debtor filed its first Subchapter V plan pursuant to Section 1189(b). *See* Docket Nos. 123, 123-1. On September 25, 2024, the Debtor filed an Amended Plan of Reorganization Dated September 25, 2024 for Small Business Under Chapter 11, Subchapter V. The amended plan was filed without any separate notice of a confirmation hearing or time

127930774.1

within which to object. Multiple parties objected, including the United States Trustee, Cohen, and Ringba. Docket Nos. 178, 187, 188.

16.     On January 23, 2025, the Debtor filed its Second Amended Chapter 11 Small Business Subchapter V Plan but named it as the *Third* Amended Chapter 11 Small Business Subchapter V Plan (Docket No. 301). Finally, on February 26, 2025, the Debtor filed its Third Amended Chapter 11 Small Business Subchapter V Plan but named it as the *Fourth* Amended Chapter 11 Small Business Subchapter V Plan (the "Plan") (Docket No. 316).

17.     On April 2, 2025, the United States Trustee filed its Objection to the Plan. Docket No. 345. The Subchapter V Trustee also filed a joinder to the United States Trustee's objection. Docket No. 348. Then, on April 8, 2025, Cohen filed its objection to the Plan at Docket No. 355. GLegal, LLC filed its Joinder of GLegal, LLC to Cohen's Objection to Plan Confirmation. Docket No. 357.

## OBJECTION TO CONFIRMATION

### A.     Applicable Law Regarding Subchapter V Cases

18.     Congress enacted the Small Business Reorganization Act of 2019, commonly knowns as "Subchapter V," to "streamline the reorganization and rehabilitation process for small business debtors." *In re: Signia, Ltd*, 2024 WL 331967, at *1 (Bankr. D. Colo. 2024). Indeed, "Subchapter V cases are supposed to proceed quickly." *Id.*; *see also In re Trepetin*, 617 B.R. 841, 846 (Bankr. D. Md. 2020) ("Congress contemplated an accelerated process for Subchapter V cases."); *see also In re Seven Stars on the Hudson Corp.*, 618 B.R. 333, 340 (Bankr. S.D. Fla. 2020) ("Subchapter V by its very nature is intended to be an expedited process."); *In re Online King*, 629 B.R. 340, 350 (Bankr. E.D.N.Y. 2021) (Subchapter V "is a fast-tracked process aimed at giving the qualifying debtor a less expensive and accelerated path to reorganize...").

127930774.1

19. Subchapter V plans must satisfy the requirements of 11 U.S.C. § 1191. Section 1191(a) incorporates the requirements of Section 1129(a), except for paragraph (15). 11 U.S.C. § 1191(a). However, if a Subchapter V plan is objected to, it must satisfy the requirements of Section 1191(b) and (c). In that case, a proposed plan must not discriminate unfairly and must be found to be "fair and equitable" pursuant to Section 1191(c).[3]

20. Among the other requirements of Section 1129, the Court can only confirm a Chapter 11 plan if it has been proposed in good faith. *In re Lost Cajun Enterprises*, LLC, 634 B.R. 1063, 1072 (Bankr. D. Colo. 2021). Whether a plan is proposed in good faith depends on whether, "there is a reasonable likelihood that the plan will achieve its intended results which are consistent with the purpose of the Bankruptcy Code, that is, the plan is feasible, practical, and would enable the company to continue and pay its debts in accordance with the plan provisions." *Id.* (citing *In re Pikes Peak Water Co.*, 779 F.2d 1456, 1459 (10th Cir. 1985)).

21. Under 11 U.S.C. § 1129(a)(1) and (2), the plan and the proponent of the plan respectively must "compl[y] with the applicable provisions of this title," *i.e.* Title 11 of the U.S. Code. The debtor bears the burden of confirmation of its plan and compliance with Section 1129, including proving good faith and proving feasibility. *In re Saratoga & N. Creek Ry., LLC*, 635 B.R. 581, 601, 608 (Bankr. D. Colo. 2022).

---

[3] Under the Section 1191(b) exception, the plan, if objected to, no longer must satisfy Sections 1129(a)(8) or (10) (in addition to Subsection (15)).

127930774.1

**B.**   **Debtor's Plan Has Been Proposed in Bad Faith in Violation of 11 U.S.C. § 1129(a)(3) (and § 1129(a)(1) and (2))**

22.     Debtor's Plan has been proposed in bad faith in violation of Section 1129(a)(3). "In the context of Chapter 11 confirmation, the plan proponent must prove, by a preponderance of the evidence, that the 'plan has been proposed in good faith and not by any means forbidden by law.'" *In re Autterson*, 547 B.R. 372, 399 (Bankr. D. Colo. 2016). "In assessing good faith, 'courts have looked to whether the debtor intended to abuse the judicial process and the purposes of the reorganization provisions.'" *Id.* (quoting *In re Paige*, 685 F.3d 1160, 1178 (10th Cir. 2012)). Thus, a plan must not only be technically in compliance with the Bankruptcy Code, but also a plan must be "proposed with honesty and sincerity." *Id.* (quoting *In re Riviera Drilling & Expl. Co.*, No. BR 10-11902, 2012 WL 6719591, at *5 (Bankr. D. Colo. Dec. 19, 2012), *aff'd*, 502 B.R. 863 (10th Cir. BAP (Colo.) 2013)). The Court must also assess "whether a plan's terms or the process used to seek its confirmation was fundamentally fair." *Riviera Drilling*, 2012 WL 6719591, at *6. Plans that fail to meet these standards and are proposed in bad faith in violation of Section 1129(a)(3) cannot be confirmed.

**i.**   **The Proposed Plan is the Result of the Debtor's Bad Faith Avoidance of Posting a Supersedeas Bond**

23.     The entire purpose of the Debtor's Bankruptcy Case and Plan is to avoid funding a supersedeas bond while it continues its saga of appeals related to Ringba's judgments. In certain circumstances, where a debtor files a bankruptcy petition as a substitute to posting a supersedeas bond on appeal in other litigation, and the debtor then fails to "mov[e] forward in good faith to confirm and implement a plan" in its bankruptcy case, the debtor's conduct constitutes bad faith. *See In re Hyatt*, 479 B.R. 880, 897 (Bankr. D.N.M. 2012). For example, in *Paolini*, where a debtor: filed for bankruptcy instead of posting a supersedeas bond; demonstrated a lack of sincerity in undertaking reorganization efforts; failed to reduce expenses during bankruptcy; and did not

operate a business that would be disrupted by dismissing the bankruptcy case, the court held that

the case had been filed in bad faith. *In re Paolini*, 312 B.R. 295, 308–9 (Bankr. E.D. Va. 2004).

Some courts have also held that such conduct constitutes bad faith even where the debtor lacks

"sufficient assets to post a bond…." *See, e.g., In re Wally Findlay Galleries (New York), Inc.,* 36

B.R. 849 (Bankr. S.D.N.Y. 1984) (dismissing case for cause in part because debtor used

bankruptcy "as a litigating tactic" and "a substitute for a supersedeas bond of state court

proceedings.").

24.      In addition to these considerations, the U.S. Bankruptcy Court for the Central

District of California has enumerated several bad faith factors when a bankruptcy case is used as

a substitute to posting a supersedeas bond, including:

> "Whether the debtor intends to pursue an effective reorganization within a reasonable period of time, or whether the debtor is unwilling or unable to propose a meaningful plan until the conclusion of the litigation;"

> "Whether the debtor has relatively few unsecured creditors, other than the holder of the adverse judgment;"

> "Whether the debtor acted in good faith to exhaust all efforts to obtain a bond to stay the judgment pending appeal;" and

> "Whether assets of the estate are being diminished by the combined ongoing expenses of the debtor, the chapter 11 proceedings, and prosecution of the appeal."

*In re Mense*, 509 B.R. 269, 279–81 (Bankr. C.D. Cal. 2014) (internal citations removed) (setting

forth seven factors for a court's good faith determination "[w]hen a debtor files chapter 11 to dodge

the requirement for an appeal bond….").[4]

---

[4] Other factors identified by the Mense Court include: "Whether the debtor is a viable business which would suffer severe disruption if enforcement of the judgment was not stayed; and the chapter 11 petition was filed to preserve its status as an ongoing concern and to protect its employees and creditors; …Whether the debtor had financial problems on the petition date, other than the adverse judgment; … [and] Whether the debtor has sufficient assets to post a bond to stay the judgment pending appeal…." *Mense*, 509 B.R. at 280.

25.    As an initial matter, as discussed in more detail below, the Debtor has demonstrated a lack of sincerity in undertaking reorganization efforts, including failing to propose a confirmable plan despite proposing numerous plans over the life of its Bankruptcy Case. Indeed, the Debtor's conduct is wholly consistent with its admission in its Status Report filed at the beginning of this case that its "preference … [was] not to file a plan of reorganization **but to seek a stay of this bankruptcy pending the outcome of the appeal or the alleged legal malpractice case against Tucker and Cohen.**" Docket No. 55, ¶ 16. By Debtor's own admission, this Bankruptcy Case and the attendant Plan serves the sole purpose of delay in paying its largest unsecured creditors while relieving Debtor of having to post a supersedeas bond. Rather than "proceed[ing] quickly to confirmation and rehabilitation," as is required in Subchapter V cases, it is apparent Debtor would prefer to use Subchapter V as a litigation tool and not for its intended purpose. *Landau*, 2022 WL 4647473, at *5; *see also Paolini*, 312 B.R. at 309 (where the debtor's bad faith conduct demonstrated a "lack of intent to seriously reorganize and speaks volumes of [the debtor's] true purpose of utilizing this proceeding not as an honest attempt to reorganize his debt but simply as an extension of [] litigation tactics in the Idaho Litigation."). In short, the Debtor seeks to "avoid the consequences of adverse state court decisions while it continues litigating." *Wally Findlay*, 36 B.R. at 851. As in *Wally Findlay*, this Court "should not … act as a substitute for a supersedeas bond of state court proceedings." *Id.*[5]

---

[5] Although it is unclear whether Debtor here could have paid the judgment at the Petition Date, the Wally Findlay Court explained that an inability to post a bond pending appeal in fact reveals a judgment debtor's motivations in bankruptcy—to avoid the consequences of an adverse state court decision. *Wally Findlay*, 36 B.R. at 851.

26. Additionally, the Debtor's desire to avoid posting a supersedeas bond is underscored by the terms of its plan of reorganization, which is contingent on the full and final conclusion of litigation with Ringba. As held by the *Paolini* Court, a proposed plan that is contingent on success in pending litigation and avoidance of a supersedeas bond, constitutes bad faith:

> The Plan proposed by [the debtor] also betrays the lack of serious commitment to reorganize. [The debtor's] Plan is largely predicated on his speculation that he will … succeed in reversing the District Court in the Idaho Litigation…. For these small and presumptively relatively painless [bond] payments, [the debtor] seeks to be able to continue his litigation with [the judgment creditors] without any risk of enforcement of [the creditors'] judgment in the interim. … [T]he Court is confronted with [the debtor's] attempt to continue the appeal of the Idaho Litigation in a manner contrary to the conditions imposed by the District Court and to postpone any material effort to reorganize until he has had the benefit of a stay of [the judgment creditors'] collection efforts without any material financial sacrifice.

*See Paolini,* 312 B.R. at 309–10.

27. The Debtor should not be permitted to propose a "Plan" that effectively allows it to avoid: (i) posting a supersedeas bond pending its appeals, and (ii) paying Ringba's and Cohen's claims at all, until the full appellate process plays out which will likely be years from now.

**ii.** **Debtor's Plan Proposes to Significantly and Purposely Delay Payment to Its Two Major Unsecured Creditors**

28. Additionally, the Plan is proposed in bad faith because it proposes to significantly delay payment to its only two major unsecured creditors, Ringba and Cohen. Although American Express, GLegal, and the IRS have claims against the Debtor, these claims are nominal and will likely be paid immediately after administrative claims. *See* Docket No. 316, Exhibit A at 39. Ringba and Cohen combined hold almost 98% of the Debtor's remaining indebtedness. *See id.* Thus, in effect, Ringba and Cohen are the Debtor's only two true remaining unsecured creditors, and the impact of the Plan on each is of paramount importance to this Court's confirmation inquiry.

- 12 -

127930774.1

29.     Indeed, the Debtor characterizes Ringba's claim and the claim of Cohen as disputed. Docket No. 316 at 8. As to Ringba's claim, the Plan states that "[i]f the Debtor prevails the amount owed to unsecured creditors will decrease," indicating the Debtor does not intend to pay the claim until the conclusion of its appellate process.[6] *Id.* The Plan further provides that where disputed claims (*i.e.*, those belonging to Ringba and Cohen) are "not subject to a Final Order, the portion of the distribution that would be paid to the disputed claimant will be held by the Debtor in an interest-bearing account until the Claim is allowed or disallowed." *Id.* at 17. This proposal demonstrates a bad faith attempt to forestall or even to avoid timely repayment of Ringba's and Cohen's valid claims. *See, e.g., In re Paolini*, 312 B.R. 295, 310 (Bankr. E.D. Va. 2004) (finding bad faith where "[the debtor's] only sincere plan to financially reorganize is to reverse the adverse ruling of the District Court and prevail on his claims against [judgment creditors]."). The bad faith of this unjustified delay is particularly acute for Ringba, who has the most substantial claim in the Debtor's Bankruptcy Case. In effect, the Plan is a continuation of the Debtor's prepetition and postpetition stays of collection, all without ever seeking a supersedeas bond.

30.     Second, the Plan does not even propose to pay Ringba the full amount of its claim. Specifically, the Plan omits interest payments on Ringba's underlying judgment claim of $640,000—an omission that is particularly glaring and in bad faith, considering the significant delay in payment discussed above. *See* Docket No. 316 at 3, 15–16. The Debtor provides no justification for its proposal not to pay Ringba interest on its Judgment claim. However, under applicable non-bankruptcy law, Colorado-issued judgments accrue interest "at the rate of eight percent per annum compounded annually…." C.R.S. § 5-12-102(1)(b). The Plan contains no

---

[6] On March 12, 2025, the Debtor filed its Petition for Certiorari in the Colorado Supreme Court. Typically, it takes several months (in some cases close to nine months) for the Colorado Supreme Court to determine a Petition for Certiorari. In addition, Ringba expects the Debtor's second appeal, now pending, will also be denied by the Colorado Court of Appeals and yet another Petition for Certiorari will be filed relating to the Debtor's second appeal.

- 13 -

explanation or justification for why interest is not being paid as required by Colorado judgment law.[7]

### iii.  Debtor's Plan Is Based on a Two-Party Dispute Between Debtor and Ringba

31.     Relatedly, the Debtor's Plan demonstrates that it is proposed effectively as a litigation tactic in a two-party dispute (even though the Debtor has already lost in the State Court Litigation). The existence of a two-party dispute may constitute bad faith, preventing confirmation of a debtor's proposed plan. *See In re Swartville, LLC*, No. 11-08676-8-SWH, 2012 WL 3564171, at *4–*5 (Bankr. E.D.N.C. Aug. 17, 2012) (analyzing two-party dispute as issue of bad faith in context of plan confirmation and denying confirmation of plan). Generally, bankruptcy courts abstain in "two-party disputes where the petitioner can obtain adequate relief in a non-bankruptcy forum." *In re Springs Hosp., Inc.*, 2006 WL 2458679, at *8 (Bankr. D. Colo. Aug. 22, 2006) (quoting *Remex Elec. Ltd. V. Axl Indus., Inc.* (*In re Remex Elec. Ltd.*), 127 B.R. 482, 484 (S.D. Fla. 1991)). Likewise, courts have resisted the use of bankruptcy as a tactic in non-bankruptcy litigation. *See, e.g., In re Schempp Real Est., LLC*, 303 B.R. 866, 877 (Bankr. D. Colo. 2003) ("This bankruptcy appears to be nothing more than an effort to enlist the resources of the bankruptcy court as yet another litigation tactic in a two-party dispute."). Indeed, one indicator of a two-party dispute is where a single creditor holds a significant share of the debtor's overall indebtedness. *See In re Ozcelebi*, 639 B.R. 365, 413-14 (Bankr. S.D. Tex. 2022) (where one of three creditors held most of the debtor's indebtedness and the court determined that debtor's bankruptcy petition constituted "textbook bad faith conduct.").

---

[7] This is also a reason the Plan is not "fair and equitable" under 11 U.S.C. § 1191(c)(2). There, debtors are required to commit the full amount of their projected disposable income to the plan payments. Section 1191 does not permit to arbitrarily *reduce* claimed amounts, *i.e.*, by omitting interest payments required by law.

32.     The Debtor's Plan here is effectively a tool of non-bankruptcy litigation and a demonstration that this Bankruptcy Case is a two-party dispute between Ringba and the Debtor. As discussed in Ringba's previously filed Motion to Convert at Docket No. 151 (currently being held in abeyance), the Debtor has used, and continues to use, bankruptcy in bad faith to avoid posting a supersedeas bond and to avoid paying Ringba on its Judgment claim while it continues its unsuccessful appeals. Indeed, from the outset, the Debtor's stated "preference" in this Bankruptcy Case was "not to file a plan of reorganization but to seek a stay of this bankruptcy pending the outcome of the appeal or the alleged legal malpractice case against Tucker and Cohen." Report ¶ 16. By the Debtor's own admission, this Bankruptcy Case and the Plan serve the sole purpose of relieving the Debtor of having to post a supersedeas bond and/or begin paying Ringba. Rather than "proceed[ing] quickly to confirmation and rehabilitation," it is apparent Debtor would prefer to use Subchapter V bankruptcy and its Plan as a litigation tool and not for their intended purposes. *In re Landau*, No. 20-21114-11, 2022 WL 4647473, at *5 (Bankr. D. Kan. Sept. 30, 2022); *see also Paolini*, 312 B.R. at 309 (where the debtor's bad faith conduct demonstrated a "lack of intent to seriously reorganize and speaks volumes of [the debtor's] true purpose of utilizing this proceeding not as an honest attempt to reorganize his debt but simply as an extension of [] litigation tactics in the [state court] Litigation."). The Plan effectuates Debtor's preference to avoid posting a supersedeas bond and paying Ringba's claim while the appeals proceed. The Plan cannot be confirmed because it is filed in bad faith.

33.     Further, Ringba is not only Debtor's largest creditor by a significant margin (Ringba's total proof of claim is $656,108.84 and the next largest claim is Cohen at $200,976.33), but also Ringba's and Cohen's claims both arise out of the State Court Litigation. In other words, the Plan appears to be the culmination of Debtor's desire to selectively pay only the creditors it

desires—namely, nominal claims and those not associated with the State Court Litigation.[8] Debtor's Plan is not sincere and is instead a litigation tool and an encapsulation of the two-party nature of its dispute with its state court creditors. For this reason, the Plan should not be confirmed per Section 1129(a)(3).

> ### iv. The Proposed Plan is a Culmination of Debtor's Bad Faith Conduct in this Bankruptcy Case

34.     In addition to the significant deficiencies and bad faith associated with Debtor's proposed Plan itself, the Plan is the culmination of a series of bad faith actions and misconduct by the Debtor in this Bankruptcy Case, in violation of Section 1129(a)(3). The Tenth Circuit has "not rule[d] out the possibility that a plan could be unconfirmable under § 1129(a)(3) because of the proponent's … improper conduct." *In re Way to Grow, Inc.*, 610 B.R. 338, 346 (D. Colo. 2019) (quoting *Paige*, 685 F.3d at 1179). Indeed, as part of the bad faith analysis under Section 1129(a)(3), the Court must also assess "whether a plan's terms **or the process used to seek its confirmation** was fundamentally fair." *Riviera Drilling*, 2012 WL 6719591, at \*6 (emphasis added).

35.     Here, the Debtor's improper conduct, culminating in its third proposed Plan, render the Plan unconfirmable. Among other actions and omissions, these include, but are not limited to:

>   a.  **DISCLOSURE OF AEO INFORMATION**: The Debtor, through Mr. O'Hare individually, filed a retaliatory *Ex Parte* Motion for Order Authorizing Rule 2004 Examination of Creditor Ringba's Agents Adam Young and

---

[8] As briefed previously by Ringba in this Bankruptcy Case, the Debtor paid, in part or in full, its prepetition counsel, Allen Vellone Wolf Helfrich & Factor, P.C. ("Allen Vellone"), and another prepetition creditor, American Express, outside of the bankruptcy process, without Court authorization. *See* Docket No. 316 at 3–4 (Michael O'Hare personally purchased Allen Vellone's Claim in this Bankruptcy Case"), 8 ("An insider of the Debtor was also an obligor on the American Express debt, who paid American Express \$41,000 in satisfaction of the non-debtor insider obligation[.]"); Docket No. 115. *See also* Docket No. 187 ¶¶ 9, 34. The Debtor purported to make these unauthorized payments by having its principal and insider, Mr. O'Hare, pay the claims himself.

Harrison Gurvitz. Docket Nos. 135, 135-1. That motion and its exhibit contained highly confidential information subject to an "attorney's eyes only" designation and a stipulated protective order between the Debtor and Ringba in the State Court Litigation. *See* Docket Nos. 135, 135-1. This appears to have been nothing more than an attempt at the time to leverage the Debtor's position in (unsuccessfully) resisting and preventing the oral examinations of Cashyew and the Debtor, through their principals. Ringba was forced to file an emergency Motion to Seal, which the Court granted. Docket Nos. 137, 138.

b. **LARGE TRANSFERS TO INSIDERS:** The Debtor's prior monthly operating reports reflect various and substantial unexplained cash payments to insiders and others. *See, e.g.,* Docket Nos. 91, 91-1, 91-2, 130, 130-1. According to the Report, Mr. and Mrs. O'Hare each received a monthly payment of $20,000 from the Debtor. Report, ¶ 15. Additionally, another $50,000 per month was being paid to Cashyew as a "management fee." *Id.* In July 2024 alone, for example, Cashyew received $85,948.60 (not including any payments made to the O'Hares directly). *See* Docket No. 130-1, p. 3. It is unclear how Cashyew's "management" responsibilities differ from the O'Hares' management of the Debtor. Report at ¶ 8. Thus, based on the foregoing, there was at least $90,000 going to the Debtor's principals each month for unknown purposes—and likely more than that amount, based on the Debtor's July 2024 Monthly Operating Report. These payments only stopped after Ringba raised this issue to the Court and to Chase, whose cash collateral

was being brazenly siphoned off by insiders of the Debtor, without authorization by the Court.

c. **FAILURE TO FULLY COMPLY WITH DISCOVERY OBLIGATIONS:** The Debtor has failed to fully comply or otherwise respond to Ringba's requests for production of documents. *See* Docket No. 22. The Debtor provided a relatively small amount of the information requested but not what it was directed to provide. At the Debtor's Rule 2004 examination, the Debtor's principal, Mr. O'Hare, testified that the Debtor provided to Ringba, that information that *the Debtor* thought was relevant and not any further information.

d. **ATTEMPT TO ASSUME POSTPETITION CONTRACT:** The Debtor has moved to assume a "Management Agreement" entered into with Cashyew, which was executed <u>postpetition</u> on June 28, 2024. Docket Nos. 58; 58-1, p. 3. The Debtor, through the postpetition Management Agreement, seeks to disburse sixty percent (60%) of the Debtor's gross revenues to Cashyew. Docket No. 58-1, p. 4. (It is not clear if this amount includes or is in addition to the $90,000 monthly that was already being paid to the Debtor's principals.) Several parties objected to the Debtor's Motion to Assume and that motion is still pending. The Debtor has since attempted, through various motions, to have Cashyew paid, either through the use of cash collateral or as an administrative expense.

e. **FAILURE TO PROVIDE NOTICE OF CASH COLLATERAL AGREEMENT:** The Debtor filed an *Ex Parte* Motion to Approve Stipulated

Final Cash Collateral Agreement without noticing all creditors and parties in interest. Docket No. 134. This motion appears to be an end-run around the three objections lodged against Debtor's Motion to Assume Management Agreement with Cashyew Holding, Inc. at Docket No. 58. *See* Docket Nos. 88, 100, 102. In other words, the *Ex Parte* Motion is an attempt by the Debtor to avoid the requirements of bankruptcy and to assume a contract not approved by this Court. The Court denied the Debtor's motion because such relief cannot be granted *ex parte*. Docket No. 139.

f.  **UNAUTHORIZED POSTPETITION TRANSFERS:** The Debtor has made several unauthorized postpetition transfers. Specifically, Debtor has paid approximately $62,000 in prepetition invoices after the Petition Date without Court approval, in violation of Section 549 of the Bankruptcy Code, paying a favored unsecured creditor postpetition. *See* Docket Nos. 120, ¶ 5; 115. Rather than seeking this Court's approval to use cash collateral to pay its appellate counsel, Debtor entered into a sham transaction through which Allen Vellone (now Debtor's appellate counsel) assigned "[f]or good and valuable consideration" its $62,092.80 debt to none other than Michael O'Hare— Debtor's CEO and principal. *Id.* at ¶ 6. Mr. O'Hare then apparently "paid the claim in full" (*i.e.*, to his own company). *Id.*; *see also 3868–70 White Plains Rd., Inc.*, 28 B.R. 515, 519 (Bankr. S.D.N.Y. 1983) (where the court in part dismissed bankruptcy case due to postpetition transfers to the debtor's attorney). Likewise, without Court authorization, Mr. O'Hare paid the Debtor's creditor American Express, "$41,000 in satisfaction of the non-debtor

- 19 -

insider obligation[.]" Docket No. 316 at 8. These are likely sums that could have been distributed to all creditors, through the Plan, but instead were paid without authorization, outside of the Bankruptcy Case.

g. **DEFICIENT SCHEDULES:** The Debtor's initial Schedules were deficient, including lacking separate "spreadsheets" for payments, distributions, or withdrawals credited or given to insiders and listing several creditors as being owed "unknown" amounts. *See* Docket No. 1.

h. **PRINCIPALS' CONFLICTS OF INTEREST:** The Debtor's principals have significant conflicts of interest. The O'Hares ostensibly operate as the Debtor's fiduciary, but they have significant disincentives to analyze and potentially bring conveyance actions against themselves or Cashyew, which is wholly owned by the O'Hares. As explained elsewhere herein, significant sums were previously transferred from the Debtor to Debtor's principals each month (both pre and postpetition). By their own admission, the O'Hares received a monthly draw in the amount of $20,000 each and Cashyew was separately paid a "management fee" in the amount of $50,000 per month (or apparently more, as demonstrated by the July 2024 Operating Report). Report ¶ 15. *See also* Docket 130-1, p. 3. The Debtor has sought to assume a "Management Agreement" entered into with Cashyew, which was executed postpetition on June 28, 2024, and has otherwise attempted to have Cashyew paid through multiple other avenues, including under 11 U.S.C. § 503(b), as an administrative priority claim.

- 20 -

36.     In the end, the Plan is an encapsulation of Debtor's continuing bad faith and misconduct in this Bankruptcy Case. Confirmation would facilitate Debtor's abuse of the bankruptcy process and undermine the actual purpose of bankruptcy; that is, reorganization and rehabilitation for honest debtors. The Debtor instead seeks to cramdown a Plan, allowing it to avoid paying Ringba its valid judgments until the appellate process is fully and finally complete. Such a Plan cannot be confirmed.

## C.     The Plan Seems to Propose Paying a Percentage of the Claims Owed to Unsecured Creditors

37.     Additionally, although unclear, it appears the Plan proposes to pay unsecured creditors only a small portion of their claim amounts. In section 6.1 of the Plan, the Debtor proposes to make payments (into the "Unsecured Creditor Account") "every month[.]" Docket No. 316 at 15. However, the Plan then discusses the amounts the Debtor will pay "during" each year. *See id.* It is unclear whether these amounts (e.g., the proposal to pay "during the first year of the Plan $26,042") are intended to be *annual* payments or *monthly* payments. *Id.* If these amounts are intended to represent the total sums the Debtor will pay to unsecured creditors each *year*, then the Debtor is proposing to pay unsecured creditors only (approximately) $261,963 <u>total</u> over the five-year payment term. *See id.* Of course, total unsecured creditor claims amount to at least $878,827.20; thus, this repayment amount represents less than 30% repayment on unsecured claims. *See id.* at 29. Moreover, the Plan states that the Debtor's obligation to make "deposits" into the Unsecured Creditor Account (*i.e.,* to make payments to unsecured creditors) "will terminate at the end of the *earlier of*: (a) the five year term of the Plan or (b) upon satisfaction of Allowed Administrative Claims and Allowed Claims in Class 4(a)." *Id.* at 12 (emphasis added). Thus, the Plan potentially proposes that, after five years, the Debtor's obligations to pay the remaining 70% of unsecured creditor claims would be terminated.

- 21 -

38.     Alternatively, if the Debtor intends to make these stated payment amounts on a *monthly* basis, then the Debtor's five-year payment term amount would be approximately $3.1 million. *Id.* at 15. A commitment to pay more than twice the amount of all claims owed (approximately $1.4 million, including administrative and secured claims but excluding interest payments) is, in turn, illogical, suggesting that the Debtor intended the annual payment schedule and the significantly reduced repayment sums.

39.     At a minimum, the Plan should not be confirmed as drafted, with respect to this provision. The Plan, which purports to be a "full payment" plan, must account for actually paying in full the claims of its creditors, including interest.

## D.     The Plan is Not Feasible Under 11 U.S.C. § 1191(c)(3)(B)(ii)

40.     Because the Debtor has elected to proceed under Subchapter V of Chapter 11, its Plan must satisfy the requirements of Section 1191(a) governing the confirmation of Subchapter V plans. Section 1191(a) incorporates the requirements of Section 1129(a), governing Chapter 11 plans in general ("The court shall confirm a plan under this subchapter only if all the requirements of section 1129(a), other than paragraph (15) of that section, of this title are met.").

41.     However, in addition to the requirements of Section 1129(a), the Debtor's objected-to Plan must also satisfy the requirements of a nonconsensual Subchapter V plan under Section 1191. One requirement of a nonconsensual or "cramdown" Subchapter V plan is that it is "feasible" under Section 1191(c)(3). *See In re Curiel*, 651 B.R. 548, 561 (B.A.P. 9th Cir. 2023) ("[Section 1191(c)] sets forth the three minimum requirements a subchapter V cramdown plan must meet to be considered 'fair and equitable.' … [Section 1191(c)(3)] requires a harder look at feasibility than otherwise conducted under [Section] 1129(a)(11) alone."); *see also In re Samurai Martial Sports,*

- 22 -

*Inc.*, 644 B.R. 667, 698 (Bankr. S.D. Tex. 2022) (stating that "Section 1191(c)(3) [is] often referred to as the feasibility test...").[9]

42.     Under Section 1191(c)(3), the Debtor must establish either (a) that the Debtor "will be able to make all payments under the plan" or (b) that "there is a reasonable likelihood that the debtor will be able to make all payments under the plan … **and** the plan provides appropriate remedies, which may include the liquidation of nonexempt assets, to protect the holders of claims or interests in the event that the payments are not made." 11 U.S.C. § 1191(c)(3) (emphasis added). The "Debtor bears the burden to show feasibility by a preponderance of the evidence." *In re Investment Company of the Southwest, Inc.*, 341 B.R. 298, 310 (B.A.P. 10th Cir. 2006) (citing *In re Danny Thomas Props. II Ltd. P'ship*, 214 F.3d 959, 963 (8th Cir. 2001)).

43.     The Debtor's Plan is not feasible because, even if the Debtor is reasonably likely to make Plan payments, the Debtor's Plan must also provide appropriate default remedies to creditors. *See* § 1191(c)(3)(B)(ii). In this case, it does not. Instead, the Plan merely points creditors to default remedies already available under state law. Docket No. 316 at 18 ("In the event of a default by the Debtor under the Plan, creditors shall be entitled to enforce all rights and remedies against the Debtor for breach of contract, the Plan."). The Plan refers vaguely to the fact that "creditors may have greater rights in the event of default" under the nonconsensual Plan, but it fails to provide any description of what these additional default remedies include. *Id.*

44.     This type of default provision is insufficient for Subchapter V plans. *See In re Channel Clarity Holdings LLC*, No. 21BK07972, 2022 WL 3710602, at *16 (Bankr. N.D. Ill. July 19, 2022) (stating that appropriate remedies must offer "specific protections for unsecured creditors who are forced to forgo some of the standard protections of a typical chapter 11 case

---

[9] Generally, Chapter 11 plans and consented-to Subchapter V plans must only satisfy the feasibility requirements of Section 1129(a)(11). *See Curiel*, 651 B.R. at 561.

when debtors elect to proceed under subchapter V. To assert that creditors can pursue remedies under applicable law if [a debtor] should default is a toothless remedy."); *see also In re McBride*, 2023 WL 8446205, at *6 (Bankr. D. Me. Dec. 5, 2023) ("Merely providing creditors with the opportunity to pursue their state law rights or to seek enforcement of a plan is insufficient."). Instead, such plans should offer "specific protections for unsecured creditors who are forced to forgo some of the standard protections of a typical chapter 11 case when debtors elect to proceed under subchapter V." *Channel Clarity*, 2022 WL 3710602, at *16. For example, in *Channel Clarity*, the court observed that, where "the objecting unsecured creditor bears a disproportionate amount of risk, Debtor could offer options such as expedited liquidation of nonexempt assets, or a truncated process for declaring a default and allowing collections to begin, or immediate conversion to allow a chapter 7 trustee to take over business operations and possibly conduct a winddown and liquidation." *Id.*

45.     Here, because Debtor's Plan is proposed under Subchapter V, it must include additional and appropriate remedies in the event of default, other than those already available under the law (*i.e.*, the right to enforce a breach of contract). The Plan does not do so and is therefore not feasible under Section 1191(c)(3)(B)(ii).

**E.     Ringba Joins and Incorporates the Objection Filed by the United States Trustee**

46.     Finally, Ringba agrees with, joins, and incorporates by reference, the objections made by the United States Trustee in his Objection to Debtor's Fourth Amended Sub-Chapter V Plan of Reorganization Dated February 26, 2025 at Docket No. 345 (the "UST Objection").[10] While Ringba joins the entire UST Objection, Ringba wishes to emphasize the significant issues

---

[10] The Subchapter V Trustee also submitted a Joinder to United States Trustee's Objection to Debtor's Fourth Amened Sub-Chapter V Plan of Reorganization Dated February 26, 2025, at Docket No. 348.

127930774.1

with the Debtor's purported "Exculpation" provision. *See* Docket No. 326 at 19; Docket No. 345 ¶ 14.

47.     As discussed in the UST Objection, exculpation is limited to entities and individuals, such as estate fiduciaries and counsel of the debtor, acting within the scope of their bankruptcy duties. *See Matter of Highland Cap. Mgmt., L.P.*, 48 F.4th 419, 437 (5th Cir. 2022); *In re Midway Gold US, Inc.*, 575 B.R. 475, 512-13 (Bankr. D. Colo. 2017); *see also* Docket No. 345. Exculpation cannot extend to *employees* of fiduciaries. *See Highland*, 48 F. 4th at 437. However, through the provision in the Debtor's Plan, the Debtor attempts to apply "Exculpation" to not only "professional[s]" but also employees of professionals and the Debtor. *See* Docket No. 326 at 11, 19. This is impermissible and would likely include both Mr. and Mrs. O'Hare.

48.     Additionally, the Debtor's use of the term "professional" is likely an attempt to exculpate not only its counsel, but also Cashyew. However, Cashyew has never applied as a professional in this Bankruptcy Case, *i.e.*, under 11 U.S.C. § 327(a). As briefed extensively in Ringba's objection to Cashyew's Section 503(b) application, Cashyew has, instead, inappropriately applied for administrative expense priority treatment under 11 U.S.C. § 503(b), which does not apply to bankruptcy professionals. *See* Docket Nos. 302, 313. Instead, Cashyew is at most, a volunteer in this Bankruptcy Case, to the extent it has provided any services at all. *In re Blair Oil Investments, LLC*, 588 B.R. 579, 591 (Bankr. D. Colo. 2018). Thus, exculpation could not extend to it.

49.     Moreover, exculpation does not and cannot extend to non-bankruptcy misconduct and violations of law. Instead, exculpation applies only to actions *in* the Bankruptcy Case, in the scope of the entity's or individual's bankruptcy duties. *See Midway Gold*, 575 B.R. at 512; *Highland*, 48 F. 4th at 437. As noted in the UST Objection, the Plan's broad definition of

- 25 -

"Exculpated Claim," including "any claim related to any act or omission in connection with, related to or arising out of the Debtor's restructuring efforts," could impermissibly encompass non-bankruptcy activity. *See* Docket No. 316 at 10; Docket No. 435 at 3–4. This broad definition must be narrowed significantly, especially so that it does not include the O'Hares or Cashyew for non-bankruptcy related actions.

50.     Finally, as noted in the UST Objection, exculpation applies only to acts or omission occurring after the bankruptcy Petition Date and before the confirmation of the Plan, not before and not after. *Claims* arising "as of" the petition date are distinguishable from *acts or omissions* occurring after the petition date; the former is impermissible because it could include liability for claims that occurred before the Debtor was even in bankruptcy. *See* Docket No. 316 at 10. Therefore, as drafted, the exculpation provision is invalid.

WHEREFORE, Adam Young, Tubmanburg Limited and Ringba, LLC, respectfully request that the Court enter an Order denying Debtor's Fourth Amended Sub-Chapter V Plan of Reorganization Dated February 26, 2025, and request such other and further relief as the Court deems appropriate.

Respectfully submitted this 9th day of April, 2025.

WOMBLE BOND DICKINSON (US) LLP

*s/ Chad S. Caby*
Chad S. Caby, No. 30927
1601 19th Street, Suite 1000
Denver, CO  80202
Tel:     303-628-9583
Fax:     303-623-9222
E-mail:  Chad.Caby@wbd-us.com

*Attorneys for Adam Young, Tubmanburg Limited and Ringba, LLC*

127930774.1

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that, on April 9, 2025, a true and correct copy of the foregoing **OBJECTION TO DEBTOR'S FOURTH AMENDED SUB-CHAPTER V PLAN OF REORGANIZATION DATED FEBRUARY 26, 2025** was electronically filed and served via CM/ECF, which action caused automatic electronic notice of such filing upon all parties in interest in this matter as follows:

Aaron A. Garber, Esq.
Wadsworth Garber Warner Conrardy, P.C.
2580 W. Main St., Ste. 200
Littleton, CO 80120
Via: CM/ECF

*Counsel for Debtor*

Vandana S. Koelsch, Esq.
Katharine S. Sender, Esq.
ALLEN VELLONE WOLF HELFRICH & FACTOR P.C.
1600 Stout Street, Suite 1900
Denver, CO 80202
Via: CM/ECF

*Special Counsel for Debtor-in-Possession*

Alan K. Motes, Esq.
Byron G. Rogers Federal Bldg.
1961 Stout St., Ste. 12-200
Denver, CO 80294
Via: CM/ECF

*Counsel for U.S. Trustee*

Peter A. Cal, Esq.
John S. Gray, Esq.
SHERMAN & HOWARD L.L.C.
675 Fifteenth St., Ste. 2300
Denver, CO 80202
Via: CM/ECF

*Counsel for JPMorgan Chase Bank, N.A.*

Joli A. Lofstedt, Esq.
PO Box 270561
Louisville, CO 80027
Via: CM/ECF

*Subchapter V Trustee*

Reza D. Rismani, Esq.
Jason D. Cooper, Esq.
TREECE ALFREY MUSAT P.C.
633 17th Street, Suite 2200
Denver, CO 80202
Via: CM/ECF

*Counsel for GLegal, LLC*

Gary Tucker, Esq.
GLEGAL, LLC
1600 Broadway, Suite 1660
Denver, CO 80202
Via: CM/ECF

*Counsel for GLegal, LLC*

Arthur Lindquist-Kleissler, Esq.
LINQUIST-KLEISSLER & COMPANY, LLC
950 S. Cherry Street, Suite 418
Denver, CO 80246
Via: CM/ECF

*Counsel for Cashyew Holding, LLC*

- 27 -

127930774.1

Jeffrey Cohen, Esq.
COHEN, LLC
1600 Broadway, Suite 1660
Denver, CO 80202
Via: CM/ECF

*Counsel for Cohen, LLC*

Robert J. Shilliday III
SHILLIDAY LAW, P.C.
2616 W. Alamo Avenue
Littleton, CO 80120
Via: CM/ECF

*Counsel for John Cimino*

*s/ Jennifer Eastin*
Of: Womble Bond Dickinson (US) LLP

- 28 -