## UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF COLORADO

| | |
|---|---|
| IN RE: | ) |
| | )    Case No. 24-12624-KHT |
| DNC AND TCPA LIST SANITIZER, LLC | ) |
| EIN: 83-3868704 | )    Chapter 11 |
| | )    Sub-Chapter V |
| Debtor | ) |

### FIFTH AMENDED SUB-CHAPTER V PLAN OF REORGANIZATION
### DATED JUNE 20, 2025

DNC and TCPA List Sanitizer, LLC (the "Debtor" or "DNC"), the Debtor and Debtor-in-Possession herein, by and through its undersigned counsel, hereby proposes, pursuant to Sub-Chapter V of Chapter 11, Title 11 of the United States Code, the following Plan of Reorganization (the "Plan").

### INTRODUCTION

This Plan and the disclosures contained herein are being provided to all creditors and Interest holders of the Debtor. This Plan is subject to confirmation pursuant to 11 U.S.C. Section 1191 by the United States Bankruptcy Court for the District of Colorado. Issues related to the merits of the Plan and its confirmation will be the subject of a confirmation hearing pursuant to Order of the Court which will be served upon you.

**The disclosures contained herein have not been approved by the Securities and Exchange Commission. The Securities and Exchange Commission has not reviewed the accuracy of adequacy of this document.**

The Plan is the governing document or contract with creditors once it is confirmed by the Court.

**WARNING: IF YOU ARE A CREDITOR YOUR RIGHTS MAY BE IMPAIRED BY THE PLAN.**

### CHAPTER 11 AND PLAN CONFIRMATION

Chapter 11 of the Code is designed to allow for the rehabilitation and reorganization of financially troubled entities or individuals. Chapter 11 allows the Debtor to retain its assets during administration of its Chapter 11 case as Debtor-in-Possession and following confirmation of a Plan as a reorganized Debtor or as provided in the Plan. Once the Plan is confirmed by the Court, the

1

Plan is the permanent restructuring of the Debtor's financial obligations.

The Plan divides creditors into Classes of similarly situated creditors. All creditors of the same Class are treated in a similar fashion. All ownership Interests in the Debtor are also classified and treated alike. Each Class of creditors or Interest holders is either impaired or unimpaired under the Plan. A Class is unimpaired if the Plan leaves unaltered the legal, equitable and contractual rights to which each creditor in the Class is entitled. Alternatively, a claimant is unimpaired if the Plan provides for the cure of a default and reinstatement of the maturity date of the Claim as it existed prior to the default.

The Bankruptcy Court set a bar date establishing July 25, 2024 as the last date for filing Proofs of Claim. The Plan provides that Claims and Interests of all Classes shall be allowed only if evidenced by a timely filed Proof of Claim or Interest or which otherwise appear in the Schedules filed by the Debtor and are not scheduled as disputed, contingent or unliquidated unless subsequently allowed by the Court. Creditors may check as to whether or not their Claims have been scheduled as disputed, contingent or unliquidated by reviewing the Schedules filed by the Debtor with the Court. Alternatively, creditors may contact counsel for the Debtor directly in order to determine how they have been scheduled.

Bankruptcy Code § 1191 provides that confirmation of the Plan shall occur if the Plan satisfies all provision of 1129(a), except subparagraphs 8, 10 and 15, and 1191(c).

## BACKGROUND AND EVENTS LEADING TO CHAPTER 11 FILING

DNC is a Colorado limited liability company based out of Colorado Springs, Colorado. It is primarily an internet-based business. The Debtor was established on March 1, 2019 by Michael and Tania O'Hare (the "O'Hares"). The O'Hares own 1% of DNC and the other 99% is owned by an affiliated entity Cashyew Holdings, LLC ("Cashyew"). Michael O'Hare owns 75% of Cashyew and Tania O'Hare owns the remaining 25%.

The Debtor has operated successfully and profitably since its inception. DNC stands for "do not call" and TCPA is the abbreviation for "Telephone Consumer Protection Act." The Debtor maintains a database of all the individuals who do not want to be called and solicited by third party businesses. If a business or person calls a person on the do not call list, it could violate the Telephone Consumer Protection Act. The Debtor will receive a company's marketing list and "sanitize" the list for a fee. That is, it will match its customer's database against its proprietary

2

"do not call" database and remove the identity/contact details of those individuals who do not want to be called.  DNC customers use this service to prevent violating the TCPA.

The Debtor maintains an informal management agreement with Cashyew, an affiliated entity. This arrangement exists because the Debtor company has no employees; Cashyew performs all management work related to the Debtor's services.

The Debtor's bankruptcy case was initiated in part because of litigation with Ringba, LLC ("Ringba").  On October 23, 2021, the Debtor filed a state court complaint against Ringba in the El Paso County District Court of Colorado (the "State Court"), initiating Case No. 2021CV31668 (the "State Court Litigation") alleging that Ringba stole its database of do not call contacts by inducing the Debtor to disclose its confidential data under the false pretense of acquiring its business.  Several months before trial, the Court excluded the expert on the Debtor's manipulation theory and Debtor withdrew this theory for relief.   The State Court Litigation never proceeded to a trial. Rather, the State Court found that the Debtor failed to meet its discovery obligations, including withholding evidence such as source code and recordings relevant to the case.  As a sanction against the Debtor, On May 12, 2023, the State Court entered an order and judgment for terminating sanctions against the Debtor. Additionally, on January 12, 2024, the State Court entered an order and judgment for attorneys' fees and costs against the Debtor and in favor of Ringba (the "State Court Ruling"). The request was for $800,000 in attorney fees and approximately $140,000 in costs.  The trial court judge awarded Ringba its attorneys' fees of $500,000 and its costs of approximately $140,000.00.  The Debtor initially hired Gary Tucker who was paid approximately $70,000.00 to represent it in the State Court Litigation.  The State Court Ruling made findings not just about the Debtor, but also Mr. Tucker.  Mr. Tucker, who did not withdraw from the case initially, referred the Debtor to attorney Jeffrey Cohen. The cost of the litigation, as estimated by Mr. Cohen, far exceeded the initial retainer request.

Debtor then hired the law firm of Allen Vellone Wolf Helfrich & Factor, P.C. (hereinafter "Allen Vellone") to take over for Mr. Cohen.  The judgment entered and Allen Vellone filed two appeals for the Debtor.  The first appeal, which relates to the dismissal of the original action against Ringba has been fully briefed and oral argument was held on September 3, 2024 (the "Merit Appeal"). The Court of Appeals upheld the State Court's dismissal of the action as a sanction for Debtor's discovery misconduct.  The second appeal, which relates to the award of attorneys' fees and costs, has not been fully briefed; the opening brief was filed on October 4, 2024 and the

Answer brief is due February 27, 2025 (the "Fee Appeal").   Michael O'Hare personally purchased Allen Vellone's Claim in this Bankruptcy Case. Allen Vellone has entered its appearance in both appeals.  On August 12, 2024, Debtor filed an ex parte application to employ Allen Vellone to represent it in both appeals, which application has been granted.

The Debtor filed bankruptcy as a result of the Ringba judgment and collection efforts related thereto along with the high cost of litigation which impacted the Debtor's cash flow.

## EVENTS DURING BANKRUPTCY CASE

### *Bankruptcy Counsel*

On the Petition Date, the Debtor retained Cimino Law Office LLC ("Cimino") as its bankruptcy counsel. Litigation ensued as to whether Cimino had a conflict that would prohibit it from continuing as counsel for the Debtor.   Cimino ultimately withdrew as counsel for the Debtor.  The Debtor also believed the bankruptcy case would be better served by seeking replacement counsel.  The Debtor then sought to retain Allen Vellone Wolf Helfrich & Factor P.C. as counsel for the Debtor.  Opposition was asserted to this representation for alleged conflicts.  The Debtor therefore selected the firm of Wadsworth Garber Warner Conrardy, PC ("WGWC") by reason of their expertise and experience in bankruptcy matters.  The retention of WGWC was approved by the Court.

### *Cash Collateral*

After the retention of WGWC, the Debtor obtained the consensual use of cash collateral.

### *Ringba, LLC*

After the retention of WGWC, the Debtor and Ringba entered into a settlement agreement and a Motion to approve the settlement agreement was filed with the Court which was later withdrawn due to a breakdown in the settlement.  Ringba and the Debtor have entered into a new settlement agreement resolving all issues between the parties, which terms are contained and incorporated in this Plan and will become effective upon the Effective Date of the Plan.

## DESCRIPTION OF ASSETS

Unless otherwise indicated, as of the Petition Date, the values for the Debtor's primary assets are as follows:

| Asset | Market Value | Liquidation Value |
|-------|-------------|-------------------|
| Bank Accounts (6/12/25) | $931,675.82 | $931,675.82 |
| Furniture and equipment | $6,500 | $6,500 |
| TCPA List | $50,000 | $50,000 |
| Domain name | $20,000 | $20,000 |
| TOTAL: | $1,008,175.82 | $1,008,175.82 |

The Debtor has listed its assets with the market values above, which the Debtor believes is generally the same as the liquation value of the assets not taking into consideration secured claims and the cost of liquidation. The Debtor may also hold litigation claims, such as malpractice claims, which are not considered in this analysis since the values are contingent and unliquidated.

The Debtor is reserving the right to bring Avoidance Actions pursuant to 11 U.S.C. §§ 545 through 550 and state law based fraudulent conveyance actions.  The Bankruptcy Code sets a 90 day look back period for creditors who are not insiders and one year for insiders.  The Debtor's Statement of Financial Affairs discloses that during the ninety day look back period the Debtor made $121,249 in payments to non-insiders as follows:

| | |
|---|---|
| American Express Line of Credit | $10,214 |
| American Express: | $49,014 |
| Allen Vellone | $62,021 |

The Statement of Financial Affairs discloses that $1,146,561.04 was paid to insiders during the one year look back period.

The Debtor is still evaluating whether these payments were made in the ordinary course and/or whether the creditors provided new value that would provide a defense to any avoidance action.  However, given that the Plan proposes to pay creditors in full, there is no advantage to bringing avoidance actions since such creditors would hold claims for the amount paid, thus successful avoidance claimants would get their money back.

## DESCRIPTION OF LIABILITIES

### A.    Priority Claims

#### 1.  Priority Claims

Priority Claims are defined in the Plan as any pre-petition Claim entitled to a priority payment under § 507(a) of the Code, excluding any Administrative Claim or Tax Claims.  The

5

Debtor did not schedule any priority Claims and none have been asserted against the bankruptcy estate of the Debtor.

### 2. Administrative Claims

The Administrative Claims, including the Professional Fees incurred during the case which remain unpaid, are as follows:

The Debtor originally retained Cimino Law Office, LLC to represent the Debtor as its bankruptcy counsel ("Cimino"). Cimino received a retainer in the amount of $20,000 prior to the Petition Date. Cimino filed a Motion to approve a retainer in the amount of $10,188.50. The balance of the $20,000 less retainer was earned by Cimino prior to the filing or paid for the bankruptcy filing fee. On October 9, 2024, Cimino filed its application to withdraw as counsel for the Debtor. Cimino has not yet filed an application for compensation in this case. Based on an estimate set forth in Amended Plan of Reorganization dated September 25, 2024 prepared by Cimino, Debtor is estimating that Cimino's requested fees and expenses after application of the $10,188.50 will not exceed $35,000. The Debtor will consider what action to take if and when Cimino files a fee application.

The Debtor retained Allen Vellone Wolf Helfrich & Factor P.C. ("Allen Vellone") as special litigation counsel to represent the Debtor in appeals related to judgment held by Ringba. Allen Vellone filed its first fee application in the case seeking $33,359.75 in fees and $458.32 in expenses for the period from August 12, 2024 through October 3, 2024, which application was allowed by the Court. The Debtor will pay the fees in due course.

The Debtor retained Wadsworth Garber Warner Conrardy, P.C. ("WGWC") as its replacement bankruptcy counsel. WGWC has not yet filed a fee application in this case. WGWC was paid a retainer in the amount of $45,000 for post-petition services. WGWC filed a Motion to supplement its retainer in the amount of $50,000. The Debtor estimates that there will be an Administrative Claim for legal fees of at least $35,000 on the Effective Date of the Plan beyond the retainers. However, the legal fees could increase or decrease depending on the level of litigation over these issues and creditor claims.

The fees of the Sub-Chapter V Trustee are estimated to not exceed $20,000. The Sub-Chapter V trustee filed an application to be paid a $3,000 retainer. which has been paid by the Debtor. The Sub-Chapter V Trustee's fees could increase or decrease depending on the disputed matters in the case. The Sub-Chapter V filed her first fee application in the case seeking $8,625.00

in fees and $28.97 in expenses for the period from May 17, 2024 through October 31, 2024, which application was allowed by the Court. The Debtor will pay the fees from the retainer and the balance in due course.

The Debtor employed SL Biggs, a division of SingerLewak LLP ("SL Biggs") as accountants for the bankruptcy estate. SL Biggs received a retainer in the amount of $10,000, which was approved by the Court. SL Biggs filed its first fee application in the case seeking $16,476.00 in fees and $43.95 in expenses for the period from July 18, 2024 through December 19, 2024, which application was allowed by the Court. Upon allowance, the Debtor will pay the fees from the retainer and the balance in due course.

On January 24, 2025, Cashyew filed its Motion for Administrative Claim seeking $210,000 for having made a substantial contribution to the Debtor. Ringba filed an objection to the Motion. The matter has been settled pursuant to the terms of this Plan.

### 3. Tax Claims

Tax Claims are any Claim of a governmental unit for taxes entitled to priority pursuant to 11 U.S.C. §507(a)(8). The Debtor did not schedule any Tax Claims. The Internal Revenue Service filed a Proof of Claim in the amount of estimated taxes in the amount of $1,4000.

### B.      Secured Claims

1.      **JP Morgan Chase Bank.** Prior to the Petition Date, and specifically on or around July 26, 2023, the Debtor and JP Morgan Chase Bank entered into a term note, credit agreement, security agreement in the principal amount of $100,000 granting JP Morgan Chase Bank a security interest in substantially all of the assets of the Debtor. JP Morgan Chase Bank filed a proof of claim in the amount of $86,329.98. The loan accrues interest of 13.45% and attorney fees and costs. The Debtor has been making adequate protection payments of $5,000 per month.

2.      **CT Corporation Systems, Inc., as representative.** The Debtor scheduled CT Corporation Systems, Inc., as representative as potentially holding a secured claim in an unknown amount because a UCC-1 financing statement was filed but the Debtor is uncertain as to who this creditor is and what debt it may relate to. CT Corporation Systems, Inc., as representative did not file a proof of claim.

### C.      Non-Priority Unsecured Creditors

The Debtor scheduled a number of unsecured pre-petition debts. At least one of the

unsecured creditors have filed a Proof of Claim. The bar date for filing Proofs of Claims against the Debtor's estate was July 25, 2024. To the extent that a creditor files a Proof of Claim, the amount of the Claim as filed in the Proof of Claim will be used. The Claims list containing all known unsecured Claims against the Debtor, other than Claim(s) held by insiders, is attached hereto as **Exhibit A**. Exhibit A shows total non-insider general unsecured claims in the amount of $963,827.20 having been asserted against the estate. The Claim of Adam Young, Tubmanburg Limited and Ringba has been settled and will be an Allowed Claim in accordance with paragraph 10.8 of this Plan. Cohen, LLC filed two proofs of claim, one in the amount of $200,000 and one in the amount of $200,976.23. Cohen, LLC appears to have filed duplicates, so only one is considered in the analysis, the $200,976.23 Claim. The Debtor disputes the Claim of Cohen, LLC. American Express filed a Proof of Claim in the amount of $49,014.09. An insider of the Debtor was also an obligor on the American Express debt, who paid American Express $41,000 in satisfaction of the non-debtor insider obligation, leaving a balance of $8,014.09 owing to American Express, which is the amount considered in this analysis and listed on Exhibit A. The Debtor is reserving the right to review and object to any Claim filed by an unsecured creditor, except the Allowed Claim filed by Adam Young, Tubmanburg Limited and Ringba which is deemed an Allowed Claim and being settled under the Plan. Allen Vellone Wolf Halfrich & Factor, PC filed a Proof of Claim in the amount of $62,092.80, which was purchased by a non-debtor insider party. This insider Claim will be subordinated to other general unsecured Claims and therefore is not considered in the calculation of the total general unsecured Claims.

**D.** **Interest Holders/Officers**

The Debtor's Interest holders and officers are comprised of: (i) Michael O'Hare, Chief Executive Officer, .5% ownership interest; (ii) Tatiana O'Hare, Secretary, .5% ownership interest and (iii) Cashyew, 99% ownership interest.

**THE PLAN**

**ARTICLE I**

**DEFINITIONS**

1.01 – <u>Administrative Claim</u> shall mean a Claim for payment of an administrative expense of a kind specified in §§ 503(b) or 1114(e)(2) of the Code and entitled to priority pursuant to § 507(a)(2) of the Code, including, but not limited to: (a) the actual, necessary costs and expenses, incurred after the Petition Date, of preserving the estate and operating the business of the Debtor,

including wages, salaries, or commissions for services rendered after the commencement of the Chapter 11 Case; (b) Professional Fees; (c) any court approved fees and costs of the Sub-Chapter V Trustee; (d) certain post-petition tax claims; and (e) all Allowed Claims that are entitled to be treated as Administrative Claims pursuant to a Final Order of the Court under § 503(b) of the Code.

1.02 – <u>Allowed Claim</u> shall mean a Claim in respect of which a Proof of Claim has been filed with the Court within the applicable time period of limitation fixed by the Court in the case or scheduled in the list of creditors prepared and filed with the Court pursuant to Rule 1007(b) and not listed as disputed, contingent or unliquidated as to amount, and as to which no timely objection to the allowance thereof has been filed pursuant to Rules 3001 and 3007 or as to which any such objection has been determined by a Final Order.

1.03 – <u>Allowed Secured Claim</u> shall mean an Allowed Claim secured by a lien, security interest or other charge against or interest in property in which the Debtor has an interest, or which is subject to setoff under § 553 of the Code, to the extent of the value (determined in accordance with § 506(a) of the Code) of the interest of the holder of any such Allowed Claim and the Debtor's interest in such property or to the extent of the amount subject to such setoff as the case may be.

1.04 – <u>Avoidance Actions</u> shall mean the Debtor's estate's interest in any and all claims, rights and causes of action which have been or may be commenced by or on behalf of the Debtor to avoid and recover any transfers of property determined to be preferential, fraudulent or otherwise avoidable pursuant to §§ 544, 545, 547, 548, 549, 550 or 553 of the Code, or under any other applicable law, or otherwise subject to equitable subordination under § 510 of the Code, regardless of whether or not such actions have been commenced prior to the Effective Date of the Plan.

1.05 – <u>Claim</u> shall mean any right to payment, or right to any equitable remedy for breach of performance if such breach gives rise to the right to payment, against the Debtor in existence on or as of the Petition Date, whether or not such right to payment or right to an equitable remedy is reduced to judgment, liquidated, unliquidated, fixed, contingent, natured, unmatured, disputed, undisputed, legal, secured or unsecured.

1.06 – <u>Class</u> shall mean any Class into which Allowed Claims are classified pursuant to Article II of the Plan.

1.07 – <u>Class 1-5 Claims and Interests</u> shall mean the Allowed Claims and Interests so classified in Article II of the Plan.

1.08 – <u>Code</u> shall mean the Bankruptcy Code, 11 U.S.C. § 101 et seq. and any amendments thereof.

1.09 – <u>Confirmation Date</u> shall mean the date upon which the Order of Confirmation is entered by the Court.

1.10 – <u>Court</u> shall mean the United States Bankruptcy Court for the District of Colorado in which the Debtor's Chapter 11 case is pending, pursuant to which this Plan is proposed, and any Court having competent jurisdiction to hear appeal or certiorari proceedings therefrom.

1.11 – <u>Debtor</u> shall mean the Debtor who is proposing this Chapter 11 Plan.

1.12 – <u>DIP Bank Account</u> shall mean the Debtor in Possession bank account maintained at Integrity Bank & Trust, last four digits of the bank account being 0627.

1.13 – <u>Disputed Claim</u> shall mean any Claim which is not an Allowed Claim, including, without limitation, any Claim designated as disputed, contingent or unliquidated in the Debtor's schedules filed in connection with the case, or any Claim against which an objection to the allowance thereof has been interposed, and as to which no Final Order has been entered.

1.14 – <u>Effective Date of the Plan</u> shall mean the Confirmation Date.

1.15 - <u>Exculpated Claim</u> means any claim related to any act or omission in connection with, relating to or arising out of the Debtor's restructuring efforts related to the bankruptcy case commencing as of the Petition Date and through the Effective Date of the Plan, including without limitation formulation, preparation, dissemination, negotiation or filing of the Plan or any contract, instrument, release or other agreement or document created or entered into in connection with this Plan, the filing of the Chapter 11 Case, the pursuit of confirmation of this Plan; provided, however, that Exculpated Claims shall not include any act or omission that is determined in a Final Order to have constituted malpractice, gross negligence, willful misconduct or fraud to the extent imposed by applicable bankruptcy or non-bankruptcy law.

1.16 - <u>Exculpated Party</u> means each of: (a) the Debtor, (b) the Sub-Chapter V trustee, and (c) the professional retained in the bankruptcy case.

10

1.17 – <u>Final Order</u> shall mean an order or judgment of the Court which shall not have been reversed, stayed, modified or amended and as to which (a) the time to appeal from or to seek review, rehearing or certiorari shall have expired, and (b) no appeal or petition for review, rehearing or certiorari is pending, or if appealed shall have been affirmed or the appeal dismissed by the highest court to which such order was appealed, or if review, rehearing or certiorari was sought, such review, rehearing or certiorari has been denied and no further hearing, appeal or petition for review, rehearing or certiorari can be taken or granted or as to which any right to appeal or to seek a review, rehearing or certiorari has been waived.

1.18 – <u>Interest</u> shall mean any member or shareholder interest or any other instrument evidencing any ownership interest in the Debtor and any option, warrant or right of any nature, contractual or otherwise, to acquire a member or other ownership interest in the Debtor.

1.19 – <u>Order of Confirmation</u> shall mean the order entered by the Court confirming the Plan in accordance with the provisions of Chapter 11 of the Code.

1.20 – <u>Petition Date</u> shall mean May 16, 2024, the date on which the Debtor filed its Voluntary Petition.

1.21 – <u>Plan</u> shall mean this Plan of Reorganization, including all exhibits and schedules attached hereto or referenced herein or therein.

1.22 – <u>Priority Claim</u> shall mean any pre-petition Claim entitled to a priority in payment under § 507(a) of the Code but shall not include any Administrative Claim or Tax Claim.

1.23 – <u>Pro Rata</u> shall mean the ratio of an Allowed Claim or Interest in a particular Class to the aggregate amount of all Allowed Claims or Interests in that Class.

1.24 – <u>Professional Fees</u> shall mean the Administrative Claims for compensation and reimbursement submitted pursuant to §§ 330, 331 and 503(b) of the Code by a professional or Subchapter V Trustee.

1.25 – <u>Rules</u> shall mean the Federal Rules of Bankruptcy Procedure and Local Bankruptcy Rules for the District of Colorado has adopted by the Court.

1.26 – <u>Tax Claim</u> shall mean any unsecured Claim of a governmental unit for taxes entitled to priority pursuant to § 507(a)(8) of the Code.

1.27 – <u>Term of the Plan</u> shall mean 1 year after the Effective Date of the Plan, or until Allowed Administrative Claims and Class 4(a) Allowed General Unsecured Claims are paid in full

1.28 – <u>Unclassified Priority Claims</u> shall mean Claims pursuant to § 507(a)(2) of the Code which are Administrative Claims allowed under § 503(b) of the Code and any fees and charges against the estates under Chapter 23 of Title 28 of the United States Code and shall further mean Allowed unsecured Claims of governmental units to the extent provided for in § 507(a)(8) of the Code.

1.29 – <u>Unsecured Creditor Account</u> shall mean that segregated account referenced and established pursuant to paragraphs 3.2 and 8.2 of this Plan, into which the Debtor will  deposit funds to be distributed to unsecured creditors in accordance with the terms of this Plan.

1.30 – <u>Other Definitions</u>.  Unless the context otherwise requires, any capitalized term used and not defined herein or elsewhere in the Plan but that is defined in the Code or Rules shall have the meaning set forth therein.

## ARTICLE II
## DESIGNATION OF CLAIMS AND INTERESTS

The following is a designation of all Classes of Claims and Interests other than those Claims of a kind specified in Sections 507(a)(2), 507(a)(3) or 507(a)(8) of the Code.

<u>Class 1</u> – All Allowed unsecured Claims specified in Section 507(a)(4) and 507(a)(5) of the Code as having priority.

<u>Class 2</u> – The Secured Claim of JP Morgan Chase Bank.

<u>Class 3</u> – The Secured Claim of CT Corporation Systems, Inc., as representative.

<u>Class 4(a)</u> –The Allowed Claims held by non-insider general unsecured creditors.

<u>Class 4(b)</u> – The Allowed Claims held by insider general unsecured creditors.

<u>Class 5</u> – The Interests in the Debtor.

## ARTICLE III
## SPECIFICATION AND TREATMENT OF UNCLASSIFIED PRIORITY CLAIMS

As provided in Section 1123(a)(1) of the Code, the Claims against the Debtor covered in this Article III are not classified.  The holders of such Allowed Claims are not entitled to vote on

the Plan.

3.1 – The holders of Administrative Claims, shall receive cash equal to the amount of their Allowed Administrative Claim, or a lesser amount or different treatment as may be acceptable and agreed to by particular holders of such Claims.  Such Claims shall be paid in full from the Unsecured Creditor Account established pursuant to paragraphs 3.2 and 8.2 of this Plan.  Section 507(a)(2) Administrative Claims that are allowed by the Court after the Effective Date of the Plan shall be paid upon allowance in accordance with this Section 3.1.

3.2 – Within ten (10) business days of the Effective Date of the Plan, the Debtor shall transfer all funds held in the DIP Bank Account to the Unsecured Creditor Account except for $150,000 plus the amount to satisfy the Class 2 Claim.  In addition, upon the first full month after the Effective Date of the Plan and every month thereafter until Administrative Claims are paid in full and then for the remainder of the term of the Plan, the Debtor will deposit into the Unsecured Creditor Account for the Term of the Plan, or until Administrative Claims and Class 4(a) Allowed Claim are paid in full in accordance with the terms of this Plan during the first year of the Plan $29,042.  At the end of each calendar month, the balance of the Unsecured Creditor Account will be distributed to the holders of Allowed Administrative Claims on a Pro Rata basis until such time as all holders of Allowed Administrative Claims have been paid in full, and then will be distributed to Class 4(a) general unsecured creditors that hold Allowed Claims on a Pro Rata basis. The obligation to make deposits into the Unsecured Creditor Account will terminate at the end of the earlier of: (a) the Term of the Plan or (b) upon satisfaction of Allowed Administrative Claims and Allowed Claims in Class 4(a).

3.3 – Notwithstanding any other provision of this Plan, the Administrative Claim of Cashyew shall be subordinated to the Claims of all other creditors holding Allowed Claims and shall not be paid unless and until all other Allowed Claims are paid in full. To the extent there is a pending Claim objection at the time all Allowed Claims are paid in full, provided the Debtor is escrowing for the disputed Claim in accordance with the terms of this Plan, the Debtor can pay the Cashyew Administrative Claim. The Debtor's closing of this bankruptcy case and receiving a discharge shall not be conditioned upon the satisfaction of the Cashyew Administrative Claim.

3.4 - Allowed Tax Claims shall be paid in monthly installments on an amortized basis over a period that does not exceed five years from the Petition Date with interest at the appropriate rate

13

set by applicable statute.

## ARTICLE IV

## SPECIFICATION AND TREATMENT OF CLASS 1 PRIORITY CLAIMS

4.1 - Allowed Class 1 Priority Claims shall be paid in full on the Effective Date.  The Class 1 Claims for certain pre-petition wages and employee Claims are more particularly described in Sections 507(a)(4) and 507(a)(5) of the Code.  The Debtor did not schedule any Class 1 Priority Claims and none have been asserted against the estate.

## ARTICLE V

## SPECIFICATION AND TREATMENT OF SECURED CREDITOR CLAIMS

5.1 - **Class 2.  JP Morgan Chase Bank, or its successors or assigns.**  The Credit Agreement, Term Note, and Continuing Security Agreement (collectively, the "Loan Documents") shall remain in effect, Chase shall retain all rights and remedies under the Loan Documents, and Chase shall retain its liens and security interest in the same priority as existed on the Petition Date. The Class 2 Secured Claim is impaired by this Plan as provided below:

a. The Class 2 Secured Claim as reflected in Proof of Claim No. 6 plus post-petition attorneys' fees and non-default interest is an Allowed Secured Claim, less payments made during the pendency of the bankruptcy case.

b. Within ten (10) business days of the Effective Date of the Plan, the Debtor shall pay the Allowed Class 2 Secured Claim in full.

c. The Class 2 Secured Claim shall accrue interest at the non-default rate under the Loan Documents (13.45% Per Annum – the "Note Rate") unless there is a (a) default as defined in the loan documents as modified by this Plan, (b) there is an existing default under the Final Cash Collateral Order; in which event the interest rate shall be at the rate of 3.00% per annum above the Note Rate, at the option of Chase.

d.The Debtor shall be entitled to prepay the Class 2 Claim without premium or penalty.

e. As of June 15, 2025 Chase is owed $92,772.09 accounting for the $5,000 June adequate protection payment which the Debtor states has been made but is yet to be received by Chase.

14

5.2. **Class 3, CT Corporation Systems, Inc., as representative.**   The Class 3 Claim shall not receive a distribution under this Plan.   CT Corporation Systems, Inc., as representative shall release its lien. If CT Corporation Systems, Inc., as representative does not release its lien, then the Debtor can file with the Colorado Secretary of State this Plan and the Order confirming this Plan evidencing the release of the lien.

## ARTICLE VI
## SPECIFICATION AND TREATMENT OF UNSECURED CREDITOR CLAIMS

6.1 – Class 4(a) consists of the non-insider general unsecured creditors of the Debtor who hold Allowed Claims.  Class 4(a) shall receive payment of their Allowed Claims as set forth below:

a.   Within ten (10) business days of the Effective Date of the Plan the Debtor shall transfer all funds held in the DIP Account except for $150,000 plus the amount to satisfy the Class 2 Claim to the Unsecured Creditor Account.  In addition, upon the first full month after the Effective Date of the Plan, and subject to Section 10.8 of the Plan, every month thereafter until Administrative Claims are paid in full and then for the remainder of the term of the Plan, the Debtor will deposit $29,042 into the Unsecured Creditor Account for the Term of the Plan, or until Administrative Claims and Class 4(a) Allowed Claim are paid in full during the first year of the Plan.   At the end of each calendar month, the balance of the Unsecured Creditor Account will be distributed to the holders of Allowed Administrative Claims on a Pro Rata basis until such time as all holders of Allowed Administrative Claims have been paid in full, and then will be distributed to Class 4(a) general unsecured creditors that hold Allowed Claims on a Pro Rata basis. The obligation to make deposits into the Unsecured Creditor Account will terminate at the end of the earlier of: (a) the Term of the Plan or (b) upon satisfaction of Allowed Administrative Claims and Allowed Claims in Class 4(a).

b.   All funds recovered by the Debtor on account of Avoidance Actions shall be distributed to Allowed Administrative Claims until paid in full and then to Class 4(a) claimants holding Allowed Claims on a Pro-Rata basis, net of attorneys' fees and costs. Whether or not the Debtor pursues any Avoidance Actions shall be up to the Debtor and the decision to pursue such claims shall be discretionary with the Debtor.

6.2 – Class 4(b) consists of the insider of the Debtor who holds the Allowed Claims.  Class

15

4(b) is subordinated to Class 1 through 4(a) and shall not receive any distribution under this Plan until all Administrative Claims and Classes 2 through 4(a) have been paid in accordance with this Plan. After such time, the Debtor and the Class 4(b) claimant can make such arrangements and agreements as they so choose to satisfy the debt of Class 4(b).  The Debtor's closing of this bankruptcy case and receiving a discharge shall not be conditioned upon the satisfaction of the Class 4(b) Claim.

## ARTICLE VII
## SPECIFICATION AND TREATMENT OF CLASS 5 INTERESTS

7.1 – Class 5 includes the Interests in the Debtor, which Interests are unimpaired by the Plan.  Upon confirmation of the Plan, all Class 5 Interest holders will retain their ownership Interests in the Debtor.

## ARTICLE VIII
## MEANS FOR THE PLAN'S EXECUTION

8.1 – Operation of Business.  The Debtor shall be empowered to take such action as may be necessary to perform its obligations under this Plan.  Cashyew shall continue to provide its management services to DNC upon and after the Effective Date of the Plan.  In accordance with the Projections attached hereto as Exhibit B, the Debtor projects that Cashyew will be paid $420,000 during the Term of the Plan,. Cashyew may be paid on a monthly basis after the Debtor meets its monthly Plan obligations for post-Confirmation services (not its Administrative Claim).

8.2 – Unsecured Creditor Account.  On the Effective Date of the Plan, the Debtor (or such other designee charged with handling the obligations under the Plan) will open a separate interest-bearing deposit account at a federally insured commercial bank selected by the Debtor.  The bank account will be maintained by the Debtor as the Unsecured Creditor Account into which all payments made by the Debtor for the benefit of holders of Allowed Administrative Claims and Class 4(a) creditors will be made until the obligations under the Plan are completed.

8.3 – Effectuating the Plan.  On the Effective Date of the Plan, Michael O'Hare shall be appointed as the agent of the Debtor pursuant to 11 U.S.C. §1142(b) for the purpose of carrying out the terms of the Plan, and taking all actions deemed necessary or convenient to consummating the terms of the Plan, including, but not limited to, executing documents.

8.4 – Disputed Claim Procedure.  Distributions to any Class of creditors will only be made on account of Allowed Claims.  In the event that distributions are made at a time that a Claim objection is pending before the Court or a judgment has entered to establish a Claim and the judgment is not subject to a Final Order, the portion of the distribution that would be paid to the disputed claimant will be held by the Debtor in an interest bearing bank account until the Claim is allowed or disallowed.  If allowed, the Claim will be paid its appropriate share of the withheld payment.  If disallowed, the withheld distribution will be paid on a Pro Rata basis to the remaining impaired claimants of the Debtor who hold Allowed Claims, or if all holders of Allowed Claims have been paid in full, paid to the Debtor.

8.5 – Claims and Litigation Bar Date and Standing.  All Avoidance Actions in the case must be filed by not later than limitation period set forth in § 546(a) of the Code.  All Claim objections not already pending shall be filed ninety (90) days following the Effective Date of the Plan.  The Debtor shall have standing to commence, prosecute, and settle Claim objections and Avoidance Actions without need for Court approval.  The Debtor has retained Wadsworth Garber Warner Conrardy, P.C. to litigate any Claim objections and Avoidance Actions on an hourly basis and/or a contingency fee basis, as it determines is reasonable and in the best interest of the estate.

8.6 – Administrative Expense Bar Date.  All applications for allowance and payment of Administrative Claims, including Professional Fees, must be filed within ninety (90) days following the Effective Date of the Plan.

8.7 – Monthly Installments.  Whenever the Plan provides for payment in monthly installments or a payment due in a certain month, the payment shall be due on the last day of the calendar month in which the payment is due, unless otherwise specified in the Plan.  The Debtor shall then have a five (5) day grace period within which the monthly payment must be received by the payee before the Debtor shall be in default, unless a longer period is specified elsewhere in the Plan.

8.8 – Final Decree.  The Debtor will request entry of a final decree closing the case on or before the later of the date all Claim objections and any pending litigation is concluded or one hundred eighty (180) days after the Effective Date of the Plan or as otherwise in compliance with orders of the Court and the Bankruptcy Code and Rules.

8.9 – Exemption from Transfer Taxes.  Pursuant to Section 1146(c) of the Code, the

issuance, transfer, or exchange of notes or equity securities under the Plan by the Debtor, the creation of any mortgage, deed of trust, or other security interest, the making or assignment of any lease or the making or delivery of any deed or instrument of transfer under, in furtherance of, or in connection with the Plan or the Agreements shall not be subject to any stamp, real estate transfer, mortgage recording, or other similar tax.

8.10 – Contractual Relationship.  The Plan, upon confirmation, constitutes a new contractual relationship by and between the Debtor and its creditors.  In the event of a default by the Debtor under the Plan, creditors shall be entitled to enforce all rights and remedies against the Debtor for breach of contract, the Plan.  Any secured creditor claiming a breach of the Plan by the Debtor will be able to enforce all of its rights and remedies under its security documents, including foreclosure of its deed of trust, security agreement, lien, or mortgage pursuant to the terms of such document.  Except as otherwise provided herein, any creditor claiming a breach by the Debtor must provide written notice to the Debtor of the claimed default, the notice must provide the Debtor a ten (10) day period within which to cure the claimed default, unless a longer period is specified elsewhere in the Plan.  Upon the Debtor's failure to cure the default within such ten (10) day period, the creditor may proceed to exercise its rights and remedies.  The creditor may, without any further notice or opportunity to cure, fully exercise its rights and remedies pursuant to applicable law and the terms of any relevant documents, including acceleration of amounts to be paid to creditor under the Plan and seeking to enforce the terms of the Plan or dismissal or conversion of the Debtor's case to a case under Chapter 7.  If the Plan is confirmed through a non-consensual confirmation under 11 U.S.C. § 1191(b), creditors may have greater rights in the event of default, as the Debtor will not receive a discharge until completion of all payments under the Plan.

If the Subchapter V Trustee's services continue after the Effective Date such that the Subchapter V trustee shall make the payments from the Unsecured Creditor Account as required under the Plan, then. in the event of a default under this Plan, the Subchapter V Trustee shall have the right to seek to enforce the terms of the Plan, including acceleration, the right to be heard on any motion or action seeking enforcement of the Plan, and to take such action as may otherwise be necessary and appropriate to carry out all statutory duties, Plan and Court-ordered duties required of the Subchapter V Trustee.

The Subchapter V Trustee shall be entitled to reasonable compensation in accordance with 11 U.S.C. § 330 for continuing services.  The Trustee's compensation must be approved by the Court for such ongoing services rendered on an hourly rate.  In order to ensure funds are available to compensate the Subchapter V Trustee for such continuing services, the Subchapter V Trustee may deduct and hold up to 5% from the payments made to the Unsecured Creditor Account prior to calculating the disbursements to be made from such account until the amount of her compensation is approved by the Court.  Upon allowance, Trustee is authorized to pay her allowed fees and expenses from the Unsecured Creditor Account.  To the extent that the 5% withheld is insufficient to pay Trustee's allowed fees and expenses, Debtor shall pay the allowed fees and expenses with 30 days.

8.12 – Exculpation. Except as otherwise specifically provided in this Plan, no Exculpated Party shall have or incur any liability for, and each Exculpated Party is hereby released and exculpated from, any Exculpated Claim, obligation, or liability for any Exculpated Claim.

## ARTICLE IX
## EXECUTORY CONTRACTS AND UNEXPIRED LEASES

9.1 – On the Effective Date of the Plan, the Debtor does hereby assume those executory contracts and unexpired leases not expressly rejected or which have not been assumed by order of the Court prior to the Confirmation Date.  On the Confirmation Date, the Debtor shall be the holder of all right, title and interest to the assumed leases and contracts and such assumed leases and contracts shall be in full effect and binding upon the Debtor and the other parties thereto. Confirmation of the Plan shall constitute a determination that the payments to be made to said creditors pursuant to the Plan satisfy all conditions precedent to assumption and assignment set forth in § 365(b) and (f) of the Code.  The Debtor is not a party to any unexpired leases or executory contacts except for the management agreement with Cashyew. Consistent with paragraph 3.3 of this Plan, the Administrative Claim of Cashyew, which is the same as the cure payment, shall be subordinated to the Claims of all other creditors holding Allowed Claims and shall not be paid unless and until all other Allowed Claims are paid in full in accordance with the terms of this Plan. To the extent there is a pending Claim objection at the time all Allowed Claims are paid in full, provided the Debtor is escrowing for the disputed Claim in accordance with the terms of this Plan, the Debtor can pay the Cashyew Administrative Claim/cure Claim.

19

9.2 – On the Effective Date of the Plan, the Debtor does hereby reject all executory contracts and unexpired leases to which it is a party for which a motion is pending or for which have been rejected by order of the Court prior to the Confirmation Date. Executory contracts and unexpired leases will be rejected pursuant to the provisions of § 365 of the Code.

9.3 – Confirmation of the Plan constitutes approval by the Court of the rejection of the executory contracts and unexpired leases described herein in accordance with the provisions of § 365 of the Code and the Rules.

9.4 – Claims Arising from Rejection. All Proofs of Claim with respect to Claims arising from the rejection of any executory contract or unexpired lease shall be filed with the Court within twenty (20) days after the earlier of: (i) the date of the Court's order approving the rejection of such executory contract or unexpired lease; (ii) rejection by operation of law under the Code; or (iii) the Confirmation Date. Any Claims not filed within such time shall be forever barred against the Debtor, its estates and property, and any such Claims shall be disallowed in full. Claims arising from such rejection, to the extent allowed, shall be treated as Class 4(a) unsecured Claims.

## ARTICLE X
## MISCELLANEOUS PROVISIONS

10.1 – Revestment. If confirmed under 1191(a), on the Effective Date of the Plan, all property of the estate shall revest in the Debtor free and clear of all liens except those specifically set forth in the Plan or as otherwise provided in the Plan. If confirmed under 1191(b), property of the estate shall not revest in the Debtor until the Debtor receives a discharge, but the Debtor can continue to utilize its assets in the Debtor's discretion subject to the terms of this Plan.

10.2 – Retention of Jurisdiction. Notwithstanding confirmation of the Plan, the Court shall retain jurisdiction for the following purposes:

(a)     Determination of the allowability of Claims upon objection to such Claims by the Debtor or by any other party in interest;

(b)     Determination of the request for payment of Claims entitled to priority under § 507(a)(2) of the Code, including compensation of the parties entitled thereto;

(c)     Resolution of any disputes regarding interpretation of the Plan;

(d)     Implementation of the provisions of the Plan and entry of orders in aid of

consummation of the Plan, including without limitation, appropriate orders to protect the revested Debtor from action by creditors;

(e)     Modification of the Plan pursuant to § 1127 of the Code;

(f)     Adjudication of any causes of action, including Avoidance Actions, brought by the Debtor, by the representative of the estate or by a Trustee appointed pursuant to the Code;

(g)     Adjudication of any cause of action brought by the Debtor, Creditors Committee, by a representative of the estate, or by a Trustee appointed pursuant to the Code, or the revested Debtor exercising rights and powers as provided in §§ 542-549 of the Code.  This section shall not be construed to limit any other power or right which the Debtor may possess under any section of the Code; and

(h)     Entry of a final decree.

10.3 – Satisfaction of Claims.  If the Plan is confirmed under § 1191(a), on the Effective Date of the Plan, the Debtor will be discharged from any debt that arose before confirmation of this Plan, to the extent specified in § 1141(d)(1)(A) of the Code, except those secured debts expressly identified and reserved herein. The Debtor will not be discharged from any debt: (i) imposed by this Plan; or (ii) excepted from discharge under § 523(a) of the Code, except as provided in Rule 4007(c) of the Federal Rules of Bankruptcy Procedure.

If the Plan is confirmed under § 1191(b), confirmation of the Plan does not discharge any debt provided for in this Plan until the court grants a discharge on completion of all payments due under the Plan within the first five years of the Plan, or as otherwise provided in § 1192 of the Code. The Debtor will not be discharged from any debt: (i) on which the last payment is due after the 5 year term of the Plan, or as otherwise provided in § 1192; or (ii) excepted from discharge under § 523(a) of the Code, except as provided in Rule 4007(c) of the Federal Rules of Bankruptcy Procedure.

Confirmation of the Plan and the occurrence of the Effective Date of the Plan shall constitute a modification of any note or obligation for which specification and treatment is provided under the Plan as set forth in the Plan.  Any obligation or note, previously in default, so modified, shall be cured as modified as of the Effective Date of the Plan.  This provision shall be operable regardless of whether the Plan provides for any obligation to be evidenced by a rewritten loan or security document following confirmation of the Plan.

21

10.4 – Headings.  The headings used in the Plan are for convenience of reference only and shall not limit or in any manner affect the meaning or interpretation of the Plan.

10.5 – Notices.  All notices, requests, demands, or other communications required or permitted in this Plan must be given in writing to the party(ies) to be notified.  All communications will be deemed delivered when received at the following addresses:

> a.  To the Debtor:
> DNC and TCPA List Sanitizer, LLC
> c/o Michael O'Hare
> 935 Pico Point
> Colorado Springs, CO 80905
>
> With a copy to:
> Aaron A. Garber
> Wadsworth Garber Warner Conrardy, P.C.
> 2580 West Main Street, Suite 200
> Littleton, CO 80120
> Email: agarber@wgwc-law.com
>
> b.  To an allowed claimant, at the address set forth in the allowed Proof of Claim, if filed, or at the address set forth for the claimant in the Debtor's Schedules filed with the Court.

10.6 – Successors and Assigns.  The Plan will be binding upon the Debtor, any creditor affected by the Plan and its heirs, successors, assigns and legal representatives.

10.7 – Unclaimed Payments.  If a person or entity entitled to receive a payment or distribution pursuant to this Plan fails to negotiate a check, accept a distribution or leave a forwarding address in the event notice cannot be provided as set forth in paragraph 10.5 of the Plan, within six months of the Effective Date of the Plan, the person or entity is deemed to have released and abandoned any right to payment or distribution under the Plan.

10.8 – Settlement with Ringba, LLC and Adam Young.

a. Ringba, Tubmanberg Limited and Adam Young's Claim will be an Allowed Claim and paid in full inclusive of judgment interest within three (3) months of the Effective Date of the Plan, at the judgment rate (8%) on all unpaid balances, which amount from the Petition Date through June 17, 2025 totals $$713,296.97.

b. All litigation between the Debtor and Ringba will be dismissed with prejudice

within three business (3) days of the Effective Date of the Plan, including, but not limited to and without limitation to, (i) DNC shall withdraw all appeals with prejudice within three (3) business days of the Effective Date of the Plan; (ii) DNC shall dismissed within three (3) business days of the Effective Date of the Plan, Adversary Proceeding Case No. 25-1124 KHT with prejudice; and (iii)  Ringba shall withdraw the contempt motion filed against Michael O'Hare within three (3) business days of the Effective Date of the Plan.

c.  DNC,Michael O'Hare and Tatiana O'Hare on the one hand, and Ringba LLC, Tubmanburg Limited and Adam Young on the other (each group, a "Party," collectively, the "Parties"), upon the Effective Date of the Plan, immediately and automatically, fully, finally, completely, and unconditionally releases, waive, and discharge each other and each of their heirs, spouses, successors, assigns, agents, attorneys, insurers, and other personal representatives from all claims, counterclaims, crossclaims, causes of action, losses, damages, contentions, rights, duties, obligations, defenses, and arguments of any kind or nature, whether known or unknown, asserted or unasserted, direct or derivative, foreseen or unforeseen, patent or latent now has or ever had against one another, or any of them separately, from the beginning of time up through and including the Effective Date of the Plan except for the obligations of the Parties  set forth in this Plan.

d. The Parties agree that effective June 16, 2025, each Party and its principals shall not make any disparaging statements about the other Party, its principals or any known agents. Neither Party shall hire or in any way cause or encourage any other person, entity, or program to make disparaging statements about the other Party, its principals, or its known agents.  For instance, Debtor and its principals, including but not limited to Michael O'Hare and Tatiana O'Hare, shall refrain from making any disparaging statements concerning Ringba, Adam Young, Harrison Gevirtz, or Ringba's employees, products, or services.  Also for instance, for the creditor Ringba and its principals, including but not limited to Adam Young and Harrison Gevirtz shall refrain from making any disparaging statements about the Debtor, Michael O'Hare and Tatiana O'Hare, or any related entities and their employees, products or services. It shall not be disparagement to respond to any lawful subpoena or other court directive, or to provide testimony or information if compelled to do so by law.  Nor shall it be disparagement to provide any truthful information to law enforcement sought in a criminal investigation.  If it becomes necessary

23

for either Party to file legal pleadings against the other, it shall not be disparagement to do so if: (1) the pleadings are filed by a licensed attorney; and (2) the filing Party uses best efforts to file the pleadings as protected, secured, sealed or otherwise protected from public disclosure (if denied once by a court, then no such efforts need to be made for future pleadings in that same court).

e. Debtor cannot withdraw or modify its Amended Plan without written consent from Ringba, which consent shall not be unreasonably withheld, and except for immaterial changes.

f. No later than June 27, 2025, the Parties will notify the Court of Appeals in Case No. 2024CA000891, that a settlement has been reached and describe the status of the bankruptcy case including an anticipated timeline for confirmation of the plan. The parties will request the case be stayed until an order confirming or denying the Plan is issued by the bankruptcy court.

Executed solely with respect to this paragraph 10.8:[1]

Ringba, LLC

*/s/ Adam Young*
Signature

Adam Young, CEO
Name and Title

Adam Young

*/s/ Adam Young*
Signature

Michael O'Hare

*Michael O'Hare*
Signature

---

[1] Signature pages attached as Exhibit C.

# ARTICLE XI
# CONFIRMATION REQUEST

11.1 – The Debtor, as the proponent of the Plan, requests confirmation of the Plan pursuant to § 1191(a) of the Code. Confirmation of the Plan will be sought under Code § 1191(b) if all applicable requirements of § 1129(a), other than paragraphs (8), (10), and (15) of that section are met with respect to the Plan. To be confirmed under § 1191(b), the Plan must not discriminate unfairly and must be fair and equitable with respect to each class of claims or interests that is impaired under, and has not accepted, the Plan. To be fair and equitable, § 1191(c)(2) requires that the Plan, among other things, provides that all of the projected disposable income of the Debtor to be received during the five year Plan term, beginning on the date that the first payment is due under the Plan will be applied to make payments under the Plan. In this case, the amount that the Debtor proposes to contribute to the Plan meets the requirements of § 1191(c)(2).

## PLAN FEASIBILITY

The Debtor asserts the proposed Plan is feasible, supported by financial projections based upon the Debtor's ongoing and growing financial success of the company. Funding for the Plan will be derived from the Debtor's cash on hand plus ongoing business operations, which have been carefully analyzed to ensure long-term sustainability. Detailed one-year financial projections, included as **Exhibit B**, provide for the Debtor's projected financial performance over the term of the Plan. These projections demonstrate that the Debtor will generate sufficient cash flow and maintain adequate liquidity to fulfill all obligations under the Plan.

As of June 12, 2025, the Debtor had $931,675.82 in the DIP Bank Account. The Debtor has been increasing the DIP Bank Account on a monthly basis by approximately $100,000. Assuming the Plan is confirmed on July 15, 2025, it is projected that the Debtor will have approximately $1,031,676 in the DIP Account. Upon the Effective Date of the Plan, the Debtor will pay JP Morgan Chase, who is projected to be owed around $85,000. Thus, the Debtor will have $946,676 to deposit into the Unsecured Creditor Account, subject to its right to reserve $150,000.[2] It is projected that within the first month of the Effective Date of the Plan, unsubordinated Allowed Priority Claims in the amount of approximately $60,000 will exist against

---

[2] The Debtor will only maintain a reserve if it can do so while satisfying its Plan obligations.

the estate. In addition, the Debtor will have made its first monthly payment into the Unsecured Creditor Account in the amount of $29,042.  Thus, within the first month of the Plan, the Debtor will have in the Unsecured Creditor Account $825,718, and after distributing to priority claimants, will have $765,718 to distribute to Class 4(a) claimants holding Allowed Claims.

The Debtor's Projections show the Debtor's annual projected income for year one of the Plan is $1,304,116.  The projected expenses for year one of the Plan is $955,611, not including the payment to unsecured creditors.  The balance, the Debtor's projected disposable income for the first year of the Plan of $348,504, which amount is being dedicated under the Plan.

The projections and cash position show the Debtor will have sufficient income to satisfy the payment to creditors in full, with interest, where required, during the first year of the Plan.

## TAX CONSEQUENCE

The Debtor is not providing tax advice to creditors or Interest holders.  Each party affected by the Plan should consult its own tax advisor for information as to the tax consequences of Plan confirmation.  Generally, unsecured creditors should have no tax impact as a result of Plan confirmation.  The recovery of each creditor is payment on account of a debt and generally not taxable, unless the creditor wrote off the debt against income in a prior year, in which case income may have to be recognized.  Interest holders may have very complicated tax effects as a result of Plan confirmation.

## LIQUIDATION ANALYSIS UNDER CHAPTER 7

The principal alternative to the Debtor's reorganization under Chapter 11 is a conversion of the case to Chapter 7 of the Code.  Chapter 7 requires the liquidation of the Debtor's assets by a Trustee who is appointed by the United States Trustee's office.  In a Chapter 7 case, the Chapter 7 Trustee would take over control of the assets.  The assets would be liquidated and the proceeds distributed to creditors in the order of their priorities.  Under a Chapter 7 liquidation, secured creditors would likely seek to obtain relief from the automatic stay and foreclose their security interests in Debtor's property.

As described in the Asset section of this Plan, the Debtor's total asset value is $1,008,175.82.  As detailed in the liabilities section of this Plan, there are secured Claims with liens on the Debtor's asset totaling approximately  $85,000.  After the satisfaction of secured Claims, there would be approximately $923,175.82 remaining. It is assumed that the cost of

liquidation to obtain the $1,008,175.82 is 7.5% or $75,613.18, leaving $847,562.64. Then the costs of administration of a Chapter 7 estate of $25,000 will be paid. Then the Chapter 7 trustee would receive his/her compensation in accordance with 11 U.S.C. § 326. Assuming an estate of $1,008,175.82, a Chapter 7 trustee would receive compensation in the amount of $53,495. After taking into consideration the cost of administration of the Chapter 7 case and paying the Chapter 7 trustee his compensation, there would be $769,067.64 available for distribution to unsecured creditors. Then a Chapter 7 Trustee would pay Chapter 11 Tax Claims and Administrative Claims, expected to total $270,000 since the administrative claim of Cashyew would not be subordinated. Thus, there would be $499,067.64 available for unsecured creditors. In a Chapter 7 case, the insider would not subordinate its unsecured claim. Thus, general unsecured Claims would total $1,025,919. Under such a scenario, general unsecured creditors would receive a pro rata distribution in a Chapter 7 of 48%. There would also likely be litigation and uncertainty in a Chapter 7 case. Would the Chapter 7 trustee continue the objection and alleged malpractice claim against Cohen, LLC and Glegal, LLC? The Chapter 7 trustee may pursue avoidance action against the insiders of the Debtor, the O'Hares. and their related entities. Under the loss of their livelihood and under mounting litigation, the question arises would the O'Hares seek bankruptcy protection. Under such uncertainty it is hard to evaluate the value of the claims a Chapter 7 trustee, the cost of litigation, and the collectability of judgment and what time frame it would take to complete litigation.

For purposes of this analysis only, and without waiving any rights and claims, including but not limited to pending and potential claim objections and appeals, Claims in the Chapter 11 case total:

Secured Claims: $80,000(estimated)

Administrative /Tax Claims: $60,000

Non-insider general unsecured claims: $963,827

TOTAL: $1,103,827

Under the projections, the Debtor will pay the Secured Claim, Administrative and Tax Claims from cash on hand. Pursuant to the Projections the Debtor will pay the non-insider general unsecured claims in full by not later than one year and likely much sooner. Thus, the Plan provides the best alternative for creditors and it assures a 100% payout to creditors plus interests where

required under this Plan.


Dated: June 20, 2025                DNC AND TCPA LIST SANITIZER, LLC


                                    By: */s/ Michael O'Hare*
                                        Michael O'Hare


WADSWORTH GARBER WARNER CONRARDY, PC


By: *Aaron A. Garber*
        Aaron A. Garber #36099
        Wadsworth Garber Warner Conrardy, P.C.
        2580 West Main Street, Suite 200
        Littleton, CO 80120
        Telephone: (303) 296-1999
        Telecopy: (303) 296-7600
        Email: agarber@wgwc-law.com


ATTORNEYS FOR DEBTOR AND DEBTOR-IN-POSSESSION

**EXHIBIT A**

**Case No. 24-12624 - DNC and TCPA List Sanitizer, LLC**

| CLAIMANT | SCHEDULED AMOUNT | PROOF OF CLAIM |
|---|---|---|
| Adam Young, Tubmanburg, Ringba | $0.00 | $656,108.84 |
| American Express LOC | $10,214.00 | $10,214.15 |
| Cohen LLC | $0.00 | $200,976.33 |
| Quandry Peak Research | $0.00 | |
| Glegal | | $2,528.70 |
| IRS | | $200.00 |
| | | |
| **TOTAL** | **$10,214.00** | **$870,028.02** |
| | | |
| **TOTAL CLAIMS ASSERTED** | | **$870,028.02** |

Total claims asserted is comprised of the "scheduled amount"
except if a proof of claim is filed, in which case the proof of claim
is considered in determing the total claims asserts

# Exhibit B

|  | Year 1 |
|---|---|
| **Income** | |
| Sales | 1,304,116 |
| **Total Income** | **1,304,116** |
| **Gross Profit** | **1,304,116** |
| **Expenses** | |
| Administrative Assistant | 12,500 |
| Management Fee | 420,000 |
| Litigators Research | 61,000 |
| Meals and Entertainment | 6,000 |
| Office Rent | 1,188 |
| It and Internet | 21,949 |
| Advertising and Marketing | 105,654 |
| Sales People | 71,055 |
| Server Cost | 26,203 |
| Commissions | 26,985 |
| Telecommunication Expense | 3,836 |
| Telephone Expense | 597 |
| Web Site Development | 72,000 |
| Credit Card Processing Fees | 45,644 |
| Accounting | 11,000 |
| Legal | 70,000 |
| **Total Operating Expenses** | **955,611** |
| Secured - JP Morgan | 0 |
| **Total Expenses** | **955,611** |
| **Net Income** | **348,504** |
| **Ending Cash (Pre-GUC Distributions)** | **739,504** |

EXHIBIT C

for either Party to file legal pleadings against the other, it shall not be disparagement to do so if: (1) the pleadings are filed by a licensed attorney; and (2) the filing Party uses best efforts to file the pleadings as protected, secured, sealed or otherwise protected from public disclosure (if denied once by a court, then no such efforts need to be made for future pleadings in that same court).

e. Debtor cannot withdraw or modify its Amended Plan without written consent from Ringba, which consent shall not be unreasonably withheld, and except for immaterial changes.

f. No later than June 27, 2025, the Parties will notify the Court of Appeals in Case No. 2024CA000891, that a settlement has been reached and describe the status of the bankruptcy case including an anticipated timeline for confirmation of the plan. The parties will request the case be stayed until an order confirming or denying the Plan is issued by the bankruptcy court.

Executed solely with respect to this paragraph 10.8:

Ringba, LLC

*Adam Young*

Signature

Adam Young  CEO

Name and Title

Adam Young        *Adam Young*

Signature

Michael O'Hare

Signature

for either Party to file legal pleadings against the other, it shall not be disparagement to do so if: (1) the pleadings are filed by a licensed attorney; and (2) the filing Party uses best efforts to file the pleadings as protected, secured, sealed or otherwise protected from public disclosure (if denied once by a court, then no such efforts need to be made for future pleadings in that same court).

e. Debtor cannot withdraw or modify its Amended Plan without written consent from Ringba, which consent shall not be unreasonably withheld, and except for immaterial changes.

f. No later than June 27, 2025, the Parties will notify the Court of Appeals in Case No. 2024CA000891, that a settlement has been reached and describe the status of the bankruptcy case including an anticipated timeline for confirmation of the plan. The parties will request the case be stayed until an order confirming or denying the Plan is issued by the bankruptcy court.


Executed solely with respect to this paragraph 10.8:


Ringba, LLC

_____
Signature

_____
Name and Title

Adam Young

_____
Signature

Michael O'Hare

_____
Signature

24