# UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF COLORADO

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | Case No. 24-12624-KHT |
| DNC and TCPA LIST | ) | |
| SANITIZER, LLC | ) | |
| | ) | Chapter 11 |
| | ) | |
| Debtor | ) | |

## RESPONSE TO ORDER TO SHOW CAUSE

Allen Vellone Wolf Helfrich & Factor P.C. (the "Firm"), hereby submits its response to the Order to Show Cause [Docket No. 408], and in support thereof state as follows:

## BACKGROUND

### A.    The Bankruptcy Was Filed in Order to Prevent the Dismantling of the Debtor by an Aggressive Judgment Creditor

1.    On May 16, 2024 (the "Petition Date"), Debtor-in-Possession, and now the Reorganized Debtor, DNC and TCPA List Sanitizer, LLC ("Debtor"), filed for voluntary relief under Chapter 11, Subchapter V, of Title 11 of the U.S. Code ("Bankruptcy Code") initiating Bankruptcy Case No. 24-12624-KHT ("Bankruptcy Case") before the U.S. Bankruptcy Court for the District of Colorado ("Bankruptcy Court").

2.    This bankruptcy filing was necessitated by and following an unfavorable judgment entered in El Paso County District Court Case No. 21CV31668, in favor of Adam Young; Tubmanburg Limited, a/k/a Ringba; and Ringba, LLC (collectively, "Ringba"). Subsequently, the trial court also granted attorneys' fees of $500,000.00 to Ringba. Debtor filed two separate appeals contesting both rulings, 2023CA891 ("Merits Appeal") and 2024CA265 ("Attorneys Fees Appeal") (together, the "Appeals").

3.    As set forth in the Debtor's Statement of Financial Affairs, the Firm had received a payment from the Debtor on an outstanding bill for pre-petition legal fees and costs in the amount of $20,000.00 on December 21, 2023. [Docket No. 1 at p. 19, item 3.2].

4.     On May 16, 2024, the Debtor filed its Application to Employ Cimino Law Office LLC as counsel, and on June 10, 2024, the court entered an Order granting the Application to Employ Cimino Law Office LLC. [Docket No. 7 & 41].

5.     On June 25, 2024, the Firm filed Proof of Claim No. 4 in the Debtor's Bankruptcy Case for pre-petition legal fees and costs in the amount of $62,092.80 ("POC No. 4").

**B.     Mr. O'Hare used personal funds to purchase the Firm's Proof of Claim No. 4 and the Debtor sought to retain the Firm to resume representation of the Appeals.**

6.     On or around August 1, 2024, the Firm received a personal check from Michael O'Hare in the amount of $58,674.00 for Mr. O'Hare's potential purchase of Proof of Claim No. 4. A copy of the check is attached hereto as **Exhibit 1**. (Declaration of Vandana Koelsch, ¶2, Ex. 1). The Firm took efforts to ensure that no funds were received from the Debtor. Later, on November 13, 2024, when the Firm filed a Fee Application [Docket No. 258], the Firm included the Declaration of Michael O'Hare in which he attested to the source of funds for the personal payment of $58,674.00 [Docket No. 258-6]. The Declaration attached bank statements in support.

> 6. The Debtor maintains a management agreement with Cashyew Holding, LLC an affiliated entity, for 60% of the Debtor's gross revenues. This arrangement exists because the Debtor has no employees; Cashyew Holdings performs all management work related to the Debtor's services.
>
> 7. I paid Debtor's debt to Allen Vellone using personal funds. Attached as Exhibit 1 is a true and correct copy of the Debtor's May 2024 bank statement, for account number ending in 3980. On May 28, 2024, Debtor received funds from an account unrelated to Debtor's business, in the ordinary course. On that same date, May 28, 2024, Debtor transferred $130,045.95 to Cashyew Holdings for ongoing management fees. Attached as Exhibit 2 is a true and correct copy of Cashyew Holding's [*sic*] May 2024 bank statement for the account number ending in 5355.
>
> 8. Subsequently, on July 29, 2024, Cashyew Holdings transferred funds to my personal accounts for management fees as follows: $59,199.80 for May 2024 and $60,141.69 for June 2024. Attached as Exhibit 3 is a true and correct copy of my personal bank account, ending in number 3980.

> 9. Accordingly, I purchased Proof of Claim No. 4 from Allen Vellone using personal funds.

7. On August 9, 2024, the Firm filed its Assignment of Proof of Claim ("Assignment"). [Docket No. 115]. The Assignment states that "[f]or good and valuable consideration …. [the Firm] hereby assigns to Michael O'Hare … all of its right, title, and interest in certain Proof of Claim the amount of $62,092.80, filed in the above referenced case on June 25, 2024, and designated as Claim No. 4." [Docket No. 115].

8. On August 12, 2024, Mr. Cimino, on behalf of the Debtor, filed its *Ex Parte* Application to Employ Special Litigation Counsel ("Special Counsel Application") pursuant to Section 327(e), seeking to represent the Debtor in two then-pending state court appeals. Docket Nos. 119 and 120.

9. In the Special Counsel Application, the Firm disclosed that it represented the Debtor on its appeal to the Colorado Court of Appeals in case styled, *TCPA Litigator List v. Ringba, LLC et al.,* No. 2023CA891 (the "Appeal"). [Docket No. 119, ¶4]. Through the Special Counsel Application, the Firm made the following disclosures:

    a. Disclosure of the issues the Debtor sought to appeal. [Docket No. 119, ¶4(a-b)];

    b. The Firm further disclosed that it did not represent the Debtor in the initial underlying state court action subject to the Appeal styled, *TCPA Litigator List v. Ringba, LLC et al.,* No. 2021CV31668 (the "Action"). Docket No. 119, ¶5;

    c. Prior to the Debtor filing the Petition, the Firm "withdrew from representing the Debtor for the Appeal as well as for ancillary matters, post-judgment, in the Action. [The Firm] did not represent the Debtor prior to the trial dismissing the Action." The ancillary matter referred to post-judgment proceedings in the Action. (Koelsch Decl. ¶3). [Docket No. 119, ¶5];

    d. The Firm filed POC No. 4. [Docket No. 119, ¶5];

    e. "On August 1, 2024, [the Firm] assigned its [POC No. 4] to Michael O'Hare, who is the Debtor's CEO, who paid for the claim in full." [Docket No. 119, ¶ 6];

    f. The Debtor selected the Firm because the Debtor and Firm "previously worked together with respect to the Appeal" and the

Firm is experienced and knowledgeable with regards to the matters sought to be employed. [Docket No. 119, ¶ 9];

g. The Firm disclosed its hourly rates and compensation arrangement. [Docket No. 119, ¶14-17] and attached Verified Statement of Attorney Vandana Koelsch. [Docket No. 119-1]; and

h. The Debtor and the Firm asserted there was no conflict with the Debtor's estate. [Docket No. 119, ¶18]. The Firm represented that there was "no interest adverse to the estate in the matter upon which it [was] engaged for the Debtor, and [the Firm's] employment is in the best interest of the estate." [Docket No. 119, ¶12]; [Docket No. 119-1. ¶7 ("The Firm does not represent any party in interest adverse to the interest of the Debtor. The Firm does not represent any creditor, shareholder, officer, or director of the Debtor.")]. [Docket No. 119-1. ¶8 ("The Firm is not aware of any other connection with the Debtor, creditors, or any other party in interest…")].

10.    Accordingly, the Firm fully disclosed that it had received funds from Mr. O'Hare regarding his purchase of the Firm's Proof of Claim No. 4 that was filed against the Debtor. (Koelsch Decl. ¶¶2-3).

11.    On August 15, 2024, the Court granted the Special Counsel Application pursuant to L.B.R. 2014-1(c), finding that the Firm "represents no interest adverse to [the Debtor] and the creditors to this estate, nor do said attorneys represent any interest adverse to the estate in the matters upon which they are to be engaged, that their appointment is necessary and would be in the best interests of the estate." [Docket No. 125].

## C. Compliance Missteps at the Outset Undermined the Debtor and Gave Ringba Leverage Toward Conversion and a One-Sided Settlement

12.    From the Petition Date through his initial representation, Mr. Cimino, on behalf of his firm and the Debtor, experienced numerous issues related to compliance under the Bankruptcy Code.

13.    On September 3, 2024, the Firm represented the Debtor before the Colorado Court of Appeals in an oral argument regarding the Merits Appeal (2023CA891). At oral argument, the Debtor presented an interim order (the "Attorneys Fee Order") from the State Court in the Action that held Debtor produced source code for the "Reconstructed Website," which tended to negate the Debtor's liability on the merits, but nevertheless awarded $500,000 in attorneys' fees. On information and belief, immediately after oral argument, Ringba sought to settle the matter that precipitated the Debtor's bankruptcy. (Koelsch Decl. ¶4).

4

14. On September 4, 2024, the day after oral argument, Ringba filed a Motion for Contempt ("Contempt Motion") against Mr. O'Hare in the State Court Action regarding *Debtor's* request filed in *this* Court for a Rule 2004 Examination which purportedly included confidential information in violation of a protective order in the Action [Docket Nos. 135, 137]. It was unclear at that time whether the Contempt Motion sought relief against Mr. O'Hare personally, or against him in his capacity as a Debtor's principal. On information and belief, the filing of the Contempt Motion was an effort to force the Debtor to settle the Ringba matter. (Koelsch Decl. ¶5). Later, at a status conference (on April 8, 2025) before the State Court, Ringba explained why it filed against Mr. O'Hare personally rather than the Debtor, although it was Debtor (or its counsel, Mr. Cimino) who filed a request for a Rule 2004 Examination:

> THE COURT:  Okay. How about argument regarding wrong party? Mr. O'Hare versus the actual party?
>
> MS. MCHUGH: Sure, I think there are - we had two choices in who we would bring a proceeding against.  Because of the bankruptcy proceeding, we could not bring it against the debtor, DNC litigator. . . . However, Mr. O'Hare is the one who took the actions.  He is the one who caused the [bankruptcy] filing to occur.

(Koelsch Decl. ¶6, **Exhibit 2,** 4/8/2025 Tr. at 6:7-13).

15. On September 10, 2024, Ringba sought to convert the Bankruptcy Case to a case under Chapter 7 of the Bankruptcy Code that was joined by other creditors. [Docket No. 151; see also Docket No. 162 (Joinder by GLEGAL, LLC)]. The Motion raised the allegation of the "Debtor's principals' conflicts of interest in investigating and pursuing conveyance claims against themselves and Cashyew." This is because, at that time, the Court had not approved a cash collateral order. The Debtor's failure to comply with the Bankruptcy Code and obtain a cash collateral order which allowed it to continue to operate as it had pre-petition was one of the principal reasons necessitating the replacement of Mr. Cimino as its Chapter 11 counsel. On information and belief, the conversion motion served as an additional measure to force Debtor to the settlement table. (Koelsch Decl. ¶7).

16. Ringba noticed a hearing for the conversion motion to October 8, 2024. [Dkt No. 152].

17. On September 19, 2024, the Court of Appeals affirmed the trial court's ruling in the Action in the Merits Appeal, 2023CA891. The Opinion was a setback for the Debtor. (Koelsch Decl. ¶8). Nevertheless, Debtor had already filed a Notice of Appeal for the Attorneys Fees Appeal (2024CA265).

18.     On October 1, 2024, the Firm filed an Opening Brief in the Attorney Fees Appeal. The Opening Brief reiterated that Debtor had produced the very code for which it was sanctioned and charged $500,000 in attorneys fees. Indeed, after Ringba filed the Response Brief (in the Attorneys Fees Appeal on February 27, 2025), it became abundantly clear that the Debtor had been unfairly charged for non-production of source code that it had actually produced. (*Id.* at ¶9).

19.     On October 2, 2024, Jason Wareham entered his ***limited*** appearance (erroneously on behalf of the Debtor, as opposed to Mr. O'Hare personally) in the Contempt Proceeding. (Koelsch Decl. ¶10). The Entry of Appearance noted the limited nature as follows:

> Jason Wareham, of Allen Vellone Wolf Helfrich & Factor, PC, hereby enters his limited entry of appearance on behalf of Plaintiff, TCPA Litigator List for the sole purpose of litigating the Motion and Affidavit for Citation for Contempt of and the resulting hearing on the same.

20.     On the same day, the Firm moved to continue the Contempt Hearing, which the state court granted and reset for January 17, 2025. (Koelsch Decl. ¶10).

21.     Mr. Wareham later explained to the State Court that he intended to enter his appearance on behalf of *Mr. O'Hare*, not the Debtor. (Ex. 2, 4/8/2025 Tr. at 4:1-8). The confusion is understandable because the conduct of which Ringba complained--violation of a protective order that issued in the State Court Action--was purportedly performed by Mr. O'Hare in his capacity as an officer of the Debtor. Ringba, however, sought to impose personal liability.

> MS. MCHUGH: . . . I'm a little confused because Mr. Wareham entered an entry of appearance last fall on behalf of DNC and TCPA litigator.  And I don't believe he's withdrawn from that representation.
>
> MR. WAREHAM:  That's actually quite fair.  Honestly, there's been some discussions within the bankruptcy piece as to Mr. O'Hare's personal representation versus the entity representation.  To clarify my entry of appearance, it is with Mr. O'Hare personally.

22.     All payments for Mr. Wareham's representation of Mr. O'Hare personally have been paid by Mr. O'Hare personally. (Koelsch Decl. ¶11, **Exhibit 3**).

**D.     The Firm Agreed to Seek Approval from the Court to Assist the Debtor under Exigent Circumstances and Imminent Conversion; However, Undersigned Counsel Inadvertently Failed to Update the Court Regarding the Contempt Proceeding Representation.**

23.     Fearing that Mr. Cimino's noncompliance under the Bankruptcy Code would cause Debtor's conversion, and because Mr. Cimino intended to withdraw as Debtor's counsel, and because the Firm understood that Debtor could not obtain alternate counsel under extreme time constraints—indeed undersigned counsel unsuccessfully referred Debtor to several bankruptcy counsel—the Firm agreed to apply to the Court for permission to represent the Debtor for the conversion hearing and thereafter. (Koelsch Decl. ¶12).

24.     On October 3, 2024, the Firm filed its Joint Notice of Substitution with Mr. Cimino and the Cimino Law Office, LLC, substituting the Firm as counsel for the Debtor. [Docket No. 194]. On the same day, the Debtor filed its Application to Employ the Firm as counsel for the Debtor pursuant to Section 327(a) of the Bankruptcy Code ("General Counsel Application"). [Docket No. 195].

25.     Through the General Counsel Application, the Firm represented that "[t]o the best of the Firm's knowledge there is no connection or conflict of interest between the Firm and the Bankruptcy Estate, its creditors, or any other party in interest…" Docket No. 195, ¶ 9; Docket No. 195-1, ¶ 4. The Debtor sought to employ the Firm as its general bankruptcy counsel as the Debtor believed it "would be in the best interest of its creditors and the Estate." [Docket No. 195, ¶ 9]. The Firm disclosed its hourly rates and compensation agreements with the Debtor. [Docket No. 195, ¶11, 14-15; Docket No. 195-1, ¶6-8].

26.     The General Counsel Application disclosed that "[o]n October 2, 2024, in connection with this representation, the Firm received two payments totaling $25,000.00 for a retainer from the Debtor. The check is being held by the Firm and shall not be deposited pending further orders of this court." [Docket No. 195, ¶12].

27.     In fact -- and to clarify the above misstatement regarding the *Debtor's* payment -- to avoid any cash collateral concerns, the Debtor did *not* pay the retainer via a *check*. Rather, Mr. O'Hare and his wife, Tatiana O'Hare, personally charged the $25,000 retainer on two ***personal*** credit cards, one in his name and one in hers. (Koelsch Decl. ¶13, **Exhibits 4, 5**).

28.     On October 3, 2024, the U.S. Trustee filed its Objection to the General Counsel Application. [Docket No. 197]. On the same day, Ringba filed its joinder. [Docket No. 198].

29.     Through its objection, the U.S. Trustee asserted that the source of funds used to purchase the Firm's claim at POC No. 4 was undisclosed. [Docket No. 197, ¶ 4(c) ("During this case, the Debtor has been transferring much of its revenue to insider Cashyew Holdings …There is no disclosure as to whether Mr. O'Hare paid [the Firm] from funds transferred by the Debtor to Cashyew without authority.")].

30.     The U.S. Trustee further objected that "[t]hat neither the Application nor the Declaration submitted therewith disclose any of the above connections to the estate. Nor do they contain an analysis as to whether and to the extent to which any of the above may affect a determination that the firm is disinterested and otherwise eligible for employment under 11 U.S.C. § 327(a). The Debtor and [the Firm] should make the appropriate disclosures." [Docket No. 197, ¶6]. The U.S. Trustee asserted that the application required notice pursuant to L.B.R. 2014-1 because the Firm "was a prepetition creditor and prepetition transfer recipient, whose prepetition claim was purchased postpetition by an insider, maybe from funds originating from the Debtor that the Debtor was not authorized to pay." [Docket No. 197, ¶7].

31.     In its Joinder, Ringba further asserted that "the Court should be aware that [the Firm] also entered its appearance in the District Court, El Paso County State of Colorado matter, styled TCPA Litigator List v. Adam Young, Tubmanburg Limited and Ringba, LLC, Case No. 20212CV31668 (the "State Court Litigation"). The entry of appearance was filed on October 2, 2024, on behalf of the Debtor, even though the pending matter before the Court is a Motion and Affidavit for Citation for Contempt of Court directed only and specifically at Michael O'Hare for violation of a protective order entered in that case." [Docket No. 198, ¶6]. Ringba asserted that the Firm "entered its appearance in the State Court Litigation, *either on behalf of the Debtor or Mr. O'Hare individually*, and has failed to disclose the same to the Court and creditors." Docket No. 198, ¶ 7 (emphasis added).

32.     It is correct that the Firm failed to disclose--as part of the (later withdrawn) Application for General Counsel--that it had filed an Entry of Appearance in the State Court Action on October 2, 2024. Both filings (the Entry of Appearance and Application) were made *the very same day*. However, the failure to disclose the limited entry in the General Counsel Application was inadvertent because of the flurry of activity, including the filing of an Opening Brief in the Attorney Fees Appeal, the day before, on October 1, 2024. (Koelsch Decl. ¶14).

33.     Moreover, *one day after the Application*, on October 3, 2024, when the Trustee and Ringba filed Objections, the Firm filed a Petition for Rehearing in the Merits Appeal (2023CA891). This is because the Attorneys Fees Order demonstrated a grave disconnect when it recognized that Debtor produced half a terabyte of Reconstructed Code, yet the Court of Appeals nevertheless affirmed the trial court. (Koelsch Decl. ¶14).

34.     As for the confusion as to against *whom* the Contempt Motion was filed, whether the Debtor or Mr. O'Hare personally, even Ringba identified that the Firm entered its appearance in the Contempt Proceeding on behalf of the Debtor or Mr. O'Hare personally. In fact, the conduct complained of related to holding Mr. O'Hare personally liable for the Debtor's actions. (Koelsch Decl. ¶15).

8

35.    As noted above, Mr. Wareham corrected any misimpressions that his limited entry of appearance had created to the State Court regarding the party represented, Mr. O'Hare personally, not the Debtor. And all payments for Mr. Wareham's representation of Mr. O'Hare have been paid by Mr. O'Hare personally. (Koelsch Decl. ¶16, Ex. 3). Mr. O'Hare made no payments to the Firm after the Contempt Proceedings resumed in State Court after a March 7, 2025 resetting. (*Id.*

### E.    WGWC Righted the Ship and Settled the Action.

36.    As noted above, the $25,000 retainer in support of the Firm's General Counsel Application was not from the Debtor but personally from Mr. O'Hare and his wife. (Koelsch Decl., Ex. 18). Given the objections, and because of the urgency in Debtor obtaining replacement counsel for the October 8, 2024 hearing, on October 7, 2024, the Firm promptly returned funds to Mr. O'Hare and his wife so that those funds could be used by alternate counsel. (*Id.*, **Exhibits 6 & 7**).

37.    On October 7, 2024, the Debtor filed its motion seeking to employ alternative general counsel at Wadsworth Garber Warner Conrardy, P.C. [Docket No. 205]. Indeed, Wadsworth Garber Warner Conrardy, P.C. disclosed that its $48,000.00 retainer was also personally paid by Mr. O'Hare. [Docket No. 205, ¶13].

38.    Afterwards, the Firm filed its Notice of Withdrawal, withdrawing the Notice of Substitution at Docket No. 194 and General Counsel Application at Docket No. 195. [Docket No. 211].

39.    The Firm withdrew its Notice of Substitution and General Counsel Application because the objections would not have been resolved before the October 8, 2024 hearing, placing the Debtor in a precarious position. (Koelsch Decl. ¶18).

40.    Although the Firm did not update the source of Mr. O'Hare's funds to purchase Proof of Claim No. 4 immediately after the Objections, the Firm was in the process of preparing its First Fee Application [filed on November 13, 2024, Docket No. 258], which included Mr. O'Hare's bank statements demonstrating the personal nature of his funds used to purchase Proof of Claim No. 4.

41.    Regrettably, the Firm did not update its disclosures to inform the Court about the Firm's Limited Appearance in the Contempt Proceeding immediately after the Trustee's and Ringba's Objection. As the Limited Appearance related to Mr. O'Hare's purported conduct on behalf of the Debtor, the Firm did not believe that there was an actual or potential conflict of interest with that representation. (Koelsch Decl., ¶19).

42.    Given the imminent conversion hearing on October 8, 2024, on October 7, 2024, Wadsworth Garber Warner Conrardy, P.C.  ("WGWC") sought to shorten

the period for the Court to approve its employment [Docket No. 208], but the Court denied it the very same day [Docket No. 218].

43.    On October 8, 2024 at a hearing on the Motion to Convert, Debtor and its principal, Mr. O'Hare appeared without counsel. Mr. Cimino did not attend. Undersigned counsel attended in her capacity as Special Counsel (Koelsch Decl. ¶20).

44.    The Court reset the date for the hearing on the Motion to Convert to October 24-25, 2024. [*See* Docket No. 233].

45.    On October 9, 2024, Mr. Cimino filed his motion to withdraw as counsel for the Debtor. [Docket No. 226].

46.    On October 21, 2024, the Debtor filed the Motion to Convert in abeyance as the Debtor and Ringba reached a settlement in principle. [Docket No. 247].

### F.    The Settlement in Principle Largely Halted All Activity

47.    On November 4, 2024, Ringba filed a Motion for Extension of Time to File its Answer Brief in the Attorneys Fees Appeal, informing the appellate court that the parties had a settlement in principle. (Koelsch Decl. ¶21). On December 4, 2024, Ringba asked for another extension, informing the court of the settlement in principle. (*Id.*). On December 31, 2024, the Debtor and Ringba filed a Joint Notice to Hold the Appeal in Abeyance due to an impending global settlement. (*Id.*).

48.    On November 20, 2024, the Debtor filed a Motion for Extension of Time to file a Petition for Certiorari in the Merits Appeal, noting the settlement in principle. (Koelsch Decl. ¶21).   On December 20, 2024, the parties filed a Joint Motion to Hold the Appeal in Abeyance, noting the settlement in principle. (*Id.*).

49.    The Contempt Proceeding was also effectively stayed. [*See* Docket No. 270, Motion to Approve Settlement] (Koelsch Decl. ¶21). And on December 20, 2024, the parties filed a Joint Motion to Continue the Contempt Hearing, in view of the Settlement Agreement, dated December 9, 2024. (Koelsch Decl. ¶21).

50.    The filings in this Action came to a standstill apart from fee applications and other procedural filings. As noted above, on November 13, 2024, the Firm filed its First Fee Application and made the requisite disclosures regarding the source of funds for Mr. O'Hare's purchase of Proof of Claim No. 4, but the Firm failed to inform the Court of its limited entry of appearance on behalf of Mr. O'Hare in the Contempt Proceeding. Had counsel properly recognized the need to update its disclosure at that time it would have also disclosed that it was likely that the parallel proceeding would be resolved as a result of the parties' settlement. (Koelsch Decl. ¶21).

51.     On December 10, 2024, Debtor filed a Motion to Approve Settlement Agreement between Debtor and Ringba. [Docket No. 270].

### G.     Litigation Resumes after Ringba Reneges

52.     After the Settlement Agreement was signed, Ringba sought to change its terms. [*See* Docket No. 297]. Indeed, the terms of the Settlement Agreement were highly favorable to Ringba, particularly because it was resolved ***three*** days before the reset hearing on the Motion to Convert. (Koelsch Decl. ¶23). In particular, the Settlement Agreement included punitive measures and a liquidated damages provision of $100,000 for each purported violation of the protective order in the State Court Action and a personal guaranty by Mr. O'Hare to pay such liquidated damages. [*See* Docket No. 270, ¶¶11-12]. Those provisions would remain in place *in perpetuity*. [*Id.*].

53.     Nevertheless, Ringba wanted more. [*See* Docket No. 297]. On January 20, 2025, Debtor withdrew its Motion to Approve Settlement because Ringba intended to object to the Court's approval of its own executed Settlement Agreement.

54.     On January 31, 2025, Debtor filed a status report with the appellate courts regarding the breakdown of the settlement. (Koelsch Decl. ¶24).

55.     In the intervening four months, the Debtor's position had substantially improved due to Debtor's compliance under the guidance of competent counsel. The Firm performed very little work in this interim period. (Koelsch Decl. ¶24).

### H.     The state court resets the Contempt Proceeding

56.     On January 28, 2025, Ringba asked the state court to reset the Contempt Hearing. (Koelsch Decl. ¶25).

57.     On March 3, 2025, the Debtor filed its Motion to Amend Application to Employ the Firm as Special Litigation Counsel ("Amended Application"). [Docket No. 321]. Through the Amended Application, the Debtor sought to expand the Firm's employment to represent the Debtor in certain arbitration. The Amended Application was granted by the Court. [Docket No. 326]. Although undersigned counsel prepared and forwarded her Declaration in support of the Application to Mr. Garber, it was inadvertently not filed, and undersigned counsel failed to check the as-filed version. (Koelsch Decl. ¶26).

58.     At this time, the Firm should have again disclosed its representation of Mr. O'Hare as a connected person, although there were again perceived to be no actual or potential conflicts. The Firm again asserted that it had no connection or conflict of interest between the firm, the bankruptcy estate, or its creditors. This

disclosure was incomplete, although the Firm did not intentionally withhold or attempt to conceal it. (Koelsch Decl. ¶27).

59.     The Motion to Amend Application was mistakenly filed under Section 327(a) but should have been filed under Section 327(e). (Koelsch Decl. ¶28). Indeed, the Motion is styled as requesting approval to serve as "Special Litigation Counsel." The Application was for the limited purpose of an arbitration proceeding (which was never instituted) and for which the Firm never requested recompense under a fee application. (Koelsch Decl. ¶28).

60.     At the time, the Firm honestly believed that its limited representation of Mr. O'Hare in the Contempt Proceeding was aligned with the interests of the Debtor. (Koelsch Decl. ¶29). Moreover, apart from continuances and resetting, there had been no substantive activity in the Contempt Proceeding since October 2, 2024. (Koelsch Decl. ¶29).

61.     Other than a preliminary assessment, the Firm was unable to proceed with the arbitration due to the press of other business, and the Firm's Second Fee Application does not identify any billing related to the arbitration. (Koelsch Decl. ¶30).

62.     Days later, on March 7, 2025, Ringba reset the Contempt hearing for April 18, 2025. (Koelsch Decl. ¶31).

63.     On March 25, 2025, the Firm filed its first substantive pleading on behalf of Mr. O'Hare in the Contempt Proceeding. (Koelsch Decl. ¶31). The Firm noted that the Debtor's and Mr. O'Hare's interests were aligned because Ringba sought to hold Mr. O'Hare liable for the Debtor's conduct, in violation of the automatic stay under 11 U.S.C. §362(a). (Koelsch Decl. ¶31).

### I.      The Debtor and Mr. O'Hare file joint pleadings in this Court

64.     On April 3, 2024, the Debtor and Mr. O'Hare together filed a Motion to Extend the Stay to Mr. O'Hare "in his representative capacity for the debtor." [Docket No. 352].

65.     On April 11, 2025, the Debtor, represented by WGWC, and its principal, Mr. O'Hare represented by the Firm, ***together*** filed an Adversary Complaint in this Court to stay the Contempt Proceeding. [Docket No. 361]. Their interests were aligned because a finding of contempt against Mr. O'Hare in the State Court would necessarily mean contempt by the Debtor:

> [D]ue to the nature of the relationship between O'Hare and the Debtor, and the fact that Defendants seek to hold O'Hare liable solely based on his conduct in relation to this bankruptcy case and

not based upon their independent conduct, a judgment against O'Hare necessarily requires a finding of liability on the part of the Debtor.  The factfinder will be required to evaluate the Debtor's conduct, through its manager, to determine whether a violation of a court order occurred upon which O'Hare's liability can be predicated.

[Dkt No. 361 ¶21].

66.     The Firm did not update its disclosure regarding an actual or potential conflict because counsel continued to believe that the parties' interests were aligned. Indeed, the Debtor and Mr. O'Hare **collectively** sought relief in this Court to protect the **Debtor**. The parties noted that the Debtor was the real party in interest in the Contempt Proceeding:

> The claims against O'Hare are not separate and independent from Debtor; rather the claim against O'Hare is essentially a claim against the Debtor. Defendants' claim arose from conduct alleged to have been taken by O'Hare in his representative capacity for Debtor, in connection with this bankruptcy case.
>
> Thus, there is such identity between the Debtor and O'Hare that the Debtor may be said to be the real party and that a judgment against O'Hare will in effect be a judgment or finding against the Debtor. Inland Pac. CO, 2013 WL 708493, at *2.

[Dkt No. 361 ¶¶29-30].

67.     The Debtor and Mr. O'Hare together sought relief because any judgment against Mr. O'Hare would be likely to effectively result in a judgment against the Debtor. [Dkt. No. 361, ¶32].

68.     The Adversary Complaint was predicated on alleged *corporate wrongdoing*, i.e., a wrong committed by the Debtor, for which Ringba intended to hold Mr. O'Hare personally liable:

> Also, due to the relationship between O'Hare and the Debtor, and the fact that Defendants seeks to hold O'Hare liable solely based on a theory of corporate action, a judgment against O'Hare necessarily requires a finding of liability as to the Debtor. Accordingly, the claim against O'Hare are [sic] tantamount to a claim against the Debtor. As a result, if the Contempt Litigation against O'Hare is not immediately stayed, the Debtor will be forced to continue to participate and defend its interests, which will require the Debtor to devote considerable resources to defend against Defendants' allegations and to guard against the risk that Defendants will be

13

> able to collaterally estop the Debtor from challenging any adverse
> ruling reached in the Contempt Litigation regarding their liability.

[Dkt. No. 361, ¶45].

69.     The Firm asked for relief because the Debtor may be harmed by the continued Contempt Proceeding regarding *corporate action*, for which Mr. O'Hare, was the principal and performed on behalf of the corporation. The parties together sought relief *to protect the Debtor's assets* for the Estate:

> The Debtor may be obligated under statutory and common law
> indemnification principles and contribution rights to (1) reimburse
> O'Hare for costs in defending the Contempt Litigation; and (2)
> indemnify O'Hare for any judgments rendered against him therein.

[Dkt No. 361, Adv. No. 1, ¶20].

70.     The purpose of identifying possible indemnification claim was not because there was an actual or potential conflict between the parties. Rather, it was an effort to show that a stay would protect both parties' interests. The Stay against Mr. O'Hare would ultimately protect the Debtor's assets. (Koelsch Decl. ¶32).

71.     Nevertheless, the Firm acknowledges that it had failed to update its disclosures regarding the representation of Mr. O'Hare in his personal capacity in the Contempt Proceeding and in this Court (which was a continuation of the Contempt Proceeding to this Court).

### J.     Ringba wielded the State Court protective order as a cudgel.

72.     As discussed *supra* Part G, the December 9, 2024 settlement agreement included onerous provisions regarding the State Court protective order.

73.     Also as noted *supra* Part C, on information and belief, Ringba filed the Contempt Proceeding to force the Debtor to settle.

74.     Through the Firm's briefing in the Contempt Proceeding and before this Court, the Firm demonstrated that Ringba deployed the State Court protective order in an effort to muzzle Debtor and Mr. O'Hare. (Koelsch Decl. ¶33).

75.     The Firm's efforts fully complied with the protective order because much of the information Ringba wanted hidden under the protective order was already public. (Koelsch Decl. ¶33).

### K.     The Firm completed Appellate Briefing

76.     On March 12, 2025, the Firm filed a Petition for Writ of Certiorari on behalf of the Debtor at the Colorado Supreme Court. (Koelsch Decl. ¶34). On May 7, 2025, the Firm filed a Reply Brief in Support of a Petition for Writ of Certiorari. (Koelsch Decl. ¶34).

77.     On April 3, 2025, the Firm filed a Reply Brief in support of Debtor in the Attorneys Fee Appeal. (Koelsch Decl. ¶34). The Reply Brief argued that Ringba's briefing in the Merits Appeal and the Attorneys Fees Appeal demonstrated the Debtor produced the very code for which it was wrongfully sanctioned. (*Id.*).

## L.     The parties sign a second settlement agreement

78.     On June 17, 2025, the parties requested the Court to vacate a confirmation proceeding as the parties had again agreed in principle. [Dkt. No. 372], which was incorporated into the Fifth Amended Sub-Chapter V Plan of Reorganization, which was filed on June 20, 2025. [Dkt. No. 374]. Missing from the Plan are obligations of personal liability or liquidated damages for purported violation of the Protective Order.

79.     The Firm's efforts on behalf of Mr. O'Hare's participation in the Contempt Proceeding and the Adversary Complaint were a factor in precipitating a better result for the Debtor.

80.     At no time did the Firm  willfully or intentionally fail to disclose its assistance to Mr. O'Hare in the Contempt Proceeding and the Firm openly represented him in the Adversary Proceeding. (Koelsch Decl. ¶35). The Firm acknowledges failing to fully comply with Rule 2014. (Koelsch Decl. ¶35).

81.     At no time has Mr. O'Hare's interest been believed to be in conflict with the Debtor's interests. (Koelsch Decl. ¶35).

82.     Nor has the Firm's representation depleted the Estate's assets to the detriment of the Estate or its creditors. In August 2024, in anticipation of retaining the Firm for the oral argument in the Merits Appeal, Mr. O'Hare used personal funds to buy the Firm's Proof of Claim No. 4. In its Fee Application dated November 13, 2024, the Firm buttressed its representations to that effect with bank statements provided by Mr. O'Hare demonstrating that he paid with personal funds. Pursuant to the Court's Approval of the $33,359.77, the Debtor paid $30,000 over three months, which was disclosed in the Second Fee Application under Rule 2016. Pursuant to the Firm's representation of Mr. O'Hare in the Contempt Proceeding, Mr. O'Hare personally paid approximately $6,326.52. (Koelsch Decl. ¶37, Ex. 3). None of the fees and expenses under the Second Fee Application have been received. (Koelsch Dec. ¶37).

83.     ). Over $70,000 remains outstanding fees for the Firm's representation of Mr. O'Hare related to the Contempt Proceeding.

84.     At all times believing that its representation was consonant with the best interests of the Estate, the Firm provided necessary assistance in getting the Debtor across the finish line in this case and the State Court action that precipitated this bankruptcy proceeding.

## APPLICABLE LAW

1.     Under Section 327, a debtor-in-possession may employ an attorney under subsection (a) "that do[es] not hold or represent an interest adverse to the estate, and that are disinterested persons, to represent or assist the [debtor] in carrying       out       the       [debtor's]       duties       under       this       title. 11 U.S.C. § 327(a).

2.     Under Section 327(e), a debtor-in-possession may employ special counsel, "with the court's approval, may employ, for a specified special purpose, other than to represent the [debtor] in conducting the case, an attorney that has represented the debtor, if in the best interest of the estate, and if such attorney does not represent or hold any interest adverse to the debtor or to the estate with respect to the matter on which such attorney is to be employed." 11 U.S.C. § 327(e).

3.     Section 329(a) of the Bankruptcy Code "requires debtors' counsel to disclose any payments they have received or any agreements they have made relating to compensation or reimbursement of expenses for representation of a bankruptcy debtor, regardless of the source of payment and regardless of whether the attorney seeks payment from the estate." *In re Gluth Bros. Const., Inc.*, 459 B.R. 351, 360 (Bankr. N.D. Ill. 2011). Under Section 329(a), any

> attorney representing a debtor in a case under this title, or in connection with such a case, whether or not such attorney applies for compensation under this title, shall file with the court a statement of the compensation paid or agreed to be paid, if such payment or agreement was made after one year before the date of the filing of the petition, for services rendered or to be rendered in contemplation of or in connection with the case by such attorney, and the source of such compensation.

11 U.S.C. § 329(a).

4.     Federal Rule of Bankruptcy Procedure 2016(b) implements Section 329(a) by requiring that every

> attorney for a debtor, whether or not the attorney applies for compensation, shall file and transmit to the United States trustee within 14 days after the order for relief, or at another time as the court may direct, the statement required by § 329 of the Code including whether the attorney has shared or agreed to share the compensation with any other entity. The statement shall include the particulars of any such sharing or agreement to share by the attorney, but the details of any agreement for the sharing of the compensation with a member or regular associate of the attorney's law firm shall not be required. A supplemental statement shall be filed and transmitted to the United States trustee within 14 days after any payment or agreement not previously disclosed.

Fed. R. Bankr.P.2016(b).

5.      If the attorney seeks payment from the estate, the attorney must also comply with Fed. R. Bankr.P.2016 (a) and file an application for compensation. This requires

> An application for compensation shall include a statement as to what payments have theretofore been made or promised to the applicant for services rendered or to be rendered in any capacity whatsoever in connection with the case, the source of the compensation so paid or promised, whether any compensation previously received has been shared and whether an agreement or understanding exists between the applicant and any other entity for the sharing of compensation received or to be received for services rendered in or in connection with the case, and the particulars of any sharing of compensation or agreement or understanding therefor, except that details of any agreement by the applicant for the sharing of compensation as a member or regular associate of a firm of lawyers or accountants shall not be required.

Fed. R. Bankr.P.2016(a).

6.      Rule 2014(a) requires that as part of its Application for Employment, a person must represent as follows.

> (2) Application for Employment . The applicant must file the application and . . . must state specific facts showing:
>
> (A) the need for the employment;
>
> (B) the name of the person to be employed;

(C) the reasons for the selection;

(D) the professional services to be rendered;

(E) any proposed arrangement for compensation; and

(F) to the best of the applicant's knowledge, all the person's connections with:

- the debtor;

- creditors;

- any other party in interest;

- their respective attorneys and accountants;

- the United States trustee; and

- any person employed in the United States trustee's office.

7.      The applicant has a continuing duty to supplement the Rule 2014 disclosure, and the term "connections" under Rule 2014(a)(2)(F) refers to any connection no matter how tenuous.  *In re Gluth Bros. Const., Inc.*, 459 B.R. at 360.

## II.    ANALYSIS

The Court's Order to Show Cause [Docket No. 408] is directed to the following concerns:

(a) *The Firm's failure to disclose the source of funds for Mr. O'Hare's purchase of the Proof of Claim in August 2024.* However, the Firm supplemented the source of funds for Mr. O'Hare's purchase with bank statements in its November 13, 2024 Fee Application. (*See supra* Part B).

(b) *The Firm's attempt to represent the Debtor under Section 327(a) when the Debtor was under threat of imminent conversion and could not obtain alternate counsel.* However, the Firm withdrew its application immediately to obviate the objections, which would not have been resolved before the hearing on the Motion to Convert. The Firm returned all personal funds to Mr. O'Hare and his wife to permit the Debtor to retain alternate counsel. (*See supra* ¶D).

(c) *The Firm's failure to disclose in the withdrawn Section 327(a) application that the Firm had entered a limited appearance in the State Court Action to represent Mr. O'Hare in a Contempt Proceeding.* The Firm concedes that its Application under Section 327(a) failed to inform the Court about its limited representation. The failure was inadvertent given the exigent circumstances as well

near simultaneous substantive filings in the Merits and Attorneys Fees Appeals. (*See supra* Part D). Nevertheless, Ringba disclosed the Firm's entry in an Objection as well as at the October 8, 2024 hearing to demonstrate the Debtor's alleged bad faith by Mr. O'Hare's retaining of the Firm, which purportedly supported conversion. At no time did the Firm attempt to conceal the limited representation. Furthermore, the Firm did not believe its limited representation of Mr. O'Hare in the Contempt Proceeding was adverse and did not raise an actual or potential conflict because the conduct of which Ringba complained was ***Debtor's*** conduct for which it intended to hold Mr. O'Hare personally liable. Less than two weeks later, the Debtor and Ringba settled, which brought the appeals and Contempt Proceeding to a standstill. Accordingly, the Firm did not think to include any disclosure of the Firm's limited representation of Mr. O'Hare in the November 13, 2024 First Fee Application.

(e) *The sloppy March 3, 2025 Application.* The Firm requested approval to serve as special counsel for the Debtor in a potential arbitration. It requested employment pursuant to Section 327(a) but was styled as an application under Section 327(e), and indeed sought employment for a narrow purpose under Section 327(e). Undersigned counsel failed to confirm that her declaration was filed by WGWC, although it would not have disclosed the Firm's representation of Mr. O'Hare. The Firm admits its missteps. (*See supra* Part H). However, the Estate was not prejudiced in any way. Indeed, the Firm never billed for any work pursuant to this Special Employment.

(f) *The work performed by the Firm on behalf of Mr. O'Hare in relation to the Contempt Proceeding and the filing of the Adversary Proceeding by the Firm on behalf of Mr. O'Hare.* Mr. O'Hare's and the Debtor's interests were at all times perceived to be completely aligned. (*See supra* Part I). While the Firm did not update its disclosure pursuant to Rule 2014, the Court was made aware of the Firm's limited representation on October 3, 2024 and then October 8, 2024. (*See supra* ¶¶ 31-34). The Firm did not conceal it. Thereafter, when the Firm filed the Adversary Complaint, it filed it ***together*** with the Debtor and Debtor's Section 327(a) counsel. The parties' interests were completely aligned because Mr. O'Hare and the Debtor both sought to stay the Contempt Proceeding. A finding of liability against Mr. O'Hare in State Court would be a finding against the absent Debtor.

Each is addressed in turn below.

## A.   Compliance with Disclosure Duties

The Firm substantially complied with its disclosure obligations in the following ways:

### 1.   Section 329 and Rule 2016 Compliance

In its August 12, 2024 Application for Special Employment [Docket No.115], the Firm disclosed that Mr. O'Hare used personal funds to purchase the Firm's Proof of Claim No. 4. (*See supra* Part B). That disclosure was supplemented on November 13, 2024, in the Firm's First Fee Application, which included Mr. O'Hare's Declaration and supporting bank statements. [Docket No. 258]. In its Second Fee Application, the Firm further disclosed that it had received $30,000.00 pursuant to the First Fee Application, which had been approved in the amount of $33,818.07. [Docket No. 377]. There were no other agreements regarding compensation with the Debtor. (Koelsch Decl. ¶36). As discussed above, no work was performed in connection with the proposed arbitration, and no engagement agreement was ever executed. Moreover, although the Firm entered into a post-petition engagement agreement related to potential representation of the Debtor under Section 327(a), that agreement was of no effect because the Firm withdrew its Application. (Koelsch Decl. ¶36; *see supra* Part D).

## 2. Section 327(a) and (e) and Rule 2014 Compliance

### a) August 12, 2024 Application

In its August 12, 2024 Application under Section 327(e), undersigned counsel correctly identified that "[t]o the best of Debtor and Allen Vellone's knowledge, Allen Vellone has no connection or relationship with creditors and is disinterested with respect to the matter for which it is to be employed." [Docket No. 120, ¶¶11-12]. It also stated that "Allen Vellone represents no interest adverse to the estate in the matter upon which it is to be engaged for the Debtor, and its employment is in the best interests of the estate." [*Id.*]. The Firm attached an Affidavit of undersigned counsel in support.

The August 2024 Application complied with both Section 327(e) and Rule 2014.

### b) October 3, 2024 Application

In its October 3, 2024 Application under Section 327(a), undersigned counsel made similar representations regarding lack of connections and best interests and attached the Declaration of Katherine Sender [Docket No. 195, 195-1]. :

> 9.    To the best of the Firm's knowledge, there is no connection or conflict of interest between the Firm and the Bankruptcy Estate, its creditors, any other party in interest, their respective attorneys and accountants, the United States Trustee's office, or any person employed in the office of the United States Trustee.

20

10.     The Debtor believes that the employment of the Firm as its general bankruptcy counsel would be in the best interest of its creditors and the Estate.

The representations were incomplete because the Firm had entered a limited appearance on behalf of Mr. O'Hare in the Contempt Proceeding on October 2, 2024, the prior day. The Firm attributes its nondisclosure to inadvertence and inattention as a result of the multiple substantive filings in the Appeals as well as the impending Motion to Convert. The Firm's failure to disclose was promptly called to the Court's attention by Ringba in its Objection that noted the limited appearance. [Docket No. 198].

The Firm's Affidavit, although incorrect, was broader than the disclosure under Section 327(e) because it represented as follows: "The Firm does not hold or represent any interest adverse to Debtor, the Bankruptcy Estate, or its creditors, and is deemed to be a "disinterested person" as that term is defined in 11 U.S.C. § 101(14) of the U.S. Bankruptcy Code." [Docket 198-1].

Accordingly, although the Firm did not properly file its disclosure, the entry of the Firm's limited appearance in the Contempt Proceeding in the State Court Action had been raised by Ringba. Furthermore, the October 3, 2024, the Application was withdrawn. (*See supra* ¶¶31-34).

The filings in the Contempt Proceeding, the Appeals, and this Action came to a halt when Ringba and the Debtor settled in principle on or around October 21, 2024. [Docket No. 247]. After Ringba reneged on the executed settlement, the Contempt Proceeding resumed in late January 2025 with the contempt hearing reset for April 18, 2025. (*See supra* Part G).

For this reason, it did not occur to undersigned counsel that the Firm needed to file a Supplement to the August 2024 Application for Special Counsel to disclose "a connection" under Rule 2014 between the Firm and its representation of Mr. O'Hare in the Contempt Proceeding.

### c)     Resumption of the Contempt Proceedings

The Firm should have, but did not, update its disclosure under Rule 2014 to identify that the Contempt Proceedings had resumed. The Firm, however, did not believe there was an actual or potential conflict between the Debtor and Mr. O'Hare. This is because the Contempt Proceeding concerned the *Debtor's conduct* for which Ringba sought to hold Mr. O'Hare personally liable. (*See supra* Parts H, I).

### d)     The March 3, 2025 Application

21

The Firm filed an Application for Employment on March 3, 2025, to potentially represent the Debtor in an arbitration against former expert witnesses. [Docket No. 321]. The Application was one for Special Counsel under Section 327(e) for a limited purpose and was styled and argued in that manner. [*Id.*]. However, the Application and the Proposed Order incorrectly identified Section 327(a) as the basis for Employment.[1]

In the Order to Show Cause, the Court noted that the Application and its Order were granted pursuant to Section 327(a). [Docket No. 408]. An applicant under Section 327(a) must represent that it does "not hold or represent an interest adverse to the estate, and that [they] are disinterested persons."

In contrast, under Section 327(e), the applicant bar is substantially lower. An applicant may be employed by the trustee if it "does not represent or hold any interest adverse to the debtor or to the estate *with respect to the matter on which such attorney is to be employed*."

Although the Firm's disclosure was correct under Section 327(e), it was incorrect and incomplete under Section 327(a) as the Firm had made a limited entry of appearance on behalf of Mr. O'Hare in the Contempt Proceeding. At all times, however, the Firm has believed in good faith that Mr. O'Hare's and the Debtor's interest aligned here.

Irrespective of whether Section 327(a) or Section 327(e) applied, Rule 2014, nevertheless, requires an applicant to disclose any connection between the application and "any other party in interest." The Firm failed to make the requisite disclosure under Rule 2014. (*See supra* Part H).

### e)   The Motion to Extend Automatic Stay and Adversary Complaint

In an attempt to halt the Contempt Proceeding, the Firm, on behalf of Mr. O'Hare made two filings in the Action: (1) a Motion to Extend the Automatic Stay and (2) Adversary Complaint on behalf of Mr. O'Hare. Both were filed in conjunction with the Debtor. [Docket Nos. 352 & 361]. This representation of Mr. O'Hare was a continuation of the Contempt Proceeding.

The concurrent representation was not a violation of Section 327(e) because Mr. O'Hare's aligned interest with the Debtor and because the Firm's

---

[1] The Application failed to attach undersigned counsel's affidavit in conjunction therewith, and undersigned counsel did not review the as-filed Application. But even if the Affidavit had been properly filed, it would have still failed to include the information about the Firm's representation of Mr. O'Hare in the Contempt Proceeding.

representation of Mr. O'Hare was not adverse to the Firm's employment as special counsel to prosecute the appeals or advance the arbitration. (*See supra* Part I).

Nevertheless, the Firm failed to file under Rule 2014 about the connection between the Firm and its representation of Mr. O'Hare.

### 3.  Disinterestedness and Lack of Adverse Interest

At no time did the Firm represent (or intend to represent) the Debtor under Section 327(a), notwithstanding the incorrect references in the March 3, 2025 Application and the resulting Order. The Ninth Circuit Bankruptcy Appellate Panel addressed a similar issue of miscitation in *In re Song*, No. CC-07-1137-DMOPA, 2008 WL 6058782, at *2 (B.A.P. 9th Cir. Feb. 12, 2008), aff'd sub nom. *In re Won Ho Song*, 359 F. App'x 817 (9th Cir. 2009).

In *Song*, the caption on the Notice of Application Employment and Employment Application cited Section 327(a) rather than 327(e). Yet both filings made clear that the trustee sought to employ counsel as special litigation counsel. *Id*. at *2, *8. The same is true here: the March 3, 2025 Application was styled as a "Motion to Amend Application to Employ Allen Vellone Wolf Helfrich & Factor P.C. as Special Litigation Counsel." [Docket No. 321]. It concluded by requesting approval to employ the Firm "as special litigation counsel for assistance with the Arbitration." [*Id*.]. The bankruptcy court in *Song* correctly recognized that the application was made under Section 327(e), not 327(a). Likewise, although this Court's March 3 Order referenced Section 327(a), it granted the Firm's request to serve as special litigation counsel. [Docket No. 326].

The *Song* court also addressed concurrent representation. Park represented the debtors in the bankruptcy while simultaneously serving as special counsel to the trustee for prosecuting the state court action. *Id*. at *2, *6. After Park prevailed in state court, the debtors challenged his fees, arguing that he was not disinterested and held adverse interests. *Id*. The bankruptcy court rejected that argument, finding the trustee's and debtors' interests were aligned. They both sought to maximize recovery from the state court litigation. *Id*. at *6. On appeal, the BAP agreed, holding that Section 327(e) governed Park's employment, and unlike Section 327(a), it does not require disinterestedness. *Id*. at *6-*8. The same reasoning applies here. The Firm's March 3, 2025 Application was effectively under Section 327(e), and thus did not require a showing of disinterestedness.

Further, as in *Song*, the Firm's concurrent representation advanced a common goal. The Firm represented Mr. O'Hare in the Contempt Proceeding and related filings in this Court to protect the Debtor's estate from a frivolous contempt action. Both the Debtor and Mr. O'Hare sought the same outcome: maximizing the

value of the estate by halting litigation designed to undercut the reorganization. (*See supra* Part H).[2]

Finally, *Song* also addressed incomplete disclosures under Rule 2014(a). There, Park had failed to disclose his prior representation of the debtors in an unrelated administrative matter. *Id*. at *4. On appeal, the debtors argued that nondisclosure was sanctionable regardless of prejudice or intent. *Id*. at *9–10. The BAP disagreed, explaining that while Rule 2014(a) disclosures allow the court to scrutinize potential adverse interests, a court may excuse nondisclosure, for example if the information was already known to the court. *Id*. at *10. The BAP affirmed that the bankruptcy court had discretion to excuse the omission and award full compensation.

The same principles apply here. The Firm's mislabeling of its March 3, 2025 Application under Section 327(a) instead of Section 327(e), as well as its incomplete disclosure of its limited representation of Mr. O'Hare, were inadvertent missteps. But they did not conceal adverse interests, and both the Court and creditors were already aware of the circumstances. As in *Song*, those errors should not result in a reduction of the Firm's fees.

### B.      Equitable Considerations

The Court cited *In re Gluth Bros. Constr., Inc*., 459 B.R. 351, 364–65 (Bankr. N.D. Ill. 2011), and *In re US Bentonite, Inc*., 536 B.R. 948, 958 (Bankr. D. Wyo. 2015), for the proposition that Rule 2014(a) imposes a continuing obligation on counsel to advise the Court whenever a potential or actual conflict of interest arises during a debtor-in-possession's representation.

Preliminarily, the Firm's representation of the Debtor in the appeals (and later the proposed arbitration) was pursuant to Section 327(e), not Section 327(a), notwithstanding the incorrect citation in the March 3, 2025 Application. Both *Gluth* and *US Bentonite* addressed employment under Section 327(a), which required disclosure of disinterestedness as opposed to Section 327(e), which mandates only that the applicant "does not represent or hold any interest adverse to the debtor or to the estate *with respect to the matter on which such attorney is to be employed*."

---

[2] *See also*, *Klitzke v. DCP Midstream*, LLC, No. 19-CV-03207-CMA-NYW, 2020 WL 6546727, at *3 (D. Colo. Nov. 6, 2020) (although the interests of the trustee and debtor are not identical, their interests are aligned; and noting that a Firm's representation of both the debtor and trustee was not a direct conflict of interest and employment of special counsel under 11 U.S.C. § 327(e) does not require the attorney to be a disinterested person).

Furthermore, Mr. O'Hare's interests in halting the Contempt Proceeding were aligned with the Debtor's objective of maximizing estate assets and protecting the estate from frivolous litigation.

As to the Firm's repeated failures to update its Rule 2014(a) disclosure, the Firm accepts full responsibility. This Court, however, sits in equity, and is charged with balancing technical compliance against fairness and the realities of complex cases. *In re US Bentonite*, 536 B.R. at 958-59. Here, the equities should weigh in favor of the Firm.

Courts considering sanctions for violations of Rule 2014(a) have applied the following factors:

- whether the connections at issue would have created a disqualifying interest under Section 327(a);

- whether the failure to disclose was inadvertent or intentional;

- the materiality of the omitted information;

- counsel's efforts to correct the deficiency; and

- the benefits provided to the estate by counsel.

*In re Am. Int'l Refinery, Inc.,* 436 B.R. 364, 380 (Bankr. W.D. La. 2010) cited in *In re Ellipso, Inc.*, No. 09-00148, 2012 WL 1865441, at *12 (Bankr. D.D.C. May 22, 2012).

First, the connections between Mr. O'Hare, the Debtor, the Firm's representation of the Debtor in the appeals, and the Firm's representation of Mr. O'Hare in the Contempt Proceeding and Adversary did not create a disqualifying interest. The Debtor and Mr. O'Hare's interests were aligned because Ringba sought to hold him personally liable for the Debtor's conduct. Protecting Mr. O'Hare therefore protected the Debtor. (*See supra* Part I).

Second, creditors had actual knowledge of the Firm's limited appearance for Mr. O'Hare in the Contempt Proceeding as of October 3, 2024, when Ringba raised the issue in its Objection and again at the October 8, 2024 hearing. (*See supra* ¶¶ 31-34). The Firm acknowledges its failure to file a separate supplemental disclosure and to note the connection in the March 3, 2025 Application. However, Ringba as the principal creditor was already aware of the facts, and the Court had also been informed, though not by Firm, through Ringba's Objection and again at the hearing.

Third, the Firm did not intentionally withhold its concurrent representation. The omission from the October 3, 2024 Employment Application was inadvertent.

(*See supra* ¶32). By November 13, 2024, the Debtor and Ringba had reached a settlement in principle, and both appellate and state courts were notified. When the Contempt Proceeding resumed in March 2025, the Firm did not supplement its March 3 Application, but by April 3 its role was evident when it filed a Motion to Extend the Automatic Stay to Mr. O'Hare. In short, the non-disclosure was unintentional, mitigated by actual notice to creditors, and apparent from the record.

Fourth, the Firm concedes that its omissions involved material information—namely, Ringba's proxy fight with Debtor via Mr. O'Hare, in which the Firm represented Mr. O'Hare. Yet Ringba, the largest creditor, was fully aware of the information and itself disclosed it to the Court on October 3 and October 8, 2024. (*See supra* ¶31).

Fifth, until the Court issued the Order to Show Cause, the Firm was not aware of any disclosure deficiency.

Sixth, the Firm's concurrent representation provided substantial benefits to the estate. In addition to WGWC's competent work, the Firm played a critical role in negating the effect of the Contempt Proceeding, leading to a favorable June 2025 settlement. There is now no risk of liquidated damages for which Mr. O'Hare could be personally liable. The Firm also nullified any violation of the State Court protective order because the allegedly  was already public.

## A.   Overlap Between Non-Disclosure and Fee Applications

Were the Court nevertheless inclined to sanction the Firm for its non-compliance under Rule 2014, the following considerations weigh against any reduction in fees:

The Firm committed no disclosure violation in connection with Mr. O'Hare's August 2024 purchase of the Firm's Proof of Claim for $58,674.00.

The Firm's First Fee Application covers the period from August 12, 2024 through October 3, 2024, culminating in the filing of a Petition for Rehearing in the Merits Appeal. The amount requested was $33,359.75.

The failure in making and updating its disclosure arose on October 3, 2024, the very same day the Firm filed its Application to represent the Debtor under exigent circumstances. It would be inequitable to disgorge fees related to the First Application, however, because the overwhelming majority of those fees related exclusively to appellate work that benefitted the estate, prior to the non-disclosure.

The Firm has received no payment on account of its Second Fee Application, which seeks $70,352.79. [Dkt. No. 377]. Nor has the Firm been compensated in full

for its representation of Mr. O'Hare personally in connection with the Contempt Proceeding and related Adversary Proceeding, in which unpaid fees exceed $70,000.

Given that the Firm's advocacy, including its work in the Contempt Proceeding and Adversary Proceeding, was necessary and aided in protecting the Debtor and advancing its reorganization, the Court should decline to impose sanctions.

### III.    Conclusion

The Firm has at all times acted in good faith, safeguarded the Estate, and delivered substantial benefits to creditors. Equity weighs in favor of the Firm and supports the conclusion that the Firm should not be penalized for inadvertent missteps when its efforts advanced the Debtor's reorganization.

Accordingly, the Firm respectfully requests that Court discharge the Order to Show Cause and decline to impose sanctions.

DATED this 28th day of August 2025.

Respectfully submitted,

ALLEN VELLONE WOLF HELFRICH & FACTOR P.C.

*s/ Vandana Koelsch*
Benjamin J. Woodruff
Jason R. Wareham
Vandana Koelsch
1600 Stout Street, Suite 1900
Denver, CO 80202
Telephone: (303) 534-4499
E-mail: bwoodruff@allen-vellone.com
E-mail: jwareham@allen-vellone.com
E-mail: vkoelsch@allen-vellone.com

27