# UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF COLORADO

| | |
|---|---|
| IN RE: ) | |
| ) | Case No. 24-12624-KHT |
| DNC and TCPA LIST ) | |
| SANITIZER, LLC ) | |
| ) | Chapter 11 |
| ) | |
| Debtor ) | |

## DECLARATION OF VANDANA KOELSCH IN SUPPORT OF RESPONSE TO ORDER TO SHOW CAUSE

I, Vandana Koelsch, pursuant to 28 U.S.C. § 1746, declare as follows:

1. I am an attorney licensed to practice in the State of Colorado and a shareholder at Allen Vellone Wolf Helfrich & Factor P.C. (the "Firm"). I submit this declaration in support of the Firm's Response to the Court's Order to Show Cause [Docket No. 408]. I have personal knowledge of the facts stated herein and, if called to testify, could and would testify competently thereto.

2. On June 25, 2024, the Firm filed Proof of Claim No. 4 in the Debtor's Bankruptcy Case for pre-petition legal fees and costs in the amount of $62,092.80 ("POC No. 4"). On or around August 1, 2024, the Firm received a personal check from Michael O'Hare in the amount of $58,674.00 for Mr. O'Hare's potential purchase of Proof of Claim No. 4. A copy of the check is attached hereto as **Exhibit 1**. (Declaration of Vandana Koelsch, ¶2, Ex. 1). The Firm took efforts to ensure that no funds were received from the Debtor. Later, on November 13, 2024, when the Firm filed a Fee Application [Docket No. 258], the Firm included the Declaration of Michael O'Hare in which he attested to the source of funds for the personal payment of $58,674.00 [Docket No. 258-6]. The Declaration attached bank statements in support.

1. On August 12, 2024, Mr. Cimino, on behalf of the Debtor, filed its *Ex Parte* Application to Employ Special Litigation Counsel ("Special Counsel Application") pursuant to Section 327(e), seeking to represent the Debtor in two then-pending state court appeals. Docket Nos. 119 and 120.

2. In the Special Counsel Application, the Firm disclosed that it represented the Debtor on its appeal to the Colorado Court of Appeals in case styled, *TCPA Litigator List v. Ringba, LLC et al.,* No. 2023CA891 (the "Appeal"). [Docket No. 119, ¶4]. Through the Special Counsel Application, the Firm made the following disclosures:

1

a. Disclosure of the issues the Debtor sought to appeal. [Docket No. 119, ¶4(a-b)];

b. The Firm further disclosed that it did not represent the Debtor in the initial underlying state court action subject to the Appeal styled, *TCPA Litigator List v. Ringba, LLC et al.,* No. 2021CV31668 (the "Action"). Docket No. 119, ¶5;

c. Prior to the Debtor filing the Petition, the Firm "withdrew from representing the Debtor for the Appeal as well as for ancillary matters, post-judgment, in the Action. [The Firm] did not represent the Debtor prior to the trial dismissing the Action." The ancillary matter referred to post-judgment proceedings in the Action. (Koelsch Decl. ¶3). [Docket No. 119, ¶5];

d. The Firm filed POC No. 4. [Docket No. 119, ¶5];

e. "On August 1, 2024, [the Firm] assigned its [POC No. 4] to Michael O'Hare, who is the Debtor's CEO, who paid for the claim in full." [Docket No. 119, ¶ 6];

f. The Debtor selected the Firm because the Debtor and Firm "previously worked together with respect to the Appeal" and the Firm is experienced and knowledgeable with regards to the matters sought to be employed. [Docket No. 119, ¶ 9];

g. The Firm disclosed its hourly rates and compensation arrangement. [Docket No. 119, ¶14-17] and attached Verified Statement of Attorney Vandana Koelsch. [Docket No. 119-1]; and

h. The Debtor and the Firm asserted there was no conflict with the Debtor's estate. [Docket No. 119, ¶18]. The Firm represented that there was "no interest adverse to the estate in the matter upon which it [was] engaged for the Debtor, and [the Firm's] employment is in the best interest of the estate." [Docket No. 119, ¶12]; [Docket No. 119-1. ¶7 ("The Firm does not represent any party in interest adverse to the interest of the Debtor. The Firm does not represent any creditor, shareholder, officer, or director of the Debtor.")]. [Docket No. 119-1. ¶8 ("The Firm is not aware of any other connection with the Debtor, creditors, or any other party in interest…")].

3. Accordingly, the Firm fully disclosed that it had received funds from Mr. O'Hare regarding his purchase of the Firm's Proof of Claim No. 4 that was filed against the Debtor.

4. On September 3, 2024, the Firm represented the Debtor before the Colorado Court of Appeals in an oral argument regarding the Merits Appeal (2023CA891). At oral argument, the Debtor presented an interim order (the "Attorneys Fee Order") from the State Court in the Action that held Debtor produced source code for the "Reconstructed Website," which tended to negate the Debtor's liability on the merits, but nevertheless awarded $500,000 in attorneys' fees. On information and belief, immediately after oral argument, Ringba sought to settle the matter that precipitated the Debtor's bankruptcy.

5. On September 4, 2024, the day after oral argument, Ringba filed a Motion for Contempt ("Contempt Motion") against Mr. O'Hare in the State Court Action regarding *Debtor's* request filed in *this* Court for a Rule 2004 Examination which purportedly included confidential information in violation of a protective order in the Action [Docket Nos. 135, 137]. It was unclear at that time whether the Contempt Motion sought relief against Mr. O'Hare personally, or against him in his capacity as a Debtor's principal. On information and belief, the filing of the Contempt Motion was an effort to force the Debtor to settle the Ringba matter. Later, at a status conference (on April 8, 2025) before the State Court, Ringba explained why it filed against Mr. O'Hare personally rather than the Debtor, although it was Debtor (or its counsel, Mr. Cimino) who filed a request for a Rule 2004 Examination:

6. Attached as **Exhibit 2** is a true and correct copy of the excerpt of a transcript of status conference held before the State Court on April 8, 2025.

7. On September 10, 2024, Ringba sought to convert the Bankruptcy Case to a case under Chapter 7 of the Bankruptcy Code that was joined by other creditors. [Docket No. 151; see also Docket No. 162 (Joinder by GLEGAL, LLC)]. The Motion raised the issue of the Debtor's principals' conflicts of interest in investigating and pursuing conveyance claims against themselves and Cashyew." This is because, at that time the Court had not approved a cash collateral order. The Debtor's failure was a result of Mr. Cimino's failure to comply with the Bankruptcy Code. On information and belief, the conversion motion served as an additional measure to force Debtor to the settlement table.

8. On September 19, 2024, the Court of Appeals affirmed the trial court's ruling in the Action in the Merits Appeal, 2023CA891. The Opinion was a setback for the Debtor. Nevertheless, Debtor had already filed a Notice of Appeal for the Attorneys Fees Appeal (2024CA265).

9. On October 1, 2024, the Firm filed an Opening Brief in the Attorney Fees Appeal. The Opening Brief reiterated that Debtor had produced the very code for which it was sanctioned and charged $500,000 in attorneys fees. Indeed, after Ringba filed the Response Brief (in the Attorneys Fees Appeal on February 27, 2025), it became abundantly clear that the Debtor had been unfairly charged for non-production of source code that it had actually produced.

3

10. On October 2, 2024, Jason Wareham entered his *limited* appearance (erroneously on behalf of the Debtor, as opposed to Mr. O'Hare personally) in the Contempt Proceeding. Mr. Wareham entered his *limited* appearance (erroneously on behalf of the Debtor, as opposed to Mr. O'Hare personally) in the Contempt Proceeding. On the same day, the Firm moved to continue the Contempt Hearing, which the state court granted and reset for January 17, 2025.

11. All payments for Mr. Wareham's representation of Mr. O'Hare personally have been paid by Mr. O'Hare personally. Attached as **Exhibit 3** is a true and correct copy of a credit card payment made by Mr. O'Hare personally for the Firm's representation in the Contempt Proceeding.

12. Fearing that Mr. Cimino's noncompliance under the Bankruptcy Code would cause Debtor's conversion, and because Mr. Cimino intended to withdraw as Debtor's counsel, and because the Firm understood that Debtor could not obtain alternate counsel under extreme time constraints—indeed undersigned counsel unsuccessfully referred Debtor to several bankruptcy counsel—the Firm agreed to apply to the Court for permission to represent the Debtor for the conversion hearing and thereafter.

13. To avoid any cash collateral concerns, the Debtor did *not* pay the retainer via a *check*. Rather, Mr. O'Hare and his wife, Tatiana O'Hare, personally charged the $25,000 retainer on two *personal* credit cards, one in his name and one in hers. Attached as **Exhibits 4 and 5** are true and correct copies of credit payment receipts.

14. The Firm failed to disclose--as part of the (later withdrawn) Application for General Counsel--that it had filed an Entry of Appearance in the State Court Action on October 2, 2024. Both filings (the Entry of Appearance and Application) were made *the very same day*. However, the failure to disclose the limited entry in the General Counsel Application was inadvertent because of the flurry of activity, including the filing of an Opening Brief in the Attorney Fees Appeal, the day before, on October 1, 2024.

15. As for the confusion as to against *whom* the Contempt Motion was filed, whether the Debtor or Mr. O'Hare personally, even Ringba identified that the Firm entered its appearance in the Contempt Proceeding on behalf of the Debtor or Mr. O'Hare personally. In fact, the conduct complained of related to holding Mr. O'Hare personally liable for the Debtor's actions.

16. As noted above, Mr. Wareham corrected any misimpressions that his limited entry of appearance had created to the State Court regarding the party represented, Mr. O'Hare personally, not the Debtor. And all payments for Mr. Wareham's representation of Mr. O'Hare have been paid by Mr. O'Hare personally.

4

Mr. O'Hare made no payments to the Firm after the Contempt Proceedings resumed in State Court after a March 7, 2025 resetting.

17. As noted, the $25,000 retainer in support of the Firm's General Counsel Application was not from the Debtor but personally from Mr. O'Hare and his wife. Given the objections, and because of the urgency in Debtor obtaining competent counsel for the October 8, 2024 hearing, on October 7, 2024, the Firm promptly returned funds to Mr. O'Hare and his wife so that those funds could be used by alternate counsel. Attached as **Exhibits 6 & 7** are true and correct copies of the Firm's return of funds to Mr. O'Hare and his wife.

18. On October 7, 2024, the Firm withdrew its Notice of Substitution and General Counsel Application because the objections would not have been resolved before the October 8, 2024 hearing, placing the Debtor in a precarious position.

19. Regrettably, the Firm did not update its disclosures to inform the Court about the Firm's Limited Appearance in the Contempt Proceeding immediately after the Trustee's and Ringba's Objection. As the Limited Appearance related to Mr. O'Hare's purported conduct on behalf of the Debtor, the Firm did not believe that there was an actual or potential conflict of interest with that representation.

20. On October 8, 2024 at a hearing on the Motion to Convert, Debtor and its principal, Mr. O'Hare appeared without counsel. Mr. Cimino did not attend. Undersigned counsel attended in her capacity as Special Counsel.

21. On November 4, 2024, Ringba filed a Motion for Extension of Time to File its Answer Brief in the Attorneys Fees Appeal, informing the appellate court that the parties had a settlement in principle. On December 4, 2024, Ringba asked for another extension, informing the court of the settlement in principle.. On December 31, 2024, the Debtor and Ringba filed a Joint Notice to Hold the Appeal in Abeyance due to an impending global settlement. On November 20, 2024, the Debtor filed a Motion for Extension of Time to file a Petition for Certiorari in the Merits Appeal, noting the settlement in principle. On December 20, 2024, the parties filed a Joint Motion to Hold the Appeal in Abeyance, noting the settlement in principle. (Id.). The Contempt Proceeding was also effectively stayed. [See Docket No. 270, Motion to Approve Settlement]. And on December 20, 2024, the parties filed a Joint Motion to Continue the Contempt Hearing, in view of the Settlement Agreement, dated December 9, 2024. ).

22. The filings in this Action came to a standstill apart from fee applications and other procedural filings. As noted above, on November 13, 2024, the Firm filed its First Fee Application and made the requisite disclosures regarding the source of funds for Mr. O'Hare's purchase of Proof of Claim No. 4, but the Firm failed to inform the Court of its limited entry of appearance on behalf of Mr. O'Hare in the Contempt Proceeding. Had counsel properly recognized the need to update its disclosure at that

5

time it would have also disclosed that it was likely that the parallel proceeding would be resolved as a result of the parties' settlement.

23. After the Settlement Agreement was signed, Ringba sought to change its terms. [*See* Docket No. 297]. Indeed, the terms of the Settlement Agreement were highly favorable to Ringba, particularly because it was resolved *three* days before the reset hearing on the Motion to Convert. In particular, the Settlement Agreement included punitive measures and a liquidated damages provision of $100,000 for each purported violation of the protective order in the State Court Action and a personal guaranty by Mr. O'Hare to pay such liquidated damages. [*See* Docket No. 270, ¶¶11-12]. Those provisions would remain in place *in perpetuity*. [*Id.*].

24. On January 31, 2025, Debtor filed a status report with the appellate courts regarding the breakdown of the settlement. In the intervening four months, the Debtor's position had substantially improved due to Debtor's compliance under the guidance of competent counsel. The Firm performed very little work in this interim period.

25. On January 28, 2025, Ringba asked the state court to reset the Contempt Hearing.

26. On March 3, 2025, the Debtor filed its Motion to Amend Application to Employ the Firm as Special Litigation Counsel ("Amended Application"). [Docket No. 321]. Through the Amended Application, the Debtor sought to expand the Firm's employment to represent the Debtor in certain arbitration. The Amended Application was granted by the Court. [Docket No. 326]. Although undersigned counsel prepared and forwarded her Declaration in support of the Application to Mr. Garber, it was inadvertently not filed, and undersigned counsel failed to check the as-filed version.

27. At this time, the Firm should have again disclosed its representation of Mr. O'Hare as a connected person, although there were again perceived to be no actual or potential conflicts. The Firm again asserted that it had no connection or conflict of interest between the firm, the bankruptcy estate, or its creditors. This disclosure was incomplete, although the Firm did not intentionally withhold or attempt to conceal it.

28. The Motion to Amend Application was mistakenly filed under Section 327(a) but should have been filed under Section 327(e). Indeed, the Motion is styled as requesting approval to serve as "Special Litigation Counsel." The Application was for the limited purpose of an arbitration proceeding (which was never instituted) and for which the Firm never requested recompense under a fee application.

29. At the time, the Firm honestly believed that its limited representation of Mr. O'Hare in the Contempt Proceeding was aligned with the interests of the

6

Debtor. Moreover, apart from continuances and resetting, there had been no substantive activity in the Contempt Proceeding since October 2, 2024.

30. Other than a preliminary assessment, the Firm was unable to proceed with the arbitration due to the press of other business, and the Firm's Second Fee Application does not identify any billing related to the arbitration.

31. Days later, on March 7, 2025, Ringba reset the Contempt hearing for April 18, 2025. On March 25, 2025, the Firm filed its first substantive pleading on behalf of Mr. O'Hare in the Contempt Proceeding. The Firm noted that the Debtor's and Mr. O'Hare's interests were aligned because Ringba sought to hold Mr. O'Hare liable for the Debtor's conduct, in violation of the automatic stay under 11 U.S.C. §362(a).

32. The purpose of identifying possible indemnification claim was not because there was an actual or potential conflict between the parties. Rather, it was an effort to show that a stay would protect both parties' interests. The Stay against Mr. O'Hare would ultimately protect the Debtor's assets.

33. Through the Firm's briefing in the Contempt Proceeding and before this Court, the Firm demonstrated that Ringba deployed the State Court protective order in an effort to muzzle Debtor. The Firm's efforts fully complied with the protective order because much of the information Ringba wanted hidden under the protective order was already public.

34. On March 12, 2025, the Firm filed a Petition for Writ of Certiorari on behalf of the Debtor at the Colorado Supreme Court. On May 7, 2025, the Firm filed a Reply Brief in Support of a Petition for Writ of Certiorari. On April 3, 2025, the Firm filed a Reply Brief in support of Debtor in the Attorneys Fee Appeal. The Reply Brief argued that Ringba's briefing in the Merits Appeal and the Attorneys Fees Appeal demonstrated the Debtor produced the very code for which it was wrongfully sanctioned.

35. At no time did the Firm willfully or intentionally fail to disclose its assistance to Mr. O'Hare in the Contempt Proceeding and the Firm openly represented him in the Adversary Proceeding. The Firm acknowledges failing to fully comply with Rule 2014. At no time has Mr. O'Hare's interest been believed to be in conflict with the Debtor's interests.

36. There were no agreements regarding compensation with the Debtor except as to the Appeal. No work was performed in connection with the proposed arbitration, and no engagement agreement was ever executed. Moreover, although the Firm entered into a post-petition engagement agreement related to potential representation of the Debtor under Section 327(a), that agreement was of no effect because the Firm withdrew its Application.

7

37. The Firm's representation did not deplete the Estate's assets to the detriment of the Estate or its creditors. In August 2024, in anticipation of retaining the Firm for the oral argument in the Merits Appeal, Mr. O'Hare used personal funds to buy the Firm's Proof of Claim No. 4. In its Fee Application dated November 13, 2024, the Firm buttressed its representations to that effect with bank statements provided by Mr. O'Hare demonstrating that he paid with personal funds. Pursuant to the Court's Approval of the $33,359.77, the Debtor paid $30,000 over three months, which was disclosed in the Second Fee Application under Rule 2016. Pursuant to the Firm's representation of Mr. O'Hare in the Contempt Proceeding, Mr. O'Hare personally paid approximately $6,326.52. (Ex. 3). None of the fees and expenses under the Second Fee Application have been received. Over $70,000 remains outstanding fees for the Firm's representation of Mr. O'Hare related to the Contempt Proceeding.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 28th day of August 2025.

Denver, Colorado.

*s/Vandana Koelsch*